**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYAN BARRON, FILIPPO BULGARINI D'ELCI, DENIS DESARI, ILLIA CHEHERST, MARAT GARIBYAN, RISHI KHANCHANDANI, DANIILS LEBEDEUS, DONG SEOK LEE, TAREK RAHMAN, ABHISHEK SIKARIA, for themselves and a class of others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | Civil Action No.: |
| v. | |
| HELBIZ INC., SALVATORE PALELLA, NETELLER (US) INC., SKRILL USA INC., LORENZO PELLEGRINO, MILOS CITOVEK, JONATHAN HANNESTAD, STEFANO CIRAVEGNA, MICHAEL COPPOLA, GIULIO PROFUMO, JUSTIN GUILIANO, and SAEED ALDARMAKI, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Now come Plaintiffs, RYAN BARRON, FILIPPO BULGARINI D'ELCI,

DENIS DESARI, ILLIA CHEREST, MARAT GARIBYAN, RISHI

KHANCHANDANI, DAANIILS LEBEDEUS, DONG SEOK LEE, TAREK

RAHMAN, ABHISHEK SIKARIA, for themselves and a class of others similarly

situated, by and through their undersigned attorneys, LOEVY & LOEVY, and

complaining of Defendants, HELBIZ INC., SALVATORE PALELLA,

NETELLER (US) INC., SKRILL USA INC., LORENZO PELLEGRINO, MILOS

CITOVEK, JONATHAN HANNESTAD, STEFANO CIRAVEGNA, MICHAEL COPPOLA, GIULIO PROFUMO, JUSTIN GUILIANO, and SAEED ALDARMAKI, state as follows:

## INTRODUCTION

1.    Dating back centuries, enterprising hucksters and charlatans have been piggybacking on technological developments to devise get-rich-quick schemes to enrich themselves by fleecing unsuspecting investors. The internet blockchain technology that gave rise cryptocurrencies has proved very fertile ground for just these types of frauds.

2.    This action is brought to obtain justice for approximately 20,000 small investors who were swindled in a crypto currency scam called HelbizCoin perpetrated by Defendants PALELLA and HELBIZ INC. ("HELBIZ"). The scam preyed mainly on small, unsophisticated investors, with the average investment being approximately $2,000. But by leveraging the exponential messaging capacity of social media worldwide, and by creating purposeful misimpressions about the size of the company and the popularity of the investment, Defendants were able to trick thousands of people and extract over $40 million dollars by an initial coin offering ("ICO") and by later dumping the coins on the secondary market.

3.    As part of the illicit scheme, PALELLA falsely claimed to the prospective coin buyers that HELBIZ had built and was growing a vast

transportation rental platform that used smartphone apps to allow customers to rent everything from flying drone taxis to cars, bikes and scooters. The pitch, which came as the value of another popular blockchain-based coin (bitcoin) was marching its way to $20,000, was that HELBIZ would now use similar blockchain technology to create a single method of payment for every rental: the HelbizCoin. According to the Defendants, HelbizCoin was set to become the bitcoin of all transportation, and would allegedly rise in value as people everywhere turned to it to rent vehicles on the growing Helbiz-branded platform.

4.      The problem was that PALELLA's statements were not true. HELBIZ had barely developed the platform, had no working app and few if any customers. PALELLA used the ICO and secondary sales to raise capital to build the company from its nascent state after failing to raise serious money from equity investors or gain any backing for a traditional IPO.

5.      Instead, PALELLA took the coin investors' money, lavished it on himself and his inner circle, and built a far more modest platform than promised, limited mainly to electronic scooters.  Worse, he did not even make HelbizCoin the currency of the platform, charging instead in fiat currencies like US dollars and Euros for almost every rental. PALELLA and HELBIZ kept these payments for themselves, leaving the investors holding worthless coins. He stole their money and the company that the investors paid to build (and then some).

6.      Recently, PALELLA announced his intention to make an initial public offering of stock in HELBIZ on the NASDAQ in New York and on the Borsa Italiana in Milan. In an attempt to extinguish the coin holders' rights in this stolen company, PALELLA and HELBIZ have orchestrated a campaign to essentially delete the coins by destroying the Etherium blockchain smart contract (number 0xe34e1944e776f39b9252790a0527ebda647ae668) to which the HelbizCoin is attached.  A smart contract is a set of computer code executed on the Etherium blockchain.

7.      That announcement was made late last month, with the coin now scheduled to be destroyed no later than July 31, 2020.

8.      This class action seeks the Court's assistance to enjoin Defendants from destroying the coin's Etherium smart contract, as well as to award them damages and other relief.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because sufficient diversity of citizenship exists between the parties in this action, the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, and there are 100 or more members of the Class.

10.    This Court has personal jurisdiction over Defendant SALVATORE PALELLA because he is a resident of New York, New York and much of his misconduct occurred here. The court has jurisdiction over Defendant HELBIZ because it is headquartered here. The Court has jurisdiction over PAYSAFE CAPITAL LLC, NETELLER (US) INC., SKRILL USA INC., LORENZO PELLEGRINO, MILOS CITOVEK, JONATHAN HANNESTAD, STEFANO CIRAVEGNA, MICHAEL COPPOLA, GIULIO PROFUMO, JUSTIN GUILIANO, and SAEED AL DEMARKI, because each joined a conspiracy with PALELLA and HELBIZ based here, and a substantial portion of which was carried out here.  Additionally, CITOVEK, PROFUMO and GUILLIANO reside here, while PAYSAFE, NETELLER and SKRILL maintain a business presence here.

11.    Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because: (a) at least five of the Defendants reside here and (b) a substantial part of the acts or omissions giving rise to the claims occurred here.

## FACTS

### A.    The Helbiz Defendants

12.    Defendant SALVATORE PALELLA is 32 years-old and currently resides in New York City.  He incorporated Defendant HELBIZ in 2015, and floundered for several years thereafter. In 2017, when cryptocurrency trading was entering the public consciousness and bitcoin began skyrocketing toward $20,000,

PALELLA pivoted to try to market HELBIZ as a blockchain-based business, hoping to take advantage of the massive amounts of money suddenly flowing into the crypto space.

13.   PALELLA is a self-promoter, with a presence on Twitter, Instagram and other media outlets. In order to lure unwitting crypto investors, often young people just learning to invest, PALELLA resorted to outlandish exaggerations and misleading statements about himself. For example, he claimed to have started "one of the first funds globally to receive authorization to trade cryptocurrency"; in reality, there is no global authority for cryptocurrency and no one needs authorization to trade cryptocurrency, regardless.

14.   Similarly, PALELLA falsely claimed that his fund "manages over $250m," has a close network of partners with "9 figure businesses" as well as "CEOs and executives of multinational conglomerates" and "hedge fund managers" and "an unparalleled crypto, business and political network with direct ties to the inner circles of governments," among other boastful statements that lacked any confirmable specifics. Elsewhere, he claimed to have started "one of the most successful [money management] firms in Europe."  Contrary to these misrepresentations, what is clear is that PALELLA did not have the capital to finance HELBIZ or build it into a successful business before he started selling investors the "HelbizCoin" on the internet.

15.     PALELLA owns the majority of HELBIZ shares and controls the

company's actions.

16.     Defendant HELBIZ INC. ("HELBIZ") is a Delaware Corporation

with its headquarters and principal place of business in New York, New York.

According to its website "Serial entrepreneur Salvatore Palella founded intra-urban

transportation company HELBIZ in 2016, at the age of 29, with a mission to solve

the first- and last-mile transportation problem of cities around the world through an

innovative and scalable transportation rental platform designed for the sharing

economy." It claims to have offices in Singapore, although that office appears to be

a mail drop or shared space for dozens of companies.

17.     As described above and below, HELBIZ and PALELLA are issuers

and promoters of a cryptocurrency called "HelbizCoin" or HBZ. They are, jointly

and severally, responsible for the flotation of the issue.

18.     In addition to HELBIZ and PALELLA, Plaintiffs also bring the

following claims against a set of co-conspirator defendants whose roles are

discussed later in the complaint. Some of these are also promoters and dealers of

the coins.

**B.     Helbiz Coin and the Helbiz ICO**

19.     In or about November of 2017, Defendants announced an ICO

whereby investors could purchase HelbizCoin, which would be (and is) an ERC-20

digital token created on the Etherium blockchain. The HelbizCoin would be purchased in exchange for Ether (abbreviated ETH) which is the native coin of the Etherium blockchain.

