# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

RYAN BARRON *et al.*, for themselves and a
class of others similarly situated,

                    Plaintiffs,

    v.

HELBIZ INC., *et al.*,

                    Defendants.

No.: 1:20-cv-04703-LLS

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs, Ryan Barron *et al.*, respectfully submit this memorandum of points and authorities in support of their Motion hfor Temporary Restraining Order and Preliminary Injunction. The Motion should be granted for the following reasons:

## INTRODUCTION

Plaintiffs recently filed a putative class action complaint ("Complaint") on behalf of approximately 20,000 people who were scammed by a group of fraudsters working in concert to dupe them into purchasing a crypto currency called "HelbizCoin," also known as "HBZ" for its trading symbol. See Complaint, Dkt. 3 at ¶¶ 19-43. Two of the Defendants Plaintiffs have sued, Helbiz Inc ("Helbiz") and its main owner, Salvatore Palella (collectively, the "HBZ Defendants"), were principals in the scam and are the subject of this motion, which relates to the imminent threatened destruction of the coins.

HBZ Defendants (or their affiliates, as explained below) are about to ruin Plaintiffs' coins by destroying the computer code that allows them to exist. Specifically, HelbizCoin is a type of

cryptocurrency known as an "ERC-20" token. *Id.* ¶ 19. ERC-20 tokens are created by computer code called a "smart contract" that sits on the Ethereum blockchain network. *Id.* ¶¶ 6, 109. The smart contract is the source of the coins' functionality so, if the contract is destroyed, the coin can no longer be exchanged or spent. *Id.* The destruction cannot be undone. Therefore, Plaintiffs seek an immediate restraining order to prohibit the destruction and a preliminary injunction to continue protecting it while Plaintiffs have an opportunity to prove their case.

There are three main issues in this motion, two of which we do not expect to be in dispute. First, it is tortious to destroy the computer code that allows the coins to exist. Defendants sold these coins and transferred ownership to them and it would be a trespass to and conversion of personal property (at a minimum) to destroy their functionality. Second, the threatened destruction of personal property is a well-established basis for an injunction, and particularly so here because the contract, once destroyed, can never be restored.

The third issue is where Plaintiffs anticipate the arguments will be focused: Defendants' responsibility for the computer code. HBZ Defendants have been distancing themselves from the coin ever since its value dropped by over 99% (as the result of a pump and dump scheme they orchestrated, *Id.* Dkt. 69-96). Most recently, the represented to the Court on June 23, 2020 that "the non-party HBZ Systems PTE LTD ("HBZ Systems") [is] the company that controls the computer code for the smart contracts at issue." Dkt. 24. Plaintiffs attach to this motion a host of evidence demonstrating that Defendants' representation was false and that the HBZ Defendants are orchestrating the destruction in order to close the books on the cryptocurrency liability and make way for them to issue stock in an IPO. Some of this is evidence Defendants deleted from the public record just this week (after an unfavorable news article pointed it out) — thereby

demonstrating consciousness of guilt — but Plaintiffs believe they have accurate copies, which are included below.

The Court should issue a temporary restraining order (TRO) and preliminary injunction (PI) to preserve the status quo while Defendants and Plaintiffs litigate this case.

## FACTS

### A.    Recent Factual Developments

Before explaining the history of how HBZ Defendants created, marketed and controlled HelbizCoin, it is best to first orient the Court to what the HBZ Defendants are currently claiming about their relationship to the smart contract and their recent conduct with regard to it.

As the Court will recall, Plaintiffs filed a letter brief on June 19 and a reply on June 23, 2020 seeking expedited discovery of Defendants' control over the coin for purposes of supporting this motion (as of the filing hereof, Plaintiffs are still awaiting return on those subpoenas). Dkt. 13, 25.  In particular, Plaintiffs sought to gather evidence that the HBZ Defendants control the website on which the destruction of the smart contract was recently announced, HBZCoin.com.[1]  Counsel for Defendants filed a response opposing this discovery and claiming, *inter alia*, that "non-party HBZ Systems PTE LTD ("HBZ Systems") [is] the company that controls the computer code for the smart contracts at issue," that "HBZ Systems is a Singaporean company that is beyond this Court's jurisdiction," and that the initial coin offering for HelbizCoin "raised only 1,804.45 Ethereum, which is the equivalent of approximately $1.56

---

[1] This notice, which was attached to Defendant's Counsel's June 16, 2020 letter to Plaintiffs, states: "[I]t is with a heavy heart this journey comes to an end inevitably leading to the decision to close the HBZ Coin, delist from all exchanges followed by contract destruction. . . . [T]he HBZ smart contract will be destroyed July 31st."  The bottom of the page shows that Defendants' Counsel printed the notice from https://www.hbzcoin.com. Exhibit A hereto.

million" (insinuating that this is therefore an unimportant case). See June 23, 2020 letter from Robert Heim to Judge Stanton at 1, Dkt. 24.

