**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYAN BARRON, *et al.* , for themselves and a class of others similarly situated,<br><br>                                        Plaintiffs,<br><br>     v.<br><br>HELBIZ INC*. et al.*,<br><br>                                        Defendants. | Civil Action No.: 20-cv-04703<br><br><br>Hon. Louis L. Stanton,<br>District Judge |

<u>**PLAINTIFFS' MEMORANDUM IN RESPONSE TO THE COURT'S LETTER RE**</u>
<u>***Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869 (2010)**</u>

Plaintiffs respectfully submit this memorandum in response to this Court's July 22, 2020 letter (Dkt. 64) regarding the applicability to this action of the Supreme Court's holding in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 130 S. Ct. 2869 (2010). At base, this case is about obtaining a remedy against New York-based defendants in the courts of their home state for conduct that gave rise to a host of potential claims. *Morrison* only applies to a subset of the potential claims — those arising under a federal statute, and says nothing about common law and state statutory claims moving forward where there is jurisdiction over the defendants.

While Plaintiffs did not allege federal counts, assuming that federal claims are stated in the Complaint anyway, Plaintiffs begin by explaining why the facts alleged in the Complaint, and/or facts which could be added by amendment, provide sufficient basis to infer that the transactions in question involve the requisite degree of U.S. nexus under *Morrison*. Plaintiffs then explain why the "transactional test" from *Morrison* is not the governing framework for the counts currently listed in the Complaint that do not arise under the Securities Exchange Act.

*Morrison* is not a case about the boundaries of this Court's jurisdiction; rather, it sets a nexus pleading standard for claims brought under the Securities Exchange Act. 561 U.S. at 254 ("[T]o ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case.") (internal quotation marks omitted).

Plaintiffs next address the relationship between the state-law claims they have brought and the preemption standards under the Securities Litigation Uniform Standards Act (SLUSA), 15 U.S.C. § 78bb(f)(1). Specifically, none of the prerequisites necessary to invoke preemption is present here. Accordingly, Plaintiffs' state-law claims should not be dismissed on the basis of *Morrison* under any circumstances. *In re Kingate Mgmt. Ltd. Litig.,* 784 F.3d 128, 142-43 (2d Cir. 2015) (non-preempted state-law claims should be severed and allowed to move forward). The fact that the Second Circuit has declined to extend *Morrison* to state-law claims provides yet further support for allowing non-preempted state-law claims to proceed. *See, e.g.*, *id.* at 133 n.3.

Finally, in the event that the Court finds that *Morrison* and/or the federal securities laws do bar some or all of Plaintiffs' claims, Plaintiffs should be allowed to cure by amendment, including to add facts and other potential federal causes of action.

I.      **Plaintiffs' Allegations Provide Sufficient Basis for Inferring that *Morrison's* "Transactional Test" Is Satisfied**

    A.      ***Morrison* and its Second Circuit Progeny Establish a "Transactional Test" for Securities Exchange Act Claims**

In *Morrison*, the Supreme Court faced the question whether foreign plaintiffs bringing claims over sales of foreign securities on a foreign exchange could use Sec. 10(b) of the Securities Exchange Act for a remedy. 561 U.S. at 250-52. The Court emphasized that there is a presumption against the extraterritorial application of federal legislation absent a clear statement

to the contrary. "[U]nless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions." 561 U.S. at 255 (internal quotation marks omitted).

Applying that general principle to Sec. 10(b) of the Securities Exchange Act and implementing regulation 10b-5, the Court found such a clear statement lacking, and therefore held that the statute did not have extraterritorial effect. *Id.* at 265. The Court then examined the domestic conduct that was the "concern" of the statute, finding that the statute's "focus" was "purchases and sales of securities in the United States." *Id.* At 266. Accordingly, the Court announced a new "transactional test" to determine the scope of the statute: "Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* at 269, 273.

Because in the case before it, "all aspects of the purchases complained of . . . occurred outside of the United States," the Court found that the plaintiffs failed its transactional test and therefore Sec. 10(b) and Rule 10b-5 did not apply. *Id.* The Court also made clear that this shortcoming did *not* affect the federal courts' subject-matter jurisdiction to hear the case. Rather, plaintiffs' failure to satisfy the transactional test simply meant they had not stated a claim upon which relief could be granted under the Securities Exchange Act. *Id.* at 253-54.

Assuming that Plaintiffs' complaint is construed to include a Securities Exchange Act claim (in addition to Plaintiffs' multiple state law theories), the Court needs to determine the locus of the relevant transactions under the plausibility standard on a motion to dismiss. *Giunta v. Dingman*, 893 F.3d 73, 80 (2d Cir. 2018). As the Second Circuit has interpreted *Morrison,* this would require a finding of at least one of the following: "the parties incur[red] irrevocable

liability to carry out the transaction within the United States" or that "title [to the coin was] passed within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2012).

A wide range of facts can bear on the question of "where irrevocable liability was incurred or legal title transferred… 'including but not limited to, facts concerning the formation of contracts, the placement of purchase orders, … or the exchange of money.'" *In re Petrobras Sec.,* 862 F.3d 250, 262 (2d Cir. 2017) (quoting *Absolute Activist*, 677 F.3d at 70). And at the 12(b)(6) stage, as always, the Court must "draw[] all reasonable inferences in the plaintiffs' favor." *Giunta* 893 F.3d at 79 (2d Cir. 2018).

### B.   Plaintiffs' Complaint Meets the Criteria of *Morrison* and *Absolute Activist*

As discussed above, to determine the locus of the relevant transactions, the controlling test is whether "the parties incur[red] irrevocable liability to carry out the transaction within the United States" or if "title [was] passed within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2012). The facts Plaintiffs allege, and/or which can be alleged, support an inference of a sufficiently domestic transaction under either prong.

As for "domestic transactions" under the irrevocable liability prong, the Complaint ¶¶ 19-27 alleges that New York-resident Palella, by, through, and on behalf of his New York-headquartered business, Helbiz, orchestrated the ICO on Helbizcoin.io, which at the time of the coin sales was housed on a server located in Kansas. Compl. ¶ 25. Plaintiffs have also adduced evidence that, despite any representations to the contrary, Palella owned and controlled Helbizcoin.io during the ICO, registering it in Helbiz's name. *See*, *e.g.*, Dkt. 54.[1] *Cf. In re Tezos*

---

[1] On July 31, the Helbiz Defendants filed a purported motion to dismiss attaching evidence that is not only extraneous to the complaint and thus inappropriate on a 12(b)(6) motion, but also shaky, incomplete, highly disputed and ripe for discovery. For example, Defendants contend that the ICO was conducted by a Singaporean corporation, but Plaintiffs contend that the arrangement is a sham: Plaintiffs have alleged

*Sec. Litig.,* No. 17-CV-06779-RS, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018) (finding a "domestic transaction" where *inter alia* the plaintiff purchased cryptocurrency from an "interactive website" that was "run primarily by [the defendant] in California").

More broadly, all transactions in HelbizCoin during the ICO and on the secondary market could only be completed via Ethereum, and those transactions occur within the United States. *See In re Tezos Sec. Litig.,* No. 17-CV-06779-RS, 2018 WL 4293341, at *8 (noting the transactions must be "validated by a network of global 'nodes' clustered more densely in the United States than in any other country."). The Ethereum blockchain is a global network of decentralized ledgers or "nodes," which must jointly agree to cause the coin to transfer from one owner's address to another's on the blockchain. *See* Ethereum White Paper, https://ethereum.org/ en/whitepaper/ ("A commonly asked question is 'where' contract code is executed, in terms of physical hardware. This has a simple answer: . . . the code execution spawned by [a] transaction will be executed by all nodes . . ."); Virginia Cram-Martos, Presentation to WTO, *What Is Blockchain and DLT?,* at 16, https://www.wto.org/english/res_e/reser_e/ 01_a_virginia_cram-martos_final_wto_2019-1202.pdf (noting that on the Ethereum blockchain, "all nodes participate in the consensus process" used to validate any new data). The Ethereum blockchain clearly has more nexus to one country than any other: the United States, home to by far the most Ethernodes

---

ample facts to make that showing plausible (*e.g.* Compl. ¶¶ 16, 125B, 125C, 125M) and also provided the Court with other evidence to that effect (such as Palella's direct ownership of the ICO website; an official Singapore ACRA filing that the front company never did business, contrary to their affidavits; and Palella's many public statements contradicting the involvement of the front company and the amount of the ICO) in their briefing on the Preliminary Injunction and request for evidence preservation. *See, e.g.*, Dkts. 31-1, 31-10, 54. The evidence that the Helbiz Defendants attached to their motion to dismiss could at best be raised in a doomed motion for summary judgment, but it is certainly useless at the pleadings stage. To the extent that the Defendants attempt to rely on any of that evidence in their discussion of *Morrison*, it is just as fruitless. The Court should consider it on the *Morrison* question, if at all, only in an orderly fashion after Plaintiffs are given their opportunity for discovery. Plaintiffs intend to address the flimsy evidence further in responding to the Helbiz Defendants' motion to dismiss.

and almost twice as many as the country with the next-highest number, China. *See* https://ethernodes.org/countries.

The Court in *Morrison* did not foresee (nor could it) blockchain-based contracts that require execution on computers in multiple countries to take effect. But that does not change the fact that involvement of the Ethernodes in the United States was not only necessary to complete the transaction, they in fact played a more central role in the digital transaction of the HelbizCoins than those of any other country.[2] *Cf. Myun–Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60 (2d Cir. 2018) (finding that trades in South Korean securities executed by South Korean traders placing orders from South Korea nonetheless "incurred irrevocable liability" in the United States for Morrison purposes because they were "matched" with counterparties via the electronic CME Globex trading platform in Illinois). Wherever else the relevant transaction may have been contemporaneously added to the blockchain, it certainly also executed within the territorial limits of the United States.

Similarly, under the transfer of title prong, title does not transfer until the specific coins themselves transfer from one wallet address to another. *See First Nat. Bank v. State of Texas*, 87 U.S. 72, 22 L. Ed. 295 (1873)("A note payable to bearer . . . passes by delivery the legal title to the holder"); *see also* N.Y. U.C.C. Law § 2-401 (McKinney) ("(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract. . . .(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his

---

[2] Plaintiffs note that the Court need not hold that *all* transactions that take place on the Ethereum blockchain are sufficiently domestic for purposes of *Morrison*. Rather, under conditions where the transaction involved U.S.-based actors and extensive U.S.-based activities, as here, the concentration of Ethereum nodes in the United States should suffice to keep the contract within the purview of U.S. laws. Such an approach would allow the Court, as it must, to "proceed cautiously in applying teachings the *Morrison* Court developed in a case involving conventional purchases and sales of stock" to more complex transactions. *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE,* 763 F.3d 198, 214 (2d Cir. 2014). Furthermore, unlike in *Parkcentral,* the instruments purchased in this case were "pegged" (if at all) to the performance of a U.S.-based company, Helbiz.

performance with reference to the physical delivery of the goods"). On Ethereum, purchase coins are specified and transferred when the nodes in the United States agree (amongst themselves and with other foreign nodes) to note on the shared ledger the address change for those specific coins to the buyers' wallet. *See supra* at 5-6. Thus, the transfer of title takes place in the United States. This is true of every transaction of HelbizCoins from the ICO to the trading in the secondary market (and even to the recent swap offer, mis-described in Defendants' filings). Even though nodes in other countries must also be involved to effect the transfer of title, the requirement for U.S. nodes establishes that the law is not being exercised on a transaction outside the United States. Indeed, because the United States is by far the largest center of Ethereum nodes, the transaction takes place even more so in the United States than in any other country.  The only other court that appears to have confronted the applicability of *Morrison* to an Ethereum-based transaction reached the same conclusion as Plaintiffs urge here. *See In re Tezos Sec. Litig.,* No. 17-CV-06779-RS, 2018 WL 4293341, at *8. *Cf. Securities and Exchange Commission v. Traffic Monsoon,* LLC, 245 F.Supp.3d 1275, 1296 (D. Utah 2017) (where non-exchange listed securities are offered and sold over the internet, the sale takes place in both the location of the seller and the location of the buyer for purposes of SEC's 10(b) enforcement.).

To summarize, this case is about U.S.-based defendants using a U.S.-based business to sell, and cause to be sold, virtual tokens that acted as a contractual claim upon services of that U.S.-based business. And the sale of that virtual currency was executed on a network of digital nodes that have more nexus to the U.S. than to any other country. "At the pleading stage, it is sufficient for the plaintiff 'to allege facts leading to the plausible inference' of a domestic transaction." *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018). Taken together, and with all

reasonable inferences drawn in Plaintiffs' favor, Plaintiffs have alleged more than enough facts to meet this standard.

### C.  Plaintiffs Can Plead Additional Facts to Cure Any Deficiencies

To the extent the Court finds that some or all of Plaintiffs claims nonetheless require additional allegations in order to satisfy the *Morrison* standard, Plaintiffs are prepared to replead to cure those deficiencies and request the opportunity to do so. First, additional allegations about the Helbiz Defendants' interactions with investors or counterparties within the U.S. are appropriate (despite Helbiz's declarations falsely claiming otherwise) and could shed light on where the "meeting of the minds" occurred. *See., e.g.,* www.eventbrite.com/e/helbiz-mobility-system-event-nyc-tickets-42254532444?aff=estw# (invitation for U.S. investors to attend a Jan. 24, 2018 event hosted by Helbiz about the ICO in New York: "Enjoy complimentary beverages, amazing food and even better networking and conversation on blockchain technology, cryptocurrency and how the Helbiz ICO will disrupt the sharing economy and transportation sector… CIPRIANI 55 WALL STREET"). Any oral promises made at such meetings would add further weight to the domestic nature of the relevant transactions. *Cf. Giunta v. Dingman*, 893 F.3d 76-77, 80-81(2d Cir. 2018) (finding that an oral agreement reached in New York constituted a "domestic transaction" under *Morrison).*

Likewise, while the Complaint does not allege the server location of sales on exchanges after the ICO, this too is something that Plaintiffs can add by amendment if needed. For example, the IP address from Coinhub.io, an exchange that listed HBZ, is located on the same Kansas server farm as Helbizcoin.io. See https://securitytrails.com/domain/coinhub.io/dns (identifying IP address 104.20.159.55 for Coinhub.io) and https://whatismyipaddress.com/ip/104.20.159.55 (locating that address in Kansas). This is unsurprising since that the server farm is associated

with Amazon Web Services and many online businesses use those servers. Similarly, the subpoena responses have revealed that Defendant Palella owned a crypto exchange called Babylonia that also transacted HBZ. Plaintiffs did not have this information at the time of filing the Complaint (indeed Helbiz publicly claimed there was no connection to Babylonia) but would certainly add the allegations by amendment. Further, although the citizenship of the persons transacting in HBZ is not dispositive of the location of the transaction, it is also true that U.S. citizens did transact in HelbizCoin. Plaintiff Barron, for example, is a U.S. Citizen and Helbiz itself is a U.S. corporation that transacted in the coins after the ICO. According to Palella, Helbiz held hundreds of millions of HelbizCoins with which it paid its partners and, plaintiffs allege, sold for dollars.[3] So these transactions by Helbiz are also U.S.-based transactions in HelbizCoin.

These and other facts may aid the court in its analysis. Particularly given that Plaintiffs did not include a count under the Securities Exchange Act, they should be given an opportunity to replead to cure any deficiencies identified and to provide the Court more information about the domestic nature of the relevant transactions. *Cf. Pope Investments II, LLC v. Deheng Law Firm,* No. 10 CIV. 6608 LLS, 2012 WL 3526621, at *8 (S.D.N.Y. Aug. 15, 2012) (Stanton, J.) (granting leave to replead after dismissing 10(b) claims on *Morrison* grounds).

---

[3] When rumors started circling that Helbiz and the insiders were dumping HelbizCoins, Palella claimed on the official Medium.com site that "Helbiz currently holds 48% of the total token supply . . . . We encourage everyone to use a bit of common sense, and not see every happening as an intentional action by the company and myself. . . .[W]ith HBZ as an integrated core part of all transactions, we truly believe that HBZ will cross $10/HBZ in the near future…" Later in 2018 Helbiz stated on the same site: "All partners of Helbiz projects, large and small, are compensated in HBZ.  Transactions are made to their respective accounts on various exchanges, even if the partners usually only accept fiat. It is a requirement of Helbiz to compensate its partners in HBZ *only*." (italics in original).

II.      *Morrison* **Does Not Provide a Basis for Dismissing Plaintiffs' Common-Law and New York Statutory Claims**

A. *Morrison* **only provides the applicable framework if the Securities Exchange Act completely preempts Plaintiffs' claims.**

While Plaintiffs contend that there are enough allegations in the complaint and facts thus far in the record to support a plausible inference of a sufficiently domestic transaction, *see supra*, Plaintiffs respectfully suggest that neither the *Morrison* nor *Absolute Activist* test is relevant to the common law and state statutory claims in the case. Unless a federal statute preempts plaintiffs' state-law claims, the question at the 12(b)(6) stage is whether plaintiffs have plausibly alleged violations of common law (such as breach of contract and trespass to chattels) and the state unfair practices statute.

The Court observed in its July 22, 2020 letter that "acts… pleaded in the complaint… appear to violate the Securities Exchange Act." And the Court is of course correct to note that federal courts are directed to grant relief "to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). At this stage, Plaintiffs take no position on the question whether HelbizCoin would qualify as a "security" for purposes of the Securities Exchange Act, or indeed whether defendants may ultimately be liable to Plaintiffs for violations of that statute. But if *Morrison* or any other rule of law dictates that plaintiffs are *not* entitled to relief under the Securities Exchange Act, that is not a basis for dismissing plaintiffs' other claims. Only if the Securities Exchange Act completely preempts plaintiffs' claims would a failure to satisfy *Morrison's* standards doom the complaint in its entirety.

Plaintiffs also note that the Second Circuit has declined to extend *Morrison* to state-law claims, allowing investors in offshore funds to proceed with such claims even where they had acknowledged that *Morrison* barred claims they had brought under the Securities Exchange Act.

10

*In re Kingate Mgmt. Ltd. Litig.,* 784 F.3d 128, 133 n.3 (2d Cir. 2015). *See also* Restatement

(Fourth) of Foreign Relations Law § 404 (2018), cmt. A ("As a presumption about congressional

intent, the federal presumption against extraterritoriality applies only to federal statutes and

causes of action.").  To Plaintiffs' knowledge, no court in this circuit has ever applied *Morrison*

to bar a plaintiff's state-law claims on the basis of extraterritoriality. Indeed, at least one court in

this district has explicitly disclaimed the applicability of *Morrison* to state-law claims, even

where the underlying transactions are *entirely* foreign. *Ge Dandong v. Pinnacle Performance*

*Ltd*., 966 F. Supp. 2d 374, 387 (S.D.N.Y. 2013) ("[N]othing in Morrison—which held, as a

matter of statutory construction, that Section 10(b) of the Securities Exchange Act of 1934 does

not extend to extraterritorial conduct, see Morrison, 130 S.Ct. at 2884—supports [the

defendant's] argument that 'New York state law [cannot] ... regulat[e] entirely foreign securities

transactions...")." New York State courts agree. *See* Aozora Bank v. Credit Agricole, 2015 N.Y.

Slip Op. 31426[U], *3, 2015 WL 4575159 (Sup.Ct., N.Y. County 2015) (citing *Pinnacle*

*Performance* and noting that the defendants "cite no authority holding that *Morrison* bars a

common law fraud claim involving an investment sold overseas"). And to the extent Plaintiffs

amend to add claims for relief under federal statutes, *Morrison's* "transactional test" still does

not provide a one-size-fits-all test for evaluating those claims. *See infra* Sec. II.C.

**B.  The Securities Exchange Act does not preempt Plaintiffs' state-law claims.**

The scope of preemption of state-law class actions under the federal securities laws is

governed by the Securities Litigation Uniform Standards Act (SLUSA), 15 U.S.C. § 78bb(f)(1),

which amended the Securities Exchange Act and the Securities Act of 1933. It is Plaintiffs'

position that under SLUSA, the federal securities laws do not preempt any of their claims under

state law. This is so for two reasons. First, the complaint does not allege any facts concerning a

transaction in a "covered security" as SLUSA defines the term. Second, many of plaintiffs' state-law claims can succeed without a finding of deception.

The Supreme Court has made crystal clear that SLUSA only preempts state law suits arising out of transactions in "covered securities" as the statute defines it. *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 387 (2014) ("[T]he Act focuses upon transactions in covered securities, not upon transactions in uncovered securities.") See also *id.* at 387-33 (noting that the statute requires the dismissal of a state-law-based class action where deception "makes a significant difference to someone's decision to purchase or to sell a *covered* security, not to purchase or sell an uncovered security, *something about which the Act expresses no concern*") (emphases added). In *Troice*, despite the fact that the plaintiffs had explicitly brought claims arising out of transactions in securities, the Court found that because the securities were not "covered" under SLUSA, the state-law claims could proceed. The key question for preemption purposes, then, is not whether HelbizCoin qualifies as a security in any general sense, but whether it is a "covered security" under SLUSA.

SLUSA defines "covered security" as "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred…" 15 U.S.C.A. § 78bb(f)(5)(E). The referenced paragraphs in the Securities Act of 1933 encompass two categories of securities: a security "that is listed, or authorized for listing, on a national securities exchange (or tier or segment thereof)" and one that is "issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." 15 U.S.C.A. § 77r(b)(1)(A), (b)(2). *See also Troice*, 571

U.S. at 380-81 (noting this definition of a "covered security"); *Romano v. Kazacos*, 609 F.3d 512, 520 n.3 (2d Cir. 2010) (same).

There are no facts alleged in the complaint that support an inference that HelbizCoin satisfies any of the criteria for a "covered security" under SLUSA. First, Plaintiffs did not plead any connection to a security "that is listed, or authorized for listing, on a national securities exchange," nor are they aware of any evidence that would qualify HelbizCoin for such a designation. "National securities exchanges" are defined as exchanges that register with the SEC pursuant to the requirements of the Securities Exchange Act. 15 U.S.C. § 78(f). The SEC maintains a list of all national securities exchanges that have so registered. *See National Securities Exchanges*, Securities and Exchange Commission, https://www.sec.gov/fast-answers/divisionsmarketregmrexchangesshtml.html (last accessed August 3, 2020). Plaintiffs are not aware of HelbizCoin being listed or authorized for listing on any of the named exchanges. Second, Plaintiffs did not plead that HelbizCoin was issued by an "investment company registered, or that has filed a registration statement, under the Investment Company Act of 1940," nor are they aware of any evidence that HelbizCoin was issued by such an entity.

Accordingly, under the plain text of SLUSA and controlling Supreme Court precedent, because Plaintiffs' complaint does not allege a transaction in a "covered security," their state-law claims are not preempted under the federal securities laws. Plaintiffs believe this determination alone suffices to dispose of the *Morrison* issue. Absent any rule of law that requires the Court to construe the entire complaint as a claim for relief under the Securities Exchange Act, there is no basis for dismissing the complaint on the ground that plaintiffs failed to allege the domestic transactions necessary for a Sec. 10(b) claim.

There is a separate and independent reason that SLUSA does not preempt all of plaintiffs' state-law claims. Even if the Court finds that the claim arises from a transaction in a "covered security," Plaintiffs can succeed in establishing liability under the common law without proving falsity. By its own terms, SLUSA only preempts state-law class actions alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" or "that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C.A. § 78bb(f)(1). Crucially, the Second Circuit has made clear that the mere *presence* of allegations of falsity does not doom a complaint. Rather, the operative inquiry is whether a claim could succeed in the absence of such allegations. "SLUSA requires courts to inquire whether the allegation is necessary to or extraneous to liability under the state law claims. If the allegation is extraneous to the complaint's theory of liability, it cannot be the basis for SLUSA preclusion. *In re Kingate Mgmt. Ltd. Litig.,* 784 F.3d 128, 142–43 (2d Cir. 2015). Courts are "required to conduct this analysis on a claim-by-claim basis." *Id.* at 143.

Neither Plaintiffs' claim for breach of contract nor their claim for trespass to chattels requires allegations of falsity to establish liability. Plaintiffs allege that the Helbiz Defendants promised to use HelbizCoin as the exclusive medium of exchange on their transportation platform and then failed to do so, fatally undermining the coin's value. *See, e.g.,* Compl. ¶¶ 5, 44, 58-59. Whether or not the Helbiz Defendants intended at the formation of the relevant contracts to perform on these promises the failure to perform would still constitute a breach of contract (and Plaintiffs are entitled to both alternatives at the pleading stage). *M & T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405, 411 (E.D.N.Y. 2004) (plaintiffs can pursue alternative theories of breach of contract and fraud in the inducement). And of course, even the claims

14

which do sound in fraud (fraudulent inducement in the ICO and the pump and dump following the ICO) are still not preempted so long and HelbizCoin is not a covered security, which it is not.

In short, finding that this case is completely preempted under SLUSA would require *both* that Plaintiffs' claims arise from a transaction in a "covered security" *and* that all the state-law claims require a finding of falsity. Neither condition is met. Accordingly, this Court should allow the state-law claims to proceed.

If, however, the Court finds that any of Plaintiffs' claims (or the claims as to any particular Plaintiff or Defendant) is hopelessly preempted under SLUSA, Second Circuit precedent directs the Court to sever the non-preempted state-law claims rather than dismissing the whole complaint. *Kingate*, 784 F.3d at 142-43 ("The district court concluded that because some allegations in the complaint involved material misstatements in connection with the purchase or sale of a covered security, the Complaint should be dismissed in its entirety… The district court was required to conduct this analysis on a claim-by-claim basis.") And if the Court finds preemption because of issues that might be cured with further amendments to the allegations, Plaintiffs should be granted leave to replead.

III.    *Morrison's* "Transactional Test" Cannot Be Applied Mechanically to Other Federal Causes of Action

Finally, Plaintiffs note that *Morrison's* transactional test may not be the controlling framework even under other *federal* causes of action. *Morrison* makes clear that its holding must be applied in a statute-specific manner. That is, if the presumption against extraterritoriality is not rebutted, a court must still determine the "territorial event" that is the "focus" or "concern" of the particular statute. 561 U.S. at 266-67. Thus, the *Morrison* Court emphasized that "the focus *of the Exchange Act* is not upon the place where the deception originated, but the purchases and sales of securities in the United States." *Id.* at 266 (emphasis added).

In applying *Morrison* to other federal statutes, the Second Circuit has similarly ensured that it is proceeding on a statute-by-statute basis. *See, e.g., Loginovskaya v. Batratchenko,* 764 F.3d 266, 271 (2d Cir. 2014) ("Absent a clear statement by Congress that § 10(b) has extraterritorial effect, *Morrison* proceeded to a second inquiry: how the presumption affects *the particular statutory provision* in view of the focus of congressional concern.") (emphasis added, internal quotation marks omitted). So while the *Loginovskaya* Court did ultimately adopt the transactional test for the Commodities Exchange Act, it did so only after a close analysis of that statute's text and structure. ("Given that CEA § 22 limits the private right to suits over transactions, the suits must be based on transactions occurring in the territory of the United States"… A private right of action exists only when a plaintiff shows that one of the four transactions listed in § 22 [of the CEA] occurred within the United States.) *Id.* at 272. *Cf. Sec. & Exch. Comm'n v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1295 (D. Utah 2017), *aff'd sub nom. Sec. & Exch. Comm'n v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ("*Morrison* only analyzed the language of Section 10(b) to determine its territorial reach. It had no occasion to consider Section 17(a). Because the wording of Section 17(a) is different from Section 10(b), it requires a separate analysis.")

Plaintiffs respectfully suggest that this aspect of *Morrison* makes it an unwieldy and ultimately inapt framework for assessing the pleading standards of common-law claims of any variety. And as for other federal statutory claims, the transactional test is not a one-size-fits-all test for all such claims that require some degree of U.S nexus: rather, it applies only in situations where courts have found that "transactions" are the central "focus" or "concern" of a statute limited to domestic application.

Plaintiffs are currently determining whether HelbizCoin would fall under the purview of other federal statutes that might provide additional relief to coinholders. In particular, Plaintiffs are considering whether the facts of this case would support a claim against some or all defendants for violations of the Electronic Funds Transfer Act, for example, as it applies to prepaid stored value instruments — which is one of the ways in which the Helbiz Defendants characterized HelbizCoin. *E.g.* Compl. ¶¶ 41-43 (noting claims by Palella that HelbizCoin is a "cryptocurrency and utility token" for transportation services). Whichever federal causes of action Plaintiffs ultimately assert as grounds for relief in their amendments, the Court's *Morrison* analysis would have to be specific to the "focus" and "concern" of those statutes. Accordingly, even in the event the Court were to determine that Plaintiffs' allegations fail *Morrison's* "transactional test," that would not be a basis for automatically foreclosing all other potential avenues for relief under other federal statutes.

## IV.      Conclusion

For the foregoing reasons, Plaintiffs' complaint should not be dismissed on the basis of *Morrison.* If any of Plaintiffs' claims are dismissed, they request leave to replead.


Dated: August 3, 2020                                    RESPECTFULLY SUBMITTED,

                                                        s/ Michael Kanovitz


Michael Kanovitz (*pro hac vice*)
Karen Newirth
Scott Rauscher (*pro hac vice pending*)
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607