**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RYAN BARRON, *et al.*, for themselves and a class of others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>HELBIZ INC. *et al.*,<br><br>  Defendants. | Civil Action No.: 20-cv-04703<br><br>Hon. Louis L. Stanton,<br>District Judge |

<u>**PLAINTIFFS' RESPONSE TO**</u>
<u>**THE HELBIZ DEFENDANTS' MOTION TO DISMISS**</u>

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT .....................................................................................................4

        A.      STANDARD OF REVIEW ....................................................................4

        B.      DIVERSITY JURISDICTION ...............................................................5

        C.      Plaintiffs Have Stated a Claim for Breach of Contract........................... 9

                1.      The Whitepaper Was a Contractual Promise ...............................9

                2.      Defendants Breached ................................................................13

                3.      Plaintiffs Have Sued the Correct Defendants ...........................14

                        a.      Sham Entity................................................................ 16

                        b.      Absence of Corporate Shield .......................................20

        D.      Plaintiffs Have Adequately Pled Trespass to Chattels and Conversion ...............21

        E.      Defendants Have Not Moved to Dismiss Plaintiff's Claim for Constructive
                Trust ....................................................................................................22

        F.      Plaintiffs Have Adequately Pled an Action for Quiet Title ...................22

        G.      Plaintiffs Have Alleged a Violation of N.Y. Gen. Bus. Law § 349......................23

        H.      The Deceptive Practices Allegations Also State a Claim for Common
                Law Fraud.............................................................................................26

        I.      Plaintiffs Have Alleged Wrongdoing Against Hannestad and Ciravegna ............28

III.    MOTION TO STRIKE .....................................................................................29

IV.     Conclusion .......................................................................................................33

Plaintiffs, Ryan Barron et al., respectfully submit this memorandum is opposition to the Motion to dismiss and in the alternative to strike filed by Defendants Helbiz Inc. ("Helbiz"), Salvatore Palella ("Palella"), Jonathan Hannestad ("Hannestad"), Stefano Ciravegna ("Ciravegna"), and Giulio Profumo ("Profumo") (collectively, the "Helbiz Defendants"). The Motion should be granted as to the spoliation claims (Count VI) but otherwise denied in its entirety for the reasons that follow.

## I.    INTRODUCTION

By now the Court is familiar with the facts of this case that govern at the motion to dismiss stage. The story has been laid out in the Complaint, Dkt. 3, various motions regarding discovery and the preliminary injunction, Dkts. 13, 31-1, 54, and Plaintiffs' briefs on the merits, Dkt. 83 (*Morrison* issue), Dkt. 86 (Skrill), Dkt. 99 (Pellegrino). The arguments about the claims have also played out already in those briefs.

The Helbiz Defendants' arguments differ only because they have tried to change the facts by moving to dismiss with evidence to contradict the allegations and add additional purported facts.  Their attempt to change the story at this stage fails for multiple reasons. The least of these is that extraneous evidence, pre-discovery, is inappropriate on a motion to dismiss and should routinely be rejected. More substantially, the Defendants' evidence is false.

The crux is a declaration Defendants proffer from a man located in Singapore, Andrea Monni, who claims to be the Chief Financial Officer of Helbiz Mobility Systems Pte Ltd. ("HMSPL"), later renamed HBZ Systems Pte Ltd. Dkt. 75. Defendants point to the declaration as proof that HMSPL is responsible for HelbizCoin and a series of additional counterfactual statements. Defendants' motion depends almost entirely upon the alternative facts in this declaration.  And for that reason, the arguments fails. As Plaintiffs allege in the Complaint and

1

explain in detail below, HMSPL has always been a sham created and controlled by Mr. Palella. The appearance that Mr. Monni is falling on the sword for the HelbizCoin scam is just another boondoggle by these Defendants using the sham.

While the Complaint's allegations of the HMPSL sham, Dkts. 125A-M, 126, should control at the pleadings stage, there is already enough actual evidence to require rejecting the declaration even at summary judgment. First, Plaintiffs have already offered the official records of the Singapore Accounting and Regulatory Authority ("ACRA") which includes a sworn declaration filed in June of 2019 that HMSPL should be stricken off the ACRA registration roll because it *never functioned at all*: the "Company has not started to carry on business or begin operation."  Dkt. 45-3 at 2 of 7.  The declaration was executed on behalf of HSMPL by its registered Secretary Narul Nassir. *Id*. at 3 of 7; also compare *id*. at 2 of 7 (filer ID number S8516801J3) and 5 of 7 (showing S8516801J3 for Mr. Nasir).  In addition to being listed as Secretary of HMSPL, Mr. Nasir is Mr. Monni's business partner in Accountingmate Pte Ltd. *Id*. at 3 of 7 and 5 of 7; ACRA Record for Accountingmate Pte Ltd., Exhibit A hereto at 2 of 4.

Defendants ignore this declaration from HMSPL's Secretary, despite the fact that it was in the record and discussed in the preliminary injunction letter briefing well before Defendants filed their motion to dismiss, and it is dispositive. The Nasir declaration defeats all of Mr. Monni's averments that any activities were conducted by HMSPL rather than the Defendants, which is most of the paragraphs of his declaration. Dkt. 75 ¶¶ 1-2, 4, 6, 7-8 (claim that HMSPL authored the whitepaper), 11, 15-16.[1] It also puts the lie to Mr. Monni's claims of firsthand knowledge, because if HMSPL never functioned, he could not have firsthand knowledge. Rather,

---

[1] The same is true for the Hannestad Declaration averring to loans and a software development agreement between HMSPL and Defendant Helbiz, Dkt. 76 ¶¶ 2-8. Those averments must be taken as false at this stage because HMSPL never started to carry on business or begin operations, and are improperly considered at the pleadings stage regardless.

he is acting as the hearsay mouthpiece of the Defendants as to the foregoing averments and those in ¶¶ 17-26.  Not only that, Monni's statements about who conducted the ICO and the amounts raised are contradicted by Mr. Palella himself, in his public statements cited in the Complaint and those referenced in or attached to subsequent filings, Compl. ¶¶ 116-124, Dkts. 13, 31, all of which predate Defendants' motion to dismiss but which they leave conspicuously unaddressed.

Moreover, the Szklarek and Khanchandari declarations, Dkt 99-1 and Ex. B, show that the supposed Terms & Conditions documents Mr. Monni claims HMSPL created ("T&C") was never disclosed to the coin purchasers, much less assented to, and so all of Defendants' arguments relying on binding coinpurchasers to the T&C as a fact (of which there are many) fail utterly.  *Id.* ¶¶ 12-14. Also, the website where HMSPL supposedly conducted the ICO was owned by Defendants Palella and Helbiz, Dkt. 54, and both Defendants have consistently claimed it as their ICO, not HMSPL. *See, e.g.,* Compl. ¶¶ 116-24, Dkts. 31-13, 31-14, 31-15.  All of this evidence had been in the record well before Defendants proffered a declaration from Mr. Monni yet they have chosen to ignore it.

The sham nature of the declaration (and Mr. Monni's lack of personal knowledge) is also demonstrated by the fact that Mr. Monni is in the business of setting up shell companies through Accountingmate and his other firm Algebra Pte Ltd. Both of these companies share the same address (19 Cecil St. #04-01 The Quadrant At Cecil, Singapore 049704). Exhibit A at 2 of 4 and Algebra ACRA Filing (Exhibit C hereto) at 2 of 4. This also happens to be the exact same address as for HMPSL, Dkt. 45-3 at 5 of 7, and at least 49 other companies. See https://opengovsg.com/corporate?building=THE+QUADRANT+AT+CECIL. After Defendants fronted Mr. Monni's declaration, Plaintiffs sent an investigator to the address.  It turns out that

there in no #04-01 at the building.  Rather, the fourth floor is a workshare space where Algebra has one seat. Ziiatdinov Declaration at ¶¶ 4-6, Exhibit D hereto.

The upshot is that the evidence Defendants attached to their motion to dismiss does not move the needle at this stage of the case. Defendants' alternative facts and arguments based thereon must be discarded, and their motion decided solely on the basis of the allegations (and incorporated documents) proffered by Plaintiffs, construed in the light most favorable to Plaintiffs, and with the inferences drawn in Plaintiffs' favor.

## II.    ARGUMENT

### A.    Standard of Review

Defendants' arguments rely on factual assertions that appear nowhere in Plaintiffs' complaint or referenced documents and require the court to weigh competing evidence. Those arguments are therefore non-starters at this stage of the litigation and must be rejected. "In deciding a motion to dismiss, a court should consider only those facts alleged in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Falso v. Ablest Staffing Servs.,* 328 F. App'x 54 (2d Cir. 2009). *See also Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 663 (2d Cir. 1996) (reversing a district court's dismissal because it "improperly relied upon information outside of the four corners of [the] complaint, and failed to read the allegations … in the light most favorable to [the] plaintiff]."). The Second Circuit has made clear that at the motion to dismiss stage, a court cannot "consider[] evidence submitted in the form of affidavits and exhibits to [the] motion to dismiss without notifying [the plaintiff] that it [is] converting the motion to one for summary judgment and without allowing him an opportunity to submit evidence in opposition." *Kopec v. Coughlin*, 922 F.2d 152, 153 (2d Cir. 1991) (noting also that it was error for the district court to

consider the defendant's submissions where they "casted doubt on the allegations in the [plaintiff's] amended complaint").[2]

The question at the 12(b)(6) stage is only whether — on the basis of the complaint and documents attached to it as exhibits or incorporated into it by reference — Plaintiffs have "state[d] a claim to relief that is plausible on its face," that is, "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).[3]

As discussed in great detail below, on a 12(b)(1) motion to dismiss based on failure to meet the amount-in-controversy requirement, the court adopts "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Shulman v. Chaitman LLP*, 392 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) (internal quotation marks and citations omitted).

### B. Diversity Jurisdiction

Defendants' attack on the Court's jurisdiction fails. See Dkt. 78 at 20-22. Plaintiffs' complaint easily satisfies the jurisdictional criteria under the Class Action Fairness Act (CAFA), 28 U.S.C. §§ 1332(d)(2), under both the amount and controversy and minimal diversity prongs.

---

[2] Plaintiffs have pointed to record evidence contradicting Defendants' evidence to demonstrate additional reasons why Defendants evidence should be rejected at this pre-discovery stage. Nevertheless, in the event that the Court chooses to convert the Helbiz Defendants' motion into a summary judgment motion, Plaintiffs request notice and an opportunity to present a fulsome factual record and a request for relief under Rule 56(f).

[3] If the Court determines that amendments are necessary to cure deficiencies, Plaintiffs request leave to amend. "Rule 15 sets out a liberal standard, instructing that leave to amend should be freely granted." *Schatzki v. Weiser Capital Mgmt., LLC*, No. 10 CIV. 4685 RWS, 2015 WL 6206438, at *1 (S.D.N.Y. Oct. 16, 2015). Pellegrino's suggestion that Plaintiffs have already amended their complaint as of right (Dkt. 102 at 9 n.1) is meritless. Plaintiffs' filing corrected paragraph numbering and did not make any substantive amendment whatsoever.

Plaintiffs must "show that it appears to a reasonable probability that the aggregate claims of the plaintiff class are in excess of $5 million." *Cutrone v. Mortg. Elec. Registration Sys., Inc*., 749 F.3d 137, 142 (2d Cir. 2014) (citations and internal quotation marks omitted). "This is not an onerous burden." *GW Holdings Grp., LLC v. U.S. Highland, Inc.*, 794 F. App'x 49, 50 (2d Cir. 2019). "In satisfying the 'reasonable probability' burden, there is a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Shulman v. Chaitman LLP*, 392 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) (internal quotation marks and citations omitted). "To overcome the face-of-the complaint presumption, the party opposing jurisdiction must *show to a legal certainty that the amount recoverable does not meet the jurisdictional threshold*." *Id.* (internal quotation marks and citations omitted) (emphasis added). *See also, e.g., GW Holdings Grp., LLC v. U.S. Highland, Inc*., 794 F. App'x 49, 50–51 (2d Cir. 2019). Second Circuit case law is emphatic that "the legal impossibility of recovery must be so certain as virtually to negat[e] the plaintiff's good faith in asserting the claim." *Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*, 93 F.3d 1064, 1070 (2d Cir. 1996) (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2d Cir. 1994)). "Where the damages sought are uncertain, the doubt should be resolved in favor of the plaintiff's pleadings." *Tongkook*, 14 F.3d at 785.

On the face of the complaint, Plaintiffs make abundantly clear that the amount in controversy exceeds $5 million. The complaint alleges that Defendant's ICO "raised $38.6 million based on the US dollar (USD) value of ETH at the time." Compl. ¶ 24. This figure did not originate with Plaintiffs. Rather, it is a claim Defendant Palella has made publicly and repeatedly. See *id*. ¶ 116 (quoting Palella's claim about the ICO raising "38 million dollars" in the Italian news magazine ANSA, https://www.ansa.it/sito/notizie/economia/criptovalute/

2018/06/06/auto-in-italia-entro-2018-app-per-noleggio-tra-privati_a491df67-31dd-42a0-8447-5ab2b2efd59e.html). Elsewhere, Palella claimed to have raised $5.5 million in the ICO pre-sale phase alone. Compl. ¶¶ 117F, H.

Defendants contend that because they claim documentation demonstrating that the ICO raised only $1.56 million, Dkt. 78 at 20, jurisdiction is somehow defeated. Given the relevant legal standard, the additional facts alleged, and the avenues of relief available to Plaintiffs, this purported evidence does not come close to showing a "legal impossibility of recovery so certain as virtually to negat[e] the plaintiff's good faith in a asserting the claim." *Chase Manhattan Bank*, 93 F.3d at 1070. This is so for several reasons.

First, given Defendants' public statements that they raised close to $40 million through sales of HelbizCoin, there is a clear question of fact inappropriate for resolution on a 12(b)(1) motion. ("Where the damages sought are uncertain, the doubt should be resolved in favor of the plaintiff's pleadings." Tongkook, 14 F.3d at 785.). This is doubly true as Plaintiffs have cited Palella's and Helbiz's public statements about the $38 million ICO raise in multiple filings to the Court, *e.g.* Dkt. 31-1 at 5 and 11 of 12, and Defendants have declined to explain themselves each time. They cannot repeatedly refuse to speak and preclude a question of fact.

Second, Defendants fail to address the full scope of damages sought in the Complaint. Plaintiffs are not merely entitled to a return of the ICO money, they are entitled to the benefit of the bargain, disgorgement and/or unjust enrichment. Compl. ¶ 67 ("[A]ll profits derived from the platform and any other assets financed directly or derivatively with the coin holders' money – such as the Helbiz-branded scooters and bikes – belong to the coin holders."). That easily exceeds the jurisdictional amount. For example, Defendants filed Dkt. 24-1 in which their counsel states at page 7 that "Helbiz's normal (take) is 10,000 rides per day." (emphasis

omitted). At $5 per ride, that amounts to over $18 million per year, or more than $36 million in the over two years since the ICO.  Even at $1 per ride (the price that Palella said the pay-per-use coin would reach when the platform went live, Cmply ¶ 83) that aspect of damages alone exceeds $7 million. See *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17CV4819GBDBCM, 2018 WL 6786237, at *6 (S.D.N.Y. Dec. 13, 2018) ("These remedies are properly measured, in the first instance, by the *defendant's* net profits enjoyed as a result of its misconduct.") (emphasis in original) (citing *Restatement (Third) of Restitution and Unjust Enrichment* § 51 (2011)). Moreover, Plaintiffs seek punitive damages that increase the amount in controversy.[4]

Although the Helbiz Defendants fail to make any argument that the minimal diversity required under CAFA is not present, because other Defendants have raised this issue, Plaintiffs address this issue here as they have elsewhere. Dkt. 86 at 12-13. Because only a single plaintiff need be diverse from a single defendant, and because the complaint alleges that defendants are residents of different states, Compl. ¶¶ 10, 16, 135, it is a legal certainty that (taking the allegations as true) the diversity requirement has been satisfied. Thus, all of CAFA's prerequisites have been met. Moreover, Plaintiffs can amend to state their citizenship. For example, Mr. Barron is citizen of Texas and others are citizens of other countries.

---

[4] The Supreme Court has made clear the constitution imposes no hard-and-fast rule on the relevant ratio; to the extent there is a rule of thumb for a ratio that would implicate constitutional concerns, the Court has pointed to multipliers such as "more than four times the amount of compensatory damages" or ratios in the double digits. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). Defendants cite a single case finding unconstitutional a 1.5:1 ratio of punitive to compensatory damages, *Allam v. Meyers*, 906 F. Supp. 2d 274, 293 (S.D.N.Y. 2012). Even there, the court indicated that the 1.5:1 "ratio, standing alone, does not raise any alarms." *Allam*, 906 F.Supp. at 293. Only because of special factors in that case did the ratio offend due process. *Id.* Even if Defendants were correct that Plaintiffs could only recover $1.56 million in compensatory damages, it would only take a punitive damages ratio of roughly 2.2:1 in order for punitive damages to bring the amount in controversy over $5 million. Defendants' burden is to demonstrate why it is a "legal certainty" that such an amount would be constitutionally barred, and they have failed to carry it. See also *Eisenberg v. Reid*, 74 F. App'x 110, 111–12 (2d Cir. 2003) (7:1 ratio affirmed in fraud case).

### C.  Plaintiffs Have Stated a Claim for Breach of Contract

Defendants advance a host of arguments against the breach of contract claim, none of which are availing at the pleadings stage. First, the Complaint plainly alleges facts which show the formation of contract and the failure to perform it. Second, the allegations demonstrate that Defendants are the obligors. Third, the "Terms and Conditions" document attached to Mr. Monni's affidavit is not only extraneous to the complaint, but there is an absence of proof that it ever became part of the contract. At most, this would be a question of fact that must proceed to discovery.[5] In short, the Defendants' arguments are legally meritless, contradict the Complaint, and rely on inferences drawn in Defendants' favor. Accordingly, they cannot be a basis for a dismissal at this stage of the litigation.

### 1.  The Whitepaper Was a Contractual Promise

Defendants' argument that the Complaint fails to allege formation is limited to a few conclusory sentences at the bottom of page 17, not even citing a case for the proposition that the allegations are insufficient. Beyond that, Defendants wander between the supposed Terms &

---

[5] If the Court disagrees with Plaintiffs and finds that Defendants' putative Terms and Conditions control, they would constitute a void and unenforceable contract. This is because, per Defendants' own understanding, the supposed Terms and Conditions conferred on Helbiz (or whoever the proper counterparty was) an unconditional, unilateral right of cancellation. See Dkt. 78 at 28-29 (claiming the Terms gave the issuer "in its sole discretion" the right to "waive and null" all HelbizCoin). *See, e.g., Dorman v. Cohen,* 413 N.Y.S.2d 377, 380–81 (App. Div. 1979) (agreement where one party has the "unilateral right to cancel" was "illusory for lack of mutuality of obligation"); *Reddy v. Mihos*, 76 N.Y.S.3d 13, 17, *leave to appeal denied,* 32 N.Y.3d 902, 109 N.E.3d 1155 (App. Div. 2018) (agreement is "unenforceable for want of consideration" if one party is not bound to perform). Thus, if the Court finds that Defendants' putative Terms and Conditions govern the transactions in question, they would be void and unenforceable, allowing the Plaintiffs to recover for unjust enrichment. "If a party fails to prove a valid, enforceable contract, however, the court may nonetheless allow recovery in quantum meruit for claims arising from the same subject matter as that contract in order to prevent unjust enrichment." *Milton Abeles, Inc. v. Farmers Pride, Inc.,* 603 F. Supp. 2d 500, 503–04 (E.D.N.Y. 2009) (collecting cases). Similarly, Plaintiffs would have an unjust enrichment remedy available if the Court finds for any other reason that there was no valid and enforceable contract.

Conditions document and representations about the non-applicability of Singapore securities law. In other words, they fail to mount a legitimate challenge to the existence of the contract.

At the threshold, the Complaint clearly pleads formation of a contract in that the whitepaper – published in the name of Helbiz and on the Helbiz.com website, Compl. ¶ 33, 33A-G, signed by Palella, *id.* ¶ 33, displayed on the website where ICO purchasers paid for the HelbizCoin, *id.*, and bearing the names of the remaining Helbiz Defendants, *id.* ¶ 133 – laid out a series of representations explaining what the purchasers were buying in the ICO and what Helbiz would doing with their money.  Among others, it represented (1) that the HelbizCoin was a "pay-per-use" token that could be exchanged for rides on the Helbiz platform, (2) that HelbizCoin would be the only way to pay for the rides, and (3) that the funds raised in the ICO would be used to build the Helbiz platform. For example:

<em>Building the platform</em>

- **"Helbiz** is a fully integrated mobility ecosystem with a customer centric approach, consisting of Helbiz, a peer-to-peer vehicle sharing application, and the Helbiz Mobility System, a platform on the Ethereum blockchain open for other companies with interest in mobility related services utilizing blockchain technology (e.g insurance companies) powered by the native HelbizCoin (HBZ)." Dkt. 31-12 at 5;

- "TOKEN GENERATION In order to further develop the platform, Helbiz will conduct a token generation event that will offer 520.000.000 HBZ tokens of the 1 billion total supply. The funds raised will be used for development of the Helbiz platform, business development; onboarding new car owners, rentals, dealerships, collaborate with insurance and PR & Marketing companies to raise project awareness, token usability while at the same time building a strong local community." Dkt. 31-12 at 18; and,

- "USE OF FUNDS" section explaining 40% for "Development of the Helbiz platform according to product roadmap," 35% for Business Development to bring vehicles onto the platform and pay for partnerships with other blockchain companies, 20% for

10

Marketing and 5% for Legal. *Id.* The referenced "Roadmap" in set out at page 21 and explains the time to build the Helbiz platform quarter-by-quarter.[6]

*Pay-Per-Use and Sole Currency of the Platform*

- After explaining in the above cited language from page 4 that "Helbiz" is a platform powered by the "native" HelbizCoin, the whitepaper continued: "THE HELBIZ ECONOMIC MODEL  In order to deliver a viable business model for the long term, we establish HelbizCoin to be a pay-per-use model for getting onto the Helbiz Mobility System or for using services available on the platform."), *id. at* 17. See also *id.* at 21 (quoting Palella that "The HELBIZ token is straightforwardly a utility token")[7];

- "NATIVE TOKEN The choice to create a native token for Helbiz transactions is not casual. . . .The conclusion of our careful analysis was that only a native token allows HELBIZ to optimize for the 3 desired objectives. . . . .To guarantee fair and non-discriminatory access, a single token is required that is not connected to any external economy."); *id*. at 20; and,

- "CONVERT & USE HELBIZ COIN Helbiz Mobility System will allow users to convert major cryptocurrencies into HelbizCoin at the current exchange rate, while the built-in wallet will allow every registered user to easily manage and store HelbizCoin tokens without external services. Users will be able to convert major cryptocurrencies such as Bitcoin, Ether, Lite-coin, Dash and ERC20 tokens into HelbizCoin with the aim to add an increasing number of cryptocurrencies and also fiat currencies in the future."). *Id*. at 16. Again, the reason that one would need to convert cryto and fiat into HelbizCoin is because HelbizCoin was to be the sole method to pay for rides.[8]

---

[6] Relevant to the separate issue of nexus, the whitepaper identifies New York as the locus of the operations including the ICO. For example, it says that that the ICO and initial launch of Helbiz operations would occur in Q1 2018 and *specifies New York*. Similarly, for Q2 2018 it states commencement of the app's "blockchain system for payments" also specified as occurring in *New York*: "Helbiz app operations established in NY." *Id*.

[7] The term utility token is a private coin that represents pre-payment for a specific good or service. See *e.g.*, Monni Declaration Exhibit D Dkt. 75-4 at 5 ("Utility Tokens  Tokens representing or providing a specific of generic service to/for the user or giving digital access rights to applications or services with no direct connection to the capital markets. In fact, these tokens represent the provision of future services that users could benefit from.") This contrasts with a "Payment or Framework Token" which acts as "a medium of exchange" like Bitcoin. *Id.*

[8] As the Complaint recounts, on September 3, 2018 Defendants announced for the first time that the platform would accept fiat and acknowledged that this contravened the promise in the whitepaper. Defendants stated that accepting fiat was necessary to grow the user base for the platform which, they claimed, would benefit the coinholders in the long run, simultaneously promising to switch over to an HBZ only payment system once the user base grew. Complaint ¶¶ 55-58 ("In the 4th phase Helbiz will utilize its user base, previous growth and position within local communities to phase out direct fiat payments in the Helbiz app moving towards a crypto only solution. All purchases, even with credit card,

Similar to a stored value card, Helbiz owes the performance to any holder of HelbizCoin. *E.g., Sharabani v. Simon Prop. Grp., Inc.,* No. 15224/09, 2020 WL 5223068, at *2 (N.Y. App. Div. Sept. 2, 2020) ("no dispute that a contract was formed" between the holder of a gift card and the entity that issued the gift card); *Lonner v. Simon Prop. Grp., Inc.,* 866 N.Y.S.2d 239, 241 (App. Div. 2008) (finding that holders of prepaid gift cards could maintain an action against the issuer for breach of contract).

Helbiz has not developed any serious argument to the contrary, other than that the contractual promises were negated by the Terms & Conditions (T&C) document attached to Andrea Monni's declaration. But in placing so much reliance on the T&C document outside the Complaint, Defendants demonstrate the weakness of their position and doom their motion. As explained in Plaintiffs' Response to Defendant Pellegrino's Motion to Dismiss, Dkt. 99 at 7, the evidence does not permit a conclusion that the T&C bound the Plaintiffs. First, Defendants have failed to proffer any evidence showing the manner of assent (a point on which Monni's declaration is utterly conclusory) and the law requires specific steps for an electronic purchase. *See, e.g., Saizhang Guan v. Uber Techs., Inc.,* 236 F. Supp. 3d 711, 722–23 (E.D.N.Y. 2017) (So-called "click-wrap" agreements are only enforceable if "the party is given a sufficient opportunity to read the ... agreement, and assents thereto after being provided with an unambiguous method of accepting or declining the offer," and conducting a detailed analysis of the factual record of the "clicks" in that case) (internal quotation marks and citations omitted).

Second, Plaintiffs supplied the Declarations of Andrew Szklarek and Nick Khanchandari showing that the supposed T&C was never even on the ICO website, much less presented to the

---

will simply purchase HBZ of the open market via the exchange API to fill the in-app wallet which will only hold HBZ making it the only accepted currency.").

purchasers for assent. Dkt. 99-1 and Ex. B. In fact, only the whitepaper was displayed on the ICO website. *Id.* In other words, they have not proved assent at the pleadings stage and there is, in the best light for Defendants, an issue for trial. Accordingly, the T&C document has no bearing on the motion to dismiss and all of Defendants' arguments in reliance on the supposed Terms & Conditions (including their separately stated venue challenge) fail.

Finally, the legal opinion Defendants obtained about the non-applicability of Singapore securities law is a *non-sequitur*. The legal opinion says nothing about Helbiz's contractual liability under New York law and would not be binding on the Court even if it did. Further, the opinion is based on the factual assumption that HBZ Systems is a separate entity from Helbiz, which is untrue. See discussion infra at 16-21.

### 2. Defendants Breached

Defendants breached each of the foregoing promises. As recounted in the Complaint, Defendants never made HelbizCoin the native token of the Helbiz platform. To the contrary, when they launched the app they only accepted fiat currency, making HelbizCoin useless. Compl. ¶¶ 56-62. Later, and for only a brief time, Defendants accepted HelbizCoin in addition to fiat as payment, but even then, they did not accept it as a "pay-per-use" utility token, but, rather, as a currency valued in USD terms based on the then prevailing USD/HBZ trading pair. That is also a breach of the "pay-per-use" promise in the whitepaper. As things stand today, coin holders cannot exchange the HelbizCoin for the promised rides and its value has been destroyed. Defendants have thoroughly and completely breached. As a result, Plaintiffs have suffered damages. The elements of breach of contract have therefore been pled. *See, e.g., Wachtel v. Rich*, 797 N.Y.S.2d 75, 76 (App. Div. 2005) (breach occurred when party "failed to confer the

bargained-for benefit"); *Bibeau v. Ward*, 645 N.Y.S.2d 107, 110 (App. Div. 1996) (breach where party failed to perform tasks he promised to perform).

### 3. Plaintiffs Have Sued the Correct Defendants

Defendants next argue that Plaintiffs have asserted their breach of contract claims against the "wrong defendants." Dkt. 78 at 26-27. The argument fails at the outset because it construes the facts solely in Defendants' favor, ignoring the inferences that support Plaintiffs.

Taking a step back, anyone reading the whitepaper at the time of the ICO would find Defendants' "wrong entity" argument bizarre. Helbiz Mobility Systems PTE Ltd. is not only not mentioned in the whitepaper, it was not even incorporated until after the whitepaper was published. In fact, the *only* corporate entity ever mentioned in the whitepaper is "Helbiz Inc.," Dkt. 31-12 at 23, when identifying Defendant Salvatore Palella, who signed the whitepaper. *Id.* at 20. Thus, even assuming that Helbiz Mobility Systems PTE Ltd. was the promissor, which is counterfactual and draws the inferences improperly at this stage, Defendants would still be liable on the promises because they failed to disclose their principal. *See J.P. Endeavors v. Dushaj*, 8 A.D.3d 440, 442, 778 N.Y.S.2d 531, 533 (2004) ("The general rule is that the agent for an undisclosed principal is liable on any contracts that he or she made on behalf of the principal."). And, regardless, the only proper way to construe the record at this stage is to find that Defendants were the promissors. The name "Helbiz," which appears at the bottom of each page, is defined as all of the operations including both the app and the platform, id, at 4, and the only operations mentioned in the whitepaper are in New York where Helbiz Inc. is headquartered. *Id.* at 21.[9] Moreover, the only point of contact listed in the whitepaper is an email address on the

---

[9] The whitepaper defines "Helbiz Mobility System" as a computer platform that is part of and used by Helbiz, not a separate corporate entity, much less the sole promissor in the whitepaper. *Id.* at 3 ("Helbiz is a peer-to-peer marketplace that makes renting a car, motorcycle or bicycle convenient, affordable and rewarding... Helbiz Mobility System is a platform based on the Ethereum Blockchain and powered by the

corporate website of Helbiz Inc., Coin@Helbiz.com, and the accompanying street address is the address for Helbiz Inc's Singapore office. *Id.* at 24, Complaint ¶¶ 16, 125B.

Additionally, as a matter of contemporaneous construction, the Complaint cites multiple examples of Palella and Helbiz Inc. making public statements identifying themselves as the "Helbiz" entity referenced in the whitepaper. *E.g. Id.* ¶¶ 115-120 (Quoting Defendants as saying "we, "our," and "I" with regard to the ICO, the funds raise, the coin itself, and the platform). *McMartin v. Gen. Agents' Policyholders Serv. Office, Inc.,* 15 Misc. 2d 1071, 1073, 186 N.Y.S.2d 550, 553 (Sup. Ct. 1959) *("[T]he practical construction of an arrangement between parties may be determined by what they themselves have done pursuant thereto")* (emphasis added). Thus, there is no reason to infer that the promissor is anyone other than the Helbiz Defendants, who after all are the only persons and entities named in the whitepaper itself, *id.* at 23, much less to draw that inference solely in favor of Defendants as would be required for them to prevail on a motion to dismiss.

While the forgoing should be the end of the matter at the pleadings stage, the wrong entity argument also is unavailing for at least two additional reasons. First, the supposedly "correct" entity is a sham which serves as Defendants' alter ego. Plaintiffs have alleged (and introduced into the record) sufficient factual material to support an inference that the prerequisites for veil piercing under New York law have been met. Second, and relatedly, Helbiz Mobility Systems PTE Ltd., which was later renamed HBZ Systems PTE Ltd., was not

---

HelbizCoin tokens (HBZ). Helbiz will be the first company adopting HelbizCoin and leveraging the Helbiz Mobility System, a platform that will be open to other companies…") The term "Helbiz" as a company that uses the Helbiz Mobility System can only refer to the seller of the transportation services, Helbiz Inc., and that is the promissor mentioned at the bottom of each page and throughout the text. *See also id.* at 4 ("Helbiz is a fully integrated mobility ecosystem with a customer centric approach, consisting of Helbiz, a peer-to-peer vehicle sharing application, and the Helbiz Mobility System, a platform on the Ethereum blockchain open for other companies with interest in mobility related services utilizing blockchain . . .").

incorporated until after the whitepaper was published and the ICO underway, meaning that it cannot provide a corporate shield for the promises.

### a. Sham Entity

Under New York law, veil piercing requires "a two-part showing: (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir. 1997). Several factors bear on the "domination" prong, including:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities ... No one factor is decisive.

*Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1053 (2d Cir. 1997).

Because of the fact-intensive nature of the operative inquiry, courts in this district applying New York law have made clear that the burden on plaintiffs at the pleading stage is not overly demanding. "New York courts have recognized that a veil-piercing theory often necessitates a 'fact laden inquiry' and thus is 'unsuited for resolution on a pre-answer, pre-discovery motion to dismiss.' *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 799 (S.D.N.Y. 2017), quoting *Holme v. Glob. Minerals & Metals Corp.*, No. 600232/08, 22 Misc.3d 1123A, 880 N.Y.S.2d 873, 2009 WL 387034, at *7 (N.Y. Sup. Ct. Jan. 12, 2009). "Accordingly, while it is generally not sufficient, at the pleading stage, to make conclusory allegations of control, setting forth some examples of alleged domination may provide sufficiently specific factual allegations to support an alter ego claim and result in denial of the motion to dismiss." *Almaty,*

278 F.Supp. at 799 (internal quotation marks omitted). *See also Int'l Council of Shopping Centers, Inc. v. Info Quarter, LLC,* No. 17-CV-5526 (AJN), 2018 WL 4284279, at *4 (S.D.N.Y. Sept. 7, 2018) (denying a motion to dismiss a complaint that alleged a veil-piercing theory under New York law); *SungChang Interfashion Co. v. Stone Mountain Accessories*, *Inc.,* No. 12 CIV. 7280 ALC DCF, 2013 WL 5366373, at *11 (S.D.N.Y. Sept. 25, 2013) (same). New York courts have emphasized the importance of not short-circuiting this fact-intensive inquiry. *Ledy v. Wilson*, 38 A.D.3d 214, 215, 831 N.Y.S.2d 61, 62 (2007) (facts showing shared officers, directors, and offices resulted in a "fact-laden claim to pierce the corporate veil [that] is particularly unsuited for resolution on summary judgment"); *Forum Ins. Co. v. Texarkoma Transp. Co.,* 229 A.D.2d 341, 342, 645 N.Y.S.2d 786, 788 (1996) (similar).

Plaintiffs easily satisfy their burden at the pleading stage, namely, to "set[] forth some examples of alleged domination" in order to go beyond mere "conclusory allegations." *SungChang*, 2013 WL 5366373 at *11. *See also Moses v. Martin*, 360 F.Supp. 2d 533, 540-41 (S.D.N.Y.) (denying motion to dismiss an alter-ego claim because "it cannot be said that the complaint is totally devoid of solid, nonconclusory allegations" supporting the alter-ego theory) (internal quotation marks omitted); *Sequa Corp. v. Christopher*, 574 N.Y.S.2d 565, 566 (App. Div. 1991) (noting the court below "could not have dismissed the pleadings underlying the plaintiffs' attempt to pierce the corporate veil … without extending every favorable inference to those pleadings").

In particular, the allegations and the information uncovered through limited discovery bear on several of the *Freeman* factors that guide the "domination" prong of the inquiry.

- **Disregard of corporate formalities**: (1) Helbiz and Palella published the whitepaper and initiated the ICO before Helbiz Mobility System Pte Ltd. ("HMSPL") was even incorporated. Compl. ¶¶ 29, 125E. (2) Similarly, the Helbizcoin.com website stated that it

was being published by HMSPL even after HMSPL was struck off by the ACRA and had ceased to exist. Compl. ¶¶ 125B, M. Likewise, Palella and Helbiz were registered as the owners of that website at the time. Dkt. 54. (3) Helbiz Inc and Palella owned and created the helbizcoin.io website used for the ICO, not HMSPL. *Id.*. (4) The affidavit filed to strike off HMSPL in August of 2019 states that HMSPL never became a functioning entity, meaning it never observed any corporate formalities because it never functioned as a corporation. Dkt 45-3 ("Company has not started to carry on business or begin operation").

- **Overlap in ownership, officers, directors** (1) Although the whitepaper never claims that it is written on behalf of HMSPL, if we indulge Defendants' inference (improper though it is on a motion to dismiss), the overlap is extreme. The whitepaper (Dkt. 31-12 at 23) lists Defendants as the founders and officers on the "team" and these are the same people who are listed as the "leadership" at Helbiz Inc. Dkt. 31-1 at 8-9 (Palella, Hannestad, Profumo, Stancic, and Ciravegna ). (2) Palella is listed as the "founder" in the whitepaper and as to Helbiz Inc. Dkt. 31-12 at 23.

- **common office space, address and telephone numbers of corporate entities**: Although HMSPL never lists a phone number because it is a non-functioning entity, its address on the ACRA incorporation document is the same as the one listed for Helbiz Inc.'s address in Singapore. Compl. ¶¶ 16, 125B. Dkt. 31-1 at 10.

- **the degree of discretion shown by the allegedly dominated corporation:** The strikeoff affidavit states that HMPSL never commenced doing business. Thus, it cannot have exercised any discretion.

- **whether the dealings between the entities are at arm's length:** As HMSPL never did business, there were no dealings between the companies. Rather, Helbiz Inc. is solely misusing it.

- **whether the corporations are treated as independent profit centers:** The strike-off affidavit shows that the company never commenced business so it cannot have received the money from the ICO. Palella's and Helbiz's public statements indicate that they received the ICO funds they now claim was conducted by HMSPL, so there was an utter lack of independence with the money flowing directly to Defendants. *See, e.g.* Compl. ¶¶ 115-120 (quoting Defendants as saying "we," "our," and "I" with regard to the ICO, the coin, and the platform).

- **intermingling of property/funds:** In addition to Defendants' public "we," "our," "I" claims of ownership of the assets that they now say belonged to HMPSL, discovery also showed that Helbiz and Palella owned the helbizcoin.io and HBZCoin.com websites, Dkt. 54, supposedly also owned by HMSPL. There is also evidence that Helbiz Inc's chief engineer, Carlos Beltran, used and controlled the servers for the HBZCoin.com website. Dkt. 31-16 (Marques Declaration).

In addition to the forgoing, it is highly relevant that HMSPL never commenced operations as a functioning entity, meaning it cannot have had a separate existence from Defendant Helbiz Inc. Its lack of ever functioning is amply demonstrated at this stage of the case by the ACRA strike off affidavit stating that it never functioned. Dkt. 45-3. But there is still more evidence contradicting Defendants' claim and showing that HMSPL is a shell and a sham that never operated. After Defendants filed the Declaration of Mr. Monni, Dkt. 75, Plaintiffs investigated and learned the following:

- The official address for HMSPL is 19 Cecil Street #04-01. Dkt. 45-3 at 5. This is also the address of Algebra Pte. Ltd., an accounting firm in which Mr. Monni is a partner, and Accountingmate Pte Ltd. another company that Mr. Monni owns. Exhibits A and C. Both Algebra and Accountingmate advertise that they help set up corporations under Singapore law. https://web.archive.org/web/20191230025010/ http://accounting-mate.com/services/companysetup/("AccountingMate provides a full range of services to meet all incorporation requirements including company formations, branch / representative office registration in Singapore. The whole process is on line, we usually get the company operational within 3 hours."); http://www.algebra.sg/services/company-setup/ ("Why Singapore is an ideal place to set-up a business? (sic)").

- The Director of HMPSL is listed as Liu Shujun Dkt, 45-3 who works at Algebra (Shujun is the Tax manager). http://www.algebra.sg/about-us/. Mr. Nasir, who executed the sign off affidavit, id., is involved with Mr. Monni in Accountinmate. Exhibit A.

- In addition to these four companies using the #04-01 address, there are at least 59 more companies at that address. https://opengovsg.com/corporate?building= THE+QUADRANT+AT+CECIL.

- Plaintiffs had an investigator go to 19 Cecil Street following Defendants' filing of the Monni Declaration.  The investigator found that the building does not even appear to have an #04-01 address. It lists only three companies on the fourth floor, of which Algebra is one, but the address is #04-09. Further, there is no #04-09 as such. Rather the entire fourth floor is a workshare space, mostly empty, where Algebra has one seat.  Exhibit D ¶¶ 4-6.

- Finally, despite claiming in his declaration to have been the CFO of HMSPL (an entity which never functioned and therefore never needed a CFO), Mr. Monni makes

19

no reference to that high level position on his LinkedIn profile (listing his experience from 1996 to present). Exhibit E.

Taken together, these facts are certainly sufficient to support a plausible inference not only of domination but of the non-existence of the sham company. The other prong of the test under New York law — "that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil," *Am. Fuel Corp.*, 122 F.3d at 134 — is beyond dispute here, given the clear allegations of a complete abandonment of the contractual promises and of a pump-and-dump scheme. *See, e.g.,* Compl. ¶¶ 44-81. Plaintiffs have therefore alleged (and shown through discovery) enough for their veil-piercing theory to survive a motion to dismiss.

### b. Absence of Corporate Shield

Apart from a veil-piercing theory, Plaintiffs have also alleged that there was no separate legal entity at all as of the time Defendants published the whitepaper and commenced the ICO. According to Singapore government records, HMSPL was not incorporated until February 7, 2018. Compl. ¶ 125E; *see also* ACRA record. Plaintiffs also allege that months earlier, "Defendants PALELLA and HELBIZ published the whitepaper for HelbizCoin in or around November of 2017, although there were later versions (some post-dating commencement of the pre-sale)." Compl. ¶ 29. Even the *fourth* version of the whitepaper, Dkt. 31-12, was issued on February 2, 2018, once again before HMSPL was even incorporated. The whitepaper was issued in Helbiz's name and signed by Palella. Compl. ¶ 121. All of this calls into serious question the good faith of Defendants' representation to the Court that "the Whitepaper was a document prepared by HBZ Systems in January of 2018," Dkt. 78 at 8 n.2, as well as Defendants' repeated rhetorical reference to the "HBZ Systems' whitepaper." Dkt. 78 at 8, 11, 12. And once the corporation *was* legally formed — after the pre-sale had occurred and the ICO was already

underway — the sole member was a company formed by Palella whose leadership overlapped substantially with the Helbiz leadership. *Id.* ¶¶ 125F-G.

Given all of the above, it is far more than plausible that the issuers of HelbizCoin, the authors of all four versions of the whitepaper, and the parties responsible for the resulting contractual obligations, were the Defendants here. This makes them liable for the obligations supposedly undertaken by the non-existent Helbiz Mobility System, which later became HBZ Systems PTE Ltd. *Oost-Lievense v. N. Am. Consortium, P.C.,* 969 F. Supp. 874, 880 (S.D.N.Y. 1997) ("'[G]enerally, a promoter who executes a preincorporation contract in the name of a proposed corporation is himself personally liable on the contract unless the parties have otherwise agreed.'" ), *adhered to on reconsideration*, No. 95 CIV. 0559 (HB), 1997 WL 401665 (S.D.N.Y. July 17, 1997), quoting *Clinton Investors Co. II v. Watkins,* 536 N.Y.S.2d 270, 272 (App. Div. 1989).

### D.  Plaintiffs Have Adequately Pled Trespass to Chattels and Conversion

Defendants raise two red-herring arguments to try to distract from the obvious: that their threat to destroy (and/or force a buyout of) Plaintiffs' HelbizCoins amounts to trespass and conversion. Both are unavailing.

First, the Defendants make the unlikely claim that, for some reason, Plaintiffs agreed to purchase something that conferred no rights on them whatsoever. Relying on language in the Terms & Conditions, Defendants contend that "plaintiffs have no property interest in the smart contract underlying the HBZ coins [because] Plaintiffs agreed to language in capital letters stating that '[i]f the Company believes, in its sole discretion, that any individuals or entities owning HBZ create . . . adverse effects for the company and/or HBZ, the Company reserves the right to either waive and null or forcefully buyout all HBZ from such HBZ owners at the then-

existing market price." Dkt. 78 at 28-29. As explained with regard to the breach-of-contract

claims, however, the record at this stage in the litigation does permit the inference that Plaintiffs

ever assented to these so-called Terms. Accordingly, they should also be disregarded as to the

trespass and conversion claims.

Second, Defendants' argue that the trespass and conversion claims are barred because

they are duplicative of Plaintiffs' breach-of-contract claim. Dkt. 78 at 29. This is not accurate. As

explained in Plaintiffs' response to the Pellegrino Motion to Dismiss, Dkt. 99 at 11, Plaintiffs

have a breach of contract claim independent of any threat to destroy the smart contract. The

claims are not duplicative. Defendants' breach of the promises set out above injured plaintiffs by

reducing the value of their coins and depriving them of the pay-per-use utility. The threat to

destroy the smart contract would have made the coins un-tradable and prevented their

functionality on the blockchain network. Further, the breach of contract occurred well prior to

the destruction threat, which was not even made until May of 2020. Compl. ¶ 109.

### E.  Defendants Have Not Moved to Dismiss Plaintiffs' Claim for Constructive Trust

Plaintiffs' bring a count for constructive trust (Compl. ¶¶ 174-77, Count III), tracing the

coinholders funds into the assets in Helbiz's possession.  Defendants have not moved to dismiss.

### F.  Plaintiffs Have Adequately Pled an Action for Quiet Title

Defendants' motion to dismiss Plaintiffs' quiet title claim (Compl. ¶¶ 178-79, Count IV)

relies on factual assertions that are inappropriate on a 12(b)(6) motion. First, Defendants reprise

their argument that Helbiz and HBZ Systems are "two separate and distinct companies." Dkt. 78

at 30. As explained *supra*, this assertion flies in the face of the complaint and is contradicted by

substantial additional evidence Plaintiffs have already adduced. Second, the Defendants suggest

that the companies' assets would exceed the damages available for breach, but do not support

this claim, much less acknowledge that the damages exceed $38 million based on the

presumptively true allegations of the Complaint. *Id.* Third, Defendants resort once again to the

waivers contained in the purported Terms and Conditions. *Id.* at 31. But as explained *supra*, the

facts for purposes of this motion is that the document was never presented to the purchasers not

were the asked to assent to it. Becuase the arguments are predicated on untenable constructions

of the record at this stage, they fail and must be denied.

### G.  Plaintiffs Have Alleged a Violation of N.Y. Gen. Bus. Law § 349

Defendants' primary argument for dismissing Plaintiffs' New York General Business

Law § 349 claim relies on the same doomed theory that the other defendants have focused on:

that purchasers of HelbizCoin cannot assert a GBL claim because some of them may have

purchased the coin at least partly as an "investment." Dkt. 78 at 31-32. Accordingly, they

contend, the transactions in question could not have been "consumer oriented," which is a

requirement to bring them under the purview of the statute. *Id*.

As Plaintiffs have pointed out in their earlier filings, Dkt. 86 at 21-22, Dkt. 99 at 15-17,

this argument relies on a misunderstanding of the law. A given plaintiff's investment motive is

irrelevant; the proper inquiry is whether the conduct in question affected the consumer market,

regardless of whether investors also participated. *See Koch v. Greenberg*, 626 F. App'x 335, 340

(2d Cir. 2015) (deception in the sale of high-end wine sold as a collectible still could serve as

basis for a § 349 claim, since other purchasers might consume the wine). "[C]onsumer-oriented

within the meaning of the NYGBL is broadly interpreted and requires merely that the conduct at

issue 'have a broader impact on consumers at large'… So long as the conduct at issue *can*

'*potentially* affect similarly situated consumers,' the requirement of consumer-oriented conduct

is met." *Id.*, quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85

N.Y.2d 20 (1995) (emphasis added). Relatedly, the Second Circuit has recognized that

businesses can bring § 349 claims against other businesses, so long as the conduct giving rise to

the claim posed some harm to the public. "[C]orporate competitors now have standing to bring a

claim under [§ 349]… so long as some harm to the public at large is at issue." *Securitron*

*Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotation marks and

citations omitted). Here, Plaintiffs are individuals who themselves purchased HelbizCoins that

had both (putative) consumption and exchange value. Their claims are founded on Defendants'

actions and omissions surrounding the creation of a transportation platform where consumers

have already purchased large numbers of rides. Dkt. 76 ¶ 8(Hannestad Decl.) (average of 10,000

rides per day). There is thus no basis for finding that the conduct in question had insufficient

impact on consumers as a matter of law.

Somewhat absurdly, Defendants themselves are at pains to emphasize the consumption or

use purpose of HelbizCoin elsewhere in their brief. *See, e.g.,* Dkt. 78 at 12 ("The HBZ coin is a

utility token that can be used to purchase transportation services."); 12-13 (noting Singaporean

lawyer's conclusion that "the HBZ coin was a utility token and not a security"); 14 (similar); 15

(similar). As the 12(b)(6) stage, this alone should be sufficient to support an inference that "the

defendant's conduct was consumer-oriented." *Koch*, 525 F. App'x 335 at 340.

Defendants also contend that because *some* cryptocurrencies are commodities or

securities, any transaction in any company's proprietary coin is somehow beyond the reach of §

349. Dkt. 78 at 32. This argument is meritless. At the 12(b)(6) stage, Plaintiffs have alleged —

and Defendants have admitted — more than enough facts to support an inference that

HelbizCoins were marketed and made available to consumers to purchase transportation services

from Helbiz. This is all that is needed to satisfy the "consumer-oriented" prong of the relevant test. *See also Securitron Magnalock,* 65 F.3d. at 264-65 (noting also that the identity of the person or entity bringing the claim is not the operative inquiry).

The other elements of a § 349 claim are not in serious dispute. It is self-evident that the Defendants are alleged to have "engaged in an act or practice that is deceptive or misleading in a material way." Koch v. Greenberg, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014), *aff'd,* 626 F. App'x 335 (2d Cir. 2015). The false marketing, the overall pump-and-dump scheme, and the litany of individual false or misleading statements alleged easily qualify. And as holders of worthless or nearly worthless tokens, all purchasers of HelbizCoins including Plaintiffs have been "injured by reason thereof." *Id.*

Although the Helbiz Defendants do not make an argument relating to the transactions' nexus to New York, Plaintiffs address this issue here as it has been raised by other defendants and therefore may appear in Helbiz's reply. *See, e.g.,* Dkt. 88-1 at 28-29, Dkt. 102 at 17-19. It is true that only a transaction with some New York nexus can give rise to a § 349 claim. See *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 (2002). But the bar for sufficient nexus is not a high one, and it is met in this case. *See People ex rel. Spitzer v. Telehublink Corp*., 301 A.D.2d 1006, 1009 (2003) ("[T]he interests of New York were implicated when [the defendant] used a New York address to send and receive correspondence related to the telemarketing scheme, including the discount benefits package containing the mischaracterized credit card sent to the deceived consumers."); *People ex rel. Spitzer v. H & R Block, Inc.,* 847 N.Y.S.2d 903, 2007 WL 2330924 2007 N.Y. Slip Op. 51562(U) *at* *8 ("*Goshen* only requires that '*(s)ome part* of the underlying transaction' occur in New York for Section 349 to apply.") (emphasis added), *quoting Sterling Nat'l Bank v. Kings Manor Estates*, LLC, 808

N.Y.S.2d 920, 2005 WL 2464167 [NY City Civ.Ct.2005] at *4 n.5.[10] While it is true that a deceptive scheme merely "hatched" in New York and carried out entirely elsewhere would not meet this standard, *Goshen,* 98 N.Y.2d at 324, Defendants did much more than cook up their fraud in New York. As detailed in Plaintiffs' response to the Pellegrino Motion to Dismiss, Dkt. 99 at 14-15, Defendants sent out deceptive communications from New York-based addresses and social media accounts, held marketing events in New York to (fraudulently) promote their coin, executed transactions that required New York-based Ethernodes to function, and perpetrated other aspects of their conspiracy from within New York, *inter alia. See, e.g.,* Compl. ¶¶ 21, 29-33, 39, 42, 53-55, 64, 71-77. At the Motion to Dismiss stage, this is sufficient to support an inference that at least some of the transactions in question had sufficient nexus to New York.

### H.  The Deceptive Practices Allegations Also State a Claim for Common Law Fraud

As plaintiffs have pointed out in their prior responses, the deceptive practices allegations of the Complaint also demonstrate that the Defendants are liable for common law fraud. "The elements of a fraud cause of action consist of a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827,

---

[10] Pellegrino is correct in his reply that there was a "split of authority" in New York courts over the correct test to use in applying *Goshen, i.e.*, whether it is based on the transaction's ties to New York or the location where the victim is deceived. Dkt. 102 at 18. What he fails to mention is that the Second Circuit noted this split *and chose a side*, finding that the better test is "the strength of New York's connection to the allegedly deceptive transaction" and *not* where the plaintiff was deceived. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122 (2d Cir. 2013). The Second Circuit in *Cruz* specifically cited *Telehublink*, 301 A.D.2d  — which found that using a New York address to perpetrate a deception on victims outside of New York violates § 349  — as one of the New York appellate cases whose test it was adopting. Finally, it is of no moment (as Pellegrino suggests, Dkt. 102 at 18) that *Telehublink* was a case brought by the Attorney General. The territorial reach of § 349 is governed by § 349(a), which applies equally to actions brought by private plaintiffs and those brought by the AG. ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."). *See also Goshen*, 98 N.Y.2d (interpreting ¶ 349 (a) as the source of the New York nexus requirement).

59 N.E.3d 485 (2016) (internal quotation marks and citations omitted). The Complaint is replete

with allegations of specific false and/or misleading statements made by the Defendants as well as

material omissions, all of which they knew to be false or misleading. *See, inter alia,* ¶ 14

(Palella's false statements about his background and resources); ¶ 21 (undisclosed bounty

program to create a false sense of interest and buzz around the coin); ¶¶ 29-33 (false and

misleading statements in whitepaper); ¶¶ 39 (false statement that HelbizCoin would be the

"native token for Helbiz transactions"); ¶ 42 (falsely promising "a single payment system

utilizing blockchain to eliminate transaction fees" and falsely representing that the Helbiz

platform was further along than it was); ¶ 53-55 (misleading statements about progress of the

business and reasons for setbacks) ¶ 64 (alleging facts showing that defendants' statements about

building a blockchain-based app were false); ¶¶ 71-77 (string of specific misleading statements

meant to inflate the value of the HelbizCoin to make possible the pump-and-dump scheme).

    While it is true that (unlike a N.Y. Gen Bus. L. § 349 claim) justifiable reliance is an

element of a common law fraud claim, Plaintiffs would not need to prove reliance in an

individualized fashion. Rather, "Plaintiffs can prove reliance on a class-wide basis through

common, circumstantial evidence."[11] *Ge Dandong v. Pinnacle Performance Ltd.,* No. 10 CIV.

---

[11] In his reply, Pellegrino cites a Southern District of New York case noting that the presumption of reliance in material omission cases is not automatic under New York common law as it is in federal securities law cases. *See* Dkt. 102 at 15, 21, 23 (though the quotation at 21 is to the wrong case). That case merely stands for the proposition that a plaintiff cannot show reliance *merely* by showing that an omission (e.g. the omission of the bounty program used to gin up artificial buzz) is material, as he can in a federal securities action. *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 387 (S.D.N.Y. 2011). But broader circumstantial evidence can still support a presumption of reliance without individualized proof. *Int'l Fund Mgmt.* also predates the Second Circuit's decision in *In Re Foodservice Litig.*, 729 F.3d, which made clear that class-wide circumstantial evidence can give rise to an inference of reliance. See also *Ge Dandong*, 2013 WL 5658790 at *10 (acknowledging the impact of *In Re Foodservice*). To the extent Plaintiffs refer in past filings to a presumption of reliance, Dkt. 99 at 20-21, they mean to point out that under New York law, the totality of the facts, including circumstantial evidence, can support such a presumption. *See, e.g., Brandon v. Chefetz,* 485 N.Y.S.2d 55, 59 (App. Div. 1985); *Ackerman v. Price Waterhouse,* 683 N.Y.S.2d 179, 192–93 (App. Div. 1998) (citing *Chefetz* for the proposition that "proof of individual reliance [is] unnecessary in cases involving fraudulent material

8086 JMF, 2013 WL 5658790, at *10 (S.D.N.Y. Oct. 17, 2013). The Court need merely find

that, assuming all the alleged facts are true, it is plausible that Plaintiffs would be able to prove

reliance through "common evidence (that is, through legitimate inferences based on the nature of

the alleged misrepresentations at issue)." *In re U.S. Foodservice Inc. Pricing Litig.,* 729 F.3d

108, 120 (2d Cir. 2013). On the basis of the alleged facts, it is not only plausible, but likely, that

Plaintiffs would ultimately be able to show — via "common evidence" and "legitimate

inferences" — that they justifiably relied on the lies and misrepresentations that painted an

almost entirely fictional picture of what they were buying. Plaintiffs specifically allege that

Helbiz pursued its course of action "in violation of… the coin investors' *objectively reasonable*

*expectations*." Compl. ¶ 44 (emphasis added). As alleged, Plaintiffs bought HelbizCoin thinking

they were buying one thing, when in fact they were buying something else (of virtually no

value). That states a claim for common law fraud.

## I.   Plaintiffs Have Alleged Wrongdoing Against Hannestad and Ciravegna

Defendants claim that the complaint alleges no wrongdoing against Hannestad and

Ciravegna. Not so. The Complaint alleges that Hannestad and Ciravegna joined a conspiracy to

promote HelbizCoin in the whitepaper using false and misleading statements in order to profit

thereby. Compl. ¶ 133. (And the record before the court substantiates this: both Hannestad and

Ciravegna added their names as members of Helbiz leadership in the whitepaper at the center of

this litigation. Dkt. 31-12 at 23.) The complaint further alleges insider participation in the pump

and dump scheme. Compl. ¶ 80. Though evidence is insufficient at this stage to name precisely

---

omissions" and noting that "materially misleading omissions" can "justify[] a presumption of reliance").
Especially given that *Ackerman* and *Chefetz* were decided at the summary judgment and class
certification stages, what Plaintiffs have alleged is certainly sufficient at the 12(b)(6) stage.

who sold when, as members of the Team, Hannestad and Ciravegna would have participated in the 10% HelbizCoin allocation to the team as stated in the whitepaper and thus it is a plausible inference that they sold into the pump and dump. Dkt. 31-12 at 18. Accordingly, the alleged facts make it plausible that they participated as co-conspirators for the acts alleged more specifically with regard to the other Helbiz Defendants. As Plaintiffs noted in earlier filings, Hannestad also spoke at the livestream conducted jointly by Helbiz and Skrill, further enmeshing him in the conspiracy. Dkt. 86 at 6-7.

### III.    MOTION TO STRIKE

Defendants append a motion to strike, which is their right at the pleadings stage, but they misunderstand the reason and grounds for a motion to strike.  Not liking the allegations is not the standard. Plaintiffs are entitled to present in court plausible allegations about Defendant's fraudulent contact and support these with explanation and specificity. Defendants are free to offer evidence to prove Plaintiffs wrong but they cannot short circuit a plaintiffs' "day in court" by excising valid pleadings. *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("In deciding whether to strike a Rule 12(f) motion on the ground that the matter is impertinent and immaterial, it is settled that the motion will be denied, unless it can be shown that *no evidence in support of the allegation would be admissible*. . . . [C]ourts should not tamper with the pleadings unless there is a strong reason for so doing.") (emphasis added); *United States ex rel. Raffington v. Bon Secours Health Sys., Inc.*, 285 F. Supp. 3d 759, 774 (S.D.N.Y. 2018) ("[The allegations sought to be struck] do not 'unnecessarily' reflect on the moral character of an individual or use repulsive language.") (citations omitted); *Slue v. N.Y. Univ. Med. Ctr.*, 409 F.Supp.2d 349, 374 (S.D.N.Y. 2006) ("'[m]otions to strike are generally disfavored and will not

be granted unless the matter asserted clearly has no bearing on the issue in dispute'") (quoting *Zinaman v. USTS N.Y. Inc.,* 798 F. Supp. 128, 135 (S.D.N.Y. 1992).

A. Paragraphs 1-3, 5-6, 12-15, 34-35, 47, 65, 69, 71, 75, 79, 80, 82, 85, 89-92, 94, 100-101, 107-108, 113, 130-131, 133-134, 138, 140, 185-188:

Plaintiffs plead claims for deceptive practices under consumer protection laws, which these allegations support. Compl. ¶¶ 182-84. Similarly, Plaintiffs are entitled to relief under any theory supported by the allegations even if they have not pled an express count. "Generally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim." *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 712 n. 4 (2d Cir. 1980). *See also Tardif v. City of New York,* 344 F. Supp. 3d 579, 592 (S.D.N.Y. 2018) (citing *Marbury* and noting "the Second Circuit's view that district courts should construe complaints liberally"). These allegations support a claim for common law fraud. *See supra* at 27-29. Many of the paragraphs also support the allegations of a common scheme for purposes of conspiracy, which render the various Defendants liable for their co-conspirators actions. *See, e.g.*, Dkt. 99 ay 7-9. Finally, these allegations demonstrate bad faith, a fraudulent motive, and/or wanton and willful conduct on the part of the Defendants, which justifies an award of punitive damages on the claims against them. *See, e.g., Don Buchwald & Assocs., Inc. v. Rich,* 281 723 N.Y.S.2d 8, 9 (App. Div. 2001) (standard for punitive damages in tort cases); *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 316, 662 N.E.2d 763, 767 (1995) (punitive damages available in breach of contract cases where defendant's actions display "such wanton dishonesty as to imply a criminal indifference to civil obligations," and setting forth specific criteria).

B.  Paragraph 12:

The allegation is relevant to the scheme. Defendant Palella failed to make anything of Helbiz for two years. Then, when the cryptocurrency craze struck in late 2017 (a time when many cryptocurrency scams occurred), Defendant Palella changed the company to a supposed blockchain-based platform, which it had not been for the previous two years, solely to take advantage of the frenzy by issuing a cryptocurrency. The prior two years is relevant background to show that the cryptocurrency was part of a scam. In fact, Mr. Palella admits as much in the ANSA article: "'Just when we were close to the launch [of Helbiz], the cryptocurrencies exploded' explains the CEO, in Milan in view of the launch of the application in Italy expected 'next November'. So 'we decided to create our cryptocurrency with an initial coin issue' that is an ICO (initial coin offering) raising '38 million dollars.'" Dkt 31-1 at 11.

C.  Paragraphs 13-14:

In addition to the reasons set out in Paragraph A, much of the ICO sales and secondary market pump and dump was accomplished by Palella making false statements on twitter and creating false impressions of the success of and demand for HelbizCoin. False stories about himself as the founder of Helbiz and the HelbizCoin and of his authority in the cryptocurrency space are part of his misleading campaign and are relevant.

D.  Paragraph 28:

The information is relevant only as background (which is to say, not very) but it is not at all prejudicial. It is also well grounded. No one has yet come forward credibly to identify themselves as the writer of the bitcoin whitepaper. https://en.wikipedia.org/wiki/ Satoshi_Nakamoto ("Satoshi Nakamoto is the name used by the presumed pseudonymous person

or persons who developed bitcoin, authored the Bitcoin whitepaper, and created and deployed bitcoin's original reference implementation.").

E.  Paragraphs 47, 69, 90, 130-131, 185-188:

These allegations are factual and based on Defendants' actual deletions of the Monday updates and public statements in their social media channels. Defendants have not moved with evidence to contradict it. In addition to the reasons set out in Paragraph A, above, the allegations about spoliation create the basis for adverse inferences and also supports Plaintiffs' claim for punitive damages. *Gomez v. Cabatic*, 159 A.D.3d 62, 76, 70 N.Y.S.3d 19, 28 (2018) ("[W]here, as here, a plaintiff recovers compensatory damages for a medical professional's malpractice, a plaintiff may also recover punitive damages for that medical professional's act of altering or destroying medical records in an effort to evade potential medical malpractice liability.").

F.  Facts Headings E, G and H:

The allegations of the complaint describe a scheme commonly knows as a pump and dump. Similarly, the allegations plausible show that the Defendants did destroy evidence and Plaintiffs plainly plead liability based on conspiracy. A pleader is allowed to use headings and these headings are proper.

G.  Paragraphs 100-101:

This is a factually true paragraph. In addition to the reasons set out in Paragraph A, it is relevant to the overall scheme, to the threatened trespass and conversion of the coins, and to punitive damages.  *Anniszkiewicz v. Harrison*, 291 A.D.2d 829, 829, 737 N.Y.S.2d 316 (2002) (Jury properly awarded punitive damages in trespass case "based on defendant's malicious conduct after September 9, 1999, which was intended to intimidate plaintiff")

H.  Heading in Count VI:

Plaintiff agree that there is no spoliation claim under New York law. Plaintiffs do not oppose the request to strike this heading but note for the record that their failure to state a claim does not equate to the standard for a motion to strike and, further, that Defendants have not met the standard.

## IV.  Conclusion

For the foregoing reasons, the Helbiz Defendants' Motion to Dismiss should be denied. To the extent the Court grants the Motion, Plaintiffs request leave to replead.


Submitted: September 11, 2020                                    s/ Michael Kanovitz
                                                                Michael Kanovitz

Michael Kanovitz (*pro hac vice*)
Scott Rauscher (*pro hac vice*)
Karen Newirth
LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Michael Kanovitz, an attorney, hereby certify that on September 11, 2020, I filed a copy of the foregoing via the Court's CM/ECF system and thereby served a copy on all counsel of record.

                                                                /s/ Michael Kanovitz
                                                                *Attorney for Plaintiffs*