UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RYAN BARRON et al., for themselves and
a class of others similarly situated,

                Plaintiffs,

- against -

HELBIZ INC., SALVA TORE PALELLA,
NETELLER (US) INC., SKRILL USA
INC., LORENZO PELLEGRINO, MILOS
CITOVEK, JONATHAN HANNESTAD,
STEFANO CIRA VEGNA, MICHAEL
COPPOLA, GIULIO PROFUMO, JUSTIN
GUILIANO, and SAEED ALDARMAKI,
HELBIZ INC., SALVA TORE PALELLA,
NETELLER (US) INC., SKRILL USA
INC., LORENZO PELLEGRINO, MILOS
CITOVEK, JONATHAN HANNESTAD,
STEFANO CIRA VEGNA, MICHAEL
COPPOLA, GIULIO PROFUMO, JUSTIN
GUILIANO, and SAEED ALDARMAKI,

                Defendants.

20 Civ. 4703 (LLS)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/22/21

---

In this putative class action, plaintiffs claim defendants deceived them into purchasing the HelbizCoin cryptocurrency with the false promise that it would be the exclusive payment method for the nascent Helbiz transportation rental platform, which defendants would build using money generated from the HelbizCoin initial coin offering ("ICO"), and that its value would increase with wide public use. Plaintiffs claim that instead defendants kept much of the money raised in the ICO for themselves, barely built the platform, and accepted legal tender -- rather than

-1-

their proprietary cryptocurrency -- for almost every rental, dooming HelbizCoin after selling off their own tokens while the price was still inflated from the ICO.

Plaintiffs brought this suit for breach of contract, trespass and conversion of chattels, constructive trust, quiet title, and deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, as well as to enjoin the then threatened destruction of the Ethereum blockchain smart contract to which the HelbizCoin is attached. Defendants move to dismiss the case.

The nature of the HelbizCoin ICO was stated in two documents: primarily the Whitepaper, which sets forth the token-like aspect and functions of HelbizCoin and the Helbiz transportation platform, how the money from the ICO would be spent, how the token and platform would be integrated, and how its value would increase to all parties' benefit.  That is the presentation attacked by the Amended Complaint, together with claimed false promises by the defendants in the promotion of sales.  The other document is the Terms and Conditions, a legalistic definition setting forth the essential terms of the offer to purchase HelbizCoin during the Initial Coin Offering, including prohibition of any purchases in the United States or by U.S. residents, and  provisions that the governing law shall be that of Singapore whose courts shall have exclusive jurisdiction over any disputes.

The Terms and Conditions of the Feb 3, 2018 Initial Coin Offering shun any U.S. jurisdiction. They state "You shall not acquire the HBZ Token if you are a citizen, resident (tax or otherwise) or green card holder of the United States of America" (par. 2.1); they assert (in the prelude) that the offer "does not pertain in any way to an offering of securities in any jurisdiction including in the United States of America (U.S.A.)".

The law firm of Chung Ting Fai & Co. of Singapore gave a legal opinion dated 27 April 2020 which states at p. 7, without a supporting reference, that "The archival record of the token/sale placement was also inspected by the U.S. Regulator, the S.E.C., for the purpose of verifying if any U.S. Citizen or Resident ("U.S. Persons") ever participated in the pre-sale or regular sale ICO exercise, which was confirmed not to be the case."

1.

Helbiz Coin (the "token"), the cryptocurrency at the center of this case, is a security.

The Securities Act of 1933, 15 U.S.C. § 77b(a)(1), and the Securities and Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), both include "investment contract" in their definitions of the term "security." The United States Supreme Court has defined "investment contract":

> In other words, an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946). That definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Id. at 299.

Helbiz Coin satisfies the Howey definition. Defendants treated the token as an investment from its inception. The Helbiz Coin Whitepaper's discussion of the initial coin offering ("ICO") states

> In order to further develop the platform, Helbiz will conduct a token generation event that will offer 520.000.000 HBZ tokens of the 1 billion total supply. The funds raised will be used for development of the Helbiz platform, business development; onboarding new car owners, rentals, dealerships, collaborate with insurance and PR & Marketing companies to raise project awareness, token usability while at the same time building a strong local community.

Helbiz Mobility System Whitepaper, Ex. J to Plaintiffs' Motion for Preliminary Injunction, at 17. Helbiz and its CEO Salvatore Palella described how the Helbiz transportation platform and the token were a common enterprise:

-4-

- "We are now only focused on launching and scaling operations, creating value for early investors and the #HBZ coin." Id. ¶¶ 87, 124.

- "Helbiz is focused on the long term success of HBZ and therefore the team [is buying] $1m (USD) of HBZ on the open market, paired with additional large buy walls on the main exchanges, to strengthen the company's position both internally and to new investors #Helbiz." Id. ¶ 120(I) (alteration in original).

They also worked to get the token listed on various cryptocurrency exchanges:

> A. The tweet from PALELLA on May 31, 2018: "May has come to an end. @Helbizofficial is more attainable and launched on 11 exchanges, finished our updated UI for our apps, acquired a new office in NYC and will now focus on the press aspect globally. #hbz #Helbiz."
>
> B. The tweet from PALELLA: "Eventful first 60 hours of the week, with our third exchange of the week – @Helbizofficial will list on @hitbtc!" This included a response from Defendant PELLEGRINO: "Impressive"
>
> C. Postings to PALELLA's personal facebook page: "Happy to be in #London for the launch of @Helbizofficial $HBZ (4/26) in the exchange";
>
> D. "Helbiz is now listed on its first exchange!";
>
> E. "We are happy to partner with Anthony Diorio and his team listing Helbiz on Jaxx.io";
>
> F. "Proud of my Helbiz team. I love the Jaxx.io integration. ExchangeS (sic) coming soon!" and a link to an article "Helbiz HBZ token integrated into Jaxx Multicurrency Digital Wallet";
>
> G. "Helbiz is now live and listed on bonus exchange Mercatox with a Top 10 exchange listing coming soon!";
>
> H. "It is now 1 month since Helbiz got listed, and today 30 days later Helbiz is traded on 11 exchanges and 26 markets globally. With product launch getting

>       closer I am excited for the next couple of months!
>       #HBZ #Helbiz #HelbizP2P #HelbizPay";
>
>       I. Also, @Helbizofficial tweeted in November of 2018:
>       "We are working on listing one [of] Jaxx's large
>       partner exchanges."

See id. ¶¶ 120. And plaintiffs constantly call themselves investors in the complaint (33 times) and describe the defendants' program as a "pump and dump" investment scheme:

>       This action is brought to obtain justice for
>       approximately 20,000 small investors who were swindled
>       in a crypto currency scam called HelbizCoin
>       perpetrated by Defendants PALELLA and HELBIZ INC.
>       ("HELBIZ"). The scam preyed mainly on small,
>       unsophisticated investors, with the average investment
>       being approximately $2,000. But by leveraging the
>       exponential messaging capacity of social media
>       worldwide, and by creating purposeful misimpressions
>       about the size of the company and the popularity of
>       the investment, Defendants were able to trick
>       thousands of people and extract over $40 million
>       dollars by an initial coin offering ("ICO") and by
>       later dumping the coins on the secondary market.

Complaint ¶ 2. The token was an expected source of profit on resale, and its purchase was a classic "laying out of money in a way intended to secure income or profit from its employment." Howey, 328 U.S. at 298.

While Helbiz Coin was initially sold as both a method of paying transportation fare and an investment product, when Helbiz repeatedly delayed adopting the token as its exclusive payment method, it became increasingly clear that the token was in fact an investment. After promoting Helbiz Coin as the

"native token for Helbiz transactions," the company stalled the integration of the token into its platform:

> 55. HELBIZ also changed its story about the role that the HelbizCoin would play. First, it announced plans to expand HelbizCoin's use case far beyond transportation to restaurants and online shopping and in point of sale terminals with retailers world wide. This was bunk, intended to soften the blow of the rest of the announcement.
>
> 56. Simultaneously with announcing these new ambitions for the coin, HELBIZ said that it had redesigned the platform so that it did not use HelbizCoin.
>
> 57. HELBIZ tried to justify the announcement with doubletalk to the effect that it was supposedly acting in the best interest of the coin holders by delaying its promise to make HelbizCoin the platform's currency because taking fiat currency instead of HelbizCoin would drive adoption of the platform and thereby (allegedly) increase the value of HelbizCoin when HELBIZ switched the platform over to HelbizCoin at a future date.
>
> 58. The company announced that the switch from fiat to HelbizCoin would now happen in a fourth phase of the development, Helbiz V4.0: "In the 4th phase Helbiz will utilize its user base, previous growth and position within local communities to phase out direct fiat payments in the Helbiz app moving towards a crypto only solution. All purchases, even with credit card, will simply purchase HBZ of the open market via the exchange API to fill the in-app wallet which will only hold HBZ making it the only accepted currency." (Compl. ¶s)

When Helbiz eventually began accepting the token, "it was in parallel with fiat prices, not exclusive as promised, and did not get much use as a result." Id. ¶ 66. Helbiz then abandoned the notion that the Helbiz Coin would

be its exclusive payment method, while the token's value plummeted.

Speaking of Helbiz's planned destruction of the token, Helbiz engineer Carlos Beltran tweeted "I'm a lead engineer at HELBIZ and can say a thing or 2 about the matter - I integrated HBZ as a partner payment solution. We didn't see enough usage of HBZ @hbzcoin as trip payments, and therefore discontinued the partnership." Id. ¶ 115.

The economic reality is that buyers of Helbiz Coins in the ICO expected they would profit from the tokens' value rising along with demand as Helbiz used revenue from the ICO to grow its transportation platform and promote token use. The token's admittedly trivial use as a transportation fare was dwarfed by its promotion, purchase and use as an investment product, just as the buyers of tracts of land for citrus cultivation in Howey had "no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment." 328 U.S. at 300.

The Helbiz Coin is an investment in a common enterprise, from which the investor was led to expect profits primarily from defendants' entrepreneurial efforts. Its use as a fare for transportation was insignificant. "If that test be satisfied, it is immaterial whether the enterprise is speculative or non-

speculative or whether there is a sale of property with or without intrinsic value." Id. at 301.

From any point of view, the Helbiz Coin is a security.

2.

To invoke the application of United states law to this case, plaintiffs argue (their Sept. 11, 2020 opposition brief, p.26):

> Defendants sent out deceptive communications from New York-based addresses and social media accounts, held marketing events in New York to (fraudulently) promote their coin, executed transactions that required New York-based Ethernodes to function, and perpetrated other aspects of their conspiracy from within New York, inter alia. See, e.g., Compl. ¶¶ 21, 29-33, 39, 42, 53-55, 64, 71-77. At the Motion to Dismiss stage, this is sufficient to support an inference that at least some of the transactions in question had sufficient nexus to New York.

On the contrary, that is what the Supreme Court in Morrison v. National Australia Bank, Ltd., 561 U.S. 247, 130 S. Ct. 2869 (2010) rejected in suits by disappointed investors, as a basis for extraterritorial application of the U.S. law.  It held that the proper test was "transactional": not where the deceptive action took place, but whether the purchases were made in the United States or on a domestic exchange,  It said:  The transactional test we have adopted - whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange - meets that [non-extraterritorial] requirement."  id at 269, 130 S. Ct. at 2886.

The Court explained:

> Applying the same mode of analysis here, we think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). See *SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to "regulate," see *Superintendent of Ins. of N.Y v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); it is parties or prospective parties to those transactions that the statute seeks to "protec[t]," *id.,* at 10, 92 S.Ct. 165. See also *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195 , 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies. Id. at 266, 130 S.Ct. at 2884.

3.

In this case there is no dispute: the HelbizCoin was not listed on a domestic exchange.

Nor were there domestic off-exchange purchases. The complaint points to none. (¶126 says each of the ten named plaintiffs purchased the HelbizCoin, some in the ICO, some on the secondary market. From their names, nine of the ten appear to be foreigners. The purchases of the tenth, Ryan Barron, are not specified.)

Declarations by two class plaintiffs are submitted as typical. Mr. Khanchandani resided in the United Arab Emirates

"at all times when I purchased HelbizCoin" on the ICO website (his Sept. 11 Declaration). Mr. Szklarek "resided in the U.K. at all times when I purchased HelbizCoin." (his August 17, 2020 Declaration.) When their purchases took place "the parties became bound to effectuate the transaction" Absolute Activist Value Master Fund Ltd. V. Ficeto, 677 F.3d 60, 67 (2d Cir. 2012). "Given that the point at which the parties became irrevocably bound is used to determine the timing of a purchase and sale, we similarly hold that the point of irrevocable liability can be used to determine the locus of a securities purchase or sale." id at 68. In other words, their purchases took place in, respectively, the U.A.E. and the U.K. when they completed "registering for the ICO and in executing the transaction on the helbizcoin.com site" (both Declarations). There was no facility for purchase within the United States.

Similar purchases took place in scattered locations around the world, but not in the United States.

Thus, this case does not meet the Morrison test (561 U.S. at 273, 130 S.Ct. at 2888):

> Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States. This case involves no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still have live claims occurred outside the United States. Petitioners have therefore

-11-

failed to state a claim on which relief can be granted.

4.

Plaintiffs argue for a different approach. They allege, without contradiction, that the HelbizCoin interactive website, used by such purchasers as Khanchandani and Szklarek, was housed on a server in Kansas "and all HelbizCoins were issued from there" (complaint ¶ 25). Plaintiffs say the ICO sales took place "physically" on those servers. id. They say, "More broadly, all transactions in HelbizCoin during the ICO and on the secondary market could only be completed via Ethereum, and those transactions occur within the United States" (Plaintiffs' Aug. 3, 2020 brief, p. 5).

The Ethereum blockchain is

> . . . a global network of decentralized ledgers or "nodes" which must jointly agree to cause the coin to transfer from one owner's address to another on the blockchain. . . .
>
> The Ethereum blockchain clearly has more nexus to one country than any other: the United States, home to by far the most Ethernodes and almost twice as many as the country with the next-highest number, China. id pp 5-6.

Involvement of the Ether nodes in the United States was

-12-

necessary to complete the transaction, and plaintiffs argue that "Wherever else the relevant transaction may have been contemporaneously added to the blockchain, it [was] certainly also executed within the territorial limits of the United States." id., p.6. They point out that it is on Ethereum that the buyer's coins are specified and transferred to his wallet, when the nodes in the U.S. agree, among themselves and with other foreign nodes, to note their changed address on the shared ledger. id., p. 7.

Thus, plaintiffs say, "the sale of that virtual currency was executed on a network of digital nodes that have more nexus to the U.S. than to any other country." id., p. 7.

But all that machinery for generating, administering, and delivering the bitcoin could be located in Kansas, Germany or Brazil without affecting the location of the offer and acceptance of the purchase.

Morrison dealt with the location of the change in the legal relationship between persons, not the electronic operations of creation, transport and delivery of the product.

Mr. Khanchandani did not purchase his bitcoins in Kansas. He purchased them in the United Arab Emirates, where he accepted the offer and agreed to the contract of purchase. Mr. Szklarek purchased his in Great Britain, not Kansas.

## Conclusion

The HelbizCoin Initial Coin Offer was of a security which was not listed on a United States exchange or purchased in the United states.  As stated in Morrison, p. 11-12 supra:

> This case involves no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still have live claims occurred outside the United States.  Petitioners have therefore failed to state a claim on which relief can be granted. (561 U.S. at 273)

The complaints are dismissed without prejudice to renewal in other jurisdictions.

So Ordered.

Dated:   New York, New York
         January 22, 2021

         _Louis L. Stanton_
         LOUIS L. STANTON
         U.S.D.J.