20.     Defendants promoted the HelbizCoin offering, *inter alia*, on HELBIZ's website, Helbiz.com; on PALELLA's and the HELBIZ's social media channels; and in the crypto press.

21.     To create a buzz among would-be investors, HELBIZ used a referral program or "Bounty Program" tactic whereby bloggers and influencers would receive HelbizCoins in exchange for joining and posting in HELBIZ's social media channels about the upcoming ICO. Through the program, HELBIZ created a false sense of interest in the project and of demand for the ICO, driving traffic to it. HELBIZ would then tout these signups as proof of the popularity of the company in ads about the ICO, such as "10,000 have joined our Telegram. Thank you!"

22.     The more followers a poster had on their own social media channels (e.g., Twitter), or the more the poster tweeted to promote the ICO, the more of the bounty of coins they would receive. The bounty rules included*, inter alia,* the requirement to add your name to the Helbiz public channels, to link back to the HELBIZ.com website, and to add a Helbiz hashtag to your posts such as "#IBelieveInHelbiz".

23.     The campaign, which included slick graphics and text created by Defendants and ICO marketing firms they hired, was successful in pumping up demand for the coin.

24.     The ICO took place in two phases: a "pre-sale" in January 2018, and a "crowd sale" in February through March of 2018. Together the two phases raised $38.6 million based on the US dollar (USD) value of ETH at the time.  Pleading in the alternative, the Defendants raised less than this amount, but exaggerated the ICO sales in the press before They and their affiliated dumped hundreds of millions of the coins on the secondary market.

25.     Though orchestrated by Defendants, both residing in New York, the ICO sales took place physically on servers in Kansas and all Helbiz Coins were issued from there even if later sold on the secondary markets.

26.     HELBIZ, together with PALELLA and others, issued 1,025,000,000 HelbizCoin (abbreviated "HBZ" in crypto exchanges).

27.     Investors paid on average approximately $.15 per coin for the 520 million HelbizCoins they received, making each of the roughly one billion total coins worth about $.04 on a fully diluted basis. Given fluctuations in the the price of the ETH/USD during the three months of the ICO, some investors paid as high as $.15 per HelbizCoin.

**C.     Defendants' Contract with the Coin Holders**

28.     Beginning with the Bitcoin whitepaper, which was written by (the likely pseudonymous) Satoshi Nakamoto, the practice for creators of aspiring new cryptocurrencies has been to publish whitepapers that spell out the nature of the proposed coin, the economics of its operations, and its technical details.

29.     Defendants PALELLA and HELBIZ published the whitepaper for HelbizCoin in or around November of 2017, although there were later versions (some post-dating commencement of the pre-sale). Defendants' whitepaper announced that the sale proceeds would be used as follows: 40% to product development, 35% to business development, 20% to marketing and 5% for legal expenses.

30.     The value proposition for the HelbizCoin ICO was predicated on several promises by Defendants. First, Defendants promised that HELBIZ would use the money generated in the ICO to build a smartphone-based vehicle rental platform and popularize its adoption by users. Second, they promised HELBIZ would use the platform itself to rent out vehicles and would encourage other individuals and companies to join the platform as well. Third, all transactions on the platform would take place in HelbizCoin so users of the platform would have to purchase HelbizCoin. The more popular the platform became, the more users it would have and the demand for HelbizCoin would increase, thereby causing the

price per coin to rise because (like many other cryptocurrencies) the supply of HelbizCoin was fixed.

31.     The company's represented ambitions for the platform were substantial. HELBIZ's whitepaper informed potential coin purchasers that it planned to start with cars, bicycles and motorcycles, and then extend the platform to all forms of travel and mobility rentals (land, sea and air), including HELBIZ-owned or branded vehicles, as well as those from third party transportation providers, including a private jet provider and a yacht brokerage.

32.     Defendant PALELLA predicted the price of each coin would quickly rise to $1 in a few months and that it would continue to $10 as more and more rental companies put their fleets on the platform.

33.     The whitepaper was hosted on HELBIZ's corporate website, Helbiz.com, and on a special website for the ICO called Helbizcoin.io. It was signed by PALELLA, and represented, *inter alia,* that:

> A.     **"Helbiz** is a peer-to-peer market- place that makes renting a car, motorcycle or bicycle convenient, affordable and rewarding. HELBIZ combines the familiar carsharing approach in the transportation sector with Blockchain technology. Our mobility eco-system will soon provide access to individual vehicles as well as fleets and other transportation services. **Helbiz Mobility System** is a platform based on the Ethereum Blockchain and

powered by the HelbizCoin tokens (HBZ). Helbiz will be the first company adopting HelbizCoin and leveraging the Helbiz Mobility System."

B.    "Our mobility ecosystem will soon provide access to individual vehicles, fleets and other transportation services as well as control over data sharing."

C.    "To simplify the process and increase HelbizCoin adoption, Helbiz Mobility System will integrate several services in one single platform including: An explorer to discover available transportation options and related services; An internal exchange to convert major cryptocurrencies, like bitcoin and Ethereum into HelbizCoin[; and, a] built-in wallet to store and use the tokens easily…"

D.    "The [smartphone app will] facilitate payment using HelbizCoin, a dedicated currency for the purpose, that will allow participants to avoid financial transaction fees coming from the use of money in a traditional ecosystem – for instance, the fees we pay to Mastercard and Visa."

E.    "Helbiz Mobility System will allow users to convert major cryptocurrencies into HelbizCoin at the current exchange rate, while the built-in wallet will allow every registered user to easily manage and store HelbizCoin tokens without external services. Users will be able to convert

major cryptocurrencies such as Bitcoin, Ether, Lite-coin, Dash and ERC20 tokens into HelbizCoin with the aim to add an increasing number of cryptocurrencies and also fiat currencies in the future."

F.     "**THE HELBIZ** ECONOMIC MODEL In order to deliver a viable business model for the long term, we establish HelbizCoin to be a pay-per-use model for getting onto the Helbiz Mobility System or for using services available on the platform. Helbiz will drive revenues through tools and services on the Helbiz Mobility System. . . . A Blockchain community ecosystem combined with a token needed to access services aligns incentives and generate much more participation in the platform. The products and services become more useful as more users join the system and require and use tokens."

G.     "In order to further develop the platform, Helbiz will conduct a token generation event that will offer 520.000.000 HBZ tokens of the 1 billion total supply. The funds raised will be used for development of the Helbiz platform, business development; onboarding new car owners, rentals, dealerships, collaborate with insurance and PR & Marketing companies to raise project awareness, [and promote] token usability while at the same time building a strong local community.

34.    In order to reinforce the idea that HelbizCoin was an investment and that investors "looking to buy into the platform" would get rich, the whitepaper included a picture of the HelbizCoin, golden and resembling an actual gold coin, with gold nuggets in the background.



On information and belief, the golden HelbizCoin was a photoshopped alteration of prior bitcoin art that Defendants took from the internet and used in their marketing campaign.

35.    Of the representations in the whitepaper PALELLA signed, virtually all were false, or at least highly misleading.

36.    A key element of the platform that HELBIZ promised to build was that the transactions would be blockchain-based. Its whitepaper touted blockchain

as a solution to problems and inefficiencies in the transportation sector, and

HELBIZ and PALELLA continually echoed this pitch in public statements.

37.    Importantly, one cannot spend fiat currencies on a blockchain, only

digital currencies. Further, for platforms on the Etherium blockchain, users can

only spend ETH or an Etherium-based coin like the HelbizCoin ERC-20 token.

38.    It would thus be impossible to spend other cryptocurrencies like

bitcoin, much less fiat currencies like dollars or pounds, on the platform that

HELBIZ promised to build. Relatedly, Defendants also promised that the app

would include an internal exchange for purchasing HelbizCoin using other digital

currencies and fiat. Although HELBIZ promised it would list HelbizCoin for

trading on "major exchanges," the internal exchange app was needed so that people

who did not normally invest in cryptocurrency, *i.e.* most rental customers in the

world, could pay in HelbizCoin when using the app.

39.    At no point did the whitepaper disclose any intent to allow rentals on

the Helbiz platform in any currency other than HelbizCoin. Rather, HELBIZ

represented repeatedly that HelbizCoin would be the only currency on the platform

calling it the "native token for Helbiz transactions" which is a term of art in the

cryptocurrency community for the coin that pays all transactions on a particular

network. HELBIZ further stated: "In order to deliver a viable business model for

the long term, we establish HelbizCoin to be a pay-per-use model for getting onto the Helbiz Mobility System or for using services available on the platform."

40.     Defendants made similar representations as part of their marketing campaign around the ICO. For example, on the eve of the crowd sale, a press release stated: "The Helbiz coin, which will be available through the initial offering for anyone looking to buy into the platform, is a cryptocurrency aimed at being at the center of all transportation service transactions on a global level. From peer to peer bike rentals to public transportation or private jets, it will help to make it easier than ever before to organize and arrange vehicle and transportation services."

41.     Another example from a January 2018 puff piece in "Bitcoin Magazine" quoted PALELLA describing HelbizCoin as follows: "A cryptocurrency and utility token for our transportation services. It's poised to play a leading role in this new era as a consumptive currency, applicable with all transportation services on land, water and air."

42.     PALELLA went on to say that Helbiz "will employ a single payment system utilizing blockchain to eliminate transaction fees, thereby saving our customers money on both sides of the transaction due to lack of centralization." For good measure he claimed that "We are scheduled to launch in May and will

release on iOS and Android then," thereby falsely indicating that HELBIZ was much further along than its actual level of development pre-ICO stage.

43.     Additionally, HELBIZ marketed the ICO through the public media and on the general corporate website, Helbiz.com, describing the coin as:

> A TRANSPORTATION UTILITY TOKEN
> HELBIZ COIN (HBZ)
>
> In order to deliver a viable business model for the long term, HelbizCoin was born to be a pay-per-use model for getting onto the Helbiz Mobility System and for using services available on the platform

HELBIZ referred to the HelbizCoin.io website as "our ICO site" and PALELLA called it "our main ICO" site, signing the whitepaper as "Founder of HELBIZ."

**D.     Defendants Breach and Steal the Platform from the Coin Holders**

44.     In violation of their promises in the whitepaper and the coin investors' objectively reasonable expectations, Helbiz built an app that not only accepted fiat currency payments, but which relied primarily on such payments, thereby strongly undercutting the value proposition on which the coins had been marketed. Failing to adhere to the promised plan to make HelbizCoin the exclusive currency of the platform, HELBIZ dis-intermediated the coin holders and deprived them of the value proposition promised for the coins.

45.     The breach was revealed in stages over the course of about a year. Starting shortly after the ICO, HELBIZ began providing updates to the ICO

investors informing them of various steps being taken on the platform project. These were called "Monday Updates," and HELBIZ posted them on them on the website Medium.com.

46.     Less formal announcements were made on PALELLA's and the company's various social media channels. Much of this marketing entailed PALELLA and other HELBIZ employees flying off to foreign destinations and taking pictures to post on the HELBIZ Twitter channels (@HELBIZofficial) with aspirational statements about how HELBIZ was making the future of transportation possible. Periodically they would talk about the forthcoming app, or the ability (it would have) to rent cars, scooters, and other forms of transportation.

47.     Unfortunately, Defendants recently deleted many of these announcements and all of the Monday updates as part of a campaign of spoliation, described later in this complaint, all of which Defendants undertook to disadvantage the coin holders in litigation.

48.     In the first six months or so, HELBIZ consistently represented that it was making progress building out the platform, even though things appeared to be going slower to the community than promised. Many of the announcements made it appear that good things were happening behind the scenes, like partnership with Alibaba or a flying Helbiz drone taxi that would revolution urban travel. These

announcements were intended to pacify the community and excite them to hold their HelbizCoin, and even to buy more to prop up the price.

49.     Then, on September 3, 2018, HELBIZ announced that the platform would not be as originally represented.

50.     First, despite having touted the platform car-sharing function discussed in the whitepaper, HELBIZ was going to delay the car module because of technological difficulties. Instead, it would launch the platform for use by a Helbiz-branded fleet of electronic scooter it called HelbizGo.

51.     HELBIZ described the scooters on its Helbiz.com website as follows: "HelbizGO is a dockless intra-urban transportation solution directly integrated into the Helbiz platform that allows users to instantly rent and unlock electric scooters from their smartphone and simply leave curbside when finished."

52.     The updates indicated that there was still a lot of work being done on the car-sharing module and stated that Helbiz V1.0. would now include only the scooters and that Helbiz V2.0 would add the cars and be launched around the end of the year. The updates promised further development to the Helbiz V3.0 to add jets and yachts.

53.     The stated reason provided for not including the cars in V2.0 was that "Due to the delay in finalizing the car hardware, the team decided to shift focus to

first build, launch and optimize HelbizGo while continuing to test and optimize the 4G car module on the side before finalizing the development for the carsharing."

54.    This came as a surprise to the HelbizCoin investor community given that PALELLA had announced that the car hardware was already in production *three months earlier*: "Got to inspect the final prototype of the on-board Helbiz hardware on the @Helbizofficial car-sharing platform today! Production has been started and the Los Angeles launch is getting closer!"

55.    HELBIZ also changed its story about the role that the HelbizCoin would play. First, it announced plans to expand HelbizCoin's use case far beyond transportation to restaurants and online shopping and in point of sale terminals with retailers world wide. This was bunk, intended to soften the blow of the rest of the announcement.

56.    Simultaneously with announcing these new ambitions for the coin, HELBIZ said that it had redesigned the platform so that it did *not* use HelbizCoin.

57.    HELBIZ tried to justify the announcement with doubletalk to the effect that it was supposedly acting in the best interest of the coin holders by delaying its promise to make HelbizCoin the platform's currency because taking fiat currency instead of HelbizCoin would drive adoption of the platform and thereby (allegedly) increase the value of HelbizCoin when HELBIZ switched the platform over to HelbizCoin at a future date.

58.     The company announced that the switch from fiat to HelbizCoin would now happen in a fourth phase of the development, Helbiz V4.0: "In the 4th phase Helbiz will utilize its user base, previous growth and position within local communities to phase out direct fiat payments in the Helbiz app moving towards a crypto only solution. All purchases, even with credit card, will simply purchase HBZ of the open market via the exchange API to fill the in-app wallet which will only hold HBZ making it the only accepted currency."

59.     This was a direct breach of the promises in the whitepaper. Nowhere in the whitepaper had HELBIZ said it was going to phase in development of the platform at all, much less in four phases, and it had promised that HelbizCoin would be the sole currency from the start.

60.     Moreover, the company represented in the whitepaper that it had already thought through the economics of whether to build the platform with a native coin, determined that that was the best way to make the platform thrive, and accordingly that was the reason it was asking investors to buy HelbizCoin in the first place: "NATIVE **TOKEN**  The choice to create a native token for Helbiz transactions is not casual.. . . . The conclusion of our careful analysis was that only a native token allows Helbiz to optimize for the 3 desired objectives."

61.     In trying to appease the coin holders about its decision to accept credit cards and Apple Pay instead of HelbizCoin, the company stated: "Making Helbiz a

crypto only solution too early will restrict growth, and overall hurt HBZ as it will then only be a niche project for token holders and never build the impact needed to shift consumer behavior."

62.     This announcement directly contradicts the representations HELBIZ made in the whitepaper, namely, that the "choice to create a native token for Helbiz transactions is not casual" and that it had engaged in a "careful analysis [concluding] that *only* a native token" allows Helbiz to achieve its goal (italics added).

63.     Relatedly, HELBIZ announced that it had not completed the internal exchange nor the Helbiz electronic wallet aspects of the app, but that these too would come later.

64.     There was no mention made either way about keeping the promise to build the app on the Etherium blockchain. However, a review of data derived from the Etherium blockchain using etherscan.io suggests that it was not. Instead, it appears, the app was built as a centralized app, like Uber or AirBnB, that did not rely on blockchain, once again directly contradicting Defendants' representations that induced people to spend nearly $40mm on their coin.

65.     In sum, HELBIZ used the ICO money to build a fiat-based app solely for its own benefit to support rentals for its own Helbiz-branded fleet of scooters (which were also likely financed with the coin holders' money). HELBIZ took all

of the money, and left the coin holders behind.  It tried to make it appear that it was still working in the coin holders' interests, but the breach was clear and the community correctly perceived the announcement of these supposed future plans as rationalizations and double-talk.

66.    In March of 2019, HELBIZ added HelbizCoin as a payment option for scooters on the app. However, it was in parallel with fiat prices, not exclusive as promised, and did not get much use as a result.

67.    Each sale that took place on the platform in any currency other than HelbizCoin is a sale that should have inured to the benefit of the coin holders: either because the investor could have sold his/her coins for fiat to facilitate that transaction or because the demand for Helbiz Coins for that transaction would have increased the price of the coins held by the investors.  Further, all profits derived from the platform and any other assets financed directly or derivatively with the coin holders' money – such as the Helbiz-branded scooters and bikes – belong to the coin holders.

68.    As a result, Defendants owe damages to the coin holders for these full amounts. Further, because Defendants' resorted to fraud and deception to complete the breach and made knowingly false promises, Defendants are also liable to coin holders for punitive damages in an amount to be determined by a jury.

E.     **The Pump and Dump**

69.     In the six or so months while HELBIZ was secretly building the non-compliant fiat platform and getting read to launch the branded scooter product, Defendants and others acting at their direction were engaged in a campaign of misinformation with overly-optimistic statements and predictions targeted at the coin holders. Some of these were set out above, some are recounted below, but most have been deleted by Defendants as part of their spoliation efforts.

70.     For example, in late April of 2018, PALELLA announced: "We have been fortunate to secure numerous partnerships over the last month for the overall ecosystem, allowing us to significantly improve the use of our Helbiz token, both from an integration, transaction and partnership perspective, even beyond the transportation sector. Paired with our transaction wallet application, we believe that our token offers wide and seamless use of the ability for third parties to integrate."

71.     The announcement was a lie. The unnamed partnerships were bunk, HELBIZ was not building the crypto wallet/exchange, and HELBIZ was not "significantly improve[ing] the use of our Helbiz token."

72.     Also in April of 2018, HELBIZ posted a picture to its official channel on Medium.com showing a model holding a smartphone running a generic app, supposedly the HelbizPay app. The picture says, "SUCCESSFUL

TRANSACTION" with the name "Salvatore Palella" and the payment amount designated in "HBZ". In fact, there was no working app and the app that Helbiz was designing had no functionality for HelbizCoin.

73.     As set out above, Defendants also falsely stated in June of 2018 that the Helbiz car module was in production and that the service would soon be launched in Los Angeles.  Accompanying the announcement was a picture of a black plastic electronic projects box with the words "HELBIZ" embossed on it, to reinforce the false message that the product was in production. On information and belief the appliance was not even close to production and the box was a prop prepared on a hobbyist-level 3D printer.

74.     In an AMA ("Ask Me Anything") chat on Telegram in July of 2018, ICO investors peppered PALELLA with questions about the Helbiz platform and why it was not already up and running. PALELLA responded: "The goal and intention is to launch the app with incentivized HBZ payments. I am always looking to increase the usability of HBZ. . . . So to answer your question the Helbiz app will have HBZ payments, also before we launch HelbizPay. We are all on the same page with the same end goal. I want nothing else than executing on the promises, and am looking forward to being able to share the positive progress."

75.     There were many more attempts to mislead purchasers in the months leading up to the September announcement about not using HelbizCoin or a

blockchain-based app. For example, in August 2018, PALELLA announced on twitter that Guilio Profumo was promoted to HELBIZ's CFO, after which followed a series of tweets from Profumo over the course of several weeks:

     A.  "Exciting meetings for @HELBIZofficial in China over the past week, China leads the way in almost every category of the current and future shared mobility market from car-sharing and ride-hailing to the country's readiness to support the looming advent of robo-taxis!"

     B.  "Official visit of the #Helbiz team at Alibaba HQ to accelerate and explore synergies within blockchain, security, payments, IoT capabilities @HELBIZofficial"

     C.  "Blockchain is here to stay! New insights @HELBIZofficial of how Alipay has expanded the application of blockchain to offer fast, secure, transparent and low-cost payments between digital wallets and ecosystem partners"

     D.  A picture of Profumo in a single-person airtaxi drone and stating: "The future doesn't seem that far away anymore! @Helbizofficial is reinventing urban mobility!!! #dronetaxi"

76.    There were many more tweets to the same effect from HELBIZ and from PALELLA on his social media channels. For example, in June he posted a

picture of himself in front of a private jest holding a cellphone to his ear, saying: "7 days, 4 deals signed. Let's make it 5. #Helbiz."

77.    On August 10, 2018, PALELLA posted a picture of an airtaxi drone and stated: "2019 the first @Helbizofficial users will take to the sky with a tap, now it is time to work with regulators to embrace this new technology and be open to how it can change our world for the better. #Helbiz"

78.    All the while there was massive selling of the HelbizCoin on the exchanges causing the prices to drop.

79.    Approximately 500 million coins were supposedly reserved for founders and employees, affiliates, backers, and the corporation.  Unlike the outsiders who purchased in the ICO and on exchanges, the insiders were well aware that the coins lacked value. HELBIZ was making the HelbizCoin worthless by creating a system using fiat sales and stealing the platform from the coin holders.

80.    On information and belief, the selling that caused the price to drop was mainly caused by insiders taking advantage of the pump campaign and not by ICO purchasers:

A.    The price dropped very significantly soon after the ICO and there is no reason to believe that ICO investors purchased in the ICO to sell in a few weeks at a loss.

B.     Blockchain data shows that the selling pressure came primarily from a handful of wallets acting in conjunction that held approximately 320 million HelbizCoin. It is unlikely that non-insider ICO investors amassed this many coins in such a small number of wallets. Most purchases were from small investors targeted in the Defendants' online marketing campaign and blogger "Bounty Program."

C.     There was no restriction on insider sales and at least 80% of the coins reserved to the company and the insiders were considered vested immediately upon the completion of the ICO.

D.      The insiders, but not the public, knew that HELBIZ was failing to honor the value proposition as explained above.

81.     The price quickly dropped. A mere two months after the ICO, American Banking and Market News wrote an article entitled *Helbiz Reaches Market Capitalization of $0.00* stating that the coin price had dropped to $0.0109.

82.     Investors attempted to contact PALELLA through twitter for him to do something about the precipitous drop and answer questions about why it was happening.  Many of them were critical of PALELLA. Some called Helbiz a scam and PALELLA a scammer. PALELLA periodically responded, continuing to pump the price of HelbizCoin even while the insiders continued to sell.

83.     At 4:25 am on May 7, 2018, PALELLA tweeted: "If you sell even a single $HBZ for under $1 before the platform has launched in July, you have really not understood the scale of the project from day 1. It is always a choice to sell, but you should REMOVE crypto investor from your bio then."

84.     And later that day he added: "It is funny how it is the same people that sell for pennies [who] complain about whales.  There are no shortcuts to wealth. Realize when you have hit a goldmine hold on."

59.     On other occasions PALELLA would try to calm the investors with false statements in similar vein. For example: "[I]f the growth of the platforms will be in line with what we expect and we are able to grow both our userbase and our payment infrastructure, with HBZ @Helbizofficial as an integrated core part of all transactions, we truly believe that HBZ will cross $10/HBZ".

60.     PALELLA also posted an accompanying statement to his FaceBook page explaining that the company would never dump coins because they are so valuable: "Helbiz currently holds 48% of the total token supply for future growth…. Helbiz is one of the few ICOs that is not built around an abstract idea but an actual product..." Instead he blamed faithless ICO investors.

61.     In June 2018, as the price of the coin was continuing to plummet, PALELLA issued the following disingenuous tweet: "I appreciate all the requests from funds and investors about investing in @Helbizofficial, but due to the #ICO

we are not looking for outside investment. We are now only focused on launching and scaling operations, creating value for early investors and the #HBZ coin. #Helbiz."

62.     Later that month, PALELLA again tweeted on the coin, this time stating that the company was going to intervene in the markets to prop up the coin by spending $1 million in the exchanges where HelbizCoin was traded.

63.     On information and belief PALELLA's claim was false, intended to trick the investors into buying more on the belief that HELBIZ was investing in the coins too.

64.     PALELLA and HELBIZ have deleted these and most of their other similar statements from the social media channels as part of a campaign of evidence destruction described in more detail below.

65.     These and similar tweets were intended to drive secondary market purchases of the coin and thus drive up the price at which the insiders could sell by communicating that HelbizCoin would rise in value because HELBIZ was supposedly committed to the coin and was building the platform to make it a success.

66.     They had their intended effect. A May 28, 2018 article in American Banking and Market News reported almost $2 million of daily trading volume for HBZ and that the market cap had risen to $7.94 million.

67.    By August, however, the coin had dropped again. Contrary to
PALELLA's tweet stating that no one should sell below a dollar with the platform
launching in July, the price fell below one penny in June and continued lower,
reaching $0.0077 in July, $0.0054 in August, $0.0027 in October and was $0.0008
by January of 2019.

68.    Meanwhile, PALELLA tweeted that everything was going great for
HELBIZ, which may have been true given that it had stolen the platform from the
coin investors and was building the business successfully with their money:
"Happy to present the full @Helbizofficial vision and roadmap which was revealed
this week in #Milano. #Helbiz #HelbizGO #HelbizBike #HelbizCar #HelbizAir
#DroneTaxi"



69.     PALELLA summed up the year in a December 2018 statement as follows: "2018 marked the beginning for #Helbiz. A fast-paced year where we overcame a lot of hurdles, developed and released the @Helbizofficial App, launched #HelbizGo, established offices in 4 countries with 80 employees, secured exclusive partnerships and built a solid foundation to scale in 2019 #HelbizFamily"

70.     It was also the year that HELBIZ raised almost $40 million in investor money, and then continued manipulating the coin holders and leaving them behind.

**F.     Helbiz Prepares a public stock offering on the NASDAQ and Announces that the HelbizCoin will be Removed from the Etherium Blockchain and Destroyed**

71.     Throughout 2019, HELBIZ continued to expand its scooter fleet to cities in the U.S. and Europe.  In addition, HELBIZ has been adding Helbiz-branded bicycle rentals. The Helbiz app had been downloaded over 100,000 times.

72.     All of this expansion was driven by the platform belonging to the coin holders, the app that they paid to develop, and more generally by the capital they invested.

73.     Many coin holders were outraged as they saw that HELBIZ and PALELLA had been lying to them, all while posting pictures of the HELBIZ inner circle flying on private jets and lavishing themselves with the money the coin holders had invested.

74.     Many of the investors were critical of PALELLA and HELBIZ on social media.  These postings have met with extremely aggressive threats of litigation by lawyers for the company, attempting to intimidate the investors to discourage them enforcing their legal rights.

75.     The company's campaign of trying to silence the coin holders with threats began in the context of HELBIZ implementing plans for a public offering of shares.

76.     HELBIZ refers to this as an IPO but, in fact, the company's initial public offering was its ICO.

77.     On June 6, 2019, HELBIZ issued a press release announcing a formal IPO:

> "NEW YORK--(BUSINESS WIRE)--Helbiz, Inc. ("Helbiz" or the "Company"), an intra-urban transportation solution that allows users to instantly rent electric scooters directly from the Helbiz mobile app, today announced the intention to file an Initial Public Offering on NASDAQ. Helbiz intends to dual list on the AIM Italia exchange, a multilateral trading facility organized and managed by Borsa Italiana S.p.A."

78.    Since that announcement, HELBIZ has raised additional rounds of pre-IPO capital. On information and belief, none of those investments come close to the $38.6m infusion by the coin holders.

79.    The coin holders should be declared the true owners of the company and its assets and therefore cannot be diluted by these later investments in HELBIZ.

80.    Among other relief, Plaintiffs seek to quiet title in the ownership of HELBIZ.

81.    Also, as part of intention to IPO its stock, HELBIZ has set about destroying the HelbizCoin in order to deprive the coin holders of their stake in the company.

82.    For example, shortly after Defendants started working on their IPO, exchanges that carried the HelbizCoin began delisting the coin. On information and belief, the de-listings were done at the demand of HELBIZ.  At least one of the exchanges has publically confirmed this in an tweet: "$HBZ has been de-listed due to team request. Please cancel any orders prior to withdrawing your tokens." Pleading in the alternative, some or all of these exchanges began delisting HelbizCoin because they recognized that it was a scam.

83.    Then, on May 2, 2020, HELBIZ (acting though an alter ego, as explained below) announced that the HelbizCoin smart contract on the Etherium

blockchain, number 0xe34e1944e776f39b9252790a0527ebda647ae668, would be deleted. Because the coins are an ERC-20 token and exist only by virtue of a smart contract on the Etheirum blockchain, the coins completely cease to exist and become useless if the blockchain is erased.

84.     The announcement included a cynical offer to swap the coins for ETH.  For anyone who bought in the ICO and who did not sell the coins, the offer is for return of the original amount of ETH paid in the ICO.  The offer is a sham, however, because no one, or almost no one, who bought in the ICO continued to hold their coins while the price was dropping almost 100-fold. They sold for what they could, never expecting that there would be a refund offer a year later, an offer made only after it was apparent that everyone had already bailed out on the coin.

85.     Defendants know that few if any of the original ICO purchasers still hold their original coins, as can be seen from an analysis of the Etherium blockchain for the Helbiz ERC-20 token. The overwhelming majority who justifiably cut their losses by selling coins after the ICO, *i.e.*, almost everyone, is ineligible for the purported "refund".

86.     As for those who bought their coins on the secondary market, the offer is to pay approximately $ .0002 USD value in ETH, essentially nothing.

87.     The announcement that the smart contract will be destroyed, coupled with the offer to repurchase for almost no money, is intended to put the coin

holders under duress and leave them no option but to sell the coins and thereby give up their rights in HELBIZ so that it can sell stock to new investors. According to the announcement, the Etherium blockchain smart contract by which the coins exist will be destroyed no later than July 31, 2020.

88.     The announcement was released on the website HBZcoin.com.  The website, which only uses the name HBZ for the Helbiz Coin, appears to take the position that the coin is the project of a third party entity, not HELBIZ and/or PALELLA. HELBIZ engineer, Carlos Beltran, recently reinforced that new party-line in a tweet to investors saying: "I'm a lead engineer at HELBIZ and can say a thing or 2 about the matter - I integrated HBZ as a partner payment solution. We didn't see enough usage of HBZ @hbzcoin as trip payments, and therefore discontinued the partnership."

89.     This position that Helbiz Coin is not HELBIZ ignores the long history of HELBIZ and PALELLA claiming ownership of the coin and its ICO, numerous examples of which are included in this Complaint. Rather, the is just another step in furtherance of HELBIZ's campaign to mislead the coin holders. HelbizCoin is not and was not a "partner" to the company. It was marketed, created, issued and controlled by Defendants and they took the proceeds from it.

90.     First, Defendants orchestrated the ICO, and the money from the ICO went to HELBIZ to build the transportation platform, app and fleets of vehicles.

As PALELLA recounted in the Italian news magazine ANSA, HELBIZ created HelbizCoin to raise money for the company, indicating that HELBIZ and PALELLA own and control it: "Salvatore Palella, who founded the startup Helbiz [explained] 'just when we were close to the launch [of Helbiz], the cryptocurrencies exploded'. So 'we decide to create our cryptocurrency with an initial coin issue', that is, an ICO (initial coin offering) raising '38 million dollars'." https://www.ansa.it/sito/notizie/economia/criptovalute/2018/06/06/auto-in-italia-entro-2018-app-per-noleggio-tra-privati_a491df67-31dd-42a0-8447-5ab2b2efd59e.html

91.     Second, HELBIZ consistently refers to HelbizCoin and everything built with the proceeds of the ICO as belonging to HELBIZ: "our platform", "our app," "our scooters".  For example, in a January 29, 2018 article in Bitcoin Magazine, Palella states: "*Our* presale ICO date was January 26, 2018 at 9 a.m. EST. *We* sold 30 million tokens in 24 hours. Following that will be the launch of *our main ICO* (on a major exchange) on February 15, 2018, at 9 a.m. EST" (italics added). Similarly, when marketing the coin in January and February of 2018, Defendants posted articles to HELBIZ's page on Facebook and channels on Twitter, Instagram and Medium.com all identifying the company as being the issuer of the coin, in charge of the ICO, and the recipient of the money raised:

A. "Exciting times. Helbiz ICO February 15";

B.  "Helbiz has partnered with Royal Yacht Brokers, increasing the usability of Helbiz Token from Day 1!  @Helbizofficial will announce more partnerships over the next couple of weeks #Blockchain #ICO"

C.  "Helbiz Pre-Sale Distributed 30 million tokens in 24 hours"

D.  "Helbiz founder Salvatore Palella sits down with Bitcoin Magazine to discuss Helbiz after selling + $4 million within 48 hours of its pre-sale"

E.  "Last night we gathered together the NYC blockchain community for a sold out event at Wall Street" with a link to a headline "Helbiz ICO Event Brings Together Investors and Enthusiasts"

F.  "Transportation industry blockchain startup Helbiz raises $5.5. million in pre-sale ahead of its ICO this Friday 15th at 9 a.m. EST"

G.  "Helbiz is a new cryptocurrency and per-to-peer mobility platform! Check out our website to learn more. HelbizCoin.io";

H.  "Helbiz: the decentralized AirBnb for transportation, Closes $5.5 million presale and launches ICO backed by AlphaBit and Binary Financial."

92.     A press release that Helbiz published on the @Helbizofficial channel on Medium.com and likely elsewhere also proves HELBIZ's ownership of the ICO:

> Overwhelming demand has forced us to close our presale earlier than we expected. For those who were able to participate, please allow up to 48 hours for registration confirmation and pre-sale token distribution. Thank you all for your support! We received hundreds of pre-sale participants and look forward to continued support through our Main ICO which begins February 15th at 9am EST
>
> For those interested in joining the Helbiz movement please visit our ICO site here
>
> *"We would like to thank the Helbiz community for your overwhelming support. Our presale CLOSED much earlier than we anticipated— days before our plan, our community has grown by tens of thousands of participants. We look forward to having more people participate and join our journey through our Main ICO."*
>
> — Salvatore Palella, Founder of Helbiz.

93.     Palella's statements may not even have been true, intended instead to try to drive up demand for the crowd sale by misrepresenting the level of demand in the pre-sale. Nevertheless, this and all of the forgoing examples are admissions that HELBIZ and PALELLA control HelbizCoin and the smart contract by which it exists.

94.     Third, after the issuance of the coin, HELBIZ and PALELLA consistently represented to the community that they controlled HelbizCoin's listing

on exchanges, and that the coin and the company were synonymous, as was the company's social media channels. For example:

A. The tweet from PALELLA on May 31, 2018: "May has come to an end. @Helbizofficial is more attainable and launched on 11 exchanges, finished our updated UI for our apps, acquired a new office in NYC and will now focus on the press aspect globally. #hbz #Helbiz."

B. The tweet from PALELLA: "Eventful first 60 hours of the week, with our third exchange of the week - @Helbizofficial will list on @hitbtc!" This included a response from Defendant PELLEGRINO: "Impressive"

C. Postings to PALELLA's personal facebook page: "Happy to be in #London for the launch of @Helbizofficial $HBZ (4/26) in the exchange";

D. "Helbiz is now listed on its first exchange!";

E. "We are happy to partner with Anthony Diorio and his team listing Helbiz on Jaxx.io";

F. "Proud of my Helbiz team. I love the Jaxx.io integration. ExchangeS (sic) coming soon!" and a link to an article "Helbiz HBZ token integrated into Jaxx Multicurrency Digital Wallet";

G. "Helbiz is now live and listed on bonus exchange Mercatox with a Top 10 exchange listing coming soon!";

H. "It is now 1 month since Helbiz got listed, and today 30 days later Helbiz is traded on 11 exchanges and 26 markets globally. With product launch getting closer I am excited for the next couple of months! #HBZ #Helbiz #HelbizP2P #HelbizPay";

I. "Helbiz is focused on the long term success of HBZ and therefore the team [is buying] $1m (USD) of HBZ on the open market, paired with additional large buy walls on the main exchanges, to strengthen the company's position both internally and to new investors #Helbiz";

J.  A link to an article stating "The ICO for the transportation disrupter Helbiz is live…"

K. Also, @Helbizofficial tweeted in November of 2018: "We are working on listing one [of] Jaxx's large partner exchanges."

95.     Fourth, the whitepaper was issued in the name of HELBIZ and signed by PALELLA, not some third party "partner" of HELBIZ.

96.     Fifth, the email address listed in whitepaper for inquiries was coin@Helbiz.com -- *i.e.* an email address on the HELBIZ's corporate website.

The whitepaper also lists HELBIZ's social media channels: "Helbizofficial" on Instagram, Facebook and Twitter.

97.     Sixth, the ICO was advertised on Helbiz.com. The people listed as the "Helbiz Team" in the whitepaper and the HelbizCoin.io are, or were at the time, HELBIZ insiders.

98.     Seventh, PALELLA himself has repeatedly indicated that HELBIZ is the issuer of the coin and that HelbizCoin is HELBIZ's project.  For example, the tweet where PALELLA publicly announced that the company did not need investors because of the money it raised in the ICO: "I appreciate all the requests from funds and investors about investing in @Helbizofficial, but due to the #ICO we are not looking for outside investment. We are now only focused on launching and scaling operations, creating value for early investors and the #HBZ coin. #Helbiz."

99.     Eighth, investigation has uncovered a slew of additional evidence that the supposed separation between HELBIZ and HelbizCoin is a sham:

         A. The IP addresses for HBZCoin.com is housed at the same server farm as Helbiz.com, which is indicative of common control. The registrar for HelbizCoin.io, HBZcoin.com and Helbiz.com is the same. Also, the three sites use the same entity to conceal the name of the person registering those sites. This is also indicative of common control.

B.  Although the statement on HBZCoin.com is unsigned, the bottom of the website bears a copyright in the name of HBZ System PTE Ltd, with an address in Singapore. This is the same mail drop or workshare address that Helbiz uses as its Singapore address.

C.  The Singapore Accounting and Corporate Regulatory Authority (ACRA) records indicate that there is no incorporated entity by that name. Rather, there is an entity with the name HBZ Systems (plural) PTE LTD.  It is unlikely that a non-sham entity does not know its own name.

D.  ACRA records indicate that the company's former name was "Helbiz Mobility System PTE LTD." Importantly, it used the "Helbiz" name, not that of a third party, and, if anything, the name related to the mobility system platform promised in the ICO rather than the coin. Records show that the name was changed in January of 2019.

E.  Helbiz Mobility System PTE LTD was not incorporated until February 7, 2018 which was after the ICO was already underway. Therefore it cannot be the legal entity that issued the HelbizCoin.

F.  From the time of incorporation, until the time of the name change, Helbiz Mobility System PTE LTD had only one member: SP1 Investments.  SP1 Investments (a/k/a SP1 Capital) (SP1) was formed by PALELLA in 2017.  SP1 was the sole incorporating member of Helbiz

Mobility System PTE LTD and held the only share of the company. The SP1 website (since deleted) listed the "SP1 Leadership" most of whom are, or have been, also listed as the "Helbiz Team" on Helbiz.com, HelbizCoin.io and in the whitepaper.

G. The registrar for SP1's website is also the same as for HelbizCoin.io, HBZcoin.com and Helbiz.com and it shares the same service to conceal the name of the person registering the site. All four sites are also housed in the same server farm in Kansas.

H. On January 4, 2019, the same day as the name change to HBZ Systems, a Bahamian company called "Quantum Analysis Management, LTD." (formerly Lambda Asset Management/Lambda Securities), LEI 254900087E8YQ27EJS36, was substituted as the sole member of Helbiz Mobility System PTE LTD and the name was changed to HBZ Systems PTE LTD.

I. Fabio Allocco, who is an officer of Quantum Analysis Management LTD and its predecessors, has been implicated in financial misconduct.

J. Quantum Analysis Management LTD has filed UCC statements in the United States regarding its supposed interests in the assets of HELBIZ.

K.  At approximately the same time as the name change and the substitution of SP1 Investments, the HelbizCoin.io site was deleted and the traffic was redirected to HBZCoin.com.

L.  PALELLA remains a director of HBZ System and can therefore exercise control.

M.  Helbiz Mobility System PTE LTD a/k/a HBZ System PTE LTD was "struck off" by the Singapore Accounting and Regulatory Authority on September 12, 2019 and ceased to exist, leaving its directors, *i.e.* Defendant PALELLA, jointly and severally liable for any corporate conduct.

100.   Neither the trade name HBZ Systems PTE LTD, nor the belatedly incorporated Helbiz Mobility System PTE LTD, shield Defendants from liability as the issuers of the HelbizCoin and the controllers of the smart contract.  The whitepaper never mentions these entities and, to the contrary, consistently indicates that HELBIZ is the coin issuer.

101.   Both PALELLA and HELBIZ are U.S. residents subject to U.S. law. The ICO sale took place physically on severs located in the United States.

102.   In addition, regardless of the shell game that HELBIZ is trying to play with the entity owning the liability for HelbizCoin, the fact remains that PALELLA and HELBIZ are liable for breaching the promise to build the platform

as represented and use the coin as represented regardless of who issued the

HelbizCoin or controlled the smart contract.

## H.    Defendants Destroy Evidence

103.    Much proof of Defendants' misconduct is to be found in the

statements they published replete with falsities and misrepresentations, including

the facts surrounding HELBIZ and their intentions with regard to HelbizCoin and

the platform. As stated elsewhere in this complaint, these statements were often

announced on the "Helbizofficial" and other public media channels controlled by

Defendants including accounts on Reddit, Twitter, Instagram, Medium.com,

Telegram, Facebook and others. Defendants also produced and published videos

on YouTube regarding Helbiz and its HelbizCoin. Defendants used these accounts

as part of their ICO marketing campaign and post-ICO misconduct.

104.    Recently Defendants deleted all of the official channels for the

HelbizCoin as well as relevant tweets on the official channels for PALELLA and

HELBIZ. The massive deletions occurred at about the same time as the

announcement that the coins will be destroyed. Additionally, Defendants also

periodically deleted relevant evidence by culling it from all of these accounts.

105.    Defendants engaged in the acts described in the preceding paragraphs

in anticipation of litigation in order to cover-up evidence of their misconduct.

**G.     The Co-Conspirators**

106.    Several additional persons and entities are liable for the claims herein as co-conspirators with HELBIZ and PALELLA.

107.    Not later than the publication of the whitepaper, an agreement was formed amongst PALELLA, MILOS CITOVEK, JONATHAN HANNESTAD, STEFANO CIRAVEGNA, MICHAEL COPPOLA, GIULIO PROFUMO, JUSTIN GUILIANO, each of whom added their names to the whitepaper, and others, to create and sell HelbizCoin in an ICO.  The members of the conspiracy understood and agreed that HelbizCoin sales would be promoted using false facts and promises that would not be, and were not intended to be performed, all as alleged above.  The conspirators planned to profit from sales of the HelbizCoin in the ICO as well as in secondary market sales with coins retained for themselves in the ICO.

108.     To increase the demand and prices for this investment, the conspirators solicited additional members who joined and agreed to its terms.

109.    LORENZO PELLEGRINO is the former CEO of Defendants NETELLER (US), INC. and SKRILL USA Inc. PELLEGRINO is a resident of Florida, and is believed to be the cousin of Defendant GUILIANO.

110.    PAYSAFE CAPITAL LLC, NETELLER (US), INC. and SKRILL USA Inc. are Delaware corporations doing business in New York, New York. Paysafe Capital, LLC (f/k/a iPayments Capital LLC), is the parent corporation to

NETELLER and SKRILL. PELLEGRINO, NETELLER and SKRILL are, or were at times relevant, partners of HELBIZ. As such, they are jointly and severally liable with HELBIZ.

111.   NETELLER and SKRILL are internet-based payment money transferors, and were partners in HELBIZ. They played a material role in the pitch for purchasing HelbizCoin and in fact facilitated the sales of HelbizCoin, *inter alia*, by getting it listed on exchanges and by processing the payments for the purchases of HelbizCoin. NETTELLER and SKRILL also promised to support the coin through marketing campaigns and development and to make it "straightforward" for users of the Helbiz platform to purchase the HelbizCoin

112.   PELLEGRINO, NETELLER and SKRILL were promoters of the HelbizCoin, promising to list HelbizCoin on their company sites, and increase the number of HelbizCoins in the market. These Defendants received compensation in the form of HelbizCoins and otherwise. They joined the conspiracy prior to the ICO, allowed their names to be used in connection with the project to build confidence in the investors to drive up the price of the coins, and actively promoted the coin. Among other methods, PELLEGRINO, PAYSAFE, NETELLER and SKRILL arranged for the coin to be listed on various exchanges which was necessary to drive demand of the coin and also to allow the aforementioned pump and dump scheme by which they and the HELBIZ insiders enriched themselves.

113.   PELLEGRINO, PAYSAFE, NETELLER and SKRILL also promised in connection with the ICO that "Pellegrino will play a key role in constructing the payment processing and second layer payment protocols of Helbiz, building the bridge between traditional blockchain application, cryptocurrency and mainstream payment processing, an essential part of Helbiz road to mainstream success." These Defendants breached that promise. Pellegrino did not integrate the promised cryptocurrency protocols into the Helbiz platform, no exchange was ever built in the platform, and it never had the promised capabilities.

114.   SAEED ALDARMAKI is a founder of AlphaBit and Binary Capital. PELLEGRINO referred to ALDARMAKI as "one of our investors" which, on information and belief, reflects the financial interest of PELLIGRINO, NETELLER AND SKRIL as partners in HELBIZ and the fact that ALDARMAKI is, or at relevant times was, a partner in HELBIZ, with joint and several liability. ALDARMAKI joined the group with full awareness of its purpose prior to the ICO, allowed his name to be used in connection with the project to build confidence in the investors to drive up the price of the coins, and actively promoted the coin. On information and belief, he received compensation in the form of HelbizCoins and otherwise, and also bought and acted as an underwriter for the coin.

**H. The Damages Suffered By The Coin Holders**

115.   By all of the above, Defendants have breached obligations owed to the coin holders and have caused them injuries.  The coin holders are entitled to remedies against the Defendants and to have them pay full damages. The Defendants, and each of them, are jointly and severally liable for all damages to the coin holders.

116.   First, Defendants are liable in the full amount of the consideration paid for the worthless coins of at least $36.8 Million USD.

117.   Second, Defendants are liable for the coin holders' losses from trading on the secondary market.

118.   Third, Defendants are liable for the entire USD value of the rentals that have taken place on the platform. These rentals should have been transacted in HelbizCoin and the coin holders would have received the benefit of the sale revenues had they been so transacted.

119.   Fourth, Plaintiffs should be awarded specific performance of the promise to create the Helbiz platform as represented in the white paper.

120.   Fifth, Plaintiffs should be awarded specific performance of the promise to make HelbizCoin the sole currency used on the platform.

121.   Sixth, Plaintiffs should be awarded specific performance of the promise to use only HelbizCoin for all Helbiz-branded or owned vehicle rentals.

122.   Seventh, Plaintiffs are entitled to an order quieting title in the equity and property of HELBIZ, awarding it to the coin holders.

123.   Eighth, Plaintiffs are entitled to a constructive trust imposed on all equity and assets of HELBIZ for the benefit of the coin holders.

124.   Ninth, the Court should grant an injunction requiring Defendants to refrain from destroying and to take all available measures to prevent the destruction of Etherium blockchain smart contract number 0xe34e1944e776f39b9252790a0527ebda647ae668.

125.   Tenth, Plaintiffs are entitled to an order prohibiting Defendants from encouraging the delisting of HelbizCoin from any exchanges and to rescind all prior requests or demands to delist it.

## THE NAMED PLAINTIFFS AND THE CLASS

126.   The Names Plaintiffs are RYAN BARRON, FILIPPO BULGARINI D'ELCI, DENIS DESARI, ILLIA CHEREST, MARAT GARIBYAN, RISHI KHANCHANDANI, DAANIILS LEBEDEUS, DONG SEOK LEE, TAREK RAHMAN, ABHISHEK SIKARIA. Each of them purchased the HelbizCoin. Some of the Plaintiffs bought HelbizCoin in the ICO, some have bought HelbizCoin on the secondary market and some have sold HelbizCoin on the second market.  All of them currently hold HelbizCoin.

59.     Plaintiffs bring this action on behalf of themselves and as a class action under Federal Rule of Civil Procedure 23, seeking damages and equitable relief for the following: "All persons and entities who purchased HelbizCoin at any time since January 1, 2018."

60.     Excluded from the class are Defendants, their employees and affiliates. Also excluded are any judge or court personnel assigned to this case and members of their immediate families.

61.     With regard to Rule 23(a) there are at least approximately 20,000 class members such that joinder is not practical. Moreover, the questions of law and fact are common to the class, the named Plaintiffs' claims are typical of the class and they will adequately and fairly represent the class.

62.     Plaintiffs seek class certification under both FRCP 23(b)(2) and (b)(3).

63.     Certification under FRCP 23(b)(2) is appropriate because the class is entitled to final injunctive relief against Defendants because they have acted, threatened to act, and refused to act in violation of the rights of the coin holders in a manner requiring the following relief for all of them:

      a.  An injunction to take all available measures to preserve Etherium smart contract number

0xe34e1944e776f39b9252790a0527ebda647ae668 and not delete it;

  b. An injunction requiring specific performance of HELBIZ's promise to accept only HelbizCoin as payment on the Helbiz app and platform;

  c. An injunction requiring specific performance of Helbiz's other promises with regard to building out the app and platform; and

  d. A declaration quieting title in the equity shares of HELBIZ and awarding them to the Class members per rata.

64.    Certification under FRCP 23(b)(3) is appropriate because Defendants have caused damages in common to all of the class members.

65.    Common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Classes.  Common questions include, but are not limited to the following:

  a.    Whether Defendants engaged in wrongful conduct as alleged herein;

  b.    Whether Defendants are the issuers of Helbiz Coin;

c.     Whether Defendants control and/or can prevent destruction of

Etherium smart contract number

0xe34e1944e776f39b9252790a0527ebda647ae668;

d.     Whether Defendants contracted build the Helbiz platform for

the benfit of the Helbiz Coin holders as alleged herein;

e.     Whether Defendants contracted to accept only Helbiz Coin for

payments for its vehicles;

f.     Whether Defendants entered into a conspiratorial agreement;

g.     Whether Defendants committed spoliation by destroying

evidence.

66.    Typicality.  Plaintiffs' claims are typical of the claims of the Class

they seek to represent because Plaintiffs and all members of the proposed Class

have suffered similar injuries as a result of the same practices alleged herein.

Plaintiffs have no interests adverse to the interests of the other members of the

Classes.

67.    Plaintiffs will fairly and adequately protect the interests of Class and

have attorneys experienced in class actions and complex litigation.

68.    Superiority.  A class action is superior to other available means for the

fair and efficient adjudication of this dispute.  The injury suffered by each Class

Member, while meaningful on an individual basis, is not of such magnitude as to

make the prosecution of individual actions against Defendants economically

feasible.  Even if Class Members could afford individual litigation, those actions

would put immeasurable strain on the court system.  Moreover, individual

litigation of the legal and factual issues of the case would increase the delay and

expense to all parties and the court system.  A class action, however, presents far

fewer management difficulties and provides the benefit of single adjudication,

economy of scale and comprehensive supervision by a single court.

69.    Claims by ERC-20 token holders are particularly amendable to class

action treatment because each movement of an ERC-20 token from one recipient to

another is recorded on the blockchain together with a digital address (called a

wallet) of the token owner. Each class member can be identified and compensated

by wallet address.

## COUNT I - BREACH OF CONTRACT

70.    Plaintiffs re-allege and incorporate every paragraph of this complaint

as if fully set forth herein.

71.    By all of the above, Defendants HELBIZ INC., SALVATORE

PALELLA, NETELLER (US) INC., SKRILL USA INC., LORENZO

PELLEGRINO, MILOS CITOVEK, JONATHAN HANNESTAD, STEFANO

CIRAVEGNA, MICHAEL COPPOLA, GIULIO PROFUMO, JUSTIN

GUILIANO, and SAEED AL DARMAKI made promises, directly and as agents

for each other, with regard to the Helbiz platform and the HelbizCoin.  These promises were made in consideration of the coin holders purchasing the HelbizCoin in the ICO and in the secondary markets.  Each member of the class either formed the contract or is the assign of a prior coin holder who formed the contract.

72.     Among other matters, these Defendants promised that HELBIZ would use the platform for all of its rentals, that the platform would use only HelbizCoin as payment for all transactions, that the platform would include an internal exchange allowing the purchase of HelbizCoin by renters, and that they would support the growth and value of HelbizCoin by performing services for the platform. Defendants, and each of them, breached some or all of the promises.

73.     Defendants also promised that the coin would be listed on public exchanges. Although it was listed for a time, Defendants have breached and caused the delisting of the coins.

74.     As a direct and proximate result, the class members were damaged by, *inter alia*: not receiving the proceeds of the transactions on the platform, lost profits in the growth of the platform that should have happened, and lost value of their coins.

75.     In addition to an award for damages already suffered, Plaintiffs are entitled to specific performance of the promises.

COUNT II – TRESSPASS AND CONVERSION OF CHATTELS

76.     Plaintiffs re-allege and incorporate every paragraph of this complaint as if fully set forth herein.

77.     By all of the above, Defendants HELBIZ INC. and SALVATORE PALELLA, acting individually and through their agents and alter egos, are threatening to destroy the Etherium smart contract 0xe34e1944e776f39b9252790a0527ebda647ae668 by which the coin holders' HelbizCoins exist. Doing so is a direct violation of the coin holders' rights to possession of the coins, without justification, and will damage the coins.

78.     HELBIZ and PALELLA are taking these actions in furtherance of their agreement amongst themselves and NETELLER (US) INC., SKRILL USA INC., LORENZO PELLEGRINO, MILOS CITOVEK, JONATHAN HANNESTAD, STEFANO CIRAVEGNA, MICHAEL COPPOLA, GIULIO PROFUMO, JUSTIN GUILIANO, and SAEED AL DARMAKI, making all of them jointly and severally liable.

79.     The class members are entitled to damages in the amount of the lost value for their coins, to punitive damages, and to injunctive relief prohibiting the destruction of the smart contract.

## COUNT III – CONSTRUCTIVE TRUST

80.    Plaintiffs re-allege and incorporate each paragraph of this complaint as if fully set form herein.

81.    By all of the above, the coin holders provided the capital to build the Helbiz platform and app and to obtain Helbiz-branded rental vehicles and to otherwise build the company and make it a success.  As a result, HELBIZ and all of its assets belong to the coin holders.

82.    Defendants have wrongfully taken these assets and converted them to their own use, including by taking the payments made in fiat currency on the Helbiz platform, which belonged to the coin holders.

83.    Plaintiffs seek an order requiring Defendants to hold these assets for the coin holders' benefit and to convey them to the coin holders.

## COUNT IV – QUIET TITLE

84.    Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

85.    HELBIZ is headquartered in this judicial district and, therefore, the shares of the company are located here. This court has jurisdiction over those shares.

86.    By all of the above, the coin holders provided the capital to build the Helbiz platform and app and to obtain Helbiz-branded rental vehicles and to otherwise build the company and make it a success.

87.    As a result, the coin holders are the owners of HELBIZ and the Court should declare them to be the owners.

## COUNT V - CONSUMER PROTECTION

88.    Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

89.    HelbizCoin was marketed as a token entitling the holders to goods, services and discounts on the Helbiz platform. These are therefore consumer goods within the meaning of NYC Administrative Code § 20-701 and N.Y. Gen. Bus. Law § 349 (McKinney).

90.    By all of the above, Defendants committed deceptive acts and practices in violation of statute and ordinance.  The coin holders are entitled to damages in an amount to be proven at trial, together with punitive damages and attorneys fees.

## COUNT VI – SPOLIATION

91.    Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

92.     By all of the above, Defendants PALELLA and HELBIZ, have destroyed evidence which they owed a duty to the coin holders to preserve.

93.     They did so with knowledge of a potential civil actions and intending to disadvantage that action.

94.     HELBIZ and PALELLA have and are taking these actions in furtherance of their agreement amongst themselves and NETELLER (US) INC., SKRILL USA INC., LORENZO PELLEGRINO, MILOS CITOVEK, JONATHAN HANNESTAD, STEFANO CIRAVEGNA, MICHAEL COPPOLA, GIULIO PROFUMO, JUSTIN GUILIANO, and SAEED AL DARMAKI, making all of them jointly and severally liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs RYAN BARRON, FILIPPO BULGARINI D'ELCI, DENIS DESARI, ILLIA CHEREST, MARAT GARIBYAN, RISHI KHANCHANDANI, DAANIILS LEBEDEUS, DONG SEOK LEE, TAREK RAHMAN, ABHISHEK SIKARIA, for themselves on behalf of all Class Members, respectfully seek from the Court the following relief:

    a.    Certification of the Class as requested herein;

    b.    Appointment of Plaintiffs as the Class representatives and their undersigned counsel as Class counsel;

c.     Award Plaintiffs and members of the proposed Class compensatory, statutory and punitive damages;

d.     Award Plaintiffs and members of the proposed Class equitable, injunctive and declaratory relief;

e.     Award Plaintiffs and members of the proposed Class pre-judgment and post-judgment interest as permitted by law;

f.     Award Plaintiffs and members of the proposed Class reasonable attorneys' fees and costs of suit; including expert witness fees; and

g.     Award Plaintiff and members of the proposed Classes any further relief the Court deems proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated: June 18, 2020

Respectfully submitted,

/s/ Karen Newirth
One of Plaintiff's Attorneys

Mike Kanovitz (mike@loevy.com) (pro hac vice forthcoming)
Karen Newirth (NY Bar No. 4115903)
Cindy Tsai (cindy@loevy.com) (pro hac vice forthcoming)
Frank Newell (frank@loevy.com) (pro hac vice forthcoming)

LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)