The Court granted the motion on June 24, 2020 and allowed Plaintiffs to subpoena the company that owns the server farm hosting HBZCoin.com (Amazon Web Services). Three events that took place shortly after the Court's order are relevant to show that Defendants' representations to the Court were false and that the HBZ Defendants do control the smart contract.

First, the day after the Court's order, the HBZCoin.com website suddenly disappeared from the internet. See June 25, 2020 Letter to Defendants' Counsel, Group Exhibit B hereto. It was down for over 12 hours. June 26, 2020 Letter from Defendants' Counsel. *Id*. When it reappeared, it had been moved from the U.S.-based Amazon Web Service servers, where it had resided at the time of the Court's order and for two years prior, to a new server. See Exhibit C (HBZCoin.com server history showing "organization" switch on 6/25/20 until 6/29/20). Given the uncanny timing, Plaintiffs' Counsel was concerned that Defendants were destroying evidence, and so immediately wrote to Defense Counsel asking for an explanation and reminding Counsel of his clients' duties to preserve evidence. Group Exhibit B. Defense Counsel wrote back, offering assurances that no evidence was being destroyed but sidestepping Plaintiffs' Counsel's concerns over the sudden change in the server location. *Id.*

Second, on June 30, 2020, an article about this case appeared in the cryptocurrency press in which HBZ Defendants were quoted regarding the same facts they had represented to the Court in Mr. Heim's letter. https://www.coindesk.com/the-novel-legal-strategy-bringing-this-ico-backed-micro-mobility-startup-to-court (last visited 7/6/20), copy attached as Exhibit D. But rather than accept those claims at face value, the journalist investigated and found statements on

the internet that the HBZ Defendants made while promoting the coin in 2018 and that contradict their current representations to the Court. *Id.* The journalist supplied links to those statements in his article. *Id.* One of these statements was a post Defendant Helbiz Inc. published on its Facebook page promoting a January 29, 2018 interview of Defendant Palella in Bitcoin Magazine. Palella's statements in that article show that HBZ Defendants control the coin and not some third party: "*Our* presale ICO start date was January 26, 2018, at 9 a.m. EST. *We* sold 30 million tokens in 24 hours. Following that will be the launch of *our* main ICO (on a major exchange) on February 15, 2018, at 9 a.m. EST." (italics added). The 2018 Bitcoin Magazine article remains on the internet, but the sudden deletion of the post on Helbiz Inc.'s official Facebook page is an attempt to cover-up the fact that the company, through its Facebook post, endorsed Palella's statements about the coin being controlled by Helbiz.[2]

Third, on June 30, 2020 the notice on the HBZCoin.com website was altered. It now said that the company in charge of HelbizCoin had been changed from HBZ Systems PTE LTD to Quantum Analysis Management LTD ("Quantum") as the successor to HBZ Systems PTE LTD (despite Defendants' representations to the Court a week earlier). *See* Quantum Destruction

---

[2] The post is tagged "social media" in the article and was presumptively working when the journalist published it on June 30, 2020, but clicking the link now takes the user to a message on Facebook.com indicating the Facebook user deleted the post. After the deletion was uncovered, Plaintiffs' Counsel asked Defendants' Counsel for a copy of the deleted post, but Counsel refused and called it a "fishing expedition." Correspondence attached as Group Exh. E. Nevertheless, Plaintiffs' Counsel believes that the deleted post referenced this Bitcoin Magazine article because we previously searched Helbiz Inc.'s Facebook page for references to "bitcoin" which returned several posts including the post about the January 29, 2018 Bitcoin Magazine article. This search result was printed and preserved and is included in Group Exhibit G hereto ("Founder Salvatore sat down with Bitcoin Magazine to discuss Helbiz after selling +4 million within 48 [hours]"). The same search on Helbiz Inc.'s Facebook page today shows that the post from January 29, 2018 Bitcoin Magazine article is gone. https://www.facebook.com/page/1310134722389485/search/?q=bitcoin (last checked 7/6/20).

Notice, Exhibit F hereto. The Quantum Destruction Notice announced that Quantum controls the smart contract and that it is going to destroy the contract on "h. 23.59 of July 31st, 2020." *Id.* In connection with the threat to destroy the contract and render the coins useless, Quantum offered to repurchase the coins at a steeply discounted price of at $.0002 per coin based on the value of ETH today (versus the ICO price of $.15 per coin).[3] The notice contains a waiver of claims for all companies "connected" with Quantum, with no specification or identity of which "connected" companies the release is aimed at. *Id.*

Undoubtedly, Defendant Helbiz Inc. intends to argue that it is a company connected with Quantum to attempt avail itself of the release. Quantum is connected to Helbiz through Palella as both he and Quantum's proprietor, Fabio Allocco, were directors of HBZ Systems (Singapore ACRA Records for HBZ Systems PTE LTD, Group Exhibit H hereto), and Quantum is connected to Helbiz Inc. through the UCC statements it filed against all of the company's assets, including the assets to which the coin holders lay claim. Complaint ¶ 125(J); UCC Statement, Exhibit I hereto (filing and release). Although Quantum and the HBZ Defendants are likely "connected" in additional ways that will only be revealed as Plaintiffs obtain discovery, the point is clear that the HBZ Defendants benefit from the release being sought in Quantum's name.[4]

Moreover, it is a mystery why any putatively unrelated third party would care to spend its own money to acquire the Helbiz Coins (particular if it was planning to destroy them), and why it would risk liability for destroying the smart contract when it gains nothing by doing so. The

---

[3] The buy back under duress offer is discussed in the Complaint at ¶¶ 107-117 and at Page 4 of Dkt. 25-1.

[4] Of course, such a release extracted using duress (given the threat to destroy the smart contract) would be voidable by the coinholders under both New York and federal common law. See *Dantas v. Citigroup, Inc.,* 779 F. App'x 16, 20 (2d Cir. 2019); *Kovian v. Fulton Cty. Nat. Bank & Tr. Co.*, 857 F. Supp. 1032, 1037 (N.D.N.Y. 1994).

conspicuous beneficiary of this bizarre campaign of duress is not the supposed third party, but

Defendant Helbiz, as it seeks to market its shares in its announced IPO. Dkt. 3 at ¶¶ 4, 103.

**B.**    **History of Defendants' Control Over Helbiz Coin**

The smart contract on which the HelbizCoin exists is Ethereum network contract number

0xe34e1944e776f39b9252790a0527ebda647ae668. See https://etherscan.io/token

/0xe34e1944e776f39b9252790a0527ebda647ae668 (last visited 7/6/2020). The contract was

created by the wallet address: 0x8BC2Fd5355fee3f7Fb5d3A8b20996321fd5Ce80D. See

https://etherscan.io/tx/0x0c0710e92bd2d932139652f02b5c20b19cc6c370fa05fbb536ba9769680b

7957. (last visited 7/6/2020). As indicated, the creator wallet is also the only one that can destroy

the smart contract.

Although ownership of the wallet is anonymous, there is a landslide of evidence that the

HBZ Defendants are the creators of HelbizCoin and thus control the wallet.

1.     **The Whitepaper**

The official whitepaper for the coin is attached hereto as Exhibit J.  Defendant Palella is

front and center and identified as the President & Founder of Helbiz Inc. (see below):

# THE **TEAM**



**Salvatore Palella**
Founder

President & founder of Helbiz Inc. brings a
decade of experience in finance &
investments.



**Michele De Buono**
General Advisor

+15 years in development and management
of ICT startups and large companies, senior
innovations manager in Cybersecurity
strategic projects and expert in Public funds.



**Armando Calvosa**
Co-Founder

A serial entrepreneur, crypto expert and
founder of an established digital marketing
firm specializing in and advising blockchain
startups and ICO's.



**Milos Citakovic**
Co-Founder

Milos brings a decade of experience building
consumer facing technology products and is
in charge of product development.



**Michael Coppola**
Strategic Advisor

Business operator, investor, advisor. A decade
experience in mobile & enterprise technology.
Held leadership roles with $200M+ exits, &
raised over $100M in capital for startups.



**Justin Giuliano**
President Blockchain operations

Experienced fin-tech consultant with over 8
years of financial services, technology,
blockchain and management consulting
experience working for a global consultancy.



**Jonathan Hannestad**
Strategic & Creative Director

Entrepreneur with a creative tech
background; has created & executed
strategies for everything from startups to
globally recognized brands & tech companies.



**Giulio Profumo**
Investor & Advisor

Fin-tech advisor, with over 8 years of
experience in financial services, blockchain
and technology.



**Stefano Ciravegna**
Crypto Advisor

Entrepreneur, C level advisor, former private
equity investor, with several years of
experience in marrying traditional asset
classes with blockchain technology.



**Jelena Stojanac**
Community Manager

Jelena is in charge of supporting and growing
our community.



**Nemanja Stancic**
Head of Engineering

Nemanja is the head of engineering and
software development. He has over a vast
experience in building scalable platform.



**Elia Fedorovski**
Head of Growth

Elia is in charge of operations, business
development and making sure Helbiz grows
quickly while maintaining the highest quality.

*Id*. at 22.  A number of the persons identified as the "Team" still work at Helbiz Inc.  See https://helbiz.com/company-info (last visited 7/6/2020) (listing Palella, Hannestad, Profumo, Stancic, and Ciravegna as Helbiz "Leadership). Mr. Palella also signed the whitepaper:



*Id.* at 20.

The text of the whitepaper identifies Helbiz as the author of the document, states that Helbiz is the creator and offeror of the coin, and explains that Helbiz will be the recipient of sale proceeds:

• The name "Helbiz" appears at the bottom left of every page. *Id.* passim;

• Helbiz identifies itself as the creator and seller of the HelbizCoin: "TOKEN GENERATION In order to further develop the platform, Helbiz will conduct a token generation event that will offer 520.000.000 HBZ tokens of the 1 billion total supply." *Id.* at 17.

• Helbiz explains that it will use the funds from the ICO to build its app and develop its business: "The funds raised will be used for development of the Helbiz platform, business development; onboarding new car owners, rentals, dealerships, collaborate with insurance and PR & Marketing companies to raise project awareness, token usability while at the same time building a strong local community." *Id.* at 17.

• Helbiz explains that it invented the HelbizCoin: "The choice to create a native token for Helbiz transactions is not casual. A hard-coded economic logic can create immense value, but has risks. If the economic logic is well designed, it drives rapid growth. If poorly designed, it could create friction in the product. The conclusion of our careful analysis was that only a native token allows HELBIZ to optimize for the 3 desired objectives." *Id.*

• Helbiz claims that it obtained a legal opinion approving the offering and that investors can contact it to get a copy: "RHT LAW is Helbiz (sic) Singapore-qualified legal counsel. A copy of the legal opinion issued in support thereof may be obtained from Helbiz upon request."[5]

• The last page of the whitepaper directs inquiries to an email address at Defendant Helbiz's corporate website address, "EMAIL: Coin@Helbiz.com" *Id.* at 23, and uses the street address for Defendants Helbiz's Singapore office:



---

[5] Helbiz is incorporated in Delaware and headquartered in New York, but it opened an office in Singapore and apparently believed this sufficed to avoid application of U.S. laws to their ICO. http://helbiz.com/company-info. See also Dkt. 3. at ¶¶ 16, 125(B), 125(C), 125(M). Further, HBZ Systems PTE LTD was not even incorporated until February 7, 2018, after the ICO pre-sale was already in full swing. See HBZ Systems incorporation record, Group Exhibit H.

Compare http://helbiz.com/company-info (last visited 7/6/2020). In addition to the email address on Helbiz.com, the last page of the whitepaper also identifies Defendant Helbiz Inc's official social media channels:



2.      **HBZ Defendants' Admissions**

        (a)      Statements in the press and social media

 The January 2018 Bitcoin Magazine article and deleted Facebook post discussed at page 5, above, are just one of numerous statements made by the HBZ Defendants indicating that they are the issuers of the Helbiz Coin and control it. The following are additional examples, ample to prove the point, but they are in no way exhaustive.

                i.      The June 2018 issue of ANSA Magazine

Palella is quoted in the June 2018 issue of the Italian magazine ANSA:

> "Just when we were close to the launch [of Helbiz], the cryptocurrencies exploded explains the CEO, in Milan in view of the launch of the application in Italy expected "next November". So "we decided to create our cryptocurrency with an initial coin issue" that is an ICO (initial coin offering) raising "38 million dollars."

*See* https://www.ansa.it/sito/notizie/economia/criptovalute/2018/06/06/auto-in-italia-entro-2018-app-per-noleggio-tra-privati_a491df67-31dd-42a0-8447-5ab2b2efd59e.html (last visited 7/6/2020).[6] Palella posted a link to the article on his Facebook page at the time it came out. https://www.facebook.com/palella/posts/1853162801372331 (last visited 7/4/20).

---

[6] The article is written in Italian but can be translated on google translate by cutting and pasting the following URL into a web browser: https://translate.google.com/translate?sl=it&tl=en&u

### ii.    Palella's June 11, 2018 Tweet

Palella tweeted boastfully from his Twitter account on June 11, 2018: "I appreciate all the requests from funds and investors about investing in @Helbizofficial, but due to the #ICO we are not looking for outside investment. We are now only focused on launching and scaling operations, creating value for early investors and the #HBZ coin. #Helbiz." Defendant has since deleted his statement but a copy of the Tweet is attached as Exhibit L hereto.[7]

### iii.    Palella's April 26, 2018 Facebook post

On April 26, 2018, Palella posted to his Facebook page another article published about Helbiz and the HelbizCoin in the Italian press. https://www.facebook.com/palella/posts/ 1811697618852183 (last visited 7/6/20).[8] The article discusses the fact that Defendants Lorenzo Pellegrino, Skrill and Neteller are partners with Defendant Helbiz in promoting the Helbiz Coin and quote Pellegrino attributing the coin to Helbiz:

---

=https%3A%2F%2Fwww.ansa.it%2Fsito%2Fnotizie%2Feconomia%2Fcriptovalute%2F2018%2 F06%2F06%2Fauto-in-italia-entro-2018-app-per-noleggio-tra-privati_a491df67-31dd-42a0- 8447-5ab2b2efd59e.html (last visited 7/6/2020). Translated copy also attached as Exhibit K hereto.

[7] Most startups are starved for cash and certainly do not burn bridges by publically rebuffing equity funds who approach and offer to give money. So this tweet seems bizarre. However, Plaintiffs allege the context in which it makes sense: Palella sent this tweet as a part of a pump and dump scheme to induce small investors to buy the coins as the Defendants dumped them in secondary markets. Palella was simply manipulating the buyers by creating the impression that Helbiz was so well capitalized and successful that it needed no more money. See Dkt. 3 at ¶¶ 69- 96 (describing the arc of the pump and dump scheme).

[8] Palella's post links to https://www.affaritaliani.it/economia/blockchain-criptovalute-helbiz- coin-scambiata-su-coinhub-bitlish-537202.html which can be translated on google translate at https://translate.google.com/translate?hl=&sl=it&tl=en&u=https%3A%2F%2Fwww.affaritaliani. it%2Feconomia%2Fblockchain-criptovalute-helbiz-coin-scambiata-su-coinhub-bitlish- 537202.html%3Frefresh_ce (last visited 7/6/2020). Translated copy also attached as Exhibit M hereto.

The announcement of the start of the exchanges of Helbiz Coin took place in the London offices of Paysafe (Skrill, Neteller & Income Access), a company with which Helbiz has started a close collaboration for the development and widespread diffusion of the digital currency. . . .

Lorenzo Pellegrino, CEO of the Paysafe division which includes the Skrill brands NETELLER & Income Access commented: "Considering the rapid growth of the Helbiz community and the substantial number of tokens already distributed, we are excited about the launch of Helbiz Coin and we are working closely contact with the Helbiz team to develop a wider partnership, with the aim of promoting the spread of this digital currency globally. "

BLOCKCHAIN SCENARIO FOCUS

The project promoted by Helbiz attests the ongoing evolution in the blockchain sector. . .

iv.     Palella's April 27, 2018 Facebook Post

On April 27, 2018, Palella posted a link on his Facebook page to a new Bitcoin Magazine article announcing in the post: "Today we release a new update about #Helbiz and #HelbizPay on Bitcoin Magazine." See https://www.facebook.com/palella/posts/1813240032031275 (last visited 7/6/20).  In the article, Palella again makes clear that he and Helbiz Inc. control HelbizCoin:

When asked about Helbiz development road map, Palella added, "We have been fortunate to secure numerous partnerships over the last month for the overall ecosystem, allowing us to significantly improve the use of *our* Helbiz token, both from an integration, transaction and partnership perspective, even beyond the transportation sector. Paired with our transaction wallet application, we believe that *our* token offers wide and seamless use of the ability for third parties to integrate."

Currently, Helbiz is working directly with the internet payments and money transfer company Skrill and their CEO, Lorenzo Pellegrino, on a large-scale partnership, with the goal of promoting the mainstream adaptation of digital currencies, and in particular their use and integration through Helbiz. According to Palella, this partnership, along with a few other integration opportunities in the works, could eventually make *Helbiz* one of the most widely accepted digital currencies in the world.

https://bitcoinmagazine.com/articles/helbiz-blockchain-and-new-future-mobility (last visited 7/6/20) (italics added).

(b)     Defendants' Statements on the Helbiz Inc. website: Helbiz.com

From the outset, the HBZ Defendants were advertising the HelbizCoin on the official Helbiz corporate website. An archive of Helbiz.com taken on January 25, 2018 advertises for the HelbizCoin, stating: "HELBIZ TOKEN (HBZ) The Helbiz coin is a consumptive token that aims to be the preferred currency for transportation services globally, from cabs and cars to trains and flights – if it transports people Helbiz will be a payment option". https://web.archive.org/web/20180125093649/http://www.helbiz.com/ (last visited 7/6/20). Immediately beneath this quote on Helbiz.com is a button "LEARN MORE" which takes the user to the ICO website: Helbizcoin.io.

(c)     Statements on Helbizcoin.io

The actual sale of the coins was conducted on the website buy.helbizcoin.io. The website was taken down following the sale, but an archive of the site taken on February 2, 2018, during the period when the ICO was live, shows that it featured Defendant Palella prominently as the "Founder."

Helbiz is decentralizing the sharing economy,
ensuring lower prices and higher earnings for all users,
while monetizing the data for the individual user

SALVATORE PALELLA - FOUNDER

https://web.archive.org/web/20180207190650/https://www.helbizcoin.io/ (last visited 7/6/2020). The archive also contains a "Helbiz Roadmap" that identifies a timeline of conduct by Defendant

Helbiz from the start of the project in 2017, to Q1 2018 ("ICO. . . MVP of Helbiz . . . Launch in NY"), and Q3 2018 ("Helbiz app expansion to a second city in US"), Q1 2019 ("Helbiz app expansion in 4 additional cities in US"). *Id.* It also lists the "The Helbiz Team" with the same current Helbiz employees as in the whitepaper. *Id.*

As Plaintiffs explained in their motion for expedited discovery, there is a great degree of overlap between the internet identity for Helbiz.com, helbizcoin.io and HBZCoin.com (as well as a fourth website associated with Mr. Palella, SP1Capital.com). Dkt. 13 at 2-3. Briefly, all four sites are registered with the same internet registrar, all use the same proxy company to hide the identity of the owner, and all are housed at the same Amazon server farm. *Id.* Or at least that *was* true of all four websites at the time of the motion, but someone, likely HBZ Defendants as explained below, moved the HBZCoin.com website the day after this Court allowed a subpoena for the server information. Exhibit C. Although it appears to have been moved back (Exhibit C, entry for 6/29/2020) following Plaintiffs' Counsel's letter to Defendants' Counsel (Exhibit A), the effect of the sudden move on the subpoenaed data remains unknown. Plaintiffs believe that the documents will shed light on HBZ Defendants' involvement in the HBZCoin.com website and its uncanny relocation the day after the Court ruled, but are filing this motion without the benefit of the subpoenaed documents in order to ensure that the Court has time to act before the July 31 destruction date.

### 3. Helbiz Inc's Involvement in Coding HBZCoin.com

After the HBZCoin.com website was taken down and relaunched in the wake of the Court's discovery order, *see* discussion *supra* at 4, Plaintiffs had the website code examined by a data scientist, Adriano Marques. *See* Marques Declaration ¶ 1-9, Exhibit N hereto. The result of the examination shows that the code bears the fingerprints of Helbiz's involvement in the

creation and modifications to the website, not some third party, further demonstrating that the announcement in the name of Quantum is just a front and that Helbiz controls the coins.

In particular, Marques examined the files that are created when a website engineer uploads code to the server that houses the website or modifies that code. Id. ¶¶ 2-5, 7-9. These uploads identify the engineer uploading the code, *id.*, and the path for HBZCoin.com appears to have come from a Helbiz Inc. software engineer named Carlos Beltran. Id. ¶ 5 (noting the file path /Users/carlos/Desktop/helbiz/hbz-redemption). Indeed, someone, most likely Mr. Beltran, later revised the file path so as to remove the name "Helbiz" and substitute "HBZ" in the revised file path. *Id*. ¶ 8-9 But the engineer making the revision still followed the exact same path convention and used the exact same file name as before (/Users/cbbc/Dessktop/hbz/hbz-redemption) indicating that the same engineer likely made the changes. *Id.* The change from Helbiz to HBZ in the code suggests a purposeful attempt to cover-up the involvement of Helbiz in the destruction notice supposedly posted by (the putatively independent) Quantum and the swap supposedly conducted by it. Not only that, but the user account that made the recent changes also appears to be a palindrome of Carlos Beltran's initials "CBBC." *Id*. ¶ 8.

## ARGUMENT

### A.    Legal Standard

To grant preliminary injunctive relief, a court must find that the moving party has shown: "(1) a likelihood of success on the merits or ... sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d

887, 895 (2d Cir. 2015) (internal quotation marks omitted). All four of these factors clearly favor Plaintiffs here.[9] "In the Second Circuit, the standard for a temporary restraining order is the same as for a preliminary injunction." *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997).

**B.      Likelihood of Success on the Merits**

Destruction of the smart contract constitutes a straightforward trespass to chattels. Plaintiffs are highly likely to succeed on this claim. Under New York Law, a "trespass to chattel occurs when a party intentionally damages or interferes with the use of property belonging to another." *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 437 (2d Cir. 2004) (internal quotation marks and citation omitted). New York recognizes two varieties of interference: "'dispossessing another of the chattel' or 'using or intermeddling with a chattel in the possession of another.'" *Id*., quoting the Restatement of Torts (Second), § 217.

Destruction of the smart contract No. 0xe34e1944e776f39b9252790a0527ebda647ae668 will dispossess the coin holders of their HelbizCoin (even though they hold the coins in their own digital wallets) because the coins exist, and can only function, as a result of the contract. Deleting the code by virtue of which the coins exist is a trespass and Defendants cannot seriously argue otherwise. See *Davidoff v. Davidoff*, 12 Misc. 3d 1162(A), 819 N.Y.S.2d 209 (Sup. Ct. 2006) (finding that deletion of data can constitute trespass to chattels). Having taken money from the coin holders and transferred possession to the coins to Plaintiffs, Defendants cannot destroy that property (even by a remote keystroke) without violating the Plaintiffs' rights of possession

---

[9] Plaintiffs acknowledge that some of the evidence they adduce in support of their Motion may qualify as hearsay. But that should not preclude the Court's consideration of such evidence at this stage of the proceedings, as "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).

and ownership. Neither may they transfer the keys to the wallet that controls the smart contract and allow another to destroy it.

## C.    <u>Irreparable Harm</u>

Plaintiffs will suffer irreparable harm if an injunction does not issue. "[T]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted). If money damages would constitute an adequate remedy at law, injunctions are not available except under "extraordinary circumstances." *Id*.

There is nothing remote or speculative about the harm Plaintiffs will suffer if Defendants delete the Etherium smart contract underlying HelbizCoin, as planned. On the contrary, Defendants have announced a date by which this will occur: July 31, 2020. There are multiple reasons why the harm is irreparable and damages insufficient. Once the contract is destroyed, it can never be reinstated, and the Helbiz Coin will cease to exist.[10] Moreover, Plaintiffs will never have the chance to benefit from any future appreciation in the value of the HelbizCoin or any future deployment of such Coin as a medium of exchange in the manner originally advertised by Defendants (both of which Plaintiffs believe would be possible if they are successful in securing specific performance, among other remedies sought in this suit).

---

[10] In this way, this suit bears similarity to contract cases in which courts have found specific performance to be a proper remedy because the damages would be insufficient to allow the aggrieved party to "cover" or acquire comparable goods. *Cf. Copylease Corp. of Am. v. Memorex Corp.,* 408 F. Supp. 758, 759 (S.D.N.Y. 1976) (inability to cover like product made specific performance appropriate).

**D.     Balance of the Hardships**

The balance of the hardships also favors Plaintiffs. Defendants cannot argue that refraining from doing something — deleting the smart contract— imposes undue burdens on them. There is no cost to just leave the code sitting on the Ethereum blockchain.  It is more of a burden to destroy the contract than to do nothing.

By contrast, the hardships to Plaintiffs of failing to issue an injunction would be serious, resulting in the effective loss of all value for their coins. Moreover, it would leave the coinholders subject to the Defendants' use of duress in the offer to buy the coins at $.0002 per coin before they destroy the contract and render them entirely useless.

**E.     Public Interest**

Here, issuance of the sought-after injunction would advance the public interest. It is certainly in the public interest to protect personal property from illegal and needless interference by others.  It is also in the public interest to ensure buyers of digital coins that the seller cannot ruin them after the sale by destroying the smart contract.  There are, at preset, almost one thousand different ERC-20 tokens in circulation, *see* https://etherscan.io/tokens?p=1 (last visited 7/6/2020), and the total market capitalization of all traded cryptocurrencies is approximately $250 billion. *See* https://coinmarketcap.com/charts/ (last visited 7/6/2020). If coin purchasers had to fear that the coin issuers could destroy their coins whenever it was against the issuers' interests to allow the coins to continue, the value of this market would drop precipitously and it would be difficult if not impossible for future issuers to raise funds by selling the coins.  In other words, there is a very strong public interest in enjoining the threatened destruction of a smart contract after the coin issuer has sold the coins.

By contrast, Defendants cannot identify a single *legitimate* private interest (much less a public interest) in threatening destruction of the contract, nor in the actual destruction of the computer code that allows the coin to continue to exist.

**F.    Fashioning the Injunction Order**

The facts set out above demonstrate that the HBZ Defendants are the creators of Helbiz Coin. That alone is sufficient for issuance of the injunction.  As the issuers, they have no right to destroy the smart contract, nor can they authorize, direct, or act in concert with another party to do so. The Court can and should issue the injunction to the HBZ Defendants on this basis alone. *See*, *e.g.*, *NML Capital, Ltd. v. Republic of Argentina*, No. 08 CIV. 6978 TPG, 2012 WL 5895786, at *5 (S.D.N.Y. Nov. 21, 2012), *aff'd*, 727 F.3d 230 (2d Cir. 2013) (finding "reasonable" an injunction that would bind third parties "in active concert or participation" with the defendant), citing Fed. R. Civ. P. 65(d)(2) (which explicitly allows injunctions that bind, *inter alia*, "the parties' officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation" with the parties or their above-mentioned associates).

But it is also true that there is additional evidence of HBZ Defendants' involvement and control: (1) the timing of the movement of the HBZCoin.com website server immediately following this Court's June 24, 2020 discovery order over HBZ Defendants' objection; (2) the file upload path on HBZCoin.com demonstrating that Helbiz Inc. engineer Carlos Beltran is responsible for the content of HBZCoin.com; (3) HBZ Defendants' recent deletion of their social media posts connecting them to the coin; and (4) the fact that HBZ Defendants are the direct beneficiaries of the threat to destroy the contract, as it coerces the coin holders to sell and clears a path for the company's IPO. Accordingly, the Court should enjoin HBZ Defendants as follows:

1.    Preserve smart contract number
      0xe34e1944e776f39b9252790a0527ebda647ae668;

2.   Refrain from requesting that any other party destroy the contract and rescind any prior requests to do so;

3.   Take all available measures to protect the smart contract from destruction.

4.   Modify the HBZCoin.com website to remove the threat to destroy the contract.

**G.    Expedite Briefing, Allow Plaintiffs' Reply and a Hearing to Take Testimony From Defendant Palella, Carlos Beltran and Others**

Plaintiff requests that the Court expedite briefing on this motion, requiring Defendants to respond by 7/10 and Plaintiffs to Reply by 7/14. After the briefing, if testimony could elucidate the issues in dispute, Plaintiffs request that the Court hold a hearing on or before 7/21/2020 to allow time for a ruling prior to the threatened destruction date.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should grant a temporary restraining order and a preliminary injunction.


Dated: July 6, 2020

Respectfully submitted,

/s/ Karen Newirth
Karen Newirth


Karen Newirth (Karen@loevy.com
Michael Kanovitz (mike@loevy.com, *pro hac vice pending*)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
312.243.5900