# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RYAN BARRON, FILIPPO BULGARINI D'ELCI, GRANT ECHOLS, ANTHONY CALIXTE, DENIS DASARI, ILLIA CHEHERST, ANDREW SKZLAREK MARAT GARIBYAN, RISHI KHANCHANDANI, DANIILS LEBEDEUS, DONG SEOK LEE, KAMEEL JIWA, TAREK RAHMAN, FRANCISO PEREIRA, and ABHISHEK SIKARIA, for themselves and a class of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> HELBIZ INC., SALVATORE PALELLA, ANTHONY DIIORIO, DECENTRAL INC., PAYSAFE LTD., LORENZO PELLEGRINO, SKRILL USA INC., ALPHABIT DIGITAL CURRENCY FUND, BINARY FINANCIAL, GIULIO PROFUMO, JONATHAN HANNESTAD, JUSTIN GIULIANO, SAEED ALDARMAKI, and unknown Defendants, <br><br> Defendants | **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> Civil Action No.: 1:20-cv-04703-LLS |

## FIRST AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

OVERVIEW OF THE ALLEGATIONS ...................................................................1

PARTIES..................................................................................................................9

    A.    The Plaintiffs ...............................................................................................9

    B.    Defendant Helbiz Inc..................................................................................17

    C.    Defendant Paysafe Ltd................................................................................18

    D.    Defendant Skrill USA Inc...........................................................................20

    E.    Defendant Salvatore Palella........................................................................21

    F.    Defendant Lorenzo Pellegrino.....................................................................22

    G.    Defendant Giulio Profumo ..........................................................................22

    H.    Defendant Justin Giuliano ...........................................................................23

    I.    Defendant Jonathan Hannestad ...................................................................24

    J.    Defendant Anthony Diiorio (a/k/a "Anthony Di Iorio").............................25

    K.    Defendants Saeed Al Darmaki, Alphabit and Binary....................................29

    L.    The Unknown Defendants ...........................................................................37

JURISDICTION AND VENUE ...........................................................................37

FACTS ..................................................................................................................39

    A.    The Ethereum Blockchain Network .............................................................39

        (1)    A decentralized, shared ledger .......................................................39

        (2)    Use of wallets ................................................................................41

        (3)    The transaction execution process..................................................42

        (4)    HelbizCoins are transferred in the United States ...............................45

(5)    "Genesis" wallets ...............................................................46

(6)    Money laundering on the Ethereum network.....................................48

B.    The HelbizCoin Smart Contracts...........................................................50

C.    The HelbizCoin ICO.............................................................................52

(1)    Promoting the ICO ...................................................................53

(2)    Defendants conducted the ICO in the United States...........................59

D.    Defendants Use Wash Sales And Money Laundering During The ICO.......61

(1)    Recycling ETH spent in the ICO to make fake purchases.................62

(2)    Large purchases faked by four genesis wallets.................................65

(3)    A fifth genesis wallet sends ETH to the creator wallet, 0x8bc2.........70

(4)    A sixth genesis wallet sends test transactions to the ICO contract and a "whale" wallet makes more fake purchases.......................................71

(5)    The PELLEGRINO Wallet (0xf3f4) and the SKRILL Wallet (0xedac) ...................................................................................76

(6)    PALELLA steals ETH and then sends it to the same Binance account used by a seventh genesis wallet.......................................................77

(7)    More DIIORIO frauds: EOS, Civic and other ICOs..........................81

E.    Defendants' Promises and False Representations in the Whitepaper ...........85

(1)    Promised "sharing economy" ecosystem using blockchain technology and carsharing smartphone app .......................................................86

(2)    Promised centrality of the HelbizCoin-only payments .......................91

(3)    Material omissions in the whitepaper and concealment of the plan for the HelbizGo scooter service..........................................................94

(4)    Knowingly false timetable for performance .....................................95

F.    Defendants Prepare to Kick Off The Pump And Dump..............................97

ii

(1)   Laundering coins to dumping wallets ....................................................98

(2)   Creating more hype ..........................................................................101

    a.   PELLEGRINO bolsters the Helbiz Team............................. 102

    b.   Corporate partnerships between HELBIZ, PAYSAFE and SKRILL...................................................................... 104

G.   Commencement Of The Pump and Dump: The PAYSAFE Livecast ........108

(1)   Palella and Hannestad .....................................................................109

(2)   Pellegrino........................................................................................114

(3)   Other Livecast speakers and Hannestad's conclusion ......................118

H.   Defendants Dump Hundreds Of Millions Coins On Unsuspecting Buyers 120

(1)   Defendants begin dumping the coins immediately ...........................121

(2)   More false statements......................................................................122

    a.   False claims that the insiders were not selling their coins..... 122

    b.   False statements about the progress on the promises ........... 125

    c.   More hype ......................................................................... 127

(3)   SKRILL pumps the HelbizCoin and adds more exchanges..............128

(4)   Defendants continue dumping the coins ..........................................135

    a.   The PELLEGRINO Wallet.................................................. 135

    b.   The PALLELA Wallet........................................................ 135

    c.   The 0x7c99 Wallet............................................................. 136

    d.   HELBIZ Engineer Carlos Beltran and others....................... 139

I.   Trading the HelbizCoin on Exchanges......................................................140

(1)   U.S.-based transactions ...................................................................140

(2)    Centralized exchanges...................................................................141

(3)    Decentralized exchanges ...............................................................143

(4)    Residence of the traders ................................................................144

J.    HELBIZ Unveils Its "HelbizGo" Scooter Product, Admits That It Breached, And Makes Fraudulent Promises To Cure The Breach.............................144

(1)    No carsharing ecosystem................................................................145

(2)    Using credit cards instead of HelbizCoin.........................................146

(3)    No HelbizPay app..........................................................................148

(4)    PALELLA embezzled all the money ...............................................149

K.    Defendants Create, Babylonia, a Fake Exchange They Used to Steal........150

L.    PALELLA Prepares a Public Offering on the NASDAQ ..........................154

(1)    PALELLA lies to new investors and fraudulently conceals HELBIZ's connection to HelbizCoin...............................................................155

(2)    PALELLA changes the names associated with HelbizCoin from "Helbiz Inc." to "HBZ Systems" and then deletes evidence of Helbiz Inc.'s involvement .........................................................................160

(3)    PALELLA acts in bad faith to make the coins useless.....................161

(4)    Defendants lean on the exchanges to delist HelbizCoin...................165

(5)    PALELLA announces the IPO and concocts a false story about HelbizCoin for the SEC filings .....................................................166

        a.    False statements about HBZ System ...................................... 168

        b.    Prior admissions by PALELLA, HELBIZ, PELEGRINO, and SKRILL................................................................................. 169

        c.    ICANN Registrar records also disprove HELBIZ's statements to the SEC ......................................................................... 174

M.    PALELLA Uses Threats And Extortion Against The Coin Holders ..........175

(1)    PALELLA threatens to destroy the smart contract ...........................176

(2)    The extortionate Exit Swap .............................................................177

(3)    Further evidence that PALELLA was behind the extortionate threats
.......................................................................................................182

    a.    PALELLA owned the websites ............................................ 182

    b.    HELBIZ engineer Carlos Beltran coded HBZCoin.com ....... 183

    c.    Carlos Beltran also controlled the *private key* to 0x8bc2 ...... 184

        (i)    Immediately after the destruction threat, Carlos Beltran created "Helbiz Tokens" on Roptsen Testnet.............. 184

        (ii)    PALELLA provided Beltan the private key to 0x8bc2 186

        (iii)    Defendants submitted knowingly false affidavits in court
.............................................................. 187

    d.    The ICO started before HBZ System existed ........................ 188

    e.    PALELLA changed the websites and social media to conceal his involvement in HelbizCoin ............................................. 189

    f.    PALELLA displayed consciousness of guilt by tampering with subpoenaed evidence and then filing a false declaration with the Court after he got caught........................................................ 189

N.    Defendants' Racketeering............................................................................191

(1)    Wire Fraud in violation of 18 US. Code §1343 ...............................192

(2)    Travel In Interstate and Foreign Commerce to Promote Criminal Activity in violation of 18 US. Code §1952 .....................................194

    a.    Travel by PELELLA, PELLEGRINO, HANNESTAD, and ALDARMAKI for the PAYSAFE Livecast .......................... 195

    b.    Travel by PALELLA and DIIORIO to meet co-conspirators 196

    c.    Travel by DIIORIO to meet Defendants in New York City.. 196

      d.     Travel by PELLEGRINO to meet EXMO exchange representatives in Kyiv .......................................................... 196

      e.     Travel by PALLELLA, DIIORIO and HANNESTAD to meet co-conspirators in Italy ......................................................... 196

    (3)    Financial Institution Fraud violating 18 US Code § 1334 ................197

    (4)    Money Laundering in violation of 18 US Code § 1956....................198

    (5)    Extortion in violation of NY Penal Law § 155.05 ............................199

    (6)    Larceny by false promise violating NY Penal Law § 155.05 ...........200

    (7)    Defendant's pattern of racketeering .................................................201

    (8)    Use and Investment of Racketeering Proceeds .................................203

    (9)    Corrupt Acquisition and Maintenance of an Interest in and Control of an Enterprise...................................................................................204

  (10)   Corrupt Control of or Participation in an Enterprise........................205

  (11)   Conspiracy......................................................................................205

O.   The Damages Suffered by The Coin Holders.............................................206

NAMED PLAINTIFFS AND THE CLASSES.....................................................208

COUNT I - BREACH OF CONTRACT ..............................................................214

COUNT II – TORTIOUS INTERFERENCE........................................................216

COUNT III – TRESPASS AND CONVERSION OF CHATTELS ....................217

COUNT IV – CONVERSION OF FUNDS AND EMBEZZLEMENT ..............217

COUNT V – CONSTRUCTIVE TRUST.............................................................219

COUNT VI – QUIET TITLE ...............................................................................219

COUNT VII – COMMON LAW FRAUD ...........................................................220

COUNT VIII - CONSUMER PROTECTION/UNFAIR PRACTICES................221

COUNT IX – NEGLIGENT SUPERVISION......................................................221

COUNT X –SECURITIES FRAUD AND PRICE MANIPULATION – Violations of § 9 of the Securities Exchange Act of 1934 .................................................222

COUNT XI – SECURITIES FRAUD --Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder.............................223

COUNT XII –VIOLATIONS OF SECURITIES EXCHANGE ACT § 20(a) .....227

COUNT XIII--MARKET AND PRICE MANIPULATION  IN VIOLATION OF THE COMMODITIES EXCHANGE ACT  AND RULE 180.1(a), 7 U.S.C. §§ 9(a)(1), 13(a)(2), 25,  and 17 C.F.R. § 180.1(a) ..................................................229

COUNT XIV – PRINCIPAL/AGENT LIABILITY  COMMODITIES EXCHANGE ACT........................................................................................233

COUNT XV – AIDING AND ABETTING COMMODITIES EXCHANGE  ACT....................................................................................................233

COUNT XVI – RACKEETERRING INFLUENCED AND CORRUPT ORGANIZATIONS ACT (“RICO”) – 18 U.S.C. § 1961 *et seq*...........................234

COUNT XVII – NEGLIGENT MISREPRESENTATION .................................235

COUNT XVIII -- UNJUST ENRICHMENT ......................................................235

COUNT XIX – RESPONDEAT SUPERIOR ......................................................236

PRAYER FOR RELIEF ......................................................................................237

JURY DEMAND .................................................................................................238

APPENDIX..........................................................................................................238

Now come Plaintiffs, RYAN BARRON, FILIPPO BULGARINI, GRANT ECHOLS, DENIS DASARI, ILLIA CHEHERST, ANTHONY CALIZTE, ANDREW SKZLAREK ,MARAT GARIBYAN,  RISHI KHANCHANDANI, DANIILS LEBEDEUS, DONG SEOK LEE, KAMIL JIWA, TAREK RAHMAN, FRANCISO PEREIRA, and ABHISHEK SIKARIA, for themselves and a class of others similarly situated, by and through their undersigned attorneys, LOEVY & LOEVY, and complaining of Defendants, HELBIZ INC., SALVATORE PALELLA, ANTHONY DIIORIO, PAYSAFE LTD., SKRILL USA INC., LORENZO PELLEGRINO, ALPHABIT DIGITAL CURRENCY FUND, BINARY FINANCIAL, GIULIO PROFUMO, JONATHAN HANNESTAD, JUSTIN GIULIANO,  SAEED ALDARMAKI, and unknown defendants, state as follows:

## OVERVIEW OF THE ALLEGATIONS

1.     Throughout history, hucksters and charlatans have been piggybacking on technological advancements to fleece unsuspecting investors with get-rich-quick schemes. Of late, the blockchain technology that gave rise to cryptocurrencies has proved very fertile ground for these types of frauds.

2.     Defendant SALVATORE PALELLA perpetrated one such fraud, called HelbizCoin. PALELLA preyed on newer investors, mainly young people, who saw the price of cryptocurrencies rising rapidly and did not want to miss out

1

on this proverbial gold rush. By the time PALELLA tried to exit the scam, two and a half years later, he had swindled more than 20,000 people, many of whom had handed him their life savings.

3.      Rarely can one commit fraud on such a grand scale without accomplices, and PALELLA had several. One was Defendant ANTHONY DIIORIO, a crypto industry influencer who made billions fleecing investors in cryptocurrencies like HelbizCoin. DIIORIO was a constant stop on the "roadshows" in which promoters pitched their new coin projects. He would jump start their sales by making large annonymous purchases to create a sense of market demand for the new coins and draw in the public. The promoters would then launder DIIORIO's money back to him, with DIIORIO keeping the coins.

4.       DIIORIO perpetrated this fraud and related moneylaundering techniques with the promoters of dozens of cryptocurrency projects including some of the largest like Bancor, Civic, EOS, and others.

5.      DIIORIO also baited investors with misleading articles published in Bitcoin Magazine, then run by DIIORIO's sister, and other industry press. These stories were released at important junctures to add the necessary patina of legitimacy to the new coins.

6.      Another of PALELLA's accomplices was Defendant LORENZO PELLEGRINO. He brought the necessary connections to the burgeoning but largely unregulated community of online cryptocurrency exchanges.

2

PELLEGRINO made these connections through his business providing payment rails like the Visa network to the exchanges and online casinos.  His company was called "Moneybookers," now known as "SKRILL," and is part of the PAYSAFE GROUP. Both joined as partners in the fraud.

7.      Defendants ran a racket. They set up Internet websites and published a whitepaper (swaths of which were plagiarized) laying out the pitch for a new cryptocurrency they called HelbizCoin. According to the whitepaper, PALELLA's company, HELBIZ, had developed a revolutionary new product – a sharing economy "ecosystem" for car owners to rent out their cars. The whitepaper likened it to AirBnB, but with a blockchain component that would allow HELBIZ to accomplish far grander results. According to the whitepaper: "'Helbiz will revolutionize the transportation industry by decentralizing the sharing economy & giving personal control to the user.'"

8.      Dendants deserve credit because it was a brilliant concept. The sharing economy model, which had been made possible by the advent of the Internet and smartphones, was allowing startups like AirBnb and Uber to disrupt entire industries. Car ownership was ripe for that same sort of disruption, and blockchain technology could add genuine value and open a competitive advantage for sharing economy platforms that relied on it. It was exactly the sort of opportunity that investors were clamoring to get in on.

9.      Defendants's pitch offered them their chance. All transactions in the ecosystem would be paid for in HelbizCoin, creating a once-in-a-lifetime opportunity for those who bought the coins before the ecosystem launched. Defendants were selling HelbizCoin to investors pre-launch, they said, to raise money to complete the ecosystem, which they claimed was just about done and ready to be launched in a few months. Public sales of cryptocurrency are called an "Initial Coin Offering" or "ICO."

10.     Unfortunately, the promised ecosystem product did not exist. It was not about to be released, and never was. Rather, Defendants just strung investors along for two and a-half years while they stole hundreds of millions of dollars.

11.     One way the conspirators fleeced the investors was through the ICO, which PALELLLA repeatedly has said raised $40 million. Defendants sold HelbizCoin in exchange for another cryptocurrency, Ether (abbreviated ETH), which has appreciated markedly, making the haul worth approximately $250 million at recent exchange rates.

12.     But Defendants did not stop there. PELLEGRINO and DIIORIO arranged for online cryptocurrency exchanges to list the HelbizCoin for trading (under the ticker symbol "$HBZ"). These exchanges gave the conspirators access to millions of new investors, whom they tricked into buying hundreds of millions more HelbizCoins.

4

13.    Defendants made up even bigger lies to drive demand for this pump and dump scheme. Their new story was that HELBIZ would use the technology it had supposedly already developed for the ecosystem to create an amazing new product: a smartphone app that would make HelbizCoin the backbone of a worldwide payments system that would disrupt the Visa network at point-of-sale terminals everywhere. PELLEGRINO added the names of his payments companies, PAYSAFE and SKRILL, as partners in the project to make the story plausible to the credulous investors.

14.    Defendants debuted their pump and dump scheme at a "livecast" event which was hosted at PAYSAFE's headquarters. They displayed the slick-looking new system to the livecast audience with slides of a smartphone app (which they called "HelbizPay") for sending HelbizCoin payment in lieu of credit cards, together with a Helbiz-branded point-of-sale hardware appliance to interface with it.

15.    In reality, there was no app and no appliance. The pitch was made up and the slides at the PAYSAFE livecast event were CGI fakes.

16.    Defendants also used Bitcoin Magazine to echo the false story in an article published two days later (emphasis in original):

"Currently, Helbiz is <u>working directly with the Internet payments and money transfer company Skrill</u> and their CEO, Lorenzo Pellegrino, on a large-scale partnership, with the goal of promoting the mainstream

adaptation of digital currencies, and in particular their use and integration through Helbiz. According to Palella, this partnership, along with a few other integration opportunities in the works, could eventually make Helbiz one of the most widely accepted digital currencies in the world."

17.    PELLEGRINO proceeded to create a Skrill-branded social media advertising campaign to encourage new investors to buy HelbizCoin while the collective Defendants -- PALELLA, PELLEGRINO and DIIORIO included -- used the exchanges to dump hundreds of millions more coins. For example:



18.    Likewise, PALELLA took to social media to discourage the public from selling their coins during the pump and dump, even while he and his co-conspirators were selling hundreds of millions of their own coins to unsuspecting buyers:



← Tweet

**Salvatore Palella**
@palella

If you sell even a single $HBZ for under $1 before the platform has launched in July, you have really not understood the scale of the project from day 1. It is always a choice to sell, but you should probably REMOVE crypto investor from your bio then.

19. When the smoke cleared, Defendants had minted over one billion HelbizCoins and stolen hundreds of millions of dollars.

20. Defendants never delivered on the promises for HelbizCoin. Quite to the contrary, within six months of the PAYSAFE livecast, HELBIZ released an app for renting Helbiz-branded electric scooters paid for with standard credit cards processed by SKRILL. The coin investors were completely cut out.

21. The scheme did not stop there. With the scooter app up and running, PALELLA wanted to pitch HELBIZ to a whole slew of new investors via an IPO on the NASDAQ. But to do the IPO, he needed to exit the fraud and untangle HELBIZ from its promise to only use HelbizCoin.

22. The exit came on May 4, 2020. PALELLA, acting through a puppet company he called HBZ System ("HBZ" was the ticker symbol for HelbizCoin),

7

issued a statement that *HBZ System,* and not HELBIZ, was the actual issuer of

HelbizCoin. The statement added that the company would soon be destroying the

computer code by which the coins exist (a "smart contract"). Unlike traditional

coins, cryptocurrencies have no physical existence; the threat to destroy the code

meant the coins would essentially disappear without a trace.

23.    The threat was followed shortly by a public offer from a second

PALELLA puppet, a Bahamian company called Quantum Analysis Management,

stating that it was willing to buy HelbizCoins from the investors for a pittance

(0.00000094 ETH per coin, or 1/1000 of what they had paid).

24.    Faced with the total loss of their assets, some of the coin holders

capitulated to PALELLA's extortion and took the deal. Others, including the

Plaintiffs here, did not bend. Instead, they have come to court to get justice.

25.    Although Defendants made millions scamming the public, the irony is

that they would have made far more if they just executed on their promises for

HelbizCoin. Palella himself predicted a profit of more than $10 per HelbizCoin

once HELBIZ executed on its promises. At $10 per coin, Plaintiffs and the class

would have earned over $10 billion.

26.    PALELLA's quantification of the damages in this case is correct.

Companies that pursued similar sharing economy models are now worth upwards

of $100 billion. The Uber ride-sharing platform has a market cap of $70 billion and

8

the less labor intensive AirBnb home-sharing model is valued at $100 billion. Carsharing has better economics than both of these platforms and the cryptocurrency component can leverage growth. For example, Helium, a decentralized company that allows users to earn the Helium Token by sharing their home wifi, started at 27 cents and recently hit $51per coin with a market cap of over $10 billion.

27.     Everyone could have made money if the Defendants had just used their genius building the ecosystem they promised instead of stealing from the public.

28.     Plaintiffs seek damages in excess of $10 billion, which amount should be trebled under the Racketeering Influenced and Corrupt Organizations Act (RICO), plus punitive damages.

29.     Plaintiffs also seek a permanent injunction to prevent destruction of the smart contract and specific performance to make HelbizCoin the sole currency accepted by HELBIZ for its products and services and specific performance of HELBIZ's promise to build the ecosystem.

## PARTIES

### A.     The Plaintiffs

30.     Ryan Barron is a citizen and resident of Texas. He presently holds 3,471,893 HelbizCoin ("HBZ") which he purchased during the class period using

the Exmo, HitBTC, and Mercatox crypto trading websites on the servers discussed below.

31.    Mr. Barron's life was upended as a result of Defendants' fraud. Duped by their promises, he spent essentially everything he had to buy HelbizCoins. He even moved 300 miles away from his home, taking a dangerous job in an oil field, to earn more money to buy the coins. Once he realized that he had been taken in by Defendants' scam and lost his life savings, and that there was no hope of Defendants delivering on their promises for HelbizCoin, he suffered a breakdown and isolated himself from family and friends. The havoc he experienced also ruined his relationship with his significant other.

32.    Fillipo Bulgarini D'Elci is a citizen and resident of Italy.  He presently holds 1,497,415 HBZ which he purchased during the class period using the Mercatox crypto trading website on the servers described below.

33.    To address the losses Defendants inflicted on him, Mr. Bulgarini had to take extra work in an extremely stressful job. He also spent many nights with insomnia, worried and frustrated about how the losses would hang over him and continue to impact his life. Mr. Bulgarini became despondent and, at times, considered suicide.

34.    Plaintiff Gerald Anthony Calixte is an American citizen and resident of Florida. He currently holds 19,400 HBZ which he purchased in the

United States during the class period using Mercatox on the servers described below.

35.    Grant Echols is a citizen and resident of California. He presently holds 18,000 HBZ which he purchased during the ICO on a server in Kansas. On February 12, 2018, he purchased all 18,000 coins at a rate of one Ethereum token ("ETH") per 8,000 HBZ. Defendants were fully aware of Mr. Echols' American citizenship when selling him HelbizCoin.

36.    The same is true of all the Plaintiffs who bought in the ICO, each of whom provided all of the information and documentation requested of them by Defendants. Plaintiffs make specific allegations as to the U.S. citizen-plaintiffs because Defendants have falsely claimed to this Court that they excluded U.S. citizens from the ICO. As with their multiple other false statements previously made to the Court, Defendants' claim not to have sold the coins to U.S. citizens is yet another lie.

37.    Mr. Echols further knows that two of his friends, also U.S. citizens, purchased in the ICO, just as he did.

38.    Illia Cheherst is a citizen and resident of Ukraine.  He presently holds 10,584,8667 HBZ which he purchased during the class period using the Bitlish, Coinhub, Exmo, HitBTC, and Mercatox crypto trading websites on the servers described below.

11

39.     In December 2017, Mr. Cheherst left his position as a top manager in an advertising company having saved to start a business of his own. Unfortunately, he was taken in by Defendants' lies and decided to invest the money in HelbizCoin instead. Even as the price of the coin dropped, he continued to believe Defendants' lies that their product release was just around the corner and their false claims of expanding lines of business, so he continued to buy more in hopes of recouping his losses. When the fraud became clear and the price dropped essentially to zero, Mr. Cheherst became depressed and incapacitated. He had to cease supporting his mother and sister, whom he has previously provided with monthly allowances, and had to move into his mother's house.

40.     Denis Dasari is a citizen and resident of the United Kingdom.  He currently holds 1,876,434 which he purchased during the class period using Exmo on the servers described below.

41.     Mr. Dasari invested in HelbizCoin because he believed in the business visions that Defendants were touting. As with many others, Mr. d'Asari chased his losses and bought more as the result of the encouraging (but false) statements Defendants kept making about the company and their imminent product releases. He suffered increasingly painful losses as a result.

42.     Marat Garibyan is a citizen and resident of the Russian Federation. He presently holds 11,539,149 HBZ which he purchased during the class period using Mercatox, Bitlish, and Exmo on the servers described below.

12

43.     Defendants' fraud upended Mr. Garibyan's life and that of his family. Due to his losses, Mr. Gaibyan could not fully provide for his family as he had before. His family includes a severely disabled child who needs medication and around-the-clock care. The losses also left the family, and the child in particular, vulnerable when the Covid-19 pandemic started as they were unable to pay for additional medical care and medicines.

44.     Daniel Grieves is a citizen and resident of Ohio. He presently holds 249,718 HBZ which he purchased during the class period using Idex on the servers described below.

45.     Kameel Jiwa is a green card holder and resident of Florida where he has lived at all times relevant. He presently holds 30,317 HBZ which he purchased in the ICO, on March 3, 2018, for 5.05 ETH.  He truthfully provided his address information and all documentation asked of him corroborating his status as U.S. resident.

46.     Rishi Khanchandani is a citizen and resident of the United Arab Emirates. He currently holds 2,355,037 HBZ which purchased during the class period in the ICO (on a server in Kansas) and on the exchanges alleged below.

47.     Danils Lebedevs is a resident of Germany. He currently holds 1,299,950 HBZ which he purchased during the class period using the Bitlish, Exmo, IDEX, and Mercatox websites on the servers described below.

13

48.    Dong Seok Lee is a citizen and resident of the Republic of Korea. He presently holds 70,460 HBZ which he purchased during the class period. During the ICO, on February 14, 2018, he bought 12,000 HBZ for 2 ETH. Those purchases took place on a server in Kansas. Mr. Lee also bought HBZ during the class period using the HitBTC site on the servers described below.

49.    Francisco Javier Suarez Pereira is citizen and resident of Venezuela. He currently holds 460,698 HBZ which he purchased during the class period using the Bitlish, Coinhub, Exmo, Hit BTC, Idex and Sistemkoin sites on the servers described below.

50.    When Mr. Pereira saw Defendants' advertisements and promises about their product, he made the decision to invest his personal life savings in HelbizCoin. Persuaded that the Defendants were legitimate, he told his immediate family members about the opportunity and they followed him with their life savings as well. He suffered losses as the price fell, but continued to believe the Defendants' lies that they would release the product soon, so he borrowed money from still more relatives to buy more coins in hopes of getting back to even or better. Eventually he tried to contact HELBIZ and PALELLA through their social media channels, but they blocked him. He panicked and sold a large chunk of his HBZ holdings at a huge loss in order to try and recoup at least something.

51.    Mr. Pereira felt ashamed to tell his family what had happened. He despaired and his wife separated from him. He has had to emigrate to earn higher

wages so that he could pay back his debts to his family, which continues to this day. He returns home every few months but then has to leave again to earn money to pay down the debts caused by Defendants' fraud.

52.    Tarek Rahman is a citizen and resident of Ontario, Canada. He currently holds 1,598,737 HBZ. During the ICO he purchased 37,506 HBZ, between February 24, 2018 and March 3, 2018, for a total of 6.251 ETH. He also purchased HBZ during the class period using Bitlish, Exmo, HitBTC, IDEX, and Mercatox sites on the servers described below, as well thru a decentralized exchange called Etherdelta, which was hosted at all relevant times on a server in California.

53.    Abishek Sikaria is a citizen of India and a resident of the United Arab Emirates. He presently holds 26,056,186 HBZ which he purchased following the ICO using the Bitlish, Coinhub Exmo, and Idex sites on the servers described below.

54.    Andrew James Stanislaw Szklarek is a citizen and resident of the United Kingdom. He presently holds 22,359,861 HBZ which he purchased during and following the ICO. During the ICO, on February 12, 2018, he paid 1.785 ETH for 14,250 HBZ and on March 2, 2018 he paid 7.54 ETH for 45,240 HBZ. He also bought over 20 million HBZ during the class period using the Bitlish and Idex sites.

55.     Mr. Sikaria was taken in by Defendants' scam and invested a large part of his savings in shortly after the PAYSAFE livecast. He bought more even as the price went down, continuing to believe Defendants' lies, and expecting that he would regain what he had lost once they followed through on their promises. Mr. Sikaria eventually resorted to using high interest credit cards for purchases to cover his purchases.

56.     Mr. Szklarek invested a large sum of money in the HelbizCoin which turned into a complete loss (which would be worth approximately $700,000 dollars at current ETH exchange rates). After suffering devastating losses, he became consumed with a sense of failure and embarrassment, and lost the ability to trust others. He and his family were forced to cut back as much as they could: they sold their car, cancelled their wedding party, and could no longer send his son to private school. He also had to lay off employees and eventually lost his business.

57.     Mr. Szklarek attempted to participate in Defendants' HelbizCoin for ETH swap in 2020 to salvage some of his losses and pay for his family to move. He sent emails to the address specified in the offer. He was given the runaround for several months and was eventually told he could only have 2.3x less ETH than was represented in the open offer because ETH had since increased in value. In the end, Defendants kept putting him off, and then simply deleted their website as described below.

16

58.    Other class members are U.S. citizens, residing in New York, California, and other states. One such class member bought HelbizCoin after PALELLA personally solicited members of her family to buy HelbizCoin, and she was looking forward to being able to use it to purchase travel on private jets and yachts as HELBIZ had represented. She bought it through the ICO website and provided pictures of herself and a picture of her U.S. passport. Two other members of her family, also U.S. citizens, did the same. Later, after announcing the end of the ICO, PALELLA again personally solicited her family members to purchase more HelbizCoin from him directly saying that it would soon be listed on exchanges so they could sell it at a profit.

## B.    Defendant Helbiz Inc.

59.    Defendant Helbiz Inc. ("HELBIZ") is a Delaware Corporation with its headquarters and principal place of business in New York City, New York. It claims to have offices in Singapore, although that address is a maildrop or shared space for dozens or more companies. HELBIZ did not operate there. As with the other Defendants, HELBIZ benefited from having its connection to the United States.

60.    HELBIZ, acting through Defendant PALELLA and others with the power to bind it, made the contractual promises and committed the frauds and other violations alleged herein. Among other remedies, Plaintiffs demand specific

17

performance requiring HELBIZ to accept only HelbizCoin as payment for its products and services.

## C.     Defendant Paysafe Ltd.

61.    Defendant PAYSAFE LTD is a Bermuda Corporation with its principal place of business in the United Kingdom. It is registered to do business in New York and its agent for service is CT Corporation, 28 Liberty Street, New York, New York.   "PAYSAFE" refers to Defendant PAYSAFE LTD and its predecessors in interest.

62.    PAYSAFE runs a mammoth international business providing electronic payment systems and cryptocurrencies. It operates in the United States through the brand names "Skrill," "Neteller" "Rapid Transfer" and others. PAYSAFE uses the d/b/a "Paysafe Group" to refer itself and its subsidiaries: "Paysafe Group comprises Paysafe Limited, together with its subsidiaries."

63.    An April 16, 2018 joint-statement by PALELLA and PELLEGRINO represents that PAYSAFE is a partner with HELBIZ and SKRILL in the HelbizCoin project.  According to PALELLA, HELBIZ's partners received HelbizCoin allotments.

64.    PAYSAFE is the successor to Neteller Ltd., a company described by the United States Department of Justice (DOJ) as "an Internet payment services company that facilitated the transfer of billions of dollars of illegal gambling proceeds from United States citizens to the owners of various Internet gambling

18

companies located overseas" giving them access to bank accounts. Following indictments, Neteller LTD changed its name to Neovia Financial and then to Optimal Payments.

65.    Defendant PELLEGRINO joined Optimal Payments in March of 2012 and was employed by the company during its 2015 rebranding to "PAYSAFE" to late 2021.

66.    PAYSAFE services online casinos and cryptocurrency exchanges under its Skrill brand. Payments made at point-of-sale terminals are also within PAYSAFE's line of business, which it pursues through Skrill and other brands. "NETeller" (also sometimes written as "Neteller" and "NETELLER") is another PAYSAFE brand. It refers to a digital wallet service owned by PAYSAFE.  The Skrill brand also provides digital wallets. These digital wallets include cryptocurrency sales and custody.

67.    At all times relevant, PELLEGRINO has been an employee of PAYSAFE and its predecessors. PAYSAFE identifies him to the public variously as "CEO Digital Wallets," "CEO Skrill, NETeller and Income Access," and as part of PAYSAFE's "Senior Management Team."  PAYSAFE's 2021 prospectus, lists PELLEGRINO as amongst "our executive officers" and discloses that he is paid by PAYSAFE

68.     PELLAGRINO is PAYSAFE's employee and agent. He acted within the scope of his employment with regard to all his conduct alleged in this complaint.

69.     PELLEGRINO's announcement of PAYSAFE's partnership with HELBIZ was important, among other reasons, because of its experience in the blockchain space. As CEO of digital wallets, PELLEGRINO had authority over the blockchain engineers employed by SKRILL and PAYSAFE.

## D.     Defendant Skrill USA Inc.

70.     Defendant SKRILL USA Inc. (SKRILL) f/k/a Moneybookers USA Inc., is part of the Paysafe Group and a subsidiary of Defendant PAYSAFE. It is a Delaware corporation. During much of the time of the fraud alleged herein, SKRILL's principal place of business was 61 Broadway, Suite 1603, New York City, New York. Its current principal place of business is One Biscayne Tower, 2 S. Biscayne Blvd., Suite 2630, Miami, Florida. SKRILL holds PELLEGRINO out as its CEO.

71.     SKRILL does business in New York City, New York and its registered agent for service is CT Corporation, 28 Liberty Street, New York City, New York.

72.     SKRILL is a FINCEN-licensed and regulated money services business.

20

73.     The April 16, 2018 joint-statement by PALELLA and PELLEGRINO represents that SKRILL is also a partner with HELBIZ in the HelbizCoin project.

74.     Plaintiffs are informed and believe that PELLEGRINO and/or SKRILL control the "Skrill Coins" Ethereum wallet discussed below.

**E.      Defendant Salvatore Palella**

75.     Defendant SALVATORE PALELLA is a citizen of New York and resides in New York City. As of the HELBIZ listing on the NASDAQ in 2021, PALELLA owned the majority of HELBIZ shares and controlled the company's actions, and may still.

76.     Among other matters, PALELLA is one of the primary architects of the conspiracy by which the members agreed that HelbizCoin would be used to steal from inventors through false facts, omissions and promises that would not be, and were not intended to be, performed, all as alleged herein. Together with the other conspirators, he received proceeds worth more than $350 million that Defendants stole.

77.      No later than November of 2017, an agreement was formed among PALELLA and others to use the Internet, the Ethereum network, and other instrumentalities of interstate and foreign commerce to commit crimes involving HelbizCoin as alleged herein. The members of the conspiracy understood and agreed that they would promote HelbizCoin using false facts and promises they did not intend to perform, all as alleged herein. The members of the conspiracy include

21

the Defendants named herein as well as other presently Unknown Defendants who may be indentified through discovery.

## F.     Defendant Lorenzo Pellegrino

78.    Defendant LORENZO PELLEGRINO is a citizen of Florida, a personal friend of Defendant PALELLA, and the cousin of Luca Santambrogio, a present or former HELBIZ employee and former employee of another of PALELLA's companies, SP1.  During the course of the fraud, PELLEGRINO met with Defendants at the HELBIZ headquarters in New York City.

79.    PELLEGRINO, acting for himself and as the agent of SKRILL and PAYSAFE, joined the conspiracy no later than when he added his name to the ICO website, HelbizCoin.com, and through him the Skrill, Netteler and Income Access brands, and began publishing false and misleading statements to aid the fraud as a member of the "Helbiz Team," in or about January of 2018.

80.    On information and belief, PELLEGRINO owns and/or controls the "Pellegrino Coins" Ethereum wallet which he used in the course of the conspiracy, as explained below.

## G.     Defendant Giulio Profumo

81.    GIULIO PROFUMO is a citizen of and domiciled in New York. He is listed as a "team" member in the whitepaper. He is also the CFO of Defendant HELBIZ. As the CFO, he was an insider who would have been able to see Defendants' fraud unfold in real time.  A CFO would also have been in charge of

the money raised in the ICO and thus, would have known about the related money laundering described below. He routinely worked for HELBIZ in New York.

82.    Additionally, PROFUMO added his name to the whitepaper. PROFUMO stated that he had eight years of experience in the blockchain space, which is unlikely given that his experience would have had to have started only two years after the Bitcoin whitepaper was published, inaugurating blockchain as a technology, and his LinkedIn profile lists no such experience.

83.    In addition, PROFUMO participated in the pump and dump, making misleading public statements about the prospects for HELBIZ and emphasizing its work in the blockchain space when he knew that HELBIZ was breaching the representations in the whitepaper and was about to release HelbizGo, without any blockchain component, taking credit cards instead of HelbizCoin and keeping all of the money.

84.    Mr. Profumo also received shares in HELBIZ in connection with its offering on the NASDAQ.

**H.    Defendant Justin Giuliano**

85.    JUSTIN GIULIANO was "President [of] Blockchain Operations" for HELBIZ. He added his name to the ICO website as a member of the team behind HelbizCoin, touting his supposed experience in blockchain technology. GIULIANO made these statements in order to engender trust among investors that HELBIZ could perform the promises about HelbizCoin and to induce purchases.

23

In addition to making the promises contained in the ICO website and whitepaper and joining the conspiracy alleged herein, GIULIANO also was an author of the whitepaper, making material false statements and omissions. He also directly conducted the ICO as the investor relations manager. He engaged in this conduct while in New York.

**I.    Defendant Jonathan Hannestad**

86.    Defendant JONATHAN HANNESTAD is or was the "Creative and Strategic Director" for HELBIZ. He added his name to the ICO website as a member of the team behind HelbizCoin, touting his supposed international business experience. HANNESTAD made these statements in order to engender trust and induce purchases of the HelbizCoin.

87.    In addition to making the false promises contained in the ICO website and whitepaper and joining the conspiracy alleged herein, HANNESTAD also spoke at the PAYSAFE livecast event in which he made multiple false statements and omissions to create the misimpression that the promised HELBIZ products were almost complete and about to launch.

88.    HANNESTAD also directly conducted the ICO on behalf of HELBIZ. For example, Plaintiff Lee submitted questions about the ICO through the ICO website and received a response directly from Defendant HANNESTAD. HANNESTAD sent the email from his corporate email address "Jonathan@Helbiz.com" with a signature block stating that he was "Creative and

24

Strategic Director, Helbiz" It included a phone number in the 917-area code (New York City) and a website address of helbizcoin.io.

89.     HANNESTAD was also the primary point of contact between HELBIZ and the developer of HelbizGo. He engaged in this conduct while in New York. HELBIZ paid the New York-based developer of HelbizGo with the funds from the ICO (after first trying unsuccessfully to convince the developer to accept HelbizCoin).

90.     As to all statements and actions alleged herein, the HELBIZ-employee Defendants acted with authority from HELBIZ, and PELLEGRINO acted with the authority of SKRILL and PAYSAFE. Moreover, each actor knew that by making the announcements, promises, and promotions described herein, it was facilitating HELBIZ to commit fraud.

**J.     Defendant Anthony Diiorio (a/k/a "Anthony Di Iorio")**

91.     Defendant ANTHONY DIIORIO is a cryptocurrency industry influencer who entered the space in 2013. His early companies include: Decentral Inc., a cryptocurrency incubator; Satoshi Circle, an Internet gambling site for Bitcoin; and a Bitcoin atm service which permitted customers to acquire Bitcoin anonymously. Decentral also runs Jaxx.io, the cryptocurrency wallet that carried HelbizCoin, and a crypto industry news outlet called Decentral TV.

92.     DIIORIO was among the earliest and largest investors in Ethereum. As such he received one of the largest, if not the largest, caches of the

25

cryptocurrency, ETH, at the inauguration of the Ethereum network on July 30, 2015.

93.     These payments of ETH were provided to the initial investors in what are called "genesis wallets." Genesis wallets make up only .0045% of the 200 million wallets that have transacted on Ethereum. Yet, eight genesis wallets were active participants in the HelbizCoin fraud as discussed below, clear and convincing evidence of DIIORIO's hand.

94.     Plaintiffs are adding Mr. DIIORIO to this Amended Complaint after receiving information from several sources about Mr. DIIORIO's involvement with HelbizCoin and the other Defendants.

95.     First, after the case was filed, a whistleblower reached out to counsel with evidence that Defendant PALELLA met with Defendant DIIORIO during the course of the fraud.

96.     Second, one of the documents that Defendants filed as Dkt. 24-1 represents, among other matters, that a sizeable percentage of the money raised in the ICO went to DIIORIO and Jaxx for serving as an advisor to HELBIZ and for promoting HelbizCoin to Jaxx customers by including it in the Jaxx wallet. The letter also said that HELBIZ paid hundreds of thousands more to list HelbizCoin on the HitBTC exchange, which, based on the facts alleged below, was brokered by DIIORIO.

26

97. Based on the forgoing disclosures, Plaintiffs undertook an investigation into DIIORIO which yielded additional evidence as detailed throughout this complaint.

98. First, Plaintiffs have found that at least eight genesis wallets are connected to the HelbizCoin fraud. Some of these wallets also laundered money from the fraud to accounts at cryptocurrency exchanges where it could be converted to cash. Not only is DIIORIO one of the extremely limited pool of people who received a genesis wallet at all, but DIIORIO would have been among the even more limited pool of those who received multiple genesis wallets. He is also the only genesis wallet recipient known to have worked with HELBIZ on the HelbizCoin. Moreover, the wallets involved in the HelbizCoin fraud are among the biggest genesis wallets, having received hundreds of thousands of ETH. DIIORIO was the biggest early Ethereum investor.

99. Plaintiffs have also discovered that Mr. DIIORIO was present with members of HELBIZ in New York City in May of 2018, where they split the costs of a party on a yacht, during the early stages of the pump and dump fraud.

100. Plaintiffs have also learned that the Christie Harkin, who was the Managing Editor of Bitcoin Magazine (but who now works at Coindesk), is Mr. DIIORIO's sister, and a former employee of his company Decentral.

101. Bitcoin Magazine assisted the HelbizCoin fraud both at the ICO and pump and dump stages by publishing a series of false and misleading articles

27

promoting PALELLA and the HelbizCoin ICO. These include: Helbiz: The Blockchain AirBnB for Transportation (Jan. 22, 2018) (announcing the forthcoming ICO); Helbiz: The Emerging Blockchain + Transportation Intersection (Jan. 29, 2018) (reminding readers that the ICO was underway and stating that 30 million tokens had already been sold); A "Four-Wheel" Economy Parked Right Up the Block (March 15, 2018); Helbiz: Blockchain and the New Future of Mobility (April 28, 2018) (published immediately after the coin was listed for trading and including false statements about the progress of development of the promised products, among others).

102.    Bitcoin Magazine went so far in service of the Defendants as to name HELBIZ one of the top companies shaping the future of blockchain and cryptocurrencies, listing it with the likes of IBM, despite the fact that it had no product or service and no trackrecord developing on Ethereum or any other blockchain.

103.    It is unlikely that Bitcoin Magazine would have published something so dishonest were it not for DIIORIO's influence on his sister.

104.    Moreover, Plaintiffs have uncovered other Bitcon Magazine articles using the same *modus operandi* with other DIIORIO-connected ICOs while Ms. Harkin was the Managing Editor. This includes, for example, Goldmint and the Future of Gold Ownership (September 19, 2017); Goldmint's Bold Quest Into the Future (September 26, 2017); Goldmint and the Future of the Gold Trade (October

28

10, 2017), <u>Goldmint Partnership Signals Strategic Advancement</u> (October 3, 2017).

105.   Plaintiffs therefore are informed and believe based on the foregoing and the other evidence of DIIORIO's involvement pleaded herein, that DIIORIO published the false and misleading statements about HelbizCoin in Bitcoin Magazine and that he did so with intent to mislead and profit through fraud.

106.   HelbizCoin was but one of DIIORIO's ICO frauds. In fact, DIIORIO played a central role in popularizing the use of ETH as a method of fundraising for new cryptocurrency projects. The so called "ICO craze" he helped kick off drove the market cap of ETH to over $600 billion in recent valuation with the market cap of ERC-20 tokens adding several hundred billion more.

107.   As one of the largest holders of ETH, DIIORIO was constantly solicited by entrepenuers with new cryptocurrencies projects. He was therefore able to cut deals with the founders (as well as other backers and promoters like Defendants Alphabit and Binary, Argon Group, CoinFund, and Michael Terpin's company, Aspire) to add liquidity in their ICOs using fraud and moneylaundering to make fake purchases and conceal the truth from the public.

108.   The Appendix hereto contains a list of additional coins where DIIORIO entered into such arrangements.

**K.   Defendants Saeed Al Darmaki, Alphabit and Binary**

29

109. Defendant ADARMAKI was a high-placed Helbiz "Team Member." He received second place billing on the ICO website, right behind Defendant PALELLA. He entered into a conspiracy with DIIORIO as well as the Helbiz Defendants and Paysafe Defendants.

110. ALDARMAKI is or was Managing Director of Defendants ALPHABIT and its sister company Defendants BINARY FINANCIAL ("BINARY").

111. According to a post by Defendant HELBIZ in the "@HelbizOfficial"[1] channel on Medium.com, HELBIZ added ALDARMAKI to is board: "NEW

---

[1] From the time of its founding in 2017 until February 9, 2022, "@HelbizOfficial" was the social media channel for Defendant HELBIZ Inc. Plaintiffs informed HELBIZ of this amended complaint on February 1, 2022. Then on February 9, 2022, HELBIZ changed its official social media channel to "@Helbiz" thereby disabling links to some posts cited herein. See www.twitter.com/helbizofficial/status/1491339390937104385



YORK, New York—Helbiz, the peer-to-peer vehicle sharing startup added a new strategic advisor to its board today, Saeed Aldarmaki. Mr Aldarmaki is Managing Director of Alphabit Digital Currency Fund, and is also a personal investor in the blockchain-based transportation sharing service."

112. In the same announcement, HELBIZ described itself as follows: "Helbiz is the seamless blockchain child of AirBnB, Hertz and Uber. With full mobile control over any vehicle combined with blockchain technology, Helbiz is revolutionizing the market. Blockchain technology authorizes the registration of all services provided through the platform and validates transactions between owners, operators, and external services automatically through a single payment system."

113. Given his inside position on HELBIZ's board, ALDARMAKI had access to the inner workings of PALELLA's plan and certainly would have known that HELBIZ had created none of the features described in the announcement nor in the whitepaper and thus that the announcement in his and his companies' names was false.

114. ALDARMAKI allowed HELBIZ to make false statements in his name on multiple occasions. For example, on or about February 15, 2018, the first day of the ICO "crowdsale," HELBIZ published an article on its Medium.com channel entitled: <u>Renowned Digital Asset Fund, Binary Financial, Officially Joins</u>

Helbiz. The article quoted ALDARMAKI, speaking on behalf of HELBIZ: "We are pleased to announce that on the first day of the Helbiz ICO we have partnered with international digital asset hedge fund, Binary Financial." It said that BINARY was joining the "long list" of HELBIZ strategic investors, and that BINARY intended to be involved in shaping HELBIZ's business.

115.    Alphabit and Binary were frequently involved with DIIORIO in other fraudulent ICOs. These are set out in the appendix.

116.    The article goes on to say that Harry Yeh, represented to be the Managing Partner of BINARY (ALDARMAKI claims to be BINARY's "Managing Director") agrees with PALELLA on the "Helbiz vision" and then quotes PALELLA: "It is important for our investors to believe in our team and our use case in the transportation market and we are very happy to have binary financial on board."

117.    ALDARMAKI likewise spoke at the PAYSAFE Livecast, immediately after HANNESTAD and PELLEGRINO had made a slew of false statements to the worldwide audience. Nevertheless, ALDARMAKI endorsed HELBIZ to the audience and took no steps to correct the lies he had just heard.

118.    On February 20, 2018, Defendant HELBIZ published an article on Medium.com entitled: HELBIZ: The decentralized AirBnB for transportation, closes $5.5m presale and launches ICO backed by AlphaBit & Binary Financial.

35

Defendants deleted this article as part of their scheme to exit the fraud and to disadvantage Plaintiffs in the litigation.

119.   Plaintiffs do not know the exact date the article was deleted but it certainly occurred prior to PALELLA's announcement of his threat to destroy the HelbizCoin smart contract.  Because of the deletion, Plaintiffs do not have the particulars on the article to plead here. However, discovery will show the details of the arrangement among HELBIZ, BINARY and ALPHABIT.

120.   Although Defendants deleted the entire set of Medium.com articles, they had posted links to it in the @HelbizOffical social media channels and the dead link still appears today in the archives of the official corporate HELBIZ Inc. FaceBook page, further proving that HELBIZ was the entity conducting the ICO:



Based on the title of the article, its timing at the outset of the ICO crowdsale, and Defendants' efforts to cover it up, discovery is likely to further demonstrate that Defendants ALPHABIT and BINARY were backers of the fraudulent ICO and participants in the HelbizCoin fraud.

## L.    The Unknown Defendants

121.    The unknown defendants are persons and entities who knowingly assisted DIIORIO to launder ETH and other cryptocurrencies, including exchanges and trading desks.

122.    The unknown defendants also include persons and entities with whom DIIORIO conspired to commit fraud in the other ICOs, including founders, backers and promoters.

## JURISDICTION AND VENUE

123.    The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because diverse of citizenship exists among the parties, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs, and there are one hundred or more members of the Class.

124.    CAFA's minimal diversity requirement is satisfied for two reasons. First, Defendant HELBIZ is domiciled in Delaware (its state of incorporation) and New York City (its headquarters), while multiple of the named plaintiffs are domiciled in other U.S. states; thus, at least one class member is a citizen of a state

37

different from at least one Defendant. 28 U.S.C. § 1332 (d)(2)(A). Second, given

Defendant HELBIZ's Delaware and New York citizenship, and given that multiple

Plaintiffs are citizens of a foreign state, at least one Plaintiff is a citizen of a

foreign state, and at least one Defendant is a citizen of a state. 28 U.S.C. § 1332

(d)(2)(B).

125.   The Court also has jurisdiction under 28 U.S.C. § 1331 as Plaintiffs

bring claims under federal securities and commodities laws, as well as under the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

126.   This Court has personal jurisdiction over Defendant PALELLA,

PROFUMO and HANNESTAD because they are residents of New York City,

New York, and because much of their misconduct occurred here. The court has

jurisdiction over HELBIZ because it is headquartered here and committed the

misconduct here. The Court has personal jurisdiction over PELLEGRINO,

PAYSAFE LTD., SKRILL USA INC., DIIORIO, GIULIANO, ALDARMAKI,

BINARY and, ALPHABIT because each joined a conspiracy based in New York,

and a substantial portion of which was carried out in New York. Additionally,

SKRILL (and PAYSAFE through SKRILL) does business in New York, and

SKRILL is licensed by New York State.

38

127.   Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because: (a) at least five of the Defendants reside here and (b) a substantial part of the acts or omissions giving rise to the claims occurred here.

## FACTS

### A.    The Ethereum Blockchain Network

128.   This Complaint provides the following overview of the Ethereum network for two reasons. First, because Defendants used the Ethereum network to commit fraud and launder the profits, an introduction to how the system functions is needed to explain their schemes.

129.   Second, in accordance with the law of this Circuit, Plaintiffs allege several, independent bases for application of U.S. laws to Defendants' misconduct. One of these is that title to the HelbizCoins transferred inside the United States. Plaintiffs explain how the network functions to support the allegation that title transferred domestically.

#### (1)    A decentralized, shared ledger

130.   HelbizCoin is a digital ERC-20 token. Such tokens exist only as an entry on the electronic ledger of the Ethereum network.

131.   The Ethereum network is a collection of independent (decentralized) computers distributed throughout the world but with the highest concentration (nearly half) located in the United States.

39

132. The computers in the Ethereum network are called nodes. Each node maintains its own copy of the electronic ledger. Similar to how a bank uses its single, centralized ledger to record dollars in a depositor's account, either crediting or debiting the account in the event of a transaction, the Ethereum network records transactions by having nodes update their copies of the shared ledger.

133. For a bank account, the credit or debit occurs where and when the bank makes the notation in its ledger. For the Ethereum network, however, the notation of a debit or credit (and thus control of the coin) is not completed until a sufficient number of the network nodes (essentially a majority) have updated their copies of the shared ledger to reflect the debit or credit.

134. In order for each node to coordinate the shared ledger, the nodes must communicate with each other about each transaction. To do this, they use a peer-to-peer transmission method.

135. Specifically, each node is connected to a set of other nodes on the network, but not all nodes connect to each other. In fact, each is connected only to a few, with each of those connecting to sets of other nodes. When a given node receives data from one of its connections, it shares that data with the rest of its connections. Those nodes do the same thing in turn, so the data travels much like a line of children playing "telephone." Because each node connects to multiple other

nodes, the messages propagate throughout the network along multiple branching and intersecting lines.

### (2)    Use of wallets

136.    ERC-20 is a standard for digital tokens like HelbizCoin. In order to own an ERC-20 token, a user needs an address on the Ethereum ledger (just as a depositor needs an account on a bank's ledger). The address is a unique string of letters and numbers, called a public key, that is cryptographically tied to a private key. The private key functions essentially as a password showing that a transaction purporting to come from a given address on the ledger was in fact signed by the owner of that address.

137.    A piece of software called a "wallet" holds a user's private key and connects to the network. To send a transaction, the wallet uses the Internet to establish communication with an Ethereum node, usually one nearby. Once connected, the wallet sends that node a message about the transaction the user wants to execute, identifying the public address to which the user wants to send coins, and signing the message with the private key for the user's own address.

138.    Key pairs (public key and corresponding private key) can be generated by any computer using a publicly available algorithm. Thus, there is no sign-up or registration process required to use the Ethereum network, and so no

41

one need reveal their identity to create an account. As a result, there is no central repository identifying who owns which addresses.

139.   There is no cost to generate an address. There are currently over 200 million addresses recorded on the Ethereum electronic ledger.

140.   Each address is often referred to as a "wallet" as shorthand, and Plaintiffs use that terminology in this complaint, referring to unique addresses as wallets.

### (3)    The transaction execution process

141.   Once a wallet has connected to a node and sent it the transaction message, that node will forward that message on to other nodes to which it is connected. The recipient nodes, in turn, pass the message along to other nodes to which they are connected, and so forth.

142.   As messages propagate through the network, each node keeps a copy of each message it receives such that each node has a list (or pool) of transactions that are waiting to be executed.

143.   Execution of the transaction begins when one of the nodes takes the transactions out of the pool, records it in a "block" of other transactions, and sends the block out to its connections to propagate throughout the network. As each node receives the block, it adds the block to its copy of the shared ledger and forwards the block on so that other nodes can add it to their copies of the ledger. The ledger

is thus a chain of blocks of transactions added one on top of the other, hence the term "blockchain."

144.   In order for each node's copy of the ledger to harmonize, they must all append the same blocks in the same order. If different nodes were to accept different blocks as the next block in the chain, the ledger would diverge into competing branches, destroying the network's viability.  Thus, each successive block must be written by one, and only one, of the nodes.

145.   To accomplish this feat, nodes compete with each other for the privilege of being the one to write the next block in a process called "mining." Essentially, a node wins the privilege by solving a difficult mathematical puzzle which is based, in part off of random information contained in the prior block. When a node solves the puzzle, it picks some of the transactions waiting in the pool and writes them into a proposed block along with the proof that it solved the puzzle. It then transmits that block to the network.

146.   Solving the puzzle requires investment of computing power and electricity. The reason miners compete is because the node that wins and writes the next block is awarded ETH by the network protocol and receives transaction fees from the network users. Thus, miners are incentivized to execute transactions and update the ledger.

147. As the block propagates via this process, each node that receives it will confirm whether the puzzle was answered correctly and, if so, the node will add that block to its copy of the shared ledger and transmit it on to other nodes. (It is difficult to find the correct answer to the mathematical puzzle, but easy to confirm whether a given answer is correct, just as it takes hours to put together a jigsaw puzzle but a moment's glance will confirm whether it was assembled correctly).

148. As the correctly solved block propagates, more and more nodes will accept that block as the next one in the blockchain and will update their copies of the shared ledger accordingly.

149. The open competition method for updating the ledger is used as an alternative to centralizing control. This makes the network secure and trustworthy compared to a traditional centralized point of control. The latter can be abused by its controller or hacked by bad actors, whereas the former cannot.

150. However, the lack of centralization creates a different problem that the nodes must solve. Because no one node is in charge and all nodes get to compete to solve the puzzle, it is frequently the case that multiple nodes will find a correct answer and transmit a solved block to their neighbors.

151. That prospect presents a problem because each miner that solves the puzzle will not necessarily have chosen the same set of transactions to include in

the block. Indeed, the pool is big enough and the blocks small enough that it would be unlikely for any two miners to draw the exact same set of transactions. Thus, multiple different but correctly-solved blocks can propagate through the network at the same time seeking to be the next block on the ledger. Yet, the nodes must agree on one, and only one, of the solved blocks to add to the blockchain, or else their copies of the ledger would diverge

152.   To solve the problem, the nodes follow a rule that whichever block is first accepted by a majority of the nodes will become the canonical block. Nodes that have already accepted a competing block that did not win the race will reject their own version of the ledger and adopt the version that has been accepted by the majority.

153.   Thus, a transaction in a block that did not win the race to be accepted by a majority of the nodes fails and does not transfer title to the coins until it is written into a new block that wins the race. Moreover, until a transaction has been written into a block accepted by the majority, the transaction may still be cancelled.

### (4)     HelbizCoins are transferred in the United States

154.   Returning to the transfer of title in HelbizCoin, transactions of HelbizCoin sent to the network will only transfer control of the coins, and thus title, to the recipient at the point when the transaction has been written into a

45

correctly-solved block *and* that block has won the race to be accepted by a majority of the nodes as the next block in the blockchain. This fact is important to the analysis of the whether title to the HelbizCoins transfers in the United States.

155.    The United States is home to the greatest concentration of Ethereum nodes. There are thousands of them located in this country, approximately 40% of the total. What this means in practical terms is that (a) it is effectively impossible for a proposed block to be accepted by a majority of the network, and thus transfer title to HelbizCoins, without first being confirmed by U.S.-based nodes; and (b) the U.S. plays a greater role in the transfer of title than other country.

**(5)    "Genesis" wallets**

156.    Two more introductory facts about the structure of the Ethereum network are relevant to the ensuing allegations.

157.    First, there is a unique type of wallet called a "genesis wallet." Almost all of the 200 million existing Ethereum addresses/wallets have been created by users since the network was launched and widely adopted, but there is a set of 8,893 original wallets that were created at the inception of the network, on July 30, 2015, to pay the initial investors who funded the Ethereum project. These are called "genesis wallets."

158.    The receeipients of the genesis wallets are those who sent Bitcoin to the Ethereum crowdsale in July-August of 2014. The one exception is that the

46

Ethereum Foundation itself received the largest genesis wallet (which contained over 11 million ETH) to pay ETH to developers and others who worked on the project.

159.   Genesis wallets are denoted on the ledger because the first transaction in them reads "genesis" and states that the transaction occurred in Block 0 (the "genesis block").  The Ethereum network is up to Block 1,400,799 as of January 15, 2022.

160.   The amount of ETH created in each genesis wallet corresponded to the amount of the investment made by the early investor, so some genesis wallets received little ETH while some received much more.

161.   There were also caps on the amount of ETH allowed in any given genesis wallet. This mean that large initial investors, like Defendant DIIORIO, would have received multiple genesis wallets to break up the amounts of their investment.  Further, large investors like DIIORIO would have received wallets with some of the larger balances of ETH.

162.   It is statistically improbably and incredibly unlikely to encounter even a single transaction by a genesis wallet. There are 200 million Ethereum wallets, a number almost two-thirds the size of the entire U.S. population, while the number of genesis wallets is like the population of a tiny town in Iowa. The 8,893 genesis

wallets make up only .0045% of the 200 million wallets that have transacted on Ethereum.

163.   Of that .0045%, Plaintiffs' investigation has uncovered *eight* genesis wallets that were involved in the HelbizCoin fraud. Less than one in a thousand Ethereum wallets had any interaction with HelbizCoin. As explained more fully below, these long odds are powerful evidence that the genesis wallets that participated in the HelbizCoin scam were under DIIORIO's control. Few if any people would control more genesis wallets than DIIORIO.

### (6)    Money laundering on the Ethereum network

164.   Turning to the issue of money laundering on Ethereum, there are several known techniques that were employed by the perpetrators of the HelbizCoin fraud to conceal the source of cryptocurrency and the proceeds of their crimes.

165.   Ethereum wallets are pseudonymous: the wallet is recorded on the ledger but the identity of the wallet's owner is not. Thus, an Ethereum wallet user can hide his or her identity while transferring coins between wallets.

166.   However, if the user wants to cash out, he or she must eventually send the coins to an exchange to trade them for dollars. Most exchanges require clients to go through Know Your Customer (KYC) procedures in order to comply with anti-money laundering laws. Thus, when a user deposits coins into an exchange to

48

sell them, the exchange will know the identity of the person using the address from which the coins came.  Such information is not public but is subject to a court's subpoena power.

167.   The Defendants here used exchanges to cash out the ETH they obtained through their fraud and to sell HelbizCoin in the pump and dump. Defendants used a collective money laundering scheme to try to cover their tracks.

168.   First, they took steps to avoid sending coins to an exchange from a wallet that directly participated in the fraud.  Instead, they would send the coins from the fraud-tainted wallet through one or more conduit wallets so that when they sent the coins to the exchanges, they did so from a "clean" wallet.

169.   Another technique Defendants used was a "mixer." A mixer is a scheme (automated or partially automated) in which a sender repeatedly executes transactions amongst tens or even hundreds of wallets before a coin arrives at its intended destination to make it impracticable to trace a given coin back to a given sender.

170.   There are multiple types of mixer algorithms, but many of Defendants' transaction included a "2/3 mixer," where inputs would come in from two different wallets and then be broken into three outputs and sent out. Each of those three outputs serves as one of the two inputs to a new 2/3 wallet, which mixes them and sends those out to three more wallets, and so on.  After only even

49

five iterations from the initial wallet that sent coins, the mixer has created 210 potential transaction paths (2 +6 +18 + 54 + 120), with the number growing exponentially with each successive mixing. In practice, the number of paths is less because the paths cross at certain points, but the programs nonetheless create substantial entropy to conceal the source of the funds.

171. There is no map of the interrelationships between the mixer wallets, or even any list of all the wallets involved; one must instead follow each path to see where it leads. Because there are dozens or even hundreds of such wallets in a mixing chain, tracking a given output through the mixer and back to a given sender requires substantial effort.

172. Devoting substantial resources to overcome Defendants' efforts to cover their tracks, Plaintiffs have discovered some of Defendants' money laundering transactions, examples of which are described below.

**B.      The HelbizCoin Smart Contracts**

173. Anyone who wishes to create a cryptocurrency can access the Ethereum network and mint an ERC-20 token like HelbizCoin. There are approximately 450,000 different ERC-20 tokens, each with an almost limitless potential supply of coins.

174.  To create a new ERC-20 token, the user must upload a "smart contract" to the Ethereum network and pay a network fee in ETH. A smart contract is essentially a computer program that is run by the Ethereum nodes.

175.  The wallet that created the HelbizCoin smart contract is 0x8bc2fd5355fee3f7fb5d3a8b20996321fd5ce80d (the "creator wallet" or "0x8bc2"). PALELLA and HELBIZ either control 0x8bc2 or acted in concert with those who do.

176.  On January 26, 2018, 0x8bc2 created two smart contracts: 0xe359[2] and 0xe34e, which is the smart contract that would mint the HelbizCoins.

177.  The two contracts worked together. When a purchaser sent ETH to 0xe359, 0xe34e would mint the corresponding amount of HelbizCoin and send it to the address from which the ETH payment originated. 0xe359 would automatically forward the ETH to another wallet, 0x7c99. 0x7c99 received ETH from 0xe359 a total of 2,682 times. The person(s) who controlled 0x7c99 (presumptively the same person(s) who controlled 0x8bc2) sent the ETH out in 113 separate transactions to 42 different wallets.

178.  Although the two contracts operated automatically when 0xe359 recevied  ETH, 0x8bc2 also retained control over the contracts and would frequently just mint HelbizCoin at whim. Thus, some wallets received HelbizCoin

---

[2] For the sake of readability, Plaintiffs will begin using abbreviations of all addresses in this complaint and provide full cites in the Appendix hereto.

because they sent ETH to 0xe359, others received HelbizCoin because Defendants chose to send it there.

179.  Defendants also sold these coins for ETH separatly from the smart contracts. For example, 0x8bc2 used 0xe34e to mint over 960 million HelbizCoins, sending them to 0x7c99, to itself, and to other insider-controlled wallets identified below. Defendants, who sold coins to purchaser separately from the smart contract sales, sent coins to the buyers from these wallets. These are direct sales, just as with the coins sold by the 0xe359 contract, but these sales were done manually rather than being automated.  These include the example of direct sales by Palella to the whistleblower group discussed below.

180.  PALELLA and HELBIZ state in the whitepaper that HELBIZ would sell approximately half of the total supply of HelbizCoins in the ICO with the remainder going to the company and the team members. Presently, the blockchain shows that there are over 20,000 wallets which own HelbizCoin, and that 1,025,000,000 were minted.

## C.    The HelbizCoin ICO

181.  On or about November of 2017, Defendants HELBIZ, PALLELA and others announced an ICO whereby the public could buy HelbizCoins in exchange for ETH.  As stated, ETH is the native coin of the Ethereum blockchain and is

used to pay transaction fees on the network. It can also be traded for other coins, like HelbizCoin, or sold for dollars on cryptocurrency trading websites.

### (1) Promoting the ICO

182. Defendants promoted the HelbizCoin offering, *inter alia*, on HELBIZ's corporate website, Helbiz.com, on PALELLA's and HELBIZ's social media channels, and in the crypto industry press, particularly Bitcoin Magazine.

183. For example, in the pre-ICO and ICO timeframe, HELBIZ's corporate website, Helbiz.com advertised HelbizCoin and the associated website for the ICO, HelbizCoin.io. Visitors to Helbiz.com, were greeted with a slider advertising the HelbizCoin with a "Learn More" link that transferred the visitor to HelbizCoin.io.

184. Additional links on the corporate website touted the whitepaper and "coin" and directed visitors to the ICO website. The whitepaper was published via both sites. The "contact us" link on the corporate website produced the email Coin@Helbiz.com.

185. Defendants stated that the sale started in or around January 26, 2018 with a "presale" and, then later, a "crowdsale." The ICO supposedly ended on March 4, 2018, but Defendants made direct sales of the coins off the books throughout the ICO and thereafter.

186. PALELLA has represented repeatedly that the ICO raised $38.6 million based on the dollar value of ETH at the time.

187.    HelbizCoin.io displayed a purported real-time count of coin sales showing how much remained available before the 520 million coin "hard cap" ran out. For example, the following screen shot shows the counter published on the website stating that 34.8 million (of 40 million available in the presale) had already been sold:



188.    Defendants announced that they had to close the presale early because they had sold out 40 million coins, raising $5.5 million. For example, HELBIZ posted the following two images to the HELBIZ corporate social mediz, "@HebizOfficial":

54



**HELBIZ PRE-SALE DISTRIBUTES
30 MILLION TOKENS IN
24 HOURS**



189.   The latter posting included text: "Helbiz is proud to announce its Pre-Sale is now SOLD OUT and has reached 100% of its goal issuing 40 million

55

tokens at $5.5 million. Thank you to everyone for your support and help building the future of transportation. The main sale will begin 15 February at 9am EST with a price of 1 ETH = 6000 HBZ."

190. Defendants used similar tactics during the crowd sale. For example, there was a counter which ticked-up from the 40 million coins sold in the presale to 367 million coins sold in the crowdsale:



191. Subsequent iterations increased the amount of coins sold to 427 millions and then eventually stated that all 520 million available coins had been sold:

56

192.   In addition to the website, PALELLA and HELBIZ also posted these and similar graphics to their social media channels.

193.   Pleading in the alternative, PALELLA and HELBIZ may have sold less coins than they claimed, but falsely exaggerated their sales to defraud others to buy it.

194.   To create additional buzz among would-be investors, HELBIZ used a tactic whereby it offered bloggers and influencers free HelbizCoins in exchange for joining and posting in HELBIZ's social media channels about the upcoming ICO. The more times the poster tweeted to promote the ICO, the more coins they would receive. To receive the coins, the posters had to follow the Helbiz social media channels, post links to the HELBIZ.com website in their own tweets, and add a hashtag from a prescribed list such as "#IBelieveInHelbiz".

57

195. HELBIZ touted these social media signups to show the popularity of the coin in ads about the ICO without disclosing the reason for these signups. For example, on February 2, 2018, HELBIZ boasted on its @HelbizOfficial corporate twitter account "10,000 have joined our Telegram" channel, omitting any mention of its payments for those signups and creating a false or, at least materially misleading, impression of the true market interest in HELBIZ.

196. Defendants also promoted the ICO to investors in personal conversations and at public gatherings. For example, on January 24, 2018, Defendants held in-person meetings with investors at a HELBIZ-sponsored even in New York City on the eve of the ICO. The invitation read:

> You are exclusively invited to join the Helbiz network and leaders in the cryptocurrency sector for the first installment of the Helbiz workshops.
>
> Enjoy complimentary beverages, amazing food and even better networking and conversation on blockchain technology, cryptocurrency and how the Helbiz ICO will disrupt the sharing economy and transportation sector.
>
> 6 PM
> WED 24 JAN
> CIPRIANI 55 WALL STREET
>
> www.helbizcoin.io

Tags: United States Events, New York Events, Things to do in New York, NY, New York Networking, New York Science & Tech Networking

197.    The following is a photograph of PALELLA addressing the audience at the New York City event with HANNESTAD and GIULIANO standing nearby.



### (2)    Defendants conducted the ICO in the United States

198.    Several, independent bases support the conclusion that Defendants sold the HelbizCoins in the United States.

199.    First, each transfer of HelbizCoin from HELBIZ to a purchaser occurred via the Ethereum network using the process explained in Section A, above. Title to the HelbizCoins therefore transferred from seller to the buyer in the United States.

200.    Second, HELBIZ was physically situated in the United States when it used its control over the 0x8bc2 wallet to mint the HelbizCoins. Relatedly, as to each ICO sale, HELBIZ was physically situated in the United States, as were

many of the buyers. For example, Plaintiffs Echols, and Jiwa bought HelbizCoins during the ICO while physically in the United States, as did multiple other U.S. citizens.

201. Third, under all circumstances, the contract to sell HelbizCoin, by which HELBIZ became irrevocably bound, was made in the United States.

202. HELBIZ setup the HelbizCoin.io website on which to form the sales contracts. The website had the whitepaper and other information about HELBIZ, the "Team," the price of the coin and the purported number of coins sold up to that time.

203. The website was essentially a vending machine -- it included a user interface (UI) by which HELBIZ automated the sale process.  The website informed the buyer how much HelbizCoins cost at the time and the total price in ETH for the amount of coins the user told the website he or she wanted to purchase. The user would then click a button to complete the purchase and a message would appear thanking the user for buying HelbizCoin. Thus, there was offer and acceptance via the HelbizCoin.io UI.

204. Helbizcoin.io was hosted on a server located in Kansas, meaning HELBIZ became irrevocably bound for each ICO sale in the United States.

205. While the location of the server alone is dispositive, Plaintiffs are also informed and believe, that HELBIZ operated the ICO website from New York

(hence the use of Eastern Standard Time in its sale announcements), which also shows that it became contractually obligated while physically situated in the United States.

206.   The website was owned by PALELLA and registered by PALELLA under HELBIZ's name using his home address in New York City. For each field associated with the website's registration -- Registrant, Technical Contact, Administrative Contact and Billing Contact -- PALELLA listed "Name: Salvatore Palella" and "Company: Helbiz Inc." The listed phone number is in the 631-area code in New York.

207.   In similar fashion, even when Defendants conducted direct sales of HelbizCoin from the 0x7c99 wallet, outside of the automated process of the 0xe359 smart contract, Helbiz became contractually liable to provde the coins where it was located, *i.e.*, in the United States. Likewise, 0x7c99 was controlled by Helbiz in the United States and title to the issued coins transferred in the United States.

**D.     Defendants Use Wash Sales And Money Laundering During The ICO**

208.   Defendants did not use the ICO to genuinely raise money to build the promised business, which they never did. Rather, they used the ICO as a vehicle to commit fraud and steal money from the Plaintiffs and others.

61

209. Fundamentally, Defendants misled the buyers with their false statements described herein about the purpose of the ICO, their intended value proposition for the coin, the supply of the coins available to trade, and where the money would go.

210. But Defendants' fraud did not end there. They also used dummy Ethereum accounts to buy their own coins to the create a false impression that there was great demand. Defendants funded the accounts with the ETH already received from earlier ICO purchases, and then they recycled the ETH back to themselves using money laundering techniques and genesis wallets controlled by Defendant DIIORIO.

### (1) Recycling ETH spent in the ICO to make fake purchases

211. One wallet that Defendants used for dummy transactions is 0x7c99. As stated above, 0x7c99 is where the ICO sales contract, 0xe35, was programed to send the ETH it received from purchasers. There is nothing inherently wrong with forwarding the ICO ETH to other wallets, but the 0x7c99 transactions did not stop there.

212. Rather, on numerous occasions Defendants sent the ETH back out to dummy accounts from which they bought more HelbizCoin from the 0xe359 contract. These are fraudulent sales used to create a false appearance of robust

demand. The following chart details one set of the fake ICO purchases on February

28, 2018:



**Feb. 28, 2018 ICO Dummy Purchases**

213.   The chart illustrates that 0x7c997 sent 24 ETH on February 28, 2018

to 0x126F.  0x126f8 then broke the ETH into smaller chunks and sent it out to new

36 wallets. Some of these wallets sent the ETH directly back to 0xe35 to effectuate new ICO purchases. Others broke the ETH down and forwarded it to yet more wallets that used it to make ICO purchases.

214.    For example, 0x126F sent .03 ETH to each of the following wallets which then sent the ETH to 0xe35 as a new ICO purchase:

- 0xdD2A purchased HelbizCoin at 5:55 pm on February 28;

- 0x4D2b purchased at 6:23 p.m.; and

- 0xC540 purchased at 9:02 pm.

215.   Analysis of the wallets that connect directly to 0x126f reveals numerous additional fraudulent purchases carried out in the same manner using the ETH that 0x7c997 sent on February 28.

216.   0x126f also sent 3 ETH apiece to seven other wallets which continued the scheme. For example, 0xab9b received the 3 ETH from 0x126f8 then distributed it into 31 other wallets. One of these, 0x8CDa, then made an ICO purchase at 6:51 pm on February 28.  The above-referenced chart provides examples of the other six wallets behaving exactly the same as 0x8CDa. These are: 0xe14d4; 0x914b; 0xe14d; 0xBD0E; 0xB990; 0xe7269. From there other wallets depicted in the chart bought more coins.

217.   The result was dozens of fake purchases carried out by 0c7c99 (and thus by 0x8bc2) on February 28 alone.

64

218.    An unsuspecting prospective purchaser who encountered the purchase statistics that Defendants posted on the ICO website and on their social media channels would have no reason to doubt them.  Even if the purchaser went to the blockchain to check the 0xe35 contract account for themselves, all they would see is a diverse set of seemingly unrelated wallets making buys in the ICO.  The only way to have discovered the fraud would have been to: (1) read the smart contract computer code itself (if one knows how) to understand that the 0xe35 wallet was set up to relay the ETH to 0x7c99 (something not suspicious in and of itself); (2) for no particular reason, choose to spend many hours trying to follow the trail of the ETH into 0x7c99, and then; (3) invest considerably more time examining not only all of the wallets that received ETH from 0x7c99 but all of the wallets to which those wallets sent the ETH. Only then would one appreciate that these wallets, three to four steps removed from the ICO contract, were recycling the ETH to make dummy buys.

219.    February 28, 2018, is just an example. Defendants used 0x7c99 to make dummy buys using the same method on multiple other days during the ICO.

### (2)    Large purchases faked by four genesis wallets

220.    Defendants also faked very large purchases to create the false appearance that big money investors ("whales") were interested in the project. For example, several large purchases were made by two related wallets: 0xe8c7 and

65

0x7725. These wallets transacted with each other, with 0x8bc2, and with multiple genesis wallets.

221.  Their first purchase was on February 13, 2018, when 0xe8c7 paid 735 ETH for 4.10 million HelbizCoin. The ETH was paid to 0xe359 and automatically forwarded to the 0x7c99 wallet.

222.  In the prior month, 0x7725 had sent well over 1,000 ETH ($1 million at the time) to 0xe8c7. 0xe8c7 also received 150 ETH from a genesis wallet that same month, 0x5b5d ("Genesis Wallet 1"). It also received 86 ETH and 7.75 million free HelbizCoin from 0x8bc2 that month, as depicted on the following illustration:



223.  On February 15, 0x7725 made the second of the three purchases for 270 ETH. Wallet 0xe8c7 made the third purchase on February 28 for 40 ETH.

66

224. These purchases, totaling to 1,045 ETH, were fake buys. 0x7c99 sent the ETH back to the owner of these two wallets by depositing it to an account at the Gemini exchange using wallet 0x88cc.

225. 0x88cc is also used by a second genesis wallet, 0x198e ("Genesis Wallet 2"). 0x198e is a behemoth. It received 608,335 ETH at genesis, making it the sixth largest of the 8,893 genesis wallets. At today's prices, the ETH from this wallet alone is worth more than $1.5 billon. DEFENDANT DIORIO is one of the few investors in the world who could have received a wallet that size, and the only one know to be involved with HelbizCoin.

226. The flowchart below shows how ETH moved from both 0x7c99 and 0x198e to the same accounts at the Gemini and Bittrex exchanges.



227.    Well over $100 million worth of ETH moved among these wallets.

228.    The foregoing connections demonstrate that the payor of this ETH in the ICO and the ultimate recipient of the ETH are the same person or group of persons acting in concert. This also means that the contract creator wallet, 0xbc2, is either owned by the same person who owns the 0x198e Genesis Wallet 2 or is acting in concert with the owner of that wallet (and Gensis Wallet 1) to launder the money.

229.    Both Bittrex and Gemini are FinCEN licensed money services businesses (and Gemini is located in New York City) so there should be full KYC information available about the owner of these two accounts.

230.    The foregoing points to DIIORIO as the owner of the wallets making these fake purchases and laundering money from the fraud.

231.    Furthering bolstering the conclusion of DIIORIO's involvement, 0x198e also directly connects to a third and fourth mammoth genesis wallets: 0x36Bf (the 20th largest with 346,837 ETH) and 0x84114 (the 27th largest with 300,000 ETH), each worth roughly $1B at today's ETH prices.

232.    These three genesis wallets shared exchange accounts at the Kraken and Poloniex exchanges using wallets 0x428F and 0xe451. Thus, the same person that owns 0x198e owns all four genesis wallets and either controlled the ICO or is acting in concert with those who controlled it to launder the money.

233. Both the Poloniex and Kraken exchanges are FinCEN-licensed money services businesses so there should be full KYC information available about the owner of those accounts.

234. The following illustrates the connections between the four genesis wallets, the exchange accounts, and the contract creator wallet 0x8bc2:



235. Together the four related genesis wallets received over 1 million ETH in Block 0. DEFENDANT DIIORIO is the only original Ethereum investor who

could have received that much ETH at genesis and is also the only original

Ethereum investor known to have been involved in the HelbizCoin project.[3]

### (3)    A fifth genesis wallet sends ETH to the creator wallet, 0x8bc2

236.    As previously explained, address 0x8bc2 created the HelbizCoin

smart contracts on January 26, 2018. HELBIZ had publicly announced that date for

the ICO "presale," so it needed to have the smart contract in place by that time.

237.    Creating the smart contracts required 0x8bc2 to pay ETH for the

network fees. But as of the start of the day on January 26, 0x8bc2 had none.

238.    Then, at 2:47 pm on January 26, 2018, 0x8bc2 received 1 ETH from

wallet 0x2835. 0x2835 is a 2/3 mixing wallet that connects to a chain of other 2/3

mixing wallets, meaning that someone attempted to conceal the source of the ETH

coming into 0x8bc2, used to create the ICO sale and minting contracts.

239.    Plaintiffs have been able traced this ETH to a **fifth genesis** wallet

0xb115e.

240.    0xb115 remained completely dormant from the time of the genesis

block on June 30, 2015, until the very day of the presale. On January 26, 2018,

0xb115 suddenly became active and started sending out ETH through mixers. The

ETH that arrived at 0x8bc2 at 2:47 pm on January 26 traces directly back to

---

[3] The foregoing wallets connect in multiple other ways. For example, 0xb96f sent ETH to both 0x88cc and 0xf11b. The latter also received ETH from 0x7725. Similarly, 0x0080 sent ETH to both 0x88cc and 0xf11b.

0xb115 through a series of wallets all used the same day. The wallet path is included in the Appendix.

### (4) A sixth genesis wallet sends test transactions to the ICO contract and a "whale" wallet makes more fake purchases

241. A little over an hour after 0x8bc2 created the ICO smart contracts, three tiny purchase orders of .0125 ETH, were sent to 0xe359. These three were test buys sent to check that the smart contract was functioning correctly.

242. The first of these three test buys was sent to 0xe359 at 8:05 p.m. It came through mixers from a **sixth genesis wallet**, 0x3bC6.

243. Just like the 0xb115 genesis wallet that sent the ETH earlier that day, 0x3bC6 had also remained dormant since Block 0 until it suddenly woke on January 26, 2018 and started sending out its ETH to 2/3 mixer wallets. One of the mixer paths leads to wallet 0xC119. The wallet path is included in the Appendix.

244. That transaction failed, which led to a second transaction for .0125 ETH.

71



245.   The second transaction came from wallet 0x79d0 almost two hours after the first failed transaction. The prior wallet in the chain is 0x1886, and the penultimate wallet is 0x5225. At 9:32 pm, 0x5225 sent over 91,000 ETH to 0x1886 (its first ever transaction) and then 0x1886 sent ETH to 0x79d0 at 9:45 pm. Two minutes later 0x79D) attempted a second .0125 HelbizCoin order. This second transaction also failed.

246.   To keep things in perspective, 91,000 ETH is a staggering sum, worth approximately $100 million at the time and closer to half a billion dollars today. A term used for such large holdings is a "whale" wallet.

247.   It is very difficult to amass $100 million worth of ETH unless one were a very large early investor in Ethereum like Defendant DIIORIO.

72

248.    As the above chart illustrates, the person who controlled the massive whale wallet clearly was making the test buys for the HelbizCoin contract. Not only did that person send ETH to 0x79d0 to use for the second test after the first test failed, that person again used his or her control over 0x79d0 after the second test failed to cause 0x79d0 to send its ETH on to 0xeAb6. This transaction occurred 10 minutes after the second test failed, and then 0xeAb6 sent the third test order three minutes later. The third order succeeded; the contract accepted it at 10:00 pm. Then the pattern stopped.

249.    There is additional evidence that the person who controlled 0x1886 is an insider to the HelbizCoin scam or acting in concert with the insiders: 0xeAb6 is an insider's wallet. It is one of a handful of wallets that received "HelbizGenesis" coins, which could only be sent by the person(s) who controlled 0x8bc2.

250.    0xeAb6 also received 1.5 million free HelbizCoins earlier in the day on January 26, 2018, which, again, could only have been sent by 0x8bc2.

251.    Further, as the following chart shows, the person that controlled the whale wallet also sent an additional 4.3 ETH to 0xeAb6, which arrived shortly after the third test transaction. Again it was sent using mixer wallets (path provided in the Appendix). 0xeAb6 then used the 4.3 ETH to make a dummy purchase as part of the ICO fraud.



252.  The 4.3 ETH bought 34,500 HelbizCoins.

253.  This was a fake purchase. Not only was the 34,500 meaningless in light of the fact that 0x8bc2 had already sent 0xeAb6 1.5 million free HelbizCoins the same day, the 4.3 ETH ended up being recycled and sent back to the owner of 0xeAb6.

254.  The dummy transaction and recycling of the ETH can be seen in the following chart:



255.  After the 0xe350 ICO sales contract received the ETH from 0xeAb6 and sent it to 0x7c99 (as it was programmed to do), 0x7c99 made a deposit to 0x1af0.

256.  0x1af0 is one of a series of wallets that the insiders used to launder ETH from the fraud to an account at Binance. Not only did 0x7c99 send ETH there after receiving it from 0xeAb6, but 0xeAb6 *itself* also sent ETH there, as did *0x8bc2*.

257.  All these wallets are related. They all sent their ETH through the same network of feeder wallets to the same Binance account, demonstrating common ownership and/or concerted action to launder the money.

258.  The participation of yet a 6th genesis wallet further demonstrates that DIIORIO was deeply involved.

### (5) The PELLEGRINO Wallet (0xf3f4) and the SKRILL Wallet (0xedac)

259.  Another example of common control in the money laundering scheme involves Defendants PELLEGRINO and SKRILL, and thus PAYSAFE.

260.  Wallet 0xf3f4 contains "Pellegrino Coins."

261.  Out of the 200 million wallets on Ethereum only one other wallet contains Pellegrino Coins and that is 0xedac. 0xedac also contains "Skrill Coins." 0xedac is not only the sole wallet on Ethereum to contain Skrill Coins; it is in fact the wallet that created the smart contracts for both "Pellegrino Cons" and "Skrill Coins."

262.  The 0xf3f4 wallet ties directly to the creator wallet, 0x8bc2, in two ways. First, on March 8, 2018, 0xf3f4 received 2 million free HelbizCoins directly from the smart contract. That is a large payment. At the $1 listing price that PALELLA and PELLEGRINO announced just six weeks later, it was worth $2 million. 0xf3f4 did not send ETH for the coins. Rather 0x8bc2 instructed the smart contract to send it.

263.   Second, the 0xf3f4 wallet received more free HelbizCoin on April 17, 2018, this time for 1.2 million HelbizCoin. Importantly, this 1.2 million came not from the smart contract but from the 0x8bc2 creator wallet itself.

### (6)   PALELLA steals ETH and then sends it to the same Binance account used by a seventh genesis wallet

264.   The 0x8bc2 creator wallet also interacted with another wallet that PALELLA owned, 0xf911. A whistleblower identifying themself as "Ryley M," came forward with information about the HelbizCoin scam and has identified 0xf911 as a wallet that PALELLA used.

265.   According to the whistleblower, PALELLA sold HelbizCoin to Ryley M's friend group directly, saying he would give them a deal before HelbizCoin started trading on the exchanges. PALELLA told them to send the ETH to 0xf911.

266.   The blockchain shows that someone, presumptively Ryley M, sent 16 ETH to 0xf911 on April 17, 2018 (the same day that 0x8bc2 sent 1.5 million free HelbizCoin to the Pellegrino Coin wallet). This was after the ICO ended and about 10 days before HelbizCoin began trading. The timing corroborates Rylely M's account that PALELLA was pitching acquaintances to buy coins directly from him before trading started.

267.   Four hours after the "Rylely M" ETH payment arrived in 0xf911, PALELLA (or those acting in concert with him) sent the ETH to another wallet,

0x87fc, from which he (or they) distributed it to six other wallets. Each of these six wallets served as conduits to various exchanges, including Binance and Kucoin.

268.   The third largest chunck was sent through a conduit wallet, 0x3829, to wallet 0xd780, a wallet which deposited to an account at Binance.

269.   0xd780 connects a **seventh genesis wallet** to the fraud -- 0x53C9. The 0xf911 PALELLA wallet and the 0x53c9 genesis wallet deposited ETH to the same account at Binance, using an identical modus operandi to conceal the source of the ETH from Binance, illustrated as follows:



270.   As the above chart shows, one of the six transactions was sent from 0x53C9. The ETH moved from this genesis wallet to 0xe3E1, where it was immediately broken up into separate wallets, one of which (0xF9a4) was a conduit to 0xd78). The genesis wallet used the same modus operandi to conceal the source of funds sent to 0xd780, as did the PALELLA wallet.

271.   0xd780 was used for six transactions between January and May of 2018 (*i.e.*, during the ICO and pump and dump time frame) and always depositing to the same Binance account. It was never used again thereafter.

272.   The owner of this 7th genesis wallet is either the same person as the owner of the PALELLA wallet or is sufficiently alligned with PALELLA to deposit money into the same account.

273.   Defendants' control of the 0xf911 wallet is further demonstrated by: (1) the fact that 0x8bc2 sent 10 million HelbizCoins to 0x911A just one day before the Rylely M payment; (2) 0x911A participated in the coordinated pump and dump ten days later (as described below); and, (3) the 0x7c997 wallet also sent 35 million coins to 0x911A, which it also promptly dumped.  In other words, 0x911A is squarely in the web of interconnected wallets that participated in the ICO fraud and the pump and dump. These transactions are discussed further in Section G on the pump and dump.

274. Plaintiffs provide 0xf911 as an example of one of the wallets owned by PALELLA, just as the "Pellegrino Coins" wallet is one of the wallets owned by PELLEGRINO. Given the pseudonymous nature of the insider wallets, discovery will be needed to identify and tie more of the insider wallets to specific insiders.

### (7)   More DIIORIO frauds: EOS, Civic and other ICOs

275. Another example of an ICO that DIIORIO tainted with fraud in EOS. The EOS ICO was conducted on Ethereum by a company called Block.One and was deemed sufficiently connected to the United States for the SEC to fine Block.One. The SEC action was based on the failure to register EOS as a security and the SEC has not released the fraud alleged herein.

276. The smart contract for the EOS token sale was 0xd0a6. The blockchain shows that 0xd0a6 received over 7.2 million ETH in ICO purchases. In turn, 0xd0a6 sent all of the ETH it received to a second smart contract, 0x9937, which forwarded it to wallet 0xA72d.



277. Several DIIORIO-connected wallets were involved in the EOS token sale including **0x7725** and **0x7277**.  As explained above, both wallets deposit ETH to the same account at the Bittrex Exchange using the 0x99f9 smart contract. Moreover, they are the only two wallets to use that contract.



278. DIIORIO used 0x7725 to buy EOS in the token sale and then used 0x7277 to receive the ETH back from the sale.  The blockchain shows that 0x7725 made 40 separate purchases of EOS between June of 2017 and April of 2018. Similarly, it shows that 0x7277 received ETH from 0xA72d in 122 separate transactions between July and October of 2017. Both sets of transactions demonstrate clear evidence of churning by DIIORIO.



279. These were not the only wallets DIIORIO used to make the fake purchases. For example, 0x5b5d (which, together with 0x7725 sent ETH to 0xe8c7 to buy in the HelbizCoin ICO) was also used to buy EOS.



280.  A similar pattern can be observed in the Civic token sale, which was conducted by a Delaware corporation, Civic Technologies Inc.  As with EOS, U.S. citizens were allowed to participate and the sale took place over the Internet on servers located in Virginia.

281.  The smart contract for the Civic token sale was 0x1244.  It automatically forwarded all the ETH from the purchasers to 0x2323 -- the "Civic Multisig" wallet. In total, this came to 17,449 ETH, all of which was raised on June 21 and June 22 of 2017.

282.  Much of this ETH was forwarded to DIIORIO's wallets in the following manner.  0x2323 sent almost 14k ETH to 0x1e27, which in turn sent 567 ETH directly to 0x7725.

283.  Additionally, 0x1e27 sent ICO ETH to DIIORIO indirectly. For example, it sent: 615 ETH to 0xf11b which is a wallet to which Diiorio's 0x7725 sent ETH; 615 ETH to 0x4b4d which sent ETH to contract 0xa38d, which also

83

received ETH from 0x7725; 615 ETH to 0x3b9b which also sent ETH to contract 0xa38d; 556 ETH to 0xa94e which sent ETH to 0x552B, which sent ETH to 0xefF2, which sent ETH to 0x7277; 409 ETH to 0x07d1 which sent ETH to 0x9b15 which also received ETH from  0x7277; 818 ETH (two transactions of 409 ETH) to 0x9c52 which sent ETH to 0x7277; 205 ETH to 0x407C which also sent ETH to contract 0xa38d.

284.   The forgoing are only examples and many of those wallets received ETH directly form Civic Multisig as well.  These demonstrate that large portions of the ETH raised in the Civic ICO were returned to DIIORIO or those working in concert with him.

285.   The Civic founders used these false sales to generate misleading hype about the public interest in Civic. In particular, they touted the fact that the ICO was scheduled to take place over the course of several weeks but sold out in just two days. Diiorio and the founders then disseminated a false story about the market's supposedly voracious appetite for the Civic coins before the coins began trading on the public exchanges.

286.   In addition to concealing that the sales were fake, the scheme included additional fraudulent misrepresentations that the ETH raised in the ICO would be used to build the Civic product (not returned to DIIORIO), that no one person was allowed to purchase more that 1% of the coins for sale, and there were

84

more than 10,000 separate purchasers. *See e.g.* Civic press release quoting the Civic founder. https://www.reuters.com/article/us-civic-blockchain-token/civic-sells-33-million-in-digital-currency-tokens-in-public-sale-idUSKBN19D200.

### E.    Defendants' Promises and False Representations in the Whitepaper

287.    The birth of cryptocurrency is commonly traced back to the Bitcoin whitepaper, originally disseminated in 2008. Thereafter, the practice for creators aspiring to sell new cryptocurrencies has been to publish their own "whitepapers" spelling out the nature of the proposed coin, the economics of its operations, how the funds raised will be used, and its technical details, among others.

288.    Given this widespread industry practice, the purchasers of HelbizCoin understood the HelbizCoin whitepaper to represent the official promise of HELBIZ and the team as to what they were undertaking to do with the funds raised, their commitment to the value proposition for the coin, and other material representations. The HelbizCoin whitepaper is attached as Exhibit A and incorporated into this Complaint.

289.    Defendants stated that the ICO was to raise funds to improve the (supposedly already extant) platform and market it: "In order to further develop the platform, Helbiz will conduct a token generation event that will offer 520.000.000 HBZ tokens of the 1 billion total supply." The proceeds would go: 40% product

85

development, 35% business development, 20% marketing, and 5% for legal expenses.

290. HELBIZ stated that the there was a "soft cap" or floor of 5,000 ETH. Thus, if HELBIZ did not sell at least 5,000 ETH's worth, everyone would get a refund.

291. HELBIZ plagiarized portions of its whitepaper from one that was published in 2017 for a different cryptocurrency project called SingularityNET.

292. PALELLA signed the whitepaper and quoted himself as "founder and CEO" stating: "Helbiz will revolutionize the transportation industry by decentralizing the sharing economy & giving personal control to the user."

293. The value proposition for the HelbizCoin, as articulated in the whitepaper, was predicated on several additional promises by Defendants, explained below.

### (1) Promised "sharing economy" ecosystem using blockchain technology and carsharing smartphone app

294. PALELLA conducted the ICO in the immediate wake of extremely successful "sharing economy" startups like AirBnB and Uber, which allowed people to share their homes or give car rides for profit. The whitepaper promised that HELBIZ would capitalize on the sharing economy movement by creating a

platform, similar to AirBnB, that enabled car owners to rent out their cars using a smartphone app.

295.   HELBIZ represented that the carsharing "ecosystem" was blockchain-based. It said it chose blockchain because the technology creates new sorts of value. For example, the platform would allow users to capture data they generate while driving and sell it to insurers, who would thus be drawn to buy HelbizCoin to pay for the data.

296.   The whitepaper contained the following illustrations, among others, explaining why HELBIZ chose to use blockchain for the platform.

87

**HELBIZ ADVANTAGE COMPARISON**

Helbiz advantage comparison

| Application | Conventional Methods | Advantages introduced by Helbiz Platform |
|---|---|---|
| **Market Management** | Centralized – not scalable<br><br>Partial participation – not addressing the full chain<br><br>Lack of privacy: a direct link between the vehicle and App Mgt System can compromise the driver's privacy (e.g., driver behavior or location)<br><br>Only App Mgt System can verify communications or history of update downloads/communications | Distributed data exchange and security provide scalability<br><br>End-to-end: involving SP, OEMs, vehicles, service centers, insurances etc<br><br>Ensure privacy of the user (also for diagnostics)<br><br>Update history as well as authenticity of the SW can be publicly verified |
| **Insurance** | Current systems are often unsafe, which puts the integrity of the vehicle at risk<br><br>Users have no control over the data exchanged<br><br>Privacy sensitive data must be sent continuously to the insurance company to receive the services | Safe and distributed data exchange that preserves privacy<br><br>Users control the data exchanged confidential data is shared on demand (for example, an incident) rather than a continuous exchange of data<br><br>The authenticity of the data stored in the users' wallet can be confirmed in a transparent manner on the blockchain |
| **Car-Sharing services** | Central payment and accounting<br><br>Users can be monitored by their identity<br>Central authorization<br><br>The location and behavior (e.g., using a specific charger on a specific day) of the user can be tracked | Private and decentralized security, payments and accounting<br><br>Users use changeable identities<br><br>Distributed authorization<br><br>User data such as location information remain private |

Table 1. A summary of Helbiz Blockchain based Platform advantages compared to conventional methods

88

297.   As for the second chart, it is important to note that the smart contract in the middle is, by definition, computer code running on a blockchain:



298.   As the illustrations demonstrate, and as detailed below, another key promise made in the whitepaper was that users would need HelbizCoin for all transactions on the ecosystem. This is what would drive the value for coin buyers who provided financing to HELBIZ through their purchases.  The more popular the platform became, the greater the demand for HelbizCoin in order to use HELBIZ services. Because the quantity of coins was limited by design, the price would rise as HELBIZ increased the popularity of the ecosystem through its efforts.

299.   Finally, HELBIZ promised there would be a smartphone app tying all these services and expenditures together, providing an internal cryptocurrency

wallet to hold the coins and an exchange where coin holders could cash out their investment by selling their HelbizCoin to people who wanted to use transportation services in the ecosystem.

300. The whitepaper contained no cautionary language suggesting that any of its representations or predictions were speculative, subject to change without notice, and/or based on contingencies, assumptions, and guesses as opposed to facts or firm plans.

301. To the contrary, HELBIZ represented that the blockchain-based platform and the peer-to-peer rental marketplace already existed and that HELBIZ was well on its way to finishing the app. The money, Defendants claimed, was just to get the product across the finish line. In fact, Defendants had not created any of it.

302. Indeed, most of what Defendants actively represented in the whitepaper was false, including, for example, that:

A. "Helbiz is a peer-to-peer market- place that makes renting a car, motorcycle or bicycle convenient, affordable and rewarding. HELBIZ combines the familiar carsharing approach in the transportation sector with Blockchain technology. . . . Helbiz Mobility System is a platform based on the Ethereum Blockchain and powered by the HelbizCoin tokens

(HBZ). Helbiz will be the first company adopting HelbizCoin and leveraging the Helbiz Mobility System."

B.    "Our mobility ecosystem will soon provide access to individual vehicles, fleets and other transportation services as well as control over data sharing."

C.    "[The app will include a]n internal exchange to convert major cryptocurrencies, like Bitcoin and Ethereum into HelbizCoin[; and, a] built-in wallet to store and use the tokens easily…"

D.    "The [smartphone app will] facilitate payment using HelbizCoin, a dedicated currency for the purpose, that will allow participants to avoid financial transaction fees coming from the use of money in a traditional ecosystem – for instance, the fees we pay to Mastercard and Visa."

303.    As described below, none of the representations in the foregoing paragraphs were true.

### (2)    Promised centrality of the HelbizCoin-only payments

304.    In addition to the illustrations and diagrams showing how HelbizCoin would function in the ecosystem, the whitepaper specifically represented that the HelbizCoin was the key element to the entire operation and that the platform would run only on HelbizCoin.

305.    It claimed that much thought had gone into the economic design of this HelbizCoin-only business, representing as follows:

A. "**NATIVE TOKEN** The choice to create a native token for Helbiz transactions is not casual. A hard-coded economic logic can create immense value, but has risks. If the economic logic is well designed, it drives rapid growth. If poorly designed, it could create friction in the product. The conclusion of our careful analysis was that only a native token allows HELBIZ to optimize for the 3 desired objectives. It creates a car & data market that makes transactions uniform, guarantees international access and encourages network growth, a native token and an optimized economic model for a 'car & data' market."

B. "**THE HELBIZ ECONOMIC MODEL** In order to deliver a viable business model for the long term, we establish HelbizCoin to be a pay-per-use model for getting onto the Helbiz Mobility System or for using services available on the platform. Helbiz will drive revenues through tools and services on the Helbiz Mobility System. . . .A Blockchain community ecosystem combined with a token needed to access services aligns incentives and generate much more participation in the platform. The products and services become more useful as more users join the system and require and use tokens."

306. Moreover, a key element of the pitch also was that all the transactions were blockchain-based and conducted in HelbizCoin.

307. Relatedly, Defendants also promised in the whitepaper that the app would include an internal cryptocurrency exchange for purchasing and selling HelbizCoin which would allow customers to buy the coins they would need to use the services on the platform, and investors to sell it to them.

308. If the platform were not based on HelbizCoin, then none of these things are needed: it could just accept credit cards. The whitepaper specifically represented that a HelbizCoin-only model had numerous advantages, including avoiding credit card fees.

309. The whitepaper championed blockchain not only as a solution to problems and inefficiencies in the transportation sector but also as allowing new forms of transactions that would unlock new value in the transportation sector, again representing that HelbizCoin was the key to allowing these transactions to occur.

310. In order to reinforce the idea that HelbizCoin was an investment, the whitepaper included a picture of the (fictional) HelbizCoin, golden and resembling an actual gold coin, with gold nuggets in the background.



On information and belief, based on similar photos appearing on the Internet, the golden HelbizCoin was a photoshopped alteration of prior Bitcoin art that Defendants took from the Internet and used in their marketing campaign.

### (3)  Material omissions in the whitepaper and concealment of the plan for the HelbizGo scooter service

311.  Virtually every single one of the various representations in the whitepaper that PALELLA signed and disseminated was false or misleading by omission.

312.  Among other omissions, Defendants failed to disclose that there was no extant product on Ethereum, and that they had not yet developed the capability to create such an ecosystem platform and did not have any plan or intention to make good on the above representations.

313.  Defendants also failed to disclose that they had no carsharing marketplace and had already ceased working on it in August of 2017 when it stopped paying the developer, another material fact that HELBIZ concealed from investors.

314.   HELBIZ further withheld the fact that it planned to release a proprietary Helbiz-branded scooter rental app that took credit cards and did not accept HelbizCoin and was thus no different than apps available from a large number of newly-formed scooter rental companies running on smartphone apps that used credit cards.

315.   Relatedly, HELBIZ did not disclose that it was actually against HELBIZ's business interests to limit payments it for its scooter rentals to HelbizCoin. HELBIZ would attract more scooter customers more easily if its rental app accepted fiat via a credit card like its competitors and could keep all the money that way.

316.   The entire value proposition that Defendants pitched to raise $40 million of ETH in in the ICO and at least one hundred million worth of ETH on the cryptocurrency trading websites was thus a knowing fraud.

### (4)   Knowingly false timetable for performance

317.   As set out above, the whitepaper represented that the platform was already substantially built and that HELBIZ was raising money to improve on the ecosystem.  It stated in the whitepaper that it would deliver an "MVP" (minimal viable working product) of the platform by the end of the month in which the ICO closed (March being the end of the first quarter), with the carsharing app and the integrated blockchain-based payments system incorporated during the second

95

quarter (*i.e.*, within three months of the ICO close). This included the following representations:

A.   "ROADMAP Q1 2018 Launching the token pre-sale and crowdsale (ICO) and getting listed on a top exchange. MVP of Helbiz marketplace and launch of operations in NY (Jersey City)."

B.   "Q2 2018 Initial integration of the blockchain system for payments. R&D for wallet and reward system. Helbiz app operations established in NY."

318.   Defendants knew that the promised product was not developed as represented, and that it was not possible to be launching in three months.  They had no intention of meeting these deadlines.

319.   For good measure, Defendants also used Bitcoin Magazine as a forum to falsely claim that HELBIZ was ahead of schedule during the ICO: "We are scheduled to launch in May and will release on iOS and Android then." The "schedule" Defendants announced was not in fact their actual plan and was, as they knew, completely false at the time they announced it, with no realistic chance of becoming true.

## F.    Defendants Prepare to Kick Off The Pump And Dump

320.    Following the ICO, Defendants set about preparing for the pump and dump.

321.    First, Defendants took steps to launder hundreds of millions of coins to the insiders' wallets to prepare them for sale.

322.    Second, PELLEGRINO and his companies used SKRILL's connections in the crypto community to have HelbizCoin listed on multiple exchanges so that the insiders would have routes to sell their coins. Relatedly they set the initial listing price at the vastly inflated sum of $1 per coin, ensuring the insiders a massive return.

323.    Third, in the lead up to the PAYSAFE livecast, PELLEGRINO, SKRILL and PAYSAFE started creating hype to drive up demand for HelbizCoins with stories about a big partnership with HELBIZ to make HelbizCoin a "household name."

324.    Thus, by the time Defendants announced the commencement of trading at the end of the PAYSAFE livecast, they had hundreds of millions of coins, were ready with exchanges on which to sell them, and had whipped up a frenzy of excited investors anxious to buy in.

97

### (1) Laundering coins to dumping wallets

325. Defendants moved hundreds of millions of coins in advance of the PAYSAFE livecast to staging wallets which they controlled and which they could use to access the exchanges. Examples already mentioned above include sending the 3.5 million coins sent to PELLEGRINO's wallet (0xf3f4), the 10 million coins sent to PALELLA's wallet (0xf911), and the 7.7 million coins sent to the 0xe8c7 wallet.

326. And these are just the tip of the iceberg. On April 17, 2018 alone, 0x8bc2 sent out 48 transactions of 500,000 HelbizCoins or more, totaling 252,958,000 coins. For example, 0x8bc2 sent massive amounts to: 0x0ca2 (15 million); 0x96ad (20 million), 0x3fa1 (25 million), 0x29ac (50 million), and 0xa05d (50 million).

327. The following chart set out the flow of coins to these wallets on April 17, 2018.



328.  In addition to having received millions of free HelbizCoins from the

contract creator, 0x8bc2, these wallets all interrelate in multiple other ways,

examples of which are cited in the above chart.

329.  Pleading additionally and in the alterntive, these transactions from the

0x7c99 wallet and/or others like it represent the direct initial offering of

HelbizCoins pursuant to sales Defendants made outside of the 0xe359 smart

contract.

99

330.    Defendants began dumping the coins in these wallets the moment trading started after the PAYSAFE livecast, often using the same money laundering techniques as in the ICO.

331.    The foregoing large transfers were not the only way that Defendants funneled coins to the exchanges to unload them.  0x8bc2 also sent out tens of thousands of smaller transactions calculated to appear innocuous. This was just another form of money laundering, as Defendants eventually collected and sold the coins on exchanges. For example, between April 26 and May 1, 2018, wallet 0x49db received 300 separate transactions of 1,000 HelbizCoins each, and 30 transactions of 2,000 HelbizCoins. These were all sent from different addresses to make them appear unrelated, but in fact these 360 addresses were all under common control.

332.    The common control is demonstrated, among other ways, because the ETH that these disparate wallets used to pay the network fees came from common sources.

333.    For example, wallet 0x09f7 received a tiny amount of ETH from 0x494b prior to sending its 1,000 HelbizCoins and it also received a tiny amount of ETH from 0xa02E. 0x09f7 used this ETH to send its HelbizCoins to 0x494b.

334.    The same pattern can be observed with 0xd223 and 0xe4ad, both of which also received small amounts of ETH from 0x49db and 0xa20E.



335.   The wallets cited herein are by way of example only. The pump and dump was broad and deep, and lasted for more than a year.

336.   Defendants' dumping schemes are described further in Section G below.

### (2)    Creating more hype

337.   Another step Defendants took was to prime the markets with new hype about HelbizCoin. PELLEGRINO, SKRILL and PAYSAFE helped lead the effort. Together with them, HELBIZ announced a new product line: a purported HelbizCoin-based payment solution to be used at point-of-sale terminals worldwide.  They called this supposed second product "HelbizPay."

338.   It was a massive new value proposition for HelbizCoin if only it were true. HelbizPay would obviate the need for credit cards and disrupt the Visa

network. In reality, Defendants had no legitimate plan to build HelbizPay, much less to roll it out "worldwide."

339.   Generally, HELBIZ would release the fake hype through the corporate @HelbizOfficial Medium.com website. They referred to these as "Monday Updates." Defendants also made announcements on other social media channels run by PALELLA, HELBIZ and SKRILL, which would include hashtags like "#Helbiz," "#HBZ" and "#HelbizCoin".

340.   Unfortunately, Defendants recently deleted many of these posts and all of the Monday Updates as part of a campaign to cover up their fraud.

341.   To the extent Defendants' deleted statements can be recovered in discovery, Plaintiffs intend to amend their complaint (where appropriate) to incorporate them. The allegations herein are drawn from the record of what Plaintiffs have been able to preserve and/or reconstruct.

### a.  PELLEGRINO bolsters the Helbiz Team

342.   On February 23, 2018, while the ICO was still ongoing, HELBIZ made a post on its Medium.com channel stating that PELLEGRINO was playing a "key role" on the "Helbiz Team" and that he had "over two decades of experience in the payment sector." Defendants further highlighted PELLEGRINO's connection to SKRILL and PAYSAFE with the posting twice mentioning that PELLAGRINO was "CEO of Skrill, NETTELER, & Income Access."

102

343.   The posting was apropos of nothing. Rather, it was intended to set the stage for the fake HelbizPay announcement they intended to release a few weeks later.

344.   PELLEGRINO stated in the posting that he would create something called "second layer payment protocols" (without explaining what "second layer protocols" are, or why they were important) that were "key" to Helbiz's success, and which would widely popularize the HelbizCoin.

345.   PELLEGRINO is quoted: "A core component of making Helbiz a household name is properly building a sophisticated payment system, through new second layer payment and conversion protocols on the Ethereum blockchain . . ."

346.   Thusly, PELLEGRINO started the narrative that would be developed over the ensuing months to the effect that the payment giants for whom PELLEGRINO worked would position HelbizCoin for mass adoption by making it a universally accepted payment system for buying goods and services.

347.   The statements were knowingly false. PELLEGRINO and SKRILL had no intention of making HelbizCoin a household name and knew that Helbiz was not building the platform on Ethereum.  They never delivered the "sophisticated payment system" and "second layer payment and conversion protocols" that PELLEGRINO touted in that announcement and which was repeated at the PAYSAFE livecast.

103

b.    **Corporate partnerships between HELBIZ, PAYSAFE and SKRILL**

348.    Soon thereafter, on April 16, 2018, Defendants published a joint statement announcing that HelbizCoin was going to be listed on its first exchanges and that they would be identifying these exchanges during a livestream broadcast from the "London offices of Paysafe (Skrill, Neteller & Income Access)" in ten days.

349.    The joint statement contained exciting news that now both SKRILL *and* PAYSAFE were joining HELBIZ as partners to take HelbizCoin from a transportation payment method to a mainstream currency for goods and services worldwide:

A.    According to the joint statement, the payments services giant PAYSAFE was partnering with HELBIZ to promote "mainstream usage" of HelbizCoin.

B.    PELLEGRINO is quoted stating that they were working on a grand plan "to promote mainstream adoption of cryptocurrency through Helbiz." Justifying the partnerships, he claimed that there has been "rapid growth" in the Helbiz community and in the distribution of HelbizCoin. PELLEGINO further stated that SKRILL was in discussions with the exchanges that planned to list HelbizCoin and would be incentivizing new traders to enter the market for the coin.

104

C.   In the same announcement, PALELLA states that the second layer protocols, earlier introduced by PELLEGRINO in the February 28, 2018 announcement, would allow HelbizCoin to be "integrated directly with the current point of sales systems globally to allow for all Helbiz holders to pay with a single tap from their smartphones in a store, restaurant, 3rd party apps or any type of transportation – at millions of locations in the near future."

D.   About the SKRILL and PAYSAFE partnerships, PALELLA said: "We are furthermore thrilled to be able to partner directly with a company such as Paysafe, processing payments for tens of millions of people and hundreds of thousands of merchants. . . . [T]he entire team is looking forward to an exciting year ahead and we are confident that HBZ will establish itself among the top currencies when we will start to announce more of the large scale fortune 500 partnerships that will shift the perception of digital currencies in general."

E.   The announced partnerships with SKRILL and PAYSAFE made the outlandish claims about the future of HelbizCoin as an alternative to the Visa network seem plausible, as they portrayed PAYSAFE and SKRILL as assisting with this new line of business for HelbizCoin.

105

350.    The announcement went on to represent that "the team" had already developed the second layer protocols for the HELBIZ transportation platform and that it would reuse these to release the standalone wallet (*i.e.* HelbizPay) that would allow people to use HelbizCoin as a means of payment at point of sale systems globally.

351.    The announcement added to the excitement with news that HelbizCoin would open trading at the listing price of .0015 ETH per coin, which was an eye-popping twenty-fold increase in the ETH/HBZ price versus the ICO just a few weeks prior. The maneuver was calculated to allow the other insiders to dump their coins at vastly inflated prices.

352.    The audience of prospective purchasers had no reason to suspect fraud in the new partnerships, nor from the increase HelbizCoin's price. The whitepaper represented that the insiders' coin were locked up for 12 months and the impression Defendants intentionally created was that the price increase reflected the new partnerships and new payment systems product.

353.    The entire announcement was false and misleading. HELBIZ had not built the infrastructure to allow HelbizCoin to even be accepted for payment inside the transportation app, much less at point-of-sale terminals worldwide. Neither did HELBIZ, PALELLA, PELLEGRINO, SKRILL or PAYSAFE actually expect that there would be global HelbizCoin payments system "in the near future."

106

354. One week later, on April 24, 2018, PALELLA tweeted that he had arrived in London for the livecast from PAYSAFE's office. He stated that the carsharing app would soon be available for download in the app store (for iPhone) and Google Play (for android smart phones, and included the hastags "#HBZ" "#HelbizCoin" and "#ShareYourWheels".

355. The statement was false and misleading in that HELBIZ had not built the carsharing app, and it was therefore not about to be released and downloadable.

356. Also on April 24th, HELBIZ released a Monday Update through its official social media channels reminding the community about the April 26 livestream and reiterating (falsely) that they had now built the second layer protocols for the payment system.

357. The announcement elaborated on PALELLA's misleading tweet of the same day, stating that HELBIZ was introducing an app dedicated to mainstream payments using HelbizCoin called "HelbizPay" which will "allow digital currencies to be spent with a tap in store, online or through 3rd party applications, with wallet addresses . . . handled automatically in the backend, allowing merchants to integrate in minutes, and use us as their digital payment processor, while allowing users to transfer among each other seamlessly. HelbizPay will be released this summer, alongside Helbiz P2P platform (*i.e.*, the carsharing app)."

358.    These statements were knowingly false. Neither the HelbizPay app nor the HelbizP2P app were under serious development or close to being ready for release during the summer, nor were they ever going to be released.

359.    Thus the supposed planned use of HelbizCoin as a mainstream payments system, and PAYSAFE's and SKRILL'S involvement in (putatively) working to make that happen, became a main focus of Defendants' representations about the value proposition for HelbizCoin, their marketing to induce the public to buy the coin, and, later, their excuse for taking longer to release the carsharing app than they had originally anticipated.

**G.    Commencement Of The Pump and Dump: The PAYSAFE Livecast**

360.    The PAYSAFE livecast was streamed on YouTube on April 26 and then left posted there until Defendants began deleting evidence, as alleged below. The following is a link to Plaintiffs' archive of the livecast:

drive.google.com/file/d/1CvPVeYW_gpeigXmsW1NjdgH9La27QfiE/view



361.   The livestream was entitled "Helbiz Initial Public Listing." It included speeches by PALELLA, PELLEGRINO, HANNESTAD, and others.

### (1)    Palella and Hannestad

362.   PALELLA started off the livecast by thanking SKRILL and PAYSAFE and then introduced Defendant HANNESTAD to speak about the transportation app and the HelbizPay app.



363.   HANNESTAD came to the podium and talked about the "platform" and showed purported pictures of the carsharing app. He spoke about the economic advantages of carsharing, described features of the app (like automatic vehicle unlocking) and how HELBIZ was supposedly automating all features of the rental process (like insurance). All of it was fake. It was a complete fraud.

364.   Boldly lying, HANNESTAD pointed to the fake screenshots from the carsharing app and said that the app was almost completed, with only some "fine tuning" left to go "over the next couple of weeks before we move into beta testing."  That too was a knowing lie. The screenshots were mockups made with CGI, and his representations about delivery schedules were simply made up out of thin air.  There was no actual expectation that the carsharing app would launch in

110

the next couple of weeks, or even the next few months.  In fact, HELBIZ never launched the carsharing app because it was secretly building HelbizGo.



365.   HANNESTAD continued to lie, stating that he would "quicky walk [the audience] through the application *as of right now*." (emphasis added). Making it all up, he described different rental options on the (fictitious app) and its functions while showing faked screen shots demonstrating them. He even claimed that HELBIZ had in development an "augmented reality" option to help the renters find their cars, and he showed a faked screenshot of that too.

366.   PALLELA knew these were all lies but stood by and allowed HANNESTAD to disseminate the false information.

367.   PALELLA and SP1 employee Santambrogio sat at the same table with PELLEGRINO during the livecast.

111

368.   Continuing his presentation and his lying, HANNESTAD told the livecast audience that HELBIZ also had already developed the crypto payments functions of the platform (which also was not true), and so HELBIZ decided it would "reuse" what it supposedly had already built in a second product called "HelbizPay."

369.   HANNESTAD said the new app would allow mainstream users to spend HelbizCoin without needing to understand cryptocurrency.  He said that the version 1.0 of HelbizPay was going to be released along with the carsharing platform (promised within weeks).

370.   He then showed purported screenshots of the HelbizPay app, but these too were fakes. This included: a screenshot purportedly showing that a user had created a wallet on the app, and a screenshot purportedly showing that the user was able to use the app to send 2,000 HBZ as a payment to PALELLA.



371.    HANNESTAD touted the simplicity and revolutionary nature of the app and concluded by stating "both of these apps are launching this summer," knowing that was untrue and that the apps had not been built and would not be.



372.    PALLELA also knew that the statements about HelbizPay were lies but stood by and allowed HANNESTAD to make these false representations to the world.

373.    PELLEGRINO also had to have known that these statements were lies, as even a modicum of his due diligence in forming the partnerships for SKRILL and PAYSAFE would have revealed it. Additionally, for HANNESTAD's stated delivery timelines to be true, PELLEGRINO would have had to have already created the in-app HelbizCoin crypto functions for the

carsharing app that HANNESTAD said were being repurposed in the HelbizPay. Those did not then exist and never did come into existence.

374.   Moreover, through his personal friendship with PALELLA, and his familial relationship with HELBIZ and SP1 employee Satambrogio, PELLEGRINO would have learned HELBIZ was not on the verge of releasing the promised carsharing app. Likewise, the partnerships between HELBIZ and SKRILL and HELBIZ and PAYSAFE would have entailed him seeing the app (if it existed) and understanding the true state of the app.



(2)   **Pellegrino**

375.   HANNESTEAD concluded by stating that HELBIZ was partnering with SKRILL and introduced PELLEGRINO to speak next.

114

376.    PELLEGRINO then came to the podium. He had been in the room at the same table less than ten feet from HANNESTAD the whole time, and thus heard all of the false representations he knew to be false. However, PELLEGRINO never corrected anything that he had just heard HANNESTAD say, despite knowing it was completely false. Far from it, PELLEGRINO went on to endorse HELBIZ, profess that he "believes" in HELBIZ and was "confident" that the products HANNESTAD described would "take off" within the next few weeks or months.



377.    PELLEGRINO told the livecast audience that SKRILL and Neteller were among the most popular digital wallet payments providers, with more than 55 million users operating in over 220 countries.  PELLEGRINO went on that SKRILL intended  soon to add the top five crypto currencies to its digital wallets,

and named HELBIZ as being in that category (when he knew it was not even close to a top five currency). He stated the partnership "is going to definitely increase the number of tokens in the market."

378.   PELLEGRINO said that his companies are "honored" to partner with HELBIZ, emphasizing HELBIZ's (nonexistent) pedigree in technology and innovation.  He went on: "We are going to support Helbiz through different initiatives. For sure we are going to be integrating on the exchanges that are going to offer the HelbizCoin in the near future in order to facilitate consumers to deposit and withdraw through Skrill. And of course we are going to support these initiatives with some co-branding and marketing campaigns. Therefore, it is going to be quite straightforward for the user to get coins. . .We really believe in this [HELBIZ] cryptocurrency business. . ."

379.   PELLEGRINO concluded: "I look forward to this partnership. I believe this is the beginning of a very exciting initiative. I met personally [with PALELLA] and I believe that the focus and effort that he is putting into this project is just outstanding and therefore we are confident that this product is going to take off the ground over the next few weeks or months."

380.   PELLEGRINO's statements were intentionally misleading. As he well knew, the product was not poised to "take off" within the next few weeks or months. It had not been created yet and PELLEGRINO knew from his experience

116

at PAYSAFE that it would require a much longer length of time to accomplish the features HANNESTAD had just described.

381.    PELLEGRINO thus endorsed HELBIZ, the statements made at the livecast, and his companies' partnership in HelbizCoin despite full knowledge of the fraud.

382.    PELLEGRINO also created the misleading impression that HelbizCoin was in the class of a top 5 cryptocurrency that would soon be added to SKRIL and NETeller digital wallet, both of which he knew was untrue.  Rather, PELLEGRINO knew that his company was going to be handling credit card payments for the app. This meant it would not be a HelbizCoin-only system, contrary the HANNESTAD's representations and those in the whitepaper, and that there would be no wallet to use for paying with HebizCoins.

383.    PELLEGRINO's one true statement was that SKRILL was going to use its connections to the online exchanges to get HelbizCoin listed for trading and bring more traders into the market. He and SKRILL had already been setting up those connections.

384.    But even that statement was misleading by omission.  PELLEGRINO failed to disclose that he personally had already received millions of free HelbizCoins, as had the other insiders, and that he and SKRILL were having the coins listed at an inflated price of $1 so that he and the other insiders could reap

117

huge profits by dumping the coins on those very exchanges. These were knowing material omissions.

385.   Further, as explained below in Section H, PELLEGRINO himself began almost immediately to dump 1 million of these HelbizCoins on the exchanges, using money laundering techniques to move the coins through conduits and mixing them with other coins in order to cover up the trail leading back to him and SKRILL.

### (3)    Other Livecast speakers and Hannestad's conclusion

386.   Last, PELLEGRINO introduced Saeed Al Darmaki as "one of our major investors."



387.   ALDARMAKI spoke briefly. He introduced himself as the Managing Director of both ALPHABIT and BINARY. He talked about the hard work he had

supposedly been doing as a part of the project, echoed the fact that the coin was bout to start trading, and then expressed confidence and belief in the team.

388.   Next, another team member, Michael Coppola, took the podium and congratulated the team. He said that he has been working with PALELLA for almost two years and was looking forward to HELBIZ's partnership with PAYSAFE and SKRILL, and said that new major partnership announcements would be announced shortly.

389.   HANNESTAD then returned to the podium to identify the exchanges that would be listing HelbizCoin for trading as soon as the livecast ended.  He put up a slide that laid out the timeline for the listings and that quality of the exchanges: "1st -  26th April, Second – May 1st, Third 10th May (Top 10 Exchange), Fourth 30th May (Top 5 Exchange)."

390.   The representation about the unnamed Top 10 and Top 5 exchanges was intended to drive sales of the coin immediately on the first and second listed exchanges, which were identified during the livecast as Coinhub and Bitlish. However, there never was a listing for HelbizCoin on a top 10 or top 5 exchange, and Defendants PALELLA, PELLEGRINO and HENNESTAD knew that that slide was false.

391.   HANNESTAD then announced that the HelbizCoin would start trading on Coinhub and Bitlish at 6:00 pm that day. It would open at the listing

119

price of .0015 ETH, which was a 10-fold increase over the ICO price, and that it would start trading in dollar and bitcoin pairs as well, starting May 1st.

392.    HANNESTAD then introduced representatives of the first exchanges to list HelbizCoin, each of whom spoke briefly. The two exchanges, Coinhub and Bitlish, talked about their websites and how much they valued their relationship to PAYSAFE.

## H.    Defendants Dump Hundreds Of Millions Coins On Unsuspecting Buyers

393.    Shortly after the conclusion of the PAYSAFE livecast, HelbizCoin commenced trading on the exchanges and PALELLA took to twitter to continue pumping the coin.

394.    He claimed that HelbizCoins were now worth $1 each: "With a total number of 1,005,250,000 HBZ in circulation, the company's total capitalization (market cap) is close to $1 billion. In the period between February 15 and March 4, Helbiz Coin launched its Initial Coin Offering (ICO) during which 400 million tokens were sold for a total raised of about 40 million dollars."

395.    PELLEGRINO "liked" the post, knowingly endorsing those false figures.

### (1)    Defendants begin dumping the coins immediately

396.    Having made the false statements leading up to and at the PAYSAFE livecast, Defendants immediately started to dump HelbizCoins as soon as trading started.

397.    For example, PALELLA's 0xf911 wallet sent 10 million coins out to Bitlish (0x789C) on the first day using three different proxy address: 5 million to 0x311d, 3 million to 0xcaf5, and 2 million to 0x91ab. Each of these conduits forwarded the HelbizCoins to Bitlish upon arrival, as depicted below:



121

398.    0xf911 was not the only insider wallet to use these routes. For example, 0x96ada, which had received 20 million coins from 0x8bc2 on April 17, sent them all to 0xcaf5 on April 27.

399.    That same day, 0xa05d, which had received 50 million HelbizCoins on April 17, sent 384,198 to 0xcaf5.

400.    0xa05d had already dumped most of its 50 million coins by sending them though conduits to other exchanges. For example, it had already sent 27 million to conduit 0x5Db49, ten million to conduit 0x318A, and 10 million to conduit 0x5f2b, each of which sent the coins to accounts at Coinhub on April 28.

401.    The "Pellegrino Coins" wallet, 0xf3f, participated in the first day of the pump and dump as well. On April 26, it sent 1 million HelbizCoins to a conduit, 0xd6aE, from which the owner forwarded it to an account at Coinhub the same day (0xBB95).

### (2)    More false statements

402.    Meanwhile, Defendants continued the campaign of false and misleading statements to drive demand and pump the price while continuing to sell their own coins.

### a.    False claims that the insiders were not selling their coins

403.    One category of misrepresentation was that the insiders were supposedly not selling their coins. For example, on April 30, 2018, PALELLA

posted on his Facebook page and in the official @Helbizoffial Medium channel that HELBIZ was retaining 48% of the total token supply for "future growth" and would not sell them. In fact, the insiders had already started the process of selling hundreds of millions of coins.

404.   Also that same day, PALELLA posted to his Facebook account: "[I]f the growth of the platform will be in line with what we expect, and we are able to grow both our user base and our payment infrastructure, with HBZ @Helbizofficial as an integrated core part of all transactions, we truly believe that HBZ will cross $10/HBZ".

405.   PALELLA's statement was fraudulent. He knew the insiders were dumping their coins and that HelbizCoin would not be "an integrated core part of all transactions" on the platform.

406.   PALELLA was making these statements to encourage the coin holders not to sell, and to even buy more, while he and his coconspirators dumped their own coins.

407.    On May 7, 2018, PALELLA made similarly cynical statements to encourage the audience to hold even while the insiders were selling. He tweeted: "If you sell even a single $HBZ for under $1 before the platform has launched in July, you have really not understood the scale of the project from day 1."



**Tweet**

**Salvatore Palella**
@palella

If you sell even a single $HBZ for under $1 before the platform has launched in July, you have really not understood the scale of the project from day 1. It is always a choice to sell, but you should probably REMOVE crypto investor from your bio then.

408. And later that day he added: "It is funny how it is the same people that sell for pennies [who] complain about whales. There are no shortcuts to wealth. Realize when you have hit a goldmine hold on."

409. These tweets were misleading not only because the insiders were already selling their coins but also because PALELLA knew: that the platform would not be launching in July, that it would not be using HelbizCoins, and that HELBIZ would not be releasing the carsharing app or HelbizPay. The price was never going to reach $10, much less return to the $1 at which it was initially listed.

410. Reinforcing the false narrative that the insiders were not selling, PALELLA also tweeted that the company was fully capitalized with no need to sell. In June 2018, PALELLA issued the following disingenuous tweet: "I

appreciate all the requests from funds and investors about investing in @Helbizofficial, but due to the #ICO we are not looking for outside investment. We are now only focused on launching and scaling operations, creating value for early investors and the #HBZ coin. #Helbiz":

### b.    False statements about the progress on the promises

411.   Another area of false statements concerned the timeline for release of the non-existing carsharing and HelbizPay apps, products that they had promised to deliver by Summer.

412.   For example, the April 28, 2018 issue of Bitcoin Magazine published an article entitled Helbiz, Blockchain and the New Future of Mobility which recited the false information that "the back end of Helbiz' platform is fully developed, with work continuing to take place on the front end with optimization and procedural testing in progress." In fact, HELBIZ had not developed the platform and was not in the optimization and procedural testing phase.

413.   On June 4, 2018, PALELLA falsely stated via Facebook (and likely his other channels) that the Helbiz car module was in production and that the service would soon be launched in Los Angeles: "Got to inspect the *final* prototype of the on-board Helbiz hardware to be installed inside all vehicles on the Helbiz car sharing platform today! *Production has started* and the Los Angeles launch is getting closer!" (emphasis added). Accompanying the announcement was a picture

of a small black plastic box with the words "HELBIZ" embossed on it to reinforce the false impression that the product was completed and in production.

414.    The tweet was a lie. Months later, when HELBIZ still had not released the carsharing app, it said that the hardware was not yet finished being designed and did not even try to explain the contradiction. On information and belief, HELBIZ and PALELLA had told so many lies by that time that they did not even remember the previous lie. Based on the appearance of the black plastic box and the other facts alleged herein, Plaintiffs are informed and believe that the picture was a fraud and the black plastic box was merely a prop, created using a hobbyist-level 3D printer.

415.    In an open AMA ("Ask Me Anything") chat on the Telegram channel in July of 2018, PALELLA stated: "**The goal and intention is to launch the (carsharing) app with incentivized HBZ payments**. I am always looking to increase the usability of HBZ. So to answer your question the Helbiz app will have HBZ payments, also before we launch HelbizPay. We are all on the same page with the same end goal. **I want nothing else than executing on the promises** and am looking forward to being able to share the positive progress." (emphasis added).

416.    The representations in the preceding paragraph were false and misleading by omission. PALELLA knew that the Helbiz app would not have carsharing nor HelbizCoin payments. To the contrary, PALELLA knew and failed

126

to disclose that, instead of "executing on the promises," HELBIZ was going to launch a closed system proprietary app, without blockchain capability, with no sharing economy aspect, and that would run on credit cards, with HELBIZ keeping the fees. PALELLA also knew that HelbizPay app was not launching either.

417.   PALELLA's false claim that he wanted "nothing else than **executing on the promises**" in the whitepaper was self-serving and untrue.

### c.    More hype

418.   Defendants came up with more false "good news" to try to pump the prices. Announcements on Medium.com on July 30, August 7, August 10 and August 13 of 2018, about HELBIZ's "China road trip" made it appear that good things were happening behind the scenes, such as a partnership with famed Chinese technology company Alibaba and a flying Helbiz drone taxi that would revolutionize urban travel.

419.   In August 2018, long after HELBIZ knew that it would not be releasing the promised ride-sharing platform nor incorporating blockchain, PALELLA took to twitter to announce that Giulio Profumo was being promoted to HELBIZ's CFO, after which a series of tweets from Profumo ensued.

420.   For example, on August 10, 2018, PALELLA posted a picture of an airtaxi drone and stated: "2019 the first @Helbizofficial users will take to the sky

127

with a tap, now it is time to work with regulators to embrace this new technology and be open to how it can change our world for the better. #Helbiz."

A.    "Exciting meetings for @HELBIZofficial in China over the past week, China leads the way in almost every category of the current and future shared mobility market from carsharing and ride-hailing to the country's readiness to support the looming advent of robo-taxis!"

B.    "Official visit of the #Helbiz team at Alibaba HQ to accelerate and explore synergies within blockchain, security, payments, IoT capabilities @HELBIZofficial"

C.    "Blockchain is here to stay! New insights @HELBIZofficial of how Alipay has expanded the application of blockchain to offer fast, secure, transparent and low-cost payments between digital wallets and ecosystem partners"

### (3)    SKRILL pumps the HelbizCoin and adds more exchanges

421.    A consistent focus and central part of the scam was the listing of HelbizCoin on more and more exchanges in order to find new victims to buy it. For example:

A.    The tweet from PALELLA on May 31, 2018 stated: "May has come to an end. @Helbizofficial is more attainable and launched on 11 exchanges, finished our updated UI for our apps, acquired a

128

new office in NYC and will now focus on the press aspect globally. #hbz #Helbiz."

B.    A posting and link on May 14, 2018 to PALELLA "Helbiz is now live and listed on bonus exchange Mercatox with a Top 10 exchange listing coming soon!";

C.    May 24, 2018 tweet from PALELLA: "Eventful first 60 hours of the week, with our third exchange of the week - @Helbizofficial will list on @hitbtc!"

D.    The May 24 tweet, included a response from Defendant PELLEGRINO, "Impressive" in which he tagged Defendant DIIORIO, thereby signifying that DIIORIO was responsible for the HitBTC listing for not himself or SKRILL.

129



**Salvatore Palella** @palella · 1gn

Eventful first 60 hours of the week, with our third exchange listing of the week - @helbizofficial will list on @hitbtc !

**Lorenzo Pellegrino**
@lollanza

@palella @diiorioanthony ve diğer 2 kişiye yanıt olarak

impressive

E.      A posting on May 29, 2018 to PALELLA's Facebook page "It is

now 1 month since Helbiz got listed, and today 30 days later

Helbiz is traded on 11 exchanges and 26 markets globally. With

product launch getting closer I am excited for the next couple of

months! #HBZ #Helbiz #HelbizP2P #HelbizPay"

422. PELLEGRINO and SKRILL joined the effort to encourage new purchasers too. For example, on April 26, SKRILL posted to its twitter channel: "Put the best of three worlds together and pay no trading fees! Only this weekend, with @helbizofficial and @skrill #cryptocurrency #blockchain." The posting included graphics with the Skrill and Helbiz logos and saying "COINHUB BRINGS YOU HELBIZ. Pay with Skrill at 0% trading fees this weekend."

423. The tweet was liked by PALELLA, SKRILL and HELBIZ, all of whom knew that HELBIZ was breaching and would not release the promised product or be incorporating blockchain.

424. May 2, 2018, SKRILL posted to its Twitter channel to: "Join CoinHub today and benefit from 0% trading fees on @Helbizofficial markets until 6th May 2018 $hbz." The post was liked by Defendants HELBIZ, PALELLA, and PELLEGRINO (listing himself as "CEO Skrill, Neteller, Income Access), and retweeted by PELLEGRINO.

425. SKRILL also announced and promoted the Bitlish and EXMO listings in the same fashion as the following postings show:

131

 **Skrill**
5 Jun 2018 · 🌐

Use cryptocurrency platform #EXMO between June 5-10 for 0% commission on all deposits via Skrill.

#EXMO has partnered with Skrill and Helbiz to bring you this exclusive promotion.



EXMO.COM
**0% commission on cryptocurrency deposits through Skrill**

132



426.   The EXMO post linked to a landing page stating: "Special offer: no commissions on deposits through Skrill. . . Cryptocurrency platform EXMO, with the support of its partners **Skrill** and **Helbiz** announces the special offer: **starting from June 5 to June, 10 there will be 0% commission on all deposits via Skrill.**

**EXMO cryptocurrency exchange added token Helbiz (HBZ) to its listing**. . . . .

**Skrill** is an international payment system enabling the online payments in real-time mode. Skrill provides an opportunity to deposit on EXMO in dollars (USD), euro (EUR), Polish zloty (PLN). Rapid Transfer is another Skrill depositing method available, which allows you to deposit funds directly to EXMO through your bank account. . . . Helbiz is the ***seamless car sharing solution***, allowing ***users to rent out their private vehicles using blockchain***, directly through the phone without any manual involvement. Users of the platform are now able to trade in the three most popular pairs: HBZ/ETH, HBZ/BTC and HBZ/USD." (bold in original, bolded italics added).

427.  PELLEGRINO endorsed the post with a "like" despite knowing that HELBIZ was a fraud.

428.   PALELLA, SKRILL, PELLEGRINO, and HELBIZ, mutually followed each other on social media and thus received each other's posts. Similarly, DIIORIO followed PALELLA.

429.  The forgoing exchange listings and promotions by SKRILL were undertaken pursuant to its partnership with HELBIZ. This was not something that SKRILL or PAYSAFE did for other coins.

430.  Thusly, PELLEGRINO and SKRILL caused the coin to be listed on exchanges to facilitate insider sales, lured buyers into the exchanges with special

134

incentives and promotional materials, provided payment rails for the buyers to buy the coins, and endorsed statements they knew to be false.

### (4)    Defendants continue dumping the coins

431.   Defendants' purpose for the foregoing conduct was to keep purchasers in the market while they dumped more of their coins.

#### a.    The PELLEGRINO Wallet

432.   As explained above, the Pellegrino Coins Wallet, 0xf3f, participated in the first day of the pump and dump. Additionally, on May 7, it sent 100,000 HelbizCoin through a different conduit, 0x7343, to the same Coinhub address the same day. Both the April 26 conduit wallet transaction and the similar May 7 transaction received the transaction fee ETH from a Coinhub account immediately before sending the HelbizCoins.

433.   Later, the Pellegrino Wallet also participated in dumping millions of coins via the fake Babylonia exchange scam, as discussed is in Section K, below, by which Defendants sold almost 90 million coins to buyers on Exmo, Mercatox and Idex.

#### b.    The PALLELA Wallet

434.   As stated above, the 0xf91 PALELLA Wallet used three conduits to dump 10 million coins to Bitlish on the first day of trading.

135

435. The PALLELA Wallet was inactive thereafter until May 28, 2019, when it received 35 million HelbizCoins from 0x7c99, which it sent the same day through a conduit, 0x2579, to contract 0x4792, which deposited it to an account at EXMO.

436. Defendants used 0x4792 many times in the course of their pump and dump scheme to deposit their coins to the EXMO exchange. All of these deposits went to the same EXMO account, demonstrating concerted action by persons with a common interest in the money.

### c.    The 0x7c99 Wallet

437. For example, on August 1, 2018, 0x7c99 sent 65 million Helbiz coins directly to 0x45cd. It also sent **over 500 million coins** to EXMO and the Mercatox exchange using passthrough wallets to launder the money.

438. The following chart shows the interrelationships between the wallets.

136



439.   As the above chart sets out, 0x7c99 also sent the coins through many

intermediaries. For example, after receiving 52,477,871 HelbizCoin from 0x7c99

in October of 2018, 0x45cd7 sent 26.2 million HelbizCoin in seven separate

transactions between November 5th and 10th. It also dumped coins to the address

that led to the Mercatox exchange account, 0x3aD2. 0x3aD2 was also used by

137

other insider affiliated wallets that also received massive amounts of HelbizCoin

from 0x7c99, including:

- 0xB8E0, which received 20 million in December 2108;

- 0x7558, which received 33 million in June 2018;

- 0x6E36, which receive 10 million in June 2019;

- 0x78fd, which received 8.5 million in May 2018;

- 0xc61, which received 18 million on November 18, 2018 from wallet 0x2365, which had received 80 million from 0x7c99 the same day;

- 0x461da, which received 20 million in December 2018;

- 0x1956, which received 30 million in December 2018;

- 0x349a, which also received 30 million in December 2018;

- 0xf40f, which received 15 million in December 2018;

- 0xb8e0, which received 20 million in December 2018;

- 0x4052, which received 25 million in May 2019 from 0x713f, which received 75 million from 0x7c99 the same day; and

- 0xA35, which received 20 million in May of 2019;

440.  In similar fashion, the 0xe8c7 wallet, had received 7.7m free

HelbizCoin from the 0x8bc2 creator wallet and had also received the ETH that

0x7c99 recycled through the Gemini and Bittrex accounts, sent the coins to

Mercatox, EXMO and Bitlish, using money laundering techniques. It passed the coins through conduit wallets 0x23c8, 0x77b, and 0x0f77 to 0xc179.

### d.     HELBIZ Engineer Carlos Beltran and others

441.   The 0x2365 wallet also connects to the wallet of another HELBIZ insider, Carlos Beltran. 0x2365 sent free HelbzCoin to wallet 0x4e6D (through the conduit 0xc61E) in connection with the Babylonia swap fraud discussed below. Wallet 0x4e6d then dumped the coins on a decentralized exchange.

442.   Beltran controlled 0x4e68, having sent ETH back and forth with it.

443.   Several of the foregoing transaction also lead to contract 0xb824, which connects to eight additional wallets that received a combined total of 118 million HelbizCoins from 0x7c99. And the foregoing are only examples, and only those that connect back directly to 0x7c99, as opposed to indirectly through more conduits.

444.   Defendants perpetrated the pump and dump in other ways as well. For example, 0x49db (the wallet discussed above that collected hundreds of small transactions from 360 coordinated wallets) dumped its coins in one transaction to Mercatox (via a conduit, 0xa02e).

## I.    Trading the HelbizCoin on Exchanges

445.    The following exchange websites listed HelbizCoin: Bitlish; IDEX; EtherDelta; Coinhub; Sistemkoin; Mercatox; IDAX; EXMO; HitBTC; Lykke; and Bleutrade. These markets were open 24/7 and their total volume at times reached the tens of millions of HelbizCoin, ranging into the hundreds of millions total.

446.    Singularly and together, the exchanges had a large customer base of active cryptocurrency traders that efficiently responded to and digested the false and misleading statements that Defendants published. Defendants disseminated their statements and misinformation via widely followed social media and publications. Although Defendants have deleted their Medium.com channel, even their official twitter and Facebook channels alone total 90,000 followers.

### (1)    U.S.-based transactions

447.    As explained in Section A above, the method that the Ethereum nodes use to update the shared ledger is such that title to HelbizCoin transfers in the United States. U.S. securities and commodities laws therefore apply. These laws also apply for the additional reason that the contracts to buy and sell HelbizCoin were formed in the United States such that irrevocable liability was incurred here.

448.    The exchanges were housed on servers located within the United States, meaning that irrevocable liability occurred here. For example, the servers on which Bitlish website customers became contractually bound were located in

140

California from 4/17/18 to 3/29/19 and 2/25/20 to 4/25/20; Coinhub's servers were in Virginia the entire time HBZ was trading; for HitBTC, the servers were located in Florida, New York and California during the time HBZ was trading; for Mercatox, the servers were located in California the entire time HBZ was trading; for IDAX, the servers were located in California from 5/22/18 to 9/8/18, in Massachusetts from 9/8/18 to 9/16/18, and in Virginia from 11/2/18 until trading in HelbizCoin stopped; EtherDelta's servers were located in California the entire time; and for IDEX, the servers were located in California the entire time as well.

449.    The exchanges that listed HelbizCoin were not national exchanges as, for example the NASDAQ is, but, rather, private companies operating private websites. The website UIs (user interfaces) provided the mechanism by which coin buyers and coin sellers contracted and became irrevocably bound on those websites.  The UIs worked as follows.

### (2)    Centralized exchanges

450.    Most of the exchanges where HelbizCoin traded are "centralized exchanges," meaning that the traders trade through a centralized order book that matches trades, similar to an electric stock exchange.

451.    They feature a UI which requires traders to specify whether they are placing a buy or a sell order, and then enter the amount of the coins they are

offering to buy or sell, and the price at which they are willing to transact (e.g., a limit or market order).

452.    The user would click a "buy" or "sell" button, as appropriate, whereupon the offer would enter an "order book" database located on the server.

453.    Even after entering the order book, the offers remained revocable. Unless and until a user's buy order matched a sell order (or vice versa), the user could use the same UI to cancel the offer. However, as soon as there was a match, the offers were accepted and would execute (or partially execute, depending upon the amount of coins in the given buy and sell orders).

454.    The match resulted in immediate irrevocable liability.  The exchanges did not allow either side to back out once they matched.

455.    On most centralized exchanges, users can also complete the order entry steps using an API (application programming interface). With the API, the user connects directly to the server, skipping the UI but providing the same information directly. Using the API does not change the fact that the matching and execution functions take place on the server. It simply automates the process of entering data into the server.

456.    Independently of the forgoing, as to all of the transactions on the centralized exchanges, when title to the coins transferred, it transferred in the United States. When the customer of a centralized exchange wanted to withdraw

142

HelbizCoin from the exchange, he or she would use the UI to specify the amount they wished to withdraw and the Ethereum address to which they wanted it sent. The exchange would then send the HelbizCoin following the transaction procedure set out in Section A. Title to the HelbizCoin would then transfer from the exchange to the customer on the Ethereum network, in the United States.

### (3)    Decentralized exchanges

457.   A decentralized exchange (or "DEX") is a method for coin holders to trade coins with each other directly. A DEX uses a smart contract (or set of smart contracts) to hold the coins that each side of the transactions wishes to exchange, and then sends the correct amounts to each party if there is a price match.  So irrevocable liability on decentralized exchanges occurs where the smart contract executes.

458.   Smart contracts do not execute on a single server. Rather, they are executed by all the Ethereum nodes in the same manner that the shared ledger gets updated. Irrevocable liability is thus a process that happens on the entire network. As explained in Section A, that process occurs in the United States (as well as in other countries where other nodes are located) and more of the computer power that goes into the execution is located in the United States than anywhere else. Relatedly, just as with any ERC-20 transaction, title to the HelbizCoin passed in

143

the United States when the coins are sent out from the smart contract to the respective parties. See Section A.

### (4)    Residence of the traders

459.    While the server location in the United States and the transfer of title via the Ethereum network are each individually sufficient bases for application of U.S law, it is also true that the insiders used these exchanges to sell coins of their own directly to the general public, which included many U.S. residents who were physically situated in the United States when they incurred irrevocable liability.

460.    HELBIZ, PALELA and HANNESTAD are residents of New York, PELLEGRINO is a resident of Florida, and GIULIANO is a resident of either NEW YORK or CALIFORNIA. The same is true for many of the non-Defendant "team members": Michael Coppolla, Giulio Profumo, Nemanja Stancic, and Jelena Stojanac are all U.S. residents. Only Defendants PAYSAFE, DI IORIO and AL DARMAKI reside outside the U.S.

## J.    HELBIZ Unveils Its "HelbizGo" Scooter Product, Admits That It Breached, And Makes Fraudulent Promises To Cure The Breach

461.    Defendants kept up the ruse that the carsharing app with HelbizCoin payments would be released imminently until September 3, 2018, when they were ready to start promoting the product they had actual built: HelbizGo.  HelbizGo was a proprietary scooter rental service that breached every promise in the whitepaper.

144

462.   HELBIZ updated the Helbiz.com website to announce the arrival of its stylish new scooter service: "HelbizGO is a dockless intra-urban transportation solution directly integrated into the Helbiz platform that allows users to instantly rent and unlock electric scooters from their smartphone and simply leave curbside when finished."

463.   Defendants took to Medium.com and posted an article for the coin buyers at the same time.

### (1)    No carsharing ecosystem

464.   HELBIZ announced that the platform would not be launched as previously represented. First, HELBIZ stated that it was going to delay the car sharing app. It claimed: "Due to the delay in finalizing the car hardware, the team decided to shift focus to first build, launch and optimize HelbizGo while continuing to test and optimize the 4G car module on the side before finalizing the development for the carsharing." The referenced car hardware was the black box pictures of which PALELLA had posted two months prior when he tweeted that "production has started" and that it was ready to be launched in Los Angeles.

465.   The announced delay in releasing the carsharing app and the reasons given for the delay further demonstrate that HANNESTAD's statement at the PAYSAFE livecast to the effect that the app was already up and running and about to be released was an intentional lie.

466. HELBIZ also represented that it would add carsharing in Version 2.0 of its app, which would be launched around the end of the year (and went on to say that Version 3.0 would be adding jets and yachts).

467. Defendants knew that all of this, too, was false and misleading by omission, and that HELBIZ would not be fulfilling its promises by the end of the year as it claimed.

### (2)    Using credit cards instead of HelbizCoin

468. The September 3 posting also stated that the app would *not* be using HebizCoin to pay for the scooters, contrary to every promise PALELLA ever made made and his assurances in the AMA several weeks prior. Rather, the app relied on credit card payments funneled through SKRILL.

469. HELBIZ tried to justify the announcement with doubletalk. It said it was acting in the coin holders' interest by delaying its promise to make HelbizCoin the platform's sole currency. Despite its representation in the whitepaper, HELBIZ now claimed that taking fiat currency instead of HelbizCoin would drive adoption of the platform and thereby (allegedly) increasing the value of HelbizCoin when HELBIZ switched the platform over to HelbizCoin-only at some future date.

470. To further mislead and appease the investors, Helbiz claimed: "Making Helbiz a crypto only solution too early will restrict growth, and overall

146

hurt HBZ as it will then only be a niche project for token holders and never build the impact needed to shift consumer behavior."

471. To the same effect, PALELLA tweeted the following day "A delayed product will be great, but a rushed product will be bad forever. #Helbiz #HelbizP2P."

472. The announcement continued that the switch from fiat credit cards to exclusively HelbizCoin payments would now happen in a fourth phase of the development, Helbiz V4.0: "In the 4th phase Helbiz will utilize its user base, previous growth and position within local communities to phase out direct fiat payments in the Helbiz app moving towards a crypto only solution. All purchases, even with credit card, will simply purchase HBZ on the open market via the exchange API to fill the in-app wallet which will only hold HBZ making it the only accepted currency."

473. This statement about the delayed switch to HelbizCoin was false and misleading, and also another direct breach of the promises in the whitepaper. Nowhere in the whitepaper had HELBIZ said it was going to phase in development of the platform at all, much less in four phases. To the contrary, it had promised that HelbizCoin would be the sole currency from day one. This promise was the entire rationale for investors to invest $40 million of ETH in the ICO (now worth $250 million) and hundreds of millions more on the exchanges.

147

474.   The contention that HELBIZ had decided that the business model needed fiat payments to popularize it conflicted completely with HELBIZ's statement in the whitepaper that it had already carefully examined the economics about whether to build the platform with a native coin, determined that a native coin was the best way to make the platform thrive, and, accordingly, was asking investors to buy HelbizCoin:

> "The choice to create a native token for Helbiz transactions *is not casual*.The conclusion *of our careful analysis* was that only a native token allows Helbiz to optimize for the 3 desired objectives."

(emphasis added).

475.   The purported new "phased" plan, which was itself insincere, shows that this statement in the whitepaper was knowingly false or recklessly made, as it was directly contradicted by the new claim that HELBIZ needed to accept fiat currency to popularize the platform.

### (3)    No HelbizPay app

476.   Relatedly, the September 3 announcement stated that HELBIZ had not completed the internal cryptocurency exchange, nor the internal wallet for the app, nor was it ready to release HelbizPay. According to the announcement, these would come with the Version 2.0, now promised by the end of the year.

477.   The announced delay in releasing HelbizPay, and the reasons given for the delay, further demonstrate that HANNESTAD's statement at the livecast to

148

the effect that that these functions had already been created was fraudulent. Moreover, the new promise that HelbizPay would be released by the end of the year was also false and misleading.

### (4) PALELLA embezzled all the money

478. If, as HELBIZ falsely claimed, it was acting earnestly in the coin holders' best interests by charging in dollars instead of HelbizCoin, there was no basis for it to keep the money it received from the credit card payments.

479. Rather, if HELBIZ was sincere about acting in the coin holders' best interests, it would have used the revenues from the credit card payments to go into the market and buy HelbizCoins, thereby simulating the process it had promised.

480. HELBIZ had promised the coin holders that their coins would increase in value because riders would need to buy the coins in order to use the platform. Even though HELBIZ had now built the app such that the rides were not paid for in HelbizCoin, there was no reason HELBIZ itself could not have created the same demand for the coins by using the HelbizGo payments to buy up HelbizCoins.

481. PALELLA, however, kept all the money for himself. He and HELBIZ left the coin holders behind, robbing them of the promised value proposition.

482. This was an embezzlement of the coin holders' investment. The proceeds PALELLA and HELBIZ enjoyed from it is pure theft.

149

**K.      Defendants Create, Babylonia, a Fake Exchange They Used to Steal HelbizCoins and Keep the Pump and Dump Going**

483.    On October 29, 2018, a new cryptocurrency exchange calling itself "Babylonia" announced on Medium.com that it would be listing HebizCoin. It was offering to exchange its own cryptocurrency, BBY, for HelbizCoin at a very favorable exchange rate of 8 HelbizCoin to 1 BBY.  Babylonia represented that it would be offering BBY to the public at $1.20 per coin, thereby valuing HelbizCoin at 15 cents each.

484.    According to the announcement, the BBY would entitle owners to discounts when trading on the exchange's supposedly forthcoming trading site and to share in the profits earned by Babylonia via a coin purchase and burning mechanism (essentially like a stock buyback).

485.    The announcement further stated that HELBIZ was partnering with Babylonia to serve as the "matching engine" that would allow for the (supposedly forthcoming) internal exchange in the app.  Helbiz said the partnership "will allow us to introduce HBZ payments in the transportation application in the near future."

486.    Plaintiff Szklarek is one of the people who responded to the Babylonia swap offer, sending in 500,000 HBZ on October 30, 2018.

487.    Babylonia was just another facet of the Defendants' fraud and a puppet of PALELLA's. Although there was briefly a Babylonia website, it never functioned. The BBY tokens were never listed for $1.20, nor at all. In the Summer of 2019, at about the same time PALELLA announced his intention to IPO HELBIZ, the Babylonia channels were deleted from Medium and Facebook and it disappeared.

488.    Plaintiffs' investigation since serving subpoenas in this case, shows that the Babylonia web address was registered by PALELLA and HELBIZ. PALELLA is listed as the owner of the Babylonia website, while the address states "Helbiz Inc." and gives the headquarters address.

489.    Plaintiffs' investigation has also demonstrated that Carlos Beltran, one of Helbiz's software engineers (not the baseball player), worked on at least some of the computer code underlying the Babylonia website. See Marques Declaration, Dkt. 31-16, incorporated herein.

490.    Further, there is evidence on the blockchain ledger leading right back to Beltran and HELBIZ.

491.    The smart contract address for the BBY token is 0x4f8a. The contract creator was itself a contract, 0xBa1b, which was in turn created the same day by wallet 0x4e6D.

151

492. As discussed above in Section H.4.d., wallet 0x4e6D received free HelbizCoin from 0x7c99 through conduits and it participated in the pump and dump.

493. Moreover, the blockchain also shows transactions between 0x4e6D and wallet 0x28ff.

494. The 0x2ff8 wallet belongs to *HELBIZ engineer Carlos Beltran*. Plaintiffs know this because on August 28, 2021, Mr. Beltran used an Ethereum wallet naming service (essentially like a vanity license plate for an Ethereum address) to register the name "CarlosBeltran.eth" to wallet 0x28ff. Plaintiffs could not have known that this address belonged to Mr. Beltran until he carelessly revealed himself while this case was on appeal.

495. Thus, in addition to PALELLA's registration of the Bablyonia website and his engineer's coding of the website, the wallet that created the fraudulent Babylonia swap contract on the Ethereum network can now be linked directly to Mr. Beltran and thus to PALELLA and HELBIZ as well.

496. As will be further explained in Section M.3.c. below, because Mr. Beltran revealed his ownership of 0x28ff, Plaintiffs can now also show that Mr. Beltran also created the smart contract for the Exit Swap in 2020 and, thus, that PALELLA was behind the threat to destroy the smart contract and put the coin

152

holders under duress. These actions were thus taken by PALELLA himself, not some third-party Singaporean corporation as PALELLA has falsely claimed.

497.    Rather, PALELLA's multiple statements to the Court that he had no control over the HelbizCoin smart contract, are now absolutely proven false: it can be shown on the blockchain that PALELLA's own engineer operated the 0x8bc2 creator wallet via its direct interactions with CarlosBeltran.eth.

498.    PALELLA's false representations and lack of candor on this score includes, among others, the sworn declaration he submitted urging the Court to cancel its hearing at which PALELLA would have had to submit to cross examination under oath.

499.    All in, approximately 88 million HelbizCoins were swapped for BBY.

500.    The swapped HelbizCoins ended up being sent not to the wallet of the supposed Babylonia exchange *but to 0x7c99*, the very same wallet that Defendants repeatedly used for so much money laundering.

501.    Moreover, 0x7c99 then distributed these coins to the insider's wallets, which then dumped them on the exchanges.  For example, the Pellegrino Wallet sent in 2 million HelbizCoins; 0x3c45 sent in 12 million HelbizCoins that 0x8bc2 had sent it through conduits; and 0x3c45 also sent in another 10.7 million through its own conduits.

153

## L.     PALELLA Prepares a Public Offering on the NASDAQ

502.    Not content to have stolen hundreds of millions of dollars from his coin holder investors, PALELLA sought to parlay the profits. Specifically, by using the capital it raised from the coin holders and by stealing the proceeds of the transportation platform, HELBIZ grew its markets and expanded its scooter fleets to cities in the U.S. and Europe. Soon the scooter app that the coin holders paid to build had been downloaded over 100,000 times.

503.    All of this expansion was driven by the platform and revenues therefrom that was repeatedly promised to the coin holders.  To quote PALELLA, by participating in the ICO, coin investors were "buy[ing] into the platform."

504.    Instead of delivering on his promise, PALLELA embezzled all of the money, siphoning it away from the HelbizCoin investors and into his own company.

505.    With the scooter service up and running, PALELLA decided that he wanted to be the CEO of a publicly-traded company. He would make an initial public offering (IPO) of HELBIZ stock on the NASDAQ.

506.    But HelbizCoin stood in his way. The problem for PALELLA was two-fold. First, HELBIZ had been capitalized with the ICO money, meaning that the coin holders had a claim on the company he wanted to sell. Second, HELBIZ was contractually obligated to only take payments in HelbizCoin – an unregistered

154

cryptocurrency security that had lost 99% of its value in the first year. The public markets were never going to accept PALELLA or his company under those circumstances.

507. True to form, PALELLA ran a racket to take care of the problem, resorting to fraud and eventually extortion.

### (1) PALELLA lies to new investors and fraudulently conceals HELBIZ's connection to HelbizCoin

508. No later than December of 2018, PALELLA and HELBIZ started the process to make a public offering of stock on the NASDAQ.  They hired an investment bank, Tripoint Global Equities LLC, and other firms to conduct the process.

509. The first step was a "pre-IPO' funding round. The funding round was conducted as a private placement under SEC Rules for Section 4(a)(2) of the Securities Act. The offering stated that HELBIZ intended to conduct a "qualified IPO" "shortly" after the private offering closed.

510. The offering commenced in mid-March, 2019, and ran through June of 2019. HELBIZ kept the private placement quiet and did not inform the coin holders.

511. In the private placement materials, which PALELLA signed, HELBIZ described itself thusly: the "Company was incorporated as a Delaware corporation

155

in October 2015 for the purpose of becoming a seamless transportation and payment ecosystem for scooter sharing."

512.  PALELLA's statement is misleading in multiple ways.  First, HelbizGo was not "scooter sharing" anymore than Hertz Rental Cars is carsharing. Helbiz was providing a rental service for its proprietary vehicles.

513.  Second, PALELLA never told the coin buyers that HELBIZ was founded to be a scooter company. In the whitepaper, PALELLA told the buyers that HELBIZ was founded to be a blockchain company that would allow car owners to rent out their personal vehicles using a blockchain platform. To the same effect are the Bitcoin Magazine articles with titles like: Helbiz: The Blockchain AirBnB for Transportation (Jan. 22, 2018); Helbiz: The Emerging Blockchain + Transportation Intersection (Jan. 29, 2018); Helbiz: Blockchain and the New Future of Mobility (April 28, 2018).

514.  PALELLA and HELBIZ routinely posted these articles to their social media channels when they were trying to sell HelbizCoins. For example, PALELLA posted the following links to the Bitcoin Magazie articles using his twitter account:

156





515.    HELBIZ was either lying to the coin investors or the pre-IPO investors.

516.    HELBIZ's pre-IPO documents further state that its customers demand convenience and specifically remark that a convenient payment system was important to the success of the company. In this regard, HELBIZ stated that nearly all of its riders pay with a credit or debit card, and that it relies on third-party payment processors, *i.e.* Defendant SKRILL, to process these payments.

517.    HELBIZ said that if it lost its relationship to the credit card payment processors, it could destroy the business and "make our platform less convenient and attractive to users, and adversely affect our ability to attract and retain riders."

518.    In other words, HELBIZ was stating that there was no way it could run the business if it only accepted HelbizCoin as payment.

519.    Relatedly, HELBIZ concealed the fact that it had already promised the coin holders that it would only accept payments made in HelbizCoin. In fact, it made only the most oblique of references to HebizCoin at all, without naming it:

> **We may in the future offer new payment options to riders that may be subject to additional regulations and risks.** We are also subject to a number of other laws and regulations relating to the payments we accept from our riders, including with respect to money laundering, money transfers, privacy and information security. **If we fail to comply with applicable rules and regulations, we may be subject to civil or criminal penalties, fines or higher transaction fees and may lose our ability to accept online payments or other payment card transactions, which could make our offerings less convenient and attractive to our riders**. . . .

For example, **if we are deemed to be a money transmitter** as defined by applicable regulation, we could be subject to certain laws, rules and regulations enforced by multiple national, regional or municipal authorities and governing bodies who may define money transmitter differently. . . .

(Emphasis added).

520.   Thus, HELBIZ was saying that if it started accepting HelbizCoin, it could run afoul of rules for money transmitters, get in trouble with regulators and lose its ability to take credit card payments, which would kill its business.

521.   Relatedly, HELBIZ omitted the fact that it had already taken in over $38 million of ETH by issuing 520 million HebizCoins, which it used to build the platform that was HELBIZ's primary asset.  At an earlier time, when it suited his plan to sell more coins, PALELLA tweeted that the ICO paid for the platform:



159

522. If HELBIZ had disclosed that it stole the platform from the coin investors, that it was contractually obligated to accept only HelbizCoin payments, and that it had already minted 1 billion unregistered cryptocurrency securities, PALELLA could not possibly attract any investment, much less pull off a public listing on the highly-regulated NASDAQ exchange

523. Thus, PALELLA lied to the stock investors and set about cutting off the coin investors.

**(2)     PALELLA changes the names associated with HelbizCoin from "Helbiz Inc." to "HBZ Systems" and then deletes evidence of Helbiz Inc.'s involvement**

524. In January of 2019, ten weeks before distributing the pre-IPO documents, PALELLA started removing himself and HELBIZ from everything having to do with the HelbizCoin.

525. First, he took himself off the ownership of his belatedly-registered Singapore company, changing its name from "**Helbiz Mobility System** PTE Ltd." to "**HBZ** Systems PTE Ltd." thereby disassociating it from himself and HELBIZ. He also transferred the one share of the company from his personal corporation, SP1, to an offshore finance operation with a reputation for money laundering called Quantum Analysis Management Ltd.

526. Second, PALELLA removed the @HelbizOfficial name from the HelbizCoin social media channels and substituted "HBZOfficial."

527.    PALELLA and HELBIZ also began deleting their social media posts in which they talked about the ICO and the HelbizCoin. They also deleted the PAYSAFE Livecast from Youtube, and eventually deleted the Medium.com postings entirely.

### (3)    PALELLA acts in bad faith to make the coins useless

528.    Additionally, PALELLA made it as difficult and expensive as possible for the coin holders to spend HelbizCoin on its scooters. To serve his own ends, he effectively sabotaged the coin in the following ways.

529.    First, as the above-quoted pre-IPO documents recite, the scooter app was designed to provide an instantaneous transportation method that the customer could unlock and use on a moment's notice. The app needed to provide quick, convenient payments, or else customers would not use it.

530.    Accordingly, PALELLA set up a process for the coin payments that would not only take hours or days to process, but was exorbitant.

531.    First, HELBIZ required anyone who wanted to pay with HelbizCoin to go through an application process that was not required of credit card users. They then had to wait to be approved. By the nature of the industry, most if not all prospective scooter renters are doing so because of an immediate need/desire on the street; few if any were reserving scooters for future rides much less cared

161

which brand they were using of the identical scooter offered by competing services.

532.   Coin holders also had to wait for HELBIZ to assign them a new Ethereum wallet address to which they could send their coins. This was not the promised in app wallet. Rather, HELBIZ had the private keys to the addresses, meaning whatever coins a user put in the wallet, they could never get any back.

533.   Moreover, the coin holder had to pay Ethereum Network gas fees to send coins to the new addresses. Gas fees routinely cost over $100 in ETH per transaction and averaged around $25 dollars in 2018. Gas fees dwarfed the cost of a scooter ride.

534.   The only alternative was to send many coins at once so as to incur only a single gas fee. But, because of the way PALELLA had set up the app, using that method meant that the coins would be trapped since HELBIZ owned the private key.

535.   Moreover, when HELBIZ did issue ride credits, it did so using the by-then battered value of the coins, not on the pay-per-use basis it had promised. Thus, price risk remained with the customer even though they could not withdraw deposited coins.

536.   Further, HELBIZ did not automate the process even though it could have created a smart contract to do so. Instead, a user had to wait for a human

162

being to notice that the coins had arrived at the assigned address and then manually credit his account. This method was unduly slow, not even necessarily completed the same day.

537.   The competing credit card method in the app was instantaneous, with no gas fees, and did not require entrusting one's financial assets to HELBIZ.

538.   Relatedly, HELBIZ trapped the coins in the wallet addresses it gave to the users, never even taking possession of them. This allowed it to plausibly deny having engaged in a money services business at all.

539.   Abandoning the coins was a small sacrifice for HELBIZ. Unsurprisingly, almost no one was willing to send it their coins and HELBIZ was continually decimating their value. The coins were worth so little by that time that a short scooter ride cost thousands of HelbizCoin.

540.   Moreover, HELBIZ only implemented its scooter fleet in a few cities so there were few users anyway (unlike as would have been the case with the promised carsharing app, which could have scaled quickly because it did not require HELBIZ to buy fleets of vehicles).

541.   As far as new users adopting HelbizCoin, PALELLA made sure that there was no incentive for customers to buy coins and put themselves through the forgoing hassles and disadvantages when they could use a credit instantaneously and for free. The only customers who would even want to use coins were the tiny

163

subset of those people who both lived in a city where HELBIZ had placed its scooter fleet and who had been previously duped into buying HelbizCoin. Those people had by then either sold the coins for a loss to recover something of their investment, or held on hoping that the value would return. There was no reason to spend extra gas fees to buy scooter rides with coins that were worth 1% of the customers' initial investment. For many, it would have been cheaper to buy the scooters.

542.    HELBIZ also took no steps to popularize the coin as it had promised to do. In  the whitepaper just a year earlier, HELBIZ said it would: use "PR & Marketing companies to raise project awareness" and the "token's adoption;" to increase "token usability while at the same time building a strong local community;" "Educate all actors involved on the use of the platform and ongoing support;" "Secure partnerships with other Blockchain players to increase token useability;" and incentivize HelbizCoin adoption and bootstrap the ecosystem;" among other similar undertakings.

543.    Also, SKRILL remained the payment provider in the app, thereby enjoying benefits from the breach of the promise to accept only HelbizCoin. Had SKRILL and HELBIZ wished, they could have made the process far more convenient and useful by including HelbizCoin in the SKRILL and NETeller

164

digital wallets, as PELLEGRINO had stated they would during the PAYSAFE livecast.

544.    PALELLA and PELLEGRINO remained steadfast friends while PALELLA pursued the IPO, for example, attending the Golden Globe Awards together in January of 2019 and vacationing together in May 2019.

### (4)    Defendants lean on the exchanges to delist HelbizCoin

545.    Defendants further set about ruining the value of HelbizCoin by having it delisted from the cryptocurrency exchanges. These delistings were devastating to the economics for the coin buyers and further drove down the prices on the exchanges.

546.    For example, HELBIZ asked EXMO to delist the coin in August 2019. EXMO, to whom the SKRILL and PAYSAFE relationship was important, obliged. The other exchanges, too, valued their relationships with SKRILL and PAYSAFE, as was made clear when the exchange owners spoke at the PAYSAFE livecast. Soon they delisted HelbizCoin as well.

547.    Defendants tried to make it appear that the exchanges arrived at the delisting decisions on their own, but that was not true. For example, the IDEX exchange stated in an April 23, 2020 tweet: "$HBZ has been de-listed **due to team request**. Please cancel any orders prior to withdrawing your tokens." (emphasis added).

165

548.   Moreover, on information and belief, PALELLA promised the exchanges he would pay them for delisting the coins. For example, HELBIZ paid Bitlish 300 ETH around December of 2020 pursuant to a prior agreement. See Section M.2., below.

549.   There was no economic incentive to delist the coins absent outside influence and side payments. Once a coin is integrated into an exchange software, there is little to no marginal costs to keeping the coin in the trading database. Exchanges routinely keep coins listed even with far worse economics than HelbizCoin did. For example, ETGP traded at .0000014 with a market cap of 32k when HelbizCoin was being delisted, but it is still trading. The same is true of JOINT, which traded at .0008 with a market cap of $400,000 when HelbizCoin was being delisted, and ELTCOIN which traded at .0004 with a market cap of $30,000 when HelbizCoin was delisted.

550.   The HelbizCoin delistings were driven by the efforts of the HELBIZ "team," which included PALELLA, PELLEGRINO DIIORIO and other co-conspirators.

### (5)   PALELLA announces the IPO and concocts a false story about HelbizCoin for the SEC filings

551.   PALELLA announced the IPO in a businesswise press release on June 6, 2019. According to the press release:

166

Helbiz, Inc. ("Helbiz" or the "Company"), an intra-urban transportation solution that allows users to instantly rent electric scooters directly from the Helbiz mobile app, today announced the intention to file an Initial Public Offering on NASDAQ. . . .

Helbiz created HelbizGO, a dockless intra-urban transportation solution directly integrated into the Helbiz platform, allowing users to download the Helbiz app from the Google Play Store or the Apple App Store to then instantly geolocate, rent and unlock electric scooters directly from their phones with a tap and simply leave curbside when finished. Built for the sharing economy and for small trips, Helbiz scooters feature on-board connectivity, and are affordable and easy to use. . . .

(emphasis added).

552.   As the excerpted language makes clear, PALELLA was proposing to sell to NASDAQ investors a company whose primary asset belonged to the coin holders: a sharing economy platform run by the Helbiz app.

553.   The announcement goes on to note that Tri-Point Global was the lead selling agent and that Ortoli Rosenstadt Ltd. was in charge of the legal compliance requirements for HELBIZ.

554.   Just like with the pre-IPO documents, when PALELLA filed the IPO documents with the SEC, he omitted the fact that HELBIZ had been built with the coin holders' money, that HELBIZ was obligated to accept payment only in HelbizCoin (an unregistered security and had lost 99% of its value inside of a year), and that HELBIZ owed the coin holders an obligation to use its best efforts

167

to promote the public to use HelbizCoin.  Coming forward with that information would have stopped the IPO in its tracks.

### a.    False statements about HBZ System

555.   Accordingly, PALELLA, aided by his co-conspirators, knowingly lied in the S-1 forms he filed with the SEC, representing that HELBIZ had no hand in the ICO and that the ICO money did not go to capitalize HELBIZ. The S-1 form stated:

> [The] initial coin offering of a crypto currency, the HBZ coin, [was] conducted by HBZ Systems PTE Ltd. ("HBZ Systems") in early 2018. Although HBZ Systems has some common ownership with us, we consider it an unrelated party. Following the initial coin offering, HBZ Systems had entered into an arms'-length loan agreement pursuant to which we received a loan of $1,361,717 with a 9% interest rate per annum (as disclosed in our financial statements). Helbiz received no other funds from HBZ Systems.

556.   The foregoing representation was knowingly false several times over.

557.   First, as discussed in detail above, Defendants laundered the ETH from the ICO. The blockchain shows that insider wallets sent it through conduits to conceal its source, and then deposited into multiple accounts at a number of different cryptocurrency exchanges (many of which lead back to DIIORIO).

558.   Defendants will not be able to provide records from these exchanges showing that the ETH was deposited into the account of HBZ System as represented to the SEC. Defendants are just making that up.

168

559.   Relatedly, the official records of the Singapore corporate registration authority (ACRA) stated that HBZ System was a nonoperational shell. It never commenced doing business and never had any assets of its own. See Dkt. 45-3.

560.   Because HBZ System never commenced doing business, it cannot have conducted the ICO, and because it never had any assets, it could not have lent the ICO proceeds to HELBIZ. The supposed loan is necessarily a sham that PALELLA created (together with the professionals) as part of his fraudulent scheme.

      **b.**     **Prior admissions by PALELLA, HELBIZ, PELEGRINO, and SKRILL**

561.   Second, Defendants new story about "HBZ coin" and "HBZ System" contradicts numerous admissions made by PALELLA and HELBIZ that they issued the HELBIZ coin and received the proceeds.

562.   PALELLA many times confirmed that HELBIZ Inc. conducted the ICO and was using the money to build the platform. For, example, his statement in the June 2018, a picture of which Plaintiffs provided above, states that HELBIZ did not want additional investment money because it had raised all the money it needs in the ICO:

> I appreciate all the requests from funds and investors
> about investing in @Helbizofficial, but due to the #ICO
> we are not looking for outside investment. We are now
> only focused on launching and scaling operations,

169

creating value for early investors and the #HBZ coin. #Helbiz.

563. This *contemporaneous* statement by PALELLA puts the lie to his false narrative in the HELBIZ SEC filings (and this case).

564. Similarly, the whitepaper explicitly states that HELBIZ was conducting the ICO and that proceeds were going to capitalize the company. Moreover, the email address listed in whitepaper for inquiries was coin@Helbiz.com – *i.e.* an email address on the HELBIZ Inc.'s corporate website. Defendant HANNESTAD responded to the emails stating that he worked for HELBIZ Inc., using an email address at the HELBIZ Inc. corporate URL, Helbiz.com, and including a phone number in New York City, not Singapore. The ICO was also advertised on Helbiz.com.

565. PALELLA also recounted in the June 6, 2018 edition of Italian news magazine ANSA, how HELBIZ itself created the HelbizCoin to raise money for the company: "Salvatore Palella, who founded the startup Helbiz [explained] 'just when we were close to the launch [of Helbiz], cryptocurrencies exploded'. So 'we decide to create our cryptocurrency with an initial coin issue', that is, an ICO (initial coin offering) raising '38 million dollars'."

566. Moreover, long before the IPO, HELBIZ publicized the January 29, 2018, Bitcoin Magazine article quoting PALELLA: "**Our** presale ICO date was January 26, 2018 at 9 a.m. EST. **We** sold 30 million tokens in 24 hours. Following

170

that will be the launch of **our main ICO** (on a major exchange) on February 15, 2018, at 9 a.m. EST" (emphasis added).

567.    The article, for which Defendants provided links on their social media channels, also states:

> The term "sharing economy has been popularized over the years by the emergence of trends like shared car services and vacation home rentals. Now a rapidly growing **company called Helbiz** seeks to further disrupt this market by launching its own unique, blockchain based concept. Salvatore Palella, founder and CEO of this **New York-based project**, took some time to answer questions about the company's goal of reshaping the peer-to-peer space to the benefit of citizens worldwide. . . .
>
> Any news on **your upcoming token sale? Our presale ICO** start date was January 26, 2018 at 9 a.m. EST. **We sold** 30 million tokens in 24 hours. Following that will be the launch of **our** main ICO (on a major exchange) on Februay 14, 2018 at 9 a.m. EST.

(emphasis added). There was no mention of any company but HELBIZ and no claim that the company conducting the ICO was in Singapore.

568.    HELBIZ also posted articles to Medium.com and @Helbizofficial social media sites, since deleted, in which HELBIZ made clear that it was the issuer of the coins, including the following statements:

> -"Exciting times. **Helbiz ICO** February 15" (Posted February 9, 2018 to the Helbiz corporate Facebook page);
>
> -"**Helbiz** has launched **its** token presale campaign on Helbizcoin.io on January 26." (Posted to Medium February 2, 2018);

171

-"**Helbiz founder** Salvatore Palella sits down with Bitcoin Magazine to discuss Helbiz after selling + $4 million within 48 hours of its pre-sale";

-January 26, 2018 posting on HELBIZ's corporate Facebook page stated "Last night **Helbiz** gathered the NYC blockchain community for a sold out event at Wall Street" with a link to a Medium post about the event entitled "**Helbiz ICO** Event Brings Together Investors and Enthusiasts";

-Medium posting on February 14, 2018 linking to the Bitcoin Manazine article"Transportation industry blockchain startup **Helbiz raises $5.5. million** in pre-sale ahead of **its** ICO this Friday 15th at 9 a.m. EST"

-"**Helbiz**: the decentralized AirBnb for transportation, Closes *$5.5* million presale and **launches ICO** backed by AlphaBit and Binary Financial" (Posted to Medium on February 2, 2018)

(Emphases added in each of the above).

569.  Thus, HELBIZ and PALELLA took ownership of the HelbizCoin when it served their interests to sell HelbizCoins.  But when PALELLA decided to launch an IPO on the NASDAQ, HELBIZ deleted all the evidence of these statements and started telling the investment community and the SEC the exact opposite.

570.  There are many more examples of HELBIZ's contemporaneous statements that it issued the coins and received the money. An official press release on the corporate @Helbizofficial Medium.com channel stated:

Overwhelming demand has forced **us** to close **our** presale earlier than we expected. For those who were able to participate, please allow up to 48 hours for registration confirmation and pre-sale token distribution. Thank

172

you all for your support! **We** received hundreds of pre-sale participants and look forward to continued support through **our Main ICO** which begins February 15th at 9am EST

For those interested in joining the **Helbiz movement** please visit **our ICO site** here

"We would like to thank the **Helbiz community** for your overwhelming support. **Our presale** CLOSED much earlier than we anticipated— days before our plan, our community has grown by tens of thousands of participants. **We look forward to** having more people participate and join our journey through **our Main ICO.**"

— Salvatore Palella, **Founder of Helbiz**.

(Emphasis added).

571.   On February 15, 2018, PALELLA posted a link on his Facebook page to the Bitcoin Magazine article stating that "**The ICO for the transportation disrupter Helbiz** is live…" (emphasis added).

572.   PELLEGRINO and SKRILL repeatedly demonstrated their understanding that HELBIZ was the issuer of HelbizCoin. PELLEGRINO's speech at the PAYSAFE livecast made that clear.

573.   SKRILL also clearly attributed the coin to HELBIZ itself when promoting investors to purchase it on the exchanges. For example, SKRILL's May 2, 2018, post to its Twitter channel: "Join CoinHub today and benefit from 0% trading fees on **@Helbizofficial markets** until 6th May 2018 $hbz." (emphasis added).  The post was liked by Defendants HELBIZ and PALELLA (and retweeted by PELLEGRINO).

173

574.   SKRILL made similar posts on other occasions attributing the coin to HELBIZ.



575.   PALELLA eventually succeeded in getting HELBIZ listed on the NASDAQ. At its recent peak, the company he built with money stolen from the coin purchasers had a market valuation in excess of $1 billion dollars ($1,000,000,000.00).

### c.    ICANN Registrar records also disprove HELBIZ's statements to the SEC

576.   Finally, subpoenas issued after this case was filed show that the website on which the ICO was conducted, HelbizCoin.com, was owned by PALELLA and registered under HELBIZ Inc.'s name using his home address in New York City. For each field associated with the website's registration –

Registrant, Technical Contact, Administrative Contact and Billing Contact –

PALELLA listed "**Name: Salvatore Palella**" and "**Company: Helbiz Inc**"

(emphasis added). The listed phone number is in the 631-area code in New York.

HELBIZ and PALELLA owned, paid for, and administered the ICO website. See

Dkt. 64-1.

**M.    PALELLA Uses Threats And Extortion Against The Coin Holders**

577.   New York Penal Law § 15.05 states that: "A person obtains property

by extortion when he compels or induces another person to deliver such property to

himself or to a third person by means of instilling in him a fear that, if the property

is not so

delivered, the actor or another will (i) Cause physical injury to some person in the

future; or (ii) Cause damage to property. . ." In the final stage of his exit from the

scam, PALELLA resorted to just such conduct.

578.   Specifically, PALELLA announced that the HelbizCoin smart contract

would be destroyed, thereby destroying every single coin.

579.   Shortly after announcing his plan to destroy them all, PALELLA

offered to purchase their coins for almost nothing. It was the cryptocurrency

equivalent of a "fire sale" racket in which thugs threaten to burn down a

neighborhood store and then offer to buy it from the proprietor on the cheap.

580.   PALELLA did not orchestrate this extortion racket it in his own name. Rather, he resorted to fraud once again to hide his identity.

### (1)    PALELLA threatens to destroy the smart contract

581.   On May 4, 2020, PALELLA announced the threat to destroy the contract in a posting on the website HBZCoin.com. The announcement said that it was from "HBZ System," and HBZ System claimed that it was the issuer of the HelbizCoin. The announcement went on to say that HBZ System had determined that HelbizCoin was a failure, and stated that it was going to unilaterally destroy the smart contract and vaporize the coins. It further said it would be willing to pay the coin holders some ETH for their coins (a "swap"). The announcement said there would be more news posted about the swap soon.

582.   PALELLA was clearly using HBZ Systems as a front. First, as explained above, the announcement purporting to be from someone other than HELBIZ and PALELLA conflicted with so many statements that HELBIZ and PALELLA had previously made taking ownership of the ICO.

583.   Likewise, as is also explained above, the official ACRA records said HBZ Systems was a defunct shell that never commenced operation. In fact, ACRA "struck off" HBZ System from its list of registered corporations long before the threat was published on HBZCoin.com. See Dkt. 45-3.

176

584.    The threat itself also made no sense. The defunct shell had no reason to destroy the smart contract, much less to pay the coin holders ETH for their coins, no matter how little. The only beneficiary would be PALELLA and HELBIZ.

### (2)    The extortionate Exit Swap

585.    Seeking to prevent PALLELA from getting away with his plan, Plaintiffs sought to have the Court enjoin PALELLA and HELBIZ from destroying the smart contract. Plaintiffs cited the ACRA evidence, among others, as proof that HBZ System was PALELLA's alter ego. E.g. Dkt 45.

586.    Shortly thereafter, a new message was posted to HBZCoin.com. This time, instead of naming the never-active and "struck off" company HBZ System, the announcement said it was from a Bahamian-incorporated company called Quantum Analysis Management Ltd.

587.    By way of background, Quantum Analysis has a reputation for assisting in fraud and money laundering. It was implicated as an accomplice to fraud and theft by insiders at the Monte dei Paschi of Siena bank. Its Director, Fabio Allocco, was accused, *inter alia*, of using fraudulent trades involving Quantum and another of his entities, Lambda Securities, to launder the stolen money to accounts in the Bahamas and Singapore.

177

588.    The new posting stated that Quantum Analysis would swap HelbizCoins for ETH prior to the contract destruction, giving coin holders the chance to save something of their investment (the "Exit Swap"). Again, the offer made no sense. Quantum had no reason to pay any ETH for coins that were about to be destroyed. The only ones who would benefit were HELBIZ and PALELLA. PALELLA was using Quantum as a front for his own extortion of the coin holders.

589.    Given the extreme duress that PALELLA had caused the coin holders with the  threat to destroy the contract, the offer was for a pittance, namely, 0.00000094 ETH per coin, or two ten-thousands of a penny at the ETH/USD rate at the time. Someone who swapped 1 million Helbiz Coin would get slightly less than 1 ETH. The ICO price had been 8,000 HelbizCoin for 1 ETH.

590.    The offer went on to provide that if a coin holder had bought HelbizCoin in the *pre-sale* phase of the ICO, not during the crowd-sale ICO phase or on the exchanges, and if the person had never moved the coins from the wallet where they first received them, then Quantum would buy the coins for the original ETH price instead of 0.00000094 ETH.

591.    There was no explanation for why pre-sale ICO purchasers should get refunded at the original rate but the crowd-sale ICO purchasers should get 1000 times less. There was also no explanation why it should matter if the pre-sale ICO buyer moved the coins instead of leaving in the same wallet. The blockchain

shows how many coins he or she bought in the presale, and one coin is as good as another. The limitation on its face made no sense.

592.    In reality, the reason behind these limitations was that Defendants had been making dummy purchases during the ICO and planned to pay the ETH to themselves.

593.    Because these were dummy purchases, Defendants had no reason to move the coins from their dummy wallets, in contrast to a real trader who would have moved them to exchanges. Thus, PALELLA crafted the Quantum offer so that he was effectively giving refunds to himself, and no one else.

594.    Analysis of the wallets that participated in the Exit Swap bears this out.

595.    These qualifications were so restrictive that only three wallets even attempted to qualify for the refund rate, having purchased coins in the pre-sale and then never moving them.

596.    Two of these wallets did not receive any ETH despite qualifying: 0xd9af and 0xDC4c. These two wallets have several features in common. First, they each received the ETH used to buy the HelbizCoin from 2/3 mixers within an hour before they bought. Second, neither wallet was ever used for any transaction other than buying the coins in 2018 and sending them in to the swap two years later.

179

597.    0xd9af and 0xDC4c are likely insider wallets used to make dummy purchases in the ICO. An actual investor, by contrast, would have complained about not receiving the swap ETH until Defendants paid it.

598.    Only one wallet that participated in the swap and qualified for the refund amount under limited terms received ETH, 0x7e5b. Tellingly, 0x7e5b is directly tied to an **eighth genesis wallet**, 0x8b71, which sent it ETH. The connection is too improbable to be a coincidence. This wallet was almost certainly controlled by Defendant DIIORIO.

599.    Even among the wallets that only qualified for the .00000094 rate, the blockchain shows that Defendants paid the ETH to themselves. They used wallets that had received massive amounts free HelbizCoin from 0x8bc2 and 0x7c99.

600.    For example, 0xeaB6 (discussed above in connection with both the test transactions on January 26, 2018 and the dummy ICO buy of the same day) swapped 1.5 million HelbizCoins that 0x8bc2 had sent it years earlier. Wallet 0xeab6 then deposited the ETH it received from the swap to the 0x1af wallet (also discussed above in connection with the ICO dummy buys). Wallet 0x1af is the deposit wallet that was also used by 0x8bc2 and 0x7c99 to deposit ETH to a common account at the Binance exchange.

601.    Similarly, wallet 0x0199 had received HelbizCoins from 0x8bc2 through a conduit wallet, 0xAed6 (not to be confused with 0xAeB6). It sent the

180

coins into the swap and then received 5 ETH from 0x8bc2, far more than the swap conditions dictated for coins not purchased in the presale. Wallet 0x0199 then sent that ETH on to 0x4a7B, where 0xAe**B**6 also sent ETH *the same day*. In effect, Defendants just moved the ETH from their right hand to their left.

602.   The following chart shows the flow of the ETH that Defendants were paying to themselves in the Exit Swap.



603.   Thus, Defendants carried out the Exit Swap just as they had the other parts of their scheme, namely, by using money laundering techniques and fraud.

604.   In total, only 48 wallets sent coins into the Exit Swap at all. This was unsurprising given the impossible conditions necessary to get a full refund and the grossly insufficient price for everyone else. Of those, only three received ETH from the swap contract (as opposed to side payments from 0x8bc2).  Bitlish

received the largest payment of ETH, and 0x8bc2 sent that payment to Bitlish *before* Bitlish sent coins to the swap contract. So there was clearly a side deal. The only payment at the full refund price went to the 0x7e5b wallet, which is connected to the genesis wallet in the manner described above. Five participating wallets did not receive any ETH at all.

### (3) Further evidence that PALELLA was behind the extortionate threats

605. There is additional proof that PALELLA was directly behind the destruction threat and Exit Swap.

### a. PALELLA owned the websites

606. The destruction announcement appeared on the website HBZCoin.com. The owner of the website was concealed from the public because at the time he registered the website, PALELLA paid for a special service to keep the ownership information out of the public record.

607. However, after Plaintiffs filed this suit, the Court granted them leave to immediately serve subpoenas so that they could identify the owner of HBZCoin.com in order to prepare for their motion to enjoin the threatened destruction of the smart contract.

608. The subpoena, which PALELLA had argued the Court should not allow, revealed that HBZCoin.com was both owned and registered by PALELLA. It further showed that PALELLA listed "Helbiz Inc." as the company that

182

administers the sites, and provided both a New York City address and phone number. There was no reference the HBZ System and no Singapore connection at all.

609.   Moreover, the same subpoena revealed that the website where purchasers purchased during the ICO, helbizcoin.io, was also created, owned and administered by HELBIZ and PALELLA, *as was the Babylonia exchange website*. See Dkt 54.

### b.   HELBIZ engineer Carlos Beltran coded HBZCoin.com

610.   In addition to the subpoenaed evidence proving PALELLA owned all the websites, Plaintiffs' counsel also had the HBZCoin.com website computer code examined. The examination showed that that HELBIZ engineer, Carlos Beltran, programed the website and controlled the servers. See Dkt. 31-16 (Marques Declaration).

611.   PALELLA has had several opportunities to respond during briefing to the evidence that his engineer Mr. Beltran coded the HBZCoin.com website and he repeatedly has declined to rebut it. This is because he cannot.

612.   Mr. Beltran is also the same engineer who wrote the Babylonia smart contract, and, as explained below in the next section, Beltran also created *the smart contract for the Exit Swap* that Defendants keep attempting to attribute to Quantum Analysis in falsely sworn statements to the Court.

183

### c.      Carlos Beltran also controlled the *private key* to 0x8bc2

613.    When Carlos Beltran's decision in August of 2021 to register a vanity name for his previously pseudonymous Ethereum wallet, 0x28ff, is perhaps that most damning piece of evidence in the case. When Beltran registered his wallet name, he carelessly revealed two facts that Defendants have repeatedly lied about in Court: First, PALELLA was the person directing the extortionate threats and Exit Swap offer; and, second, PALELLA and HELBIZ control the private key to the 0x8bc2 contract creator wallet.

614.    The destruction threat was posted to HBZCoin.com on May 4, 2020. On May 30, 2020, the same website (which was owned by PALELLA and programmed by Beltran, as set out above) was updated to inform the HelbizCoin holders that Quantum had set up a swap contract by which it would send the users ETH once they sent their coins to it.

615.    When creating a smart contract like that ETH swap contract, engineers typically test their code before loading it up to the Ethereum mainnet. The Roptsent testnet is one network where engineers conduct such tests.

### (i)      Immediately after the destruction threat, Carlos Beltran created "Helbiz Tokens" on Roptsen Testnet

616.    Carlos Beltran's 0x28ff wallet became active on the Roptsen testnet for the first time ever on May 6, 2020, *two days after the destruction threat was posted to HBZCoin.com*. Wallet 0x28ff then started using test *"Helbiz Token"*

184

created on Roptsen, sending it back and forth with *test swap contracts*. The test

swap contracts include: 0x19f8, 0xe33f, 0xe657, 0xa563, and 0xE09f.  Mr. Beltran

conducted these tests between May 6 and July 7, 2020.

617.   Beltran's creation and use of the test "Helbiz Token" on Roptsen is

clear evidence that *HELBIZ Inc.* was preparing to conduct the Exit Swap, not some

third party as Defendants have repeatedly and falsely represented and sworn to the

Court.

618.   And there is still more evidence showing Defendants lied. In each of

the tests, the smart contract would send a transaction to Mr. Beltran's 0x28ff

wallet and then Mr. Beltran would send back a responsive transaction within

moments. This coordinated timing demonstrates that Mr. Beltran was operating

both the test smart contracts and his own 0x28ff wallet at the same time.

619.   The following chart summarizes this evidence:



Roptsen Testnet "Helbiz Token" Transactions

### (ii)    PALELLA provided Beltan the private key to 0x8bc2

620.    Importantly, **0x8bc2 created one of these test contracts**, 0x209f.

Thus, Carlos Beltran, the engineer at *HELBIZ*, **was using the private key that**

**controls 0x8bc2**.

621.    Beltran's possession of the private key to 0x8bc2 puts the lie to any

claim by HELBIZ and PALELLA that they did not conduct the ICO or the

extortionate threat to destroy the HelbizCoins and the Exit Swap.

186

### (iii) Defendants submitted knowingly false affidavits in court

622. Defendants have made a number of misleading representations to the Court on this subject. By way of example only:

A.      In the June 23, 2020 Letter from R. Heim to Stanton, J., which Defendants filed as part of Dkt. 24, Defendants state falsely that: "[N]on-party HBZ Systems PTE LTD ("HBZ Systems") [is] the company that controls the computer code for the smart contracts at issue.";

B.      In the July 13, 2020 Letter from R. Heim to Stanton, J., which Defendants filed as part of Dkt. 44, Defendants state falsely that "non-party HBZ Systems PTE Ltd has confirmed in writing that it will preserve the smart contract."

C.      In the Declaration of Defendant PALELLA, which Defendants filed as part of Dkt. 51-1, PALELLA swears falsely that "Quantum . . . . acquired the rights to the HBZ coin and related smart contract in 2019."

D.      PALELLA also swears falsely that "Quantum . . . decided to make an exchange offer to the holders of HBZ coins. . . . The ICO was conducted by a Singapore company."

E.      In the Declaration of Andrea Monni, which Defendants filed as part of Dkt. 75, Defendants offer the perjured testimony that: "HBZ Systems, a

187

Singaporean company that is not a party to this action, conducted an ICO in January to March 2018."

F.    The Declaration of Jonathan Hannestad, which Defendants filed as part of Dkt. 76, at 1, HANNESTAD falsely swears that "Defendant Helbiz Inc. did not conduct the initial coin offering ("ICO") that is the subject of this litigation."

### d.    The ICO started before HBZ System existed

623.    Further proving that HBZ System is PALELLA's alter ego, the company was not even incorporated until February 7, 2018, which was long after HELBIZ began advertisinig its ICO, after 0x8bc2 created the smart contracts, after the ICO was underway, and after tens of millions of coins had already been sold. Therefore, HBZ System cannot be the legal entity that issued the HelbizCoin.

624.    Also, the street address and suite number given in the HBZ System incorporation papers is the same address HELBIZ claims for its Singapore office. The address is actually a mail drop used by at least 50 different companies.

625.    The same suite address is also used by HELBIZ's affiant, Andrea Monni, for his personal company. Monni's company is in the business of setting up shell corporations in Singapore.

626.    Moreover, PALELLA was listed as the incorporator and sole owner of HBZ System until he transferred ownership in preparation for the IPO. At the

188

time of the company's incorporation until March of 2019, SP1 Investments was the sole owner of the shell company.

### e. PALELLA changed the websites and social media to conceal his involvement in HelbizCoin

627. The name change to HBZ System, the substitution of Quantum Analysis for PALELLA's SP1 Investments company, and the change of the social media channels from @Helbizofficial to "HBZOfficial" all occurred at the same time, which was when PALELLA disseminated the pre-IPO paperwork to the new investors. PALELLA was in control of all three changes.

628. Also at the same time, the HelbizCoin.io website was deleted, and the traffic redirected to HBZCoin.com.

629. PALELLA was the person who owned both of the websites and therefore the one who deleted HelbizCoin.io and redirected the traffic.

### f. PALELLA displayed consciousness of guilt by tampering with subpoenaed evidence and then filing a false declaration with the Court after he got caught

630. As Plaintiffs explained in Letter requesting a preservation order, Dkt. 54, 55 (originally filed as Dkts. 42 and 43), which is still pending as of the filing of this amended complaint, PALELLA logged into the registrar and changed the onwership information on the HBZCoin.com website and the HelbizCoin.io website as soon as Plaintiffs moved the Court for the subpoenas. The sequence of

189

his attempts to obstruct the subpoenas and how those attempts were detected are set forth in Dkts. 45, 54-55.

631.   When Plaintiffs brought PALELLA's evidence tampering to the Court's attention, PALELLA submitted a false Declaration in response, Dkt. 51-1:

> In March 2019, when I transferred my interest in Helbiz Systems to Quantum I did not update the ownership of the domain names to Quantum at that time. I transferred my interest in Helbiz Mobility in March of 2019 because at that time the HBZ coin began successfully integrating with the Helbiz Inc. transportation platform and my efforts were focused on growing the Helbiz transportation platform. The transfer of the domain names was done in June 2020 as part of the process of preparing the exchange offer and closing the HBZ coin.

632.   The explanation is nonsensical and untrue. There was no reason for PALELLA to change the registrar information on the websites in June of 2020; the destruction threat and extortionate swap announcement had already been posted.

633.   The only reason to change the registrar information at that time was because the Court had allowed subpoenas and PALELLA wanted to conceal the fact that he was the one making the threats.

634.   Moreover, PALELLA's ownership of Helbiz Mobility System had no relationship to whether "HBZ coin began successfully integrating" with the platform nor to his "efforts on growing" the platform.

635.   Further, as explained above, HELBIZ had not successfully integrated the coin into the platform and it never did. This was yet another lie. The true reason that PALELLA changed the ownership (and the name) on Helbiz Mobilty

190

System PTE Ltd. in March of 2019 is because March of 2019 is when he circulated the pre-IPO private placement documents. As explained above, PALELLA lied in those documents about the connection between HelbizCoin and HELBIZ, and he changed the ownership and name so the two were no longer associated.

### g.    Defendants deleted evidence

636.    Defendants also showed consciousness of guilt by deleting their relevant postings on the "Helbizofficial" channels on Medium.com, Facebook, Twitter, YouTube, and others.

637.    Defendants did so to remove evidence contradicting their false statements in the IPO and in anticipation of litigation to disadvantage the coin purchasers in their pleading and proving the fraud.

## N.    Defendants' Racketeering

638.    Through the course of their conspiracy, Defendants violated the Racketeering Influenced and Corrupt Organizations Act ("RICO") – 18 U.S.C. § 1961, committing multiple crimes over the course of years. To further their conspiracy and achieve their illegal goals, defendants committed numerous acts of wire fraud, money laundering, extortion, and other violations of state and federal law.  Plaintiffs set out below the following categories of predicate acts and incorporate all allegations of this Complaint in each.

**(1)      Wire Fraud in violation of 18 US. Code §1343**

639.   Defendants relied heavily on wire fraud to support almost every aspect of their scheme.

640.   First, each of the Defendants disseminated their false statements using (1) the Internet, (1) social media channels (Facebook, Twitter, Telegram, Bitcoin talk, Instagram, and others), (3) YouTube, (4) Medium.com, (5) the websites owned by PALELLA and HELBIZ (Helbiz.com, HelbizCoin.io, HBZCoin.com, and Babylonia.org), and (6) Bitcoin Magazine at that BitcoinMagazine.com website, all as alleged above.

641.   Second, Defendants used the Ethereum Network to carry out their fraud, including: (1) creating the HelbizCoin and the Babylonia Token, (2) sending ETH with which to create the HelbizCoin and to pay the transaction fees needed to move it among wallets and to and from exchanges, (3) conducting sales of the HelbizCoin and swaps of the Babylonia Token, (4) conducting the fraudulent and extortionate Exit Swap, (5) transacting spoof trades during the ICO, (6) sending HelbizCoin coins to and from cryptocurrency exchanges in the pump and dump, and (7) laundering the money from their frauds. Likewise, DIIORIO used these same methods with reagard to the other ICO frauds he conducted.

642.    Third, Defendants used cryptocurrency exchange websites operated on U.S. based servers and/or which are U.S. companies for the pump and dump and to launder the money from their fraud.  Likewise, DIIORIO used the exchanges to sell his coins from the other ICOs.

643.    Fourth, Defendants used the wires to communicate directly with each other and with individual victims in furtherance of the fraud.  For example, PALELLA communicated with the Ryley M group using texts from his personal telephone (New York City Area Code), and the Telegram messaging service over the Internet.  Likewise, Defendants used email to create, coordinate and disseminate the fraudulent declarations of PALELLA, HANNESTAD and Andrea Monni.

644.    Fifth, Defendants used the wires to communicate with each other, the coin holders and other members of the public to commit fraud that would allow them to steal the platform from the coin holders.

645.    Sixth, Defendants used the wires to communicate with each other, the coin holders and other members of the public to commit fraud that would allow them to steal the revenues from HELBIZ rentals that were promised to the coin holders.

193

646. Seventh, Defendants used the wires to communicate with each other, the coin holders and other members of the public to defraud HelbizCoin holders as to the source of the extortionate threats to destroy the smart contract.

647. Eighth, Defendants used the wires to disseminate and file false statements in connection with the IPO and pre-IPO financing in order to steal the platform and revenues from the coin holders.

648. In each instance, Defendants used interstate wire communications in a manner that was foreseeable to all of them as part of their knowingly fraudulent scheme. This as also true of DIIORIO's use of the wires in the other ICOs.

649. Each instance of the forging is a separate violation of 18 US. Code §1343.

### (2) Travel In Interstate and Foreign Commerce to Promote Criminal Activity in violation of 18 US. Code §1952

650. Cryptocurrency exchanges are financial institutions within the meaning of 31 U.S. Code § 5312. Their activities affect interstate and foreign commerce.

651. PAYSAFE and SKRILL are also financial institutions within the meaning of 31 U.S. Code § 5312.

652. Transactions in cryptocurrencies like HelbizCoin and ETH are financial transactions.

194

653. HelbizCoin in general, and the ETH that Defendants obtained through their scheme, are both proceeds of unlawful activity and criminally derived property.

654. PAYSAFE and SKRILL are business entities involved in gambling as they provide money transmission services for Internet gamblers and Internet casinos.

655. As alleged above, Defendants furthered their scheme at the livecast event from the London offices of PAYSAFE. In addition to their fraudulent statements, Defendants' purpose for the livecast was to announce and commence trading on the cryptocurrency exchanges, facilitated by SKRILL and PAYSAFE, where financial transactions involving the HelbizCoin and ETH would occur whereby they could and did dump the HebizCoins and obtain ETH and fiat currencies for it. Their intent in doing so was to engage in the predicate acts and racketeering activity alleged herein.

### a. Travel by PELELLA, PELLEGRINO, HANNESTAD, and ALDARMAKI for the PAYSAFE Livecast

656. Defendants PALELLA, PELLEGRINO, HANNESTAD, and ALDARKMAKI travelled to London for that purpose, as did many of their co-conspirators, including Michael Coppola, Stephano Ciravegna, Luca Santambroglio and Nima Ghassemi, among others.

**b.    Travel by PALELLA and DIIORIO to meet co-conspirators in Italy**

657.    Defendants PALELLA and DIIORIO also travelled to Italy to meet with each other and discuss the fraud, including the listing on HelbizCoin on cryptocurrency exchanges to facilitate both Defendants' pump and dump and their money laundering schemes. This meeting occurred during the period of time when Defendants were listing Helbiz Coin on exchanges in the Spring and Summer of 2018.

**c.    Travel by DIIORIO to meet Defendants in New York City**

658.    Defendant DIIORIO also travelled to the United States in May of 2018 for the same purposes.

**d.    Travel by PELLEGRINO to meet EXMO exchange representatives in Kyiv**

659.    Defendant PELLEGRINO travelled to Kiev and met with representatives of the EXMO exchange on May 26, 2018. EXMO listed HelbizCoin for trading that same week.  Plaintiffs therefore believe that PELLEGRINO made this trip to facilitate illegal financial transactions alleged herein.

**e.    Travel by PALLELLA, DIIORIO and HANNESTAD to meet co-conspirators in Italy**

660.    Also, Defendants PALELLA, DIIORIO and HANNESTAD travelled to Italy to meet sometime in late May of 2018.  HelbizCoin was listed

196

for trading on HitBTC on May 25, 2018. Plaintiffs therefore believe that Defendants PALELLA, DIIORIO and HANNESTAD made this trip to facilitate illegal financial transactions alleged herein.

### (3)    Financial Institution Fraud violating 18 US Code § 1334

661.   As is explained above, centralized cryptocurrency exchanges are custodians of the digital assets that are traded on their websites, including ETH and HebizCoin.

662.   As is also explained above, cryptocurrency exchanges are financial institutions. These exchanges have anti-money laundering rules and responsibilities which forbid Defendants from using the exchanges for the fraudulent, tortious, and criminal conduct alleged herein.

663.   As is also explained above, Defendants made use of the cryptocurrency exchanges to exchange ETH and HelbizCoin for other cryptocurrencies and fiat currencies in the custody of these financial institutions, to commit the pump and dump fraud, and to launder the proceeds of the illegal activities.

664.   As is also explained above, Defendants used money laundering techniques to defraud the exchanges by concealing the source of the ETH and HelbizCoins they sent to those exchanges as well as the addresses to which they withdrew those assets

665. Each act by which defendants (a) sent ETH or HelbizCoin to an exchange in connection with the fraud, (b) withdrew ETH, HelbizCoin or other source of value in connection with the fraud, and/or (c) under the money laundering techniques allege herein in connection either of the above is a separate violation 18 US Code § 1334.

### (4)   Money Laundering in violation of 18 US Code § 1956

666. Defendants knew (a) that HelbizCoin is the proceeds of unlawful activity and of "specified unlawful activity" within the meaning of §§ 1334 and 1961 and (b) that the ETH and other forms of value they earned from selling HelbizCoin was proceeds of unlawful activity and of "specified unlawful activity" within the meaning of §§ 1956 and 1961.

667. Defendants conducted and attempted to conduct financial transactions while concealing and attempting to conceal and/or disguise the nature, source and ownership of those funds using: (a) the money laundering techniques described above and (b) the alter ego entities described above.

668. Each instance of such misconduct is a violation of 18 US Code § 1956(a)(1)(A)(i) and B(i).

669. Additionally, as set out above, Defendants PAYSAFE and SKRILL provided money transmitter services to and from the exchanges that listed HelbizCoin in order to further the commission of the criminal conduct

198

alleged herein. Each instance by which PAYSAFE and SKRILL transmitted money to and from the above listed exchanges in connection with Defendants sales of HelbizCoin and/or of ETH derived from the fraud is a violation of 18 US Code § 1956(a)(2) and (a)(3).

### (5)    Extortion in violation of NY Penal Law § 155.05

670.   A person commits larceny by extortion in violation of New York Penal Law § 155.05 when they wrongfully obtain property from another by means of instilling in him a fear that they will cause damage to the property if it is not delivered to the perpetrator or a third party.

671.   Larceny by extortion is a chargeable offence and punishable by imprisonment for more than one year.

672.   As explained above, Defendant PALELLA and HELBEZ committed extortion by threatening to destroy the HelbizCoin smart contract and thereby destroy the HelbizCoins owned by Plaintiffs and the class unless they sold the coins to him or his proxy for a miniscule price.

673.   PALELLA and HELBIZ committed those acts in New York. Likewise, the plan and preparation to commit those acts was implemented in New York by PALELLA, Carlos Beltran and others when creating the HBZCoin.com website, posting the extortionate threats thereto and creating the

199

smart contact by which to accomplish it.  Similarly, PALELLA and HELBIZ made payments of ETH pursuant to the extortionate swap from New York.

674.   Each of these acts violated New York Penal Law § 155.05 in a manner chargeable and punishable by more than one year in prison.

### (6)    Larceny by false promise violating NY Penal Law § 155.05

675.   A person commits larceny by false promise in violation of New York Penal Law § 155.05 when, pursuant to a scheme to defraud, they obtain property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when they do not intend to engage in such conduct or, as the case may be, do not believe that the third person intends to engage in such conduct.

676.   Larceny by false promise is a chargeable offence and punishable by imprisonment for more than one year.

677.   As explained above, Defendants PALELLA, HELBEZ, PELLEGRINO, DIIORIO, PAYSAFE, SKRILL, HANNESTAD, GIULIANO, PROFUMO, ALDARMAKI, ALPHABIT and BINARY made promises about the then present state of the product developments and the future conduct that they and the other members of the conspiracy would engage in.

678.   As also explained above, Defendants had not performed as they represented up to the time of the representations, did not intend to perform as

200

represented and did not believe that the other conspirators would perform as represented.

679. Defendants did so to cause others to transfer ETH, HelbizCoin and other assets to them and their co-conspirators and did obtain this property in that way

680. Defendants made these promises and published these statements variously from New York and pursuant to a conspiracy based in New York.

681. Each of these acts violated New York Penal Law § 155.05 in a manner chargeable and punishable by more than one year in prison.

682. To the extent that any of the foregoing predicate acts are actionable as fraud in the purchase or sale of securities, Plaintiffs limit their reliance on them for purposes of their RICO Act to those claims which involve damages from Defendants' conduct, not actionable as fraud in the purchase and sale of securities, such as the acts of reinvestment of the racketeering proceeds to create a competing product, extortion, interference with Plaintiffs' contractual rights, and theft of the revenues of the platform.

### (7)    Defendant's pattern of racketeering

683. Defendants' pattern of racketeering commenced with their preparation for the ICO in 2018 and has continued for years, as alleged above.

Moreover, DIIRIO's use of the same fraud techniques in other ICOs dates back to at least 2017.

684.    The acts set out herein were all in furtherance of a conspiratorial agreement to (a) defraud coin buyers through multiple methods in ICOs, (b) defraud the coin buyers through multiple methods in the HelbizCoin pump and dump, (c) to launder money from the frauds, (d) to steal the platform from the HelbizCoin buyers, (e) to steal the revenues from the HelbizCoin holders, (f) to avoid liability for the contractual obligations HELBIZ and others incurred from the fraudulent promises, (g) to avoid the responsibility for HELBIZ to accept payment only in HelbizCoin, (h) to avoid the responsibility for HELBIZ to offer the competing carsharing product, and (i) to destroy the HelbizCoin, amongst others.

685.    Moreover, Defendants, acting through the puppet companies HBZ System and Quantum Analysis, still have not rescinded the threat to destroy the smart contract.

686.    Similarly, Defendants continue to engage in racketeering to coverup their conspiracy and misconduct and their relationship and that of HELBIZ to HelbizCoin, to avoid the obligations of the company to accept payment only in HelbizCoin and the obligation to build the carsharing ecosystem, and the company's related liability for damages to the coin holders.

### (8)    Use and Investment of Racketeering Proceeds

687.    Each of the projects that DIIORIO financed using his ETH to make fake purchases are enterprises within the meaning of RICO. DIIORIO used the proceeds of his frauds to invest in each new project, conduting the affairs of the the projects. DIIORIO and the projects are engaged in and affect interstate and/or foreign commerce.

688.    HelbizGo, and its successor iterations, is an enterprise within the meaning of RICO. Defendants together are persons are associated in fact. In the alternative, HELBIZ is an enterprise and conducted the affairs of HelbizGo. Both are engaged in and affect interstate and/or foreign commerce.

689.    As explained above, Defendants used proceeds of their scam to fund the creation of HelbizGo. In doing so, they injured Plaintiffs both by depriving HELBIZ of the resources needed to perform its promises to the coin holders and created a conflict of interest where the need to provide HelbizGo users with access to credit card payments was deleterious to the value of HelbizCoin and caused Defendants HELBIZ to take actions to destroy it.

690.    Plaintiffs and the members of the classes have been damaged in their property as a result, suffering lost money and lost profits as a result. Moreover, Defendants are threatening to destroy Plaintiffs' property and should be enjoined from doing so.

### (9)    Corrupt Acquisition and Maintenance of an Interest in and Control of an Enterprise

691.    By all of the above, Defendant DIIOIRIO acquired and maintained an interest in the identified ICO projects.

692.    By all of the above, Defendants acquired and maintained an interest and/or control of HelbizGo through a pattern of racketeering activity.

693.    Pleading additionally and in the alternative, all Defendants except HELBIZ corruptly controlled HELBIZ, an enterprise which was and is engaged in and affects interstate and/or foreign commerce, through a pattern of racketeering activity.

694.    Pleading additionally and in the alternative, there was a conspiracy among all Defendants which constitutes was cohesive in its operation such that it constitutes an entity in fact which was and is engaged in and affects interstate commerce.  The Defendants corruptly controlled this entity through a pattern of racketeering activity.

695.    Plaintiffs have been damaged in their property as a result, suffering lost money and lost profits as a result. Moreover, Defendants are threatening to destroy Plaintiffs' property and should be enjoined from doing so.

204

### (10)    Corrupt Control of or Participation in an Enterprise

696.    Each Defendant is a "person" either employed by or associated with an enterprise engaged in or affecting interstate or foreign commerce.

697.    All Defendants corruptly conducted or participated in the affairs of HelbizGo.

698.    All Defendants except HELBIZ corruptly conducted or participated in the affairs of HELBIZ.

699.    All Defendants corruptly conducted or participated in the affairs of the entity in fact.

700.    Defendants have been damaged in their property as a result, suffering lost money and lost profits as a result. Moreover, Defendants are threatening to destroy Plaintiffs' property and should be enjoined from doing so.

### (11)    Conspiracy

701.    By all of the above, Defendant DIIORIO conspired with founders, promoters and backers of the identified ICOs to violate the prohibitions of 18 U.S. Code § 1962(a), (b), and (c).

702.    Defendants conspired among themselves and with others to violate the prohibitions of 18 U.S. Code § 1962(a), (b), and (c).

205

Case 1:20-cv-04703-PKC    Document 131    Filed 03/11/22    Page 211 of 253

## O.    <u>The Damages Suffered by The Coin Holders</u>

703.   By all of the above, Defendants have breached obligations owed to the Plaintiff coin purchasers and have caused them injuries. The Plaintiffs are entitled to full remedies against the Defendants, including full damages. The Defendants, and each of them, are jointly and severrably liable for all damages to the coin holders.

704.   First, Defendants are liable for the lost profits Plaintiffs and the Class would have made had HELBIZ executed on its promises to build the carsharing system and HelbizPay. Other sharing economy companies with less promising prospects are now worth between 10 and 100 billion dollars. Plaintiffs' lost profit damages exceed $10 billion, which should be trebled pursuant to 18 U.S.C. § 1964.

705.   Second, the full amount of the consideration (at the dollar value of ETH at the time of trial) paid by each coin purchaser in the ICO and in the pump and dump, less any money recouped by selling their coins. This amount is in the 100s of millions of dollars at recent ETH/USD exchange rates and should be trebled pursuant to 18 U.S.C. § 1964.

706.   Likewise, DIIORIO is responsible to the buyers in the other identified ICOs for the full amount of their consideration.

707. Third, for those who still hold the coins, damages are the difference in value between what HelbizCoin is worth now and what the coin would have been worth if Defendants had not breached their promises, or the $1 per coin price that Defendants represented it was worth when they opened trading, whichever is greater, trebled pursuant to 18 U.S.C. § 1964.

708. Fourth, disgorgement of all of Defendants' ill-gotten gains from the ICO and the pump and dump. Likewise, disgorgement of DIIORIO's ill-gotten gians from the identified ICOs.

709. Fifth, the entire USD value of all revenues that Defendants have earned from rentals on the platform that were paid in fiat.

710. Sixth, Plaintiffs should be awarded specific performance of the promise to create the Helbiz ecosystem, including the blockchain platform, the exchange and the sharing economy app for cars and other transportation, all to be paid for in HelbizCoin as represented in the whitepaper.

711. Seventh, Plaintiffs should be awarded specific performance of the promise to make HelbizCoin the sole currency accepted by HELBIZ. Additionally, and in the alternative, HELBIZ should be ordered to use all revenues derived from the platform to buy HelbizCoins on the open market.

712. Eighth, Plaintiffs should be awarded specific performance of the promise to use only HelbizCoin for all transactions on the platform.

713.    Ninth, Plaintiffs are entitled to an order quieting title in the platform that was promised to the coin holders, awarding it to the coin holders.

714.    Tenth, Plaintiffs are entitled to a constructive trust imposed on all assets of HELBIZ traceable to the fees it earned from the platform.

715.    Eleventh, the Court should grant an injunction requiring Defendants to refrain from destroying contract 0xe34e1944e776f39b9252790a0527ebda647ae668 or from permitting others to do so, and to take all available measures to prevent the destruction of the smart contract.

716.    Twelfth, Plaintiffs are entitled to an order prohibiting Defendants from encouraging the further delisting of HelbizCoin from any exchanges, to rescind all prior requests or demands to delist it, and to take affirmative steps to have it relisted.

717.    Thirteenth, recission of the coins sent to HELBIZ as part of the Exit Swap and the releases executed in conjuction therewith.

718.    Fourteenth, recission of the coins sent to HELBIZ as part of the Babylonia Swap.

## NAMED PLAINTIFFS AND THE CLASSES

719.    The Named Plaintiffs are RYAN BARRON, FILIPPO BULGARINI, GRANT ECHOLS, DENIS DASARI, ILLIA CHEHERST, ANTHONY CALIZTE, ANDREW SKZLAREK, MARAT GARIBYAN,  RISHI

208

KHANCHANDANI, DANIILS LEBEDEUS, DONG SEOK LEE, KAMIL JIWA, TAREK RAHMAN, FRANCISO PEREIRA, and ABHISHEK SIKARIA. As alleged above, each of them purchased the HelbizCoin in the ICO and/or on the cryptocurrency exchange websites.

720.    All of the Named Plaintiffs seek to represent Class 1. Class 1 brings claims on behalf of all purchasers of HelbizCoin during the class period and seeks recovery under all counts of this complaint other than Counts IX-XI.

721.    Named Plaintiffs Bulgarini, Dasari, Echols, and Rahman seek to represent Class 2. Class 2 brings claims on behalf of all purchasers of HelbizCoin during the class period and seeks recovery under Counts IX-XI of this complaint.

722.    The HelbizCoin class period is January 1, 2018 until May 4, 2020.

723.    All of the Named Plaintiffs seek to represent Class 3. Class 3 brings claims on behalf of all purchasers of the coins in the identified ICOs. Class 3 presents claims against DIIORIO under count VII-VIII, XIII-XVI and XVIII. The class period for Class 3 is March 9, 2017 though the present.

724.    Excluded from the classes are Defendants, their employees and affiliates. Also excluded are any judge or court personnel assigned to this case and members of their immediate families. Also excluded are any holders of the NASDAQ traded stock and warrants of HELBIZ Inc. or PAYSAFE Ltd.

209

725.   With regard to Rule 23(a), there are at least approximately 20,000 class members in each class; for that reason, joinder is not practical. Moreover, there are questions of law and fact that are common to each class, the respective named Plaintiffs' claims are typical of the claims of each class, and the respective Named Plaintiffs will adequately and fairly represent the classes.

726.   Plaintiffs seek class certification under both FRCP 23(b)(2) and (b)(3).

727.   Certification under FRCP 23(b)(2) is appropriate because the classes are entitled to final injunctive relief against Defendants because they have acted, threatened to act, and refused to act in violation of the rights of the coin holders, and are continuing to do so, all in a manner requiring the following relief for all of them:

　　　　　a.  An injunction to take all available measures to preserve Ethereum smart contract number 0xe34e1944e776f39b9252790a0527ebda647ae668 and not delete it;

　　　　　b.  An injunction requiring specific performance of HELBIZ's promise to accept only HelbizCoin as payment;

c.  An injunction requiring specific performance of HELBIZ's other promises with regard to the HelbizP2P and HelbizPay apps and the sharing economy platform; and

d.  A declaration quieting title in the platform and related assets over which HELBIZ claims ownership.

728.  Certification under FRCP 23(b)(3) is also appropriate because Defendants have caused damages in common to all of the class members.

729.  Common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Classes

730.  Common questions for Class 1 include, but are not limited to the following:

a.  Whether Defendants engaged in wrongful conduct as alleged herein;

b.  Whether Defendants issued HelbizCoin;

c.  Whether Defendants control and/or can prevent destruction of Ethereum smart contract number 0xe34e1944e776f39b9252790a0527ebda647ae668;

d.  Whether Defendants breached their promises regarding the HelbizCoin;

211

e.  Whether Defendants committed frauds;

f.  Whether Defendants entered into a conspiratorial agreement;

g.  Whether Defendants violated US laws against commodities fraud;

h.  Whether Defendants violated US laws against racketeering;

i.  Whether Defendants violated 18 US. Code §1343;

j.  Whether Defendants violated 18 US. Code §1952;

k.  Whether Defendants violated 18 US. Code §1952;

l.  Whether Defendants violated 18 US. Code §1956;

m.  Whether Defendants violated 18 US. Code §1957;

n.  Whether Defendants violated 18 US. Code §1960;

o.  Whether Defendants violated 31 U.S. Code § 5314;

p.  Whether Defendants violated the Currency and Foreign Transactions Reporting Act.

731.    Common questions as to Class 2 include, but are not limited to:

a.  Whether title to the HelbizCoin transferred in the United States;

b.  Whether Defendants became irrevocably bound to sell HelbizCoin in the United States;

c.  Whether Plaintiffs became irrevocable bound to buy HelbizCoin in the United States;

212

     d.    Whether defendants engaged in wash trading;

     e.    Whether Defendants made one or more of the false statements

         alleged herein; and

     f.    Whether Defendants PALELLA, PAYSAFE, SKRILL,

         ALPHABIT and BINARY had the knowledge, opportunity, and

         power to prevent and/or halt the violations of Section 10(b) and

         Rule 10b-5.

732.    Common questions as to Class 3 include, but are not limited to:

     a.    Whether title to the coins in the identified ICOs transferred in

         the United States;

     b.    Whether DIIORIO's conspirators in those frauds became

         irrevocably bound to sell the respective coins in the United

         States;

     c.    Whether the coin buyers became irrevocable bound to buy the

         coins in the United States; and

     d.    Whether DIIORIO engaged in wash trading.

733.    Typicality is met. Plaintiffs' claims are typical of the claims of the

respective Classes they seek to represent because Plaintiffs and all members of the

proposed Class have suffered similar injuries as a result of the same practices

213

alleged herein. Plaintiffs have no interests adverse to the interests of the other members of the Classes.

734.    Plaintiffs will fairly and adequately protect the interests of the Classes and their attorneys experienced in class actions and complex litigation.

735.    Superiority is met. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system. A class action presents far fewer management difficulties and provides the benefit of single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I - BREACH OF CONTRACT**
**(Against HELBIZ, PAYSAFE , SKRILL, SALVATORE PALELLA, JONATHAN HANNESTAD, GIULIO PROFUMO, JUSTIN GIULIANO, LORENZO PELLEGRINO, and SAEED ALDARMAKI)**

736.    Plaintiffs re-allege and incorporate every paragraph of this complaint as if fully set forth herein.

737.    By all of the above, Defendants HELBIZ INC., SALVATORE PALELLA, JONATHAN HANNESTAD, GIULIO PROFUMO, JUSTIN

214

GIULIANO, LORENZO PELLEGRINO, and SAEED ALDARMAKI made the made promises contained in the whitepaper and on the ICO website, directly and as agents for each other, with regard to the Helbiz platform and the HelbizCoin. These promises were made to solicit good and valuable consideration of the coin purchasers in the ICO and in the secondary markets. Each member of the class either formed the contract or is the assign of a prior coin holder who formed the contract.

738. PELLEGRINO represented himself as and was the agent of PAYSAFE and SKRILL with regard to the promises, a matter within his actual authority, and PAYSAFE and SKRILL are bound as his principal.

739. Similarly Defendants HELBIZ INC., SALVATORE PALELLA, JONATHAN HANNESTAD, GIULIO PROFUMO, JUSTIN GIULIANO, LORENZO PELLEGRINO, SAEED ALDARMAKI, SKRILL and PAYSAFE, made the promises regarding HelbizPay.

740. Defendants breached the promises as set out above.

741. As a direct and proximate result, Plaintiffs and the class members were damaged, *inter alia* in that they lost profits of at least $10 billion (an amount confirmed by PALELLA's own statements on behalf of himself, HELBIZ and the co-conspirator Defendants).

215

742.    In addition to an award for damages already suffered, Plaintiffs are entitled to specific performance of the promises.

## COUNT II – TORTIOUS INTERFERENCE
## (Defendants DIIRIO, PAYSAFE, SKRILL, and PELLEGINO)

743.    Plaintiffs re-allege and incorporate all paragraphs of this Complaint as if set forth fully herein.

744.    By all of the above, HELBIZ made valid contractual promises to the Plaintiffs and members of the class to build the car sharing product, to accept only HelbizCoins, to popularize the HelbizCoin, and to build HelbizPay, among others.

745.    Defendants DIIORIO, PAYSAFE, SKRILL and PELLEGRINO knew of these promises and caused HELBIZ not to preform them in order to engage HEBLIZ in their fraudulent and illegal practices alleged herein. Among other matters, Defendants joined a conspiracy that controlled HELBIZ and used HELBIZ as the vehicle to steel money from the coin buyers and causing the breach of its contractual obligations. Defendants did so intentionally and without justification.

746.    Plaintiffs and the class have been injured and suffered actual damages as a direct result, including the loss of over $10 billion in profits that they would have made.

747.    PALELLA predicted that the coins would be worth more than $10 each if HELBIZ executed on the promises, which equates to over $10 billion in damages to the coin holders.

216

## COUNT III – TRESPASS AND CONVERSION OF CHATTELS
### (Against Defendants HELBIZ, PALELLA, SKRILL, PELLEGRINO, PAYSAFE, HANNESTAD, PROFUMO)

748.   Plaintiffs re-allege and incorporate every paragraph of this complaint as if fully set forth herein.

749.   By all of the above, Defendants HELBIZ INC. and SALVATORE PALELLA, acting individually and through their agents and alter egos, are threatening to destroy the Ethereum smart contract for the HelbizCoin 0xe34e1944e776f39b9252790a0527ebda647ae668 by which the coin holders' HelbizCoins exist. Doing so is a direct violation of the coin holders' rights to possession of the coins, without justification, and will damage the coins.

750.   HELBIZ and PALELLA are taking these actions in furtherance of a conspiratorial agreement to commit fraud reached amongst themselves and Defendants SKRILL, PELLEGRINO, PAYSAFE, HANNESTAD, PROFUMO, and others, making all of them jointly and severally liable.

751.   The class members are entitled to damages in the amount of the lost value for their coins, to punitive damages, and to injunctive relief prohibiting the destruction of the smart contract.

## COUNT IV – CONVERSION OF FUNDS AND EMBEZZLEMENT
### (All Defendants)

752.   Plaintiffs re-allege and incorporate each paragraph of this complaint as if fully set forth herein.

217

753. By all of the above, Defendants HELBIZ and PALELLA converted funds due the Plaintiffs. In particular, these Defendants kept the revenues HELBIZ earned on the platform for themselves, whereas these funds should have been paid to the coin holders, inter alia, by purchasing HelbizCoins from the coin holders. Defendants' embezzlement and converstion of funds due the coin holders continues to this day.

754. Defendants HELBIZ and PALELLA took these actions within the scope of the conspiracy amongst all Defendants, making each of them jointly and severally liable.

755. Pleading in the alternative, the conversion and embezzlement was subsidiary or extraneous to the main agreement to commit fraud and was agreed to only among Defendants HELBIZ, PALELLA, HANNESTAD, PROFUMO and GIULIANO. HELBIZ earned all of its revenues via the embezzlement and the individual Defendants benefitted financially as they are paid by HELBIZ. Moreover, PALELLA, HANNESTAD and PROFUMO received large allotments of stock in HELBIZ, the value of which is directly impacted by the revenues that HELBIZ is stealing from the coin holders.

756. Plaintiffs have been damaged as a direct and proximate result. Plaintiffs are entitled to damages in the full amount of all HELBIZ revenues

derived from HelbizGo and any other product or service using the platform or Helbiz app together with punitive damages.

## COUNT V – CONSTRUCTIVE TRUST
### (Against Defendants HELBIZ, PALELLA, HANNESTAD and PROFUMO)

757.   Plaintiffs re-allege and incorporate each paragraph of this complaint as if fully set forth herein.

758.   By all of the above, the coin holders provided the capital used to build the Helbiz platform and app and to obtain Helbiz-branded rental vehicles and to otherwise finance the company and make it a success. They, or their assignees, are the rightful owners of the platform and the revenues from it.

759.   Defendants have wrongfully taken these assets and converted them to their own use, including by taking the payments made in fiat currency on the Helbiz platform, which belonged to the coin holders.

760.   Plaintiffs and the class members seek an order requiring Defendants to hold these assets for the coin holders' benefit and to convey them to the coin holders.

## COUNT VI – QUIET TITLE
### (Against Defendant HELBIZ)

761.   Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

219

762.    HELBIZ is headquartered in this judicial district and, therefore, the shares of the company are located here. This court has jurisdiction over those shares.

763.    By all of the above, the coin holders provided the capital to build the Helbiz platform and app and to obtain Helbiz-branded rental vehicles and to otherwise create the assets and goodwill of the company.

764.    As a result, the Plaintiff and class member are the owners of these assets and the Court should declare them to be the owners.

## COUNT VII – COMMON LAW FRAUD
## (AGAINST ALL DEFENDANTS)

765.    By all of the above, all Defendants as to the HelbizCoin, and DIIORIO as to the identified ICOs, knowingly or recklessly made or caused to be made material false statements intending that the coin buyers rely on them

766.    Defendants intended that the coin buyers rely on the statements.

767.    The coin buyers actually and reasonably relied on the statements and were injurred as a direct and proximate results.

768.    Pleading additionally and in the alternative, the price the coin buyers paid was artificially inflated because of the impact of Defendants' false statements on the market prices for the coins and the coin buyers were injured as a direct and proximate results.

769. Plaintiffs and the members of the Classes are entitled to damages as a direct and proximate result.

## COUNT VIII - CONSUMER PROTECTION/UNFAIR PRACTICES
## (AGAINST ALL DEFENDANTS)

770. Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

771. HelbizCoin was marketed as a token entitling the holders to goods, services and discounts on the Helbiz platform. These are therefore consumer goods subject to consumer protection laws. Further, as to DIIORIO, the coins in the other identified ICOs were of a type that is subject to protection under the applicable state consumer protection laws.

772. By all of the above, Defendants committed deceptive and unfair acts and practices in violation of statute and ordinance.

773. Plaintiffs and the class members are entitled to damages in an amount to be proven at trial, together with punitive damages and attorneys' fees.

## COUNT IX – NEGLIGENT SUPERVISION
## (Defendants HELBIZ, PAYSAFE, SKRILL, ALPHABIT and BINARY)

774. Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

775. Defendant HELBIZ had a duty to supervise its agents HANNESTAD and GIULIANO.

221

776.    Defendants PAYSAFE and SKRILL had a duty to supervise their agent, PELLEGINO.

777.    Defendants ALPHABIT and BINARY had a duty to supervise their agent ALDARMAKI.

778.    These Defendants breached these duties, thereby causing the false and misleading statements set out above by their respective agents.

779.    Plaintiffs and the members of the class have been damaged as a direct and proximate result. And are entitled to actual and punitive damages.

## COUNT X –SECURITIES FRAUD AND PRICE MANIPULATION – Violations of § 9 of the Securities Exchange Act of 1934 (Against DIIORIO, PALELLA, PELLEGRINO and HELBIZ)

780.    Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

781.    By all of the above, Defendants DIIORIO, PALELLA, PELLEGRINO and HELBIZ, among others, willfully engaged in spoof trading, *i.e.* roundtrip purchases where the ETH was returned to the purchaser or their co-conspirators.

782.    Such transactions did not transfer the beneficial ownership in HelbizCoin within the meaning of 15 U.S.C. §78i(1)(1) as the recipient or recipients were part of the same conspiracy whereby some or all of the profits were shared.

222

783. These transactions were intended to and did create the false appearance of demand for HelbizCoin to induce the purchase of HelbizCoin and thereby drove up the price.

784. These Defendants thereby violated 15 U.S.C. § 78i and Plaintiffs were damaged as a direct and proximate result.

785. Plaintiffs are entitled to actual damages together with punitive damages and attorneys' fees.

**COUNT XI – SECURITIES FRAUD --Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Thereunder (All Defendants)**

786. Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

787. Defendants omitted material facts necessary to make statements not misleading in selling and promoting HelbizCoin in the ICO and in promoting HelbizCoin in connection the trading thereof on exchanges. As detailed above, the various Defendants knowingly or recklessly made false statements and omitted information necessary to make their statements not misleading, *inter alia*, (a) their plans to allow fiat-currency purchases on the Helbiz app at all; (b) their plans to launch the Helbiz app as, at least at first, a fiat-currency-only app; (c) their plans to launch the app as a closed system for HELBIZ scooter rentals, rather than as an open peer-to-peer ca rental platform; (d) their plan that the app would not use

223

blockchain technology as represented; (e) their lack of ability to incorporate blockchain technology as represented; (f) the undeveloped state of the app and their inability to delivery on the promised performances by the predicted dates; (g) their lack of regulatory approvals or progress to offer the services that they represented they would offer by the dates they represented it would be available; (h) the affirmative steps they had taken to halt or abandon the carsharing app and the balance due the developer; (i) the conflict of interest created by their plans to allow rentals of HELBIZ-owned vehicles on the platform rather than the promised carsharing app for third parties; (j) their amounts of their personal stakes in, and sales of, HelbizCoin as set out in the whitepaper; (k) the fact that they lacked a genuine belief, at the time(s) they expressed such a belief, that Helbiz's app had a viable future as a blockchain-based app with HelbizCoin as its native token; (l) their failure to have made reasonable efforts to conclude that the announced business systems required or would be best-served by creating a native coin, and (m) HELBIZ'S and PALELLA'S involvement in, and conflict of interest arising from, the putatively independent Babylonia exchange. Individually, and taken together, these omissions rendered the statements described above false, misleading, and/or not genuinely believed at the time they were made.

224

788.   In the alternative, to the extent any of Defendants' statements were true at the time they were made, their failure to correct them or disclose material facts that later rendered those statements misleading or untrue.

789.   Defendants also affirmatively lied about, *inter alia*, (a) their progress toward building a carsharing app or a blockchain-based app; (b) the number and nature of their partnerships with third parties; (c) their efforts to support the coin's price on the secondary markets; (d) their claim that all vendors are paid in HelbizCoin; (e) their plans for broader integration of HelbizCoin transaction options such as point of sale terminals (even when it became clear they planned to move the app further away from HelbizCoin transactions); (f) their plans for and schedule to deliver an in-app wallet to convert fiat currency and other cryptocurrencies to HelbizCoin; (g) their economic projections about the future value proposition of HelbizCoin.

790.   Defendants made such statements and material omissions knowing they were false and/or with the intent not to perform or honor them, and to deceive and defraud Plaintiffs, and to induce Plaintiffs to make their above-described purchases of HelbizCoin. In the alternative, the omissions and false statements alleged above were made recklessly.

225

791.    To the extent Defendant made forward looking statement these were not accompanied by the qualifying or cautionary language necessary to avail Defendants of any applicable safe harbors.

792.    The acts, misrepresentations, and intentional material omissions made by or on behalf of Defendants were committed in connection with the purchase and sale of securities within the meaning of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, namely, HelbizCoin.

793.    Plaintiffs would not have agreed to make their above-described investments in HelbizCoin if they had known the true facts about Defendants' plans (or lack therefor) for the Helbiz app and transportation platform; the Defendants' plan for pumping and dumping their own holdings of HelbizCoin; or other material omissions and misrepresentations described herein.

794.    The public market for HelbizCoin was sufficiently efficient to absorb, and reflect in its pricing/valuation, statements made about HelbizCoin by Defendants.

795.    Defendants' fraudulent conduct, as alleged herein, was done purposefully, maliciously, and without regard for the rights and interests of Plaintiffs.

796.    Defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, knowingly or recklessly employed devices,

226

schemes, and artifices to defraud, made untrue statements of material facts or omitted to state facts that they were under a duty to speak, and engaged in acts of fraud and deceit upon Plaintiff, all in connection with the purchase or sale of a security.

797.   Defendants HELBIZ, PAYSAFE, SKRILL, BINARY and ALPHABIT are primarily liable for their own misleading statements and omissions as well as those made by their respective agents.

798.   Defendant DIIORIO is liable for the misleading statements he participated in publishing in Bitcoin Magazine.

799.   By reason of the foregoing, Plaintiffs are entitled to judgment against Defendants, jointly and severally, awarding Plaintiffs compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

## COUNT XII –VIOLATIONS OF SECURITIES EXCHANGE ACT § 20(a)
### (Against PALELLA, PAYSAFE, SKRILL, ALPHABIT and BINARY)

800.   Plaintiffs re-allege and incorporate all paragraphs of this complaint as if fully set forth herein.

801.   At all relevant times, individual Defendant PALELLA controlled Defendant HELBIZ and HELBIZ'S sham/alter-ego entities and instrumentalities involved in the ICO and subsequent sale and management of HelbizCoin, including

227

Helbiz Mobility Systems PTE Ltd., SP1 investments, helbizcoin.io, and the Babylonia exchange.

802.   At all relevant times Defendant PALELLA controlled Defendants HANNESTAD, PROFUMO and GIULIANO and could dictate the content of those Defendants' statements and whether and how to communicate them.

803.   At all relevant times, Defendants PAYSAFE and/or SKRILL controlled Defendant PELLEGRINO and could dictate the content of his statements and whether and how to communicate them.

804.   At all relevant times Defendants ALPHABIT and BINARY controlled DEFENDANT ALDARMAKI and could dictate the content of his statements and whether and how to communicate them.

805.   The Defendants, directly and through the entities they controlled, used and allowed to be used the resources, agents, and good-will of those entities to perpetrate the fraud described herein. Further, these Defendants allowed the conspirators to directly use its name, good-will and resources to perpetrate the fraud described herein.

806.   At all relevant times, the Defendants had the information to know that the statements by their agents and by HELBIZ described herein were false and/or materially misleading (including, *inter alia*, by virtue of the material facts they

228

omitted).  These Defendants also had the knowledge, opportunity, and power to prevent and/or halt the violations of Section 10(b) and Rule 10b-5.

807.   These Defendants had the knowledge, opportunity, and power to prevent and/or halt the violations of Section 10(b) and Rule 10b-5 committed by HELBIZ and their agents, respectively.

**COUNT XIII--MARKET AND PRICE MANIPULATION
IN VIOLATION OF THE COMMODITIES EXCHANGE ACT
AND RULE 180.1(a), 7 U.S.C. §§ 9(a)(1), 13(a)(2), 25,
and 17 C.F.R. § 180.1(a)
(AGAINST ALL DEFENDANTS)**

808.   Plaintiffs re-allege and incorporate all paragraphs of this Complaint as if set forth fully herein.

809.   Independent of any determination as to whether HelbizCoin is a security for purposes of the Securities Exchange Act or any other federal or state statute, HelbizCoin is a commodity within the definition of 7 U.S.C.A. § 1. Likewise, as to DIIORIO, the coins in the identified ICOs were commodities. These coins are thus subject to applicable provisions of the Commodities Exchange Act and associated regulations.

810.   In violation of 7 U.S.C.A. § 9(a)(1), all Defendants employed, or attempted to employ, a manipulative or deceptive device or contrivance in connection with swaps and/or contracts for sale of commodities in interstate commerce, in contravention of the CFTC's rules (including Rule 180.1).

229

Defendants' violations of Rule 180.1 included, *inter alia*, making fake purchases in the HelbizCoin ICO and, as to DIIORIO, in the designated ICOs; making untrue or misleading statements of fact, and omitting material facts necessary to make statements not misleading; creating a false appearance of market demand through round trip purchases; participating in false representations by taking and laundering ETH when the respective projects had promised coinbuyers that all the ETH raised in the ICOs would go to fund the projects; engaging in a course of business which operates or would operate as a fraud or deceit upon any person; and delivering, and knowingly (or, in the alternative, recklessly) causing to be delivered false, misleading, and/or inaccurate reports concerning market information or conditions that affect or tend to affect the price of commodities in interstate commerce. *See* 17 C.F.R. § 180.1(a)(2)-(4).

811. Defendants also, in violation of 7 U.S.C. 13(a)(2), manipulated the price of interstate commerce.

812. As recounted in more detail above, Defendants committed the above violations by, *inter alia*, laundering ETH and making roundtrip coin purchases, communicating false or misleading information about existing demand for HBZ; communicating false or misleading information about projected demand for HBZ; communicating false or misleading information about the convertibility within the Helbiz app between HBZ and other fiat and crypto currencies; communicating false

230

or misleading information about their own holdings of HBZ; arranging for HBZ to be listed on exchanges at prices they knew to be artificially inflated; omitting that plans for an HBZ-based app had been undeveloped, abandoned, and/or non-existent; omitting that plans for a blockchain based app had been undeveloped, abandoned, and/or non-existent; omitting that HBZ would not be useable as a method of payment when the app launched; omitting the fact that HBZ utility as a ride token was uncertain and/or was intended to expire; omitting the fact that the Babylonia exchange was controlled by Defendant PALELLA to the benefit of DEFENDANTS with the aim of removing HBZ from the market; omitting that BAYLONIA was never intended to be a functioning exchange and that the BBY token was valueless; threatening to destroy the HelbizCoin smart contract; falsely representing that HELBIZ was not responsible for and did not control the HelbizCoin ICO and/or the HelbizCoin smart contract; and using threats and duress to manipulate coin holders into selling their coins to HELBIZ, among others. These acts prevented true price discovery and caused artificial pricing in the ICO, in the trading markets for HBZ, in the Babylonia swap and in the Exit Swap.

813.    As a direct result of Defendants' unlawful conduct, Plaintiffs and members of the classes have suffered actual damages and injury in fact due to artificial prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein.

231

814.   Defendants engaged in a substantial amount of the manipulative conduct within the United States, including but not limited to statements made within the United States that were aimed at, and with the effect of, manipulating the price of HelbizCoin and the coins in the designated ICOs which, *inter alia*, were traded on U.S.-server-hosted cryptocurrency exchanges.

815.   All direct sales of during the respective ICOs and all sales directly by HELBIZ or any of the "team" on the secondary markets qualify as domestic transactions and were affected by Defendants' unlawful deception and manipulation.

816.   All secondary market sales of HelbizCoin and the coins in the identified ICOs on U.S.-hosted exchanges also qualify as domestic transactions and were affected by Defendants' unlawful deception and manipulation.

817.   Plaintiffs and the members of the classes seek joint and several judgments against all Defendants for actual damages, disgorgement of ill-gotten gains, and the full range of available legal remedies (including other such remedies detailed below) together with punitive damages with regard to HelbizCoin and against DIIORIO only as to the coins in the identified ICOs.

## COUNT XIV – PRINCIPAL/AGENT LIABILITY
## COMMODITIES EXCHANGE ACT
## (ALL DEFENDANTS)

818. Plaintiffs re-allege and incorporate all paragraphs of this Complaint as if fully set forth herein.

819. Defendants are each liable under Section 2(a)(1) of the Commodities Exchange Act, 7 U.S.C.A. § 2(a)(1), for the manipulative, deceptive, or fraudulent acts, or acts otherwise unlawful under the Commodities Exchange Act, of their agents, representatives, and/or others acting on their behalf within the scope of their employment.

820. Plaintiffs seek joint and several judgments against all Defendants for actual damages, disgorgement of ill-gotten gains, and the full range of available legal remedies (including other such remedies detailed below) with regard to HelbizCoin and against DIIORIO only as to the coins in the identified ICOs.

## COUNT XV – AIDING AND ABETTING
## COMMODITIES EXCHANGE ACT
## (ALL DEFENDANTS)

821. Plaintiffs re-allege and incorporate all paragraphs of this Complaint as if set forth fully herein.

822. With regard to HelbizCoin, Defendants each knowingly aided, abetted, counseled, induced and/or procured violations of the Commodities Exchange Act by the other Defendants. Each did so with the knowledge of other Defendants'

manipulation of the price of, and market for, HBZ; with the knowledge of other Defendants' manipulative and deceptive statements and trades, including the omission of material facts related thereto; and substantially and willfully intended to assist these deceptions and manipulations during the relevant time period, in violation of 7 U.S.C.A § 25(a)(1). With regard the coins in the identified ICOs, DIIORIO only engaged in these acts.

823. Plaintiffs seek joint and several judgments against all Defendants for actual damages, disgorgement of ill-gotten gains, and the full range of available legal remedies (including other such remedies detailed below) with regard to HelbizCoin and against DIIORIO only as to the coins in the identified ICOs.

## COUNT XVI – RACKEETERRING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") – 18 U.S.C. § 1961 *et seq.* (ALL DEFENDANTS)

824. Plaintiffs re-allege and incorporate all paragraphs of this Complaint as if set forth fully herein.

825. As is spelled out in Section N, above, all Defendants as to Helbiz Coin and DIIORIO as to the identified ICOs violated 18 U.S.C. § 1962 by engaging in patterns of racketeering activity, involving the predicate crimes set out above, and used the proceeds of racketeering in a manner that violated the law.

826. Defendants corruptly controlled several entities, including, in the alternative, HELBIZ.

827. Plaintiffs and the members of the classes have been damaged in their business and property as a direct and proximate result.

### COUNT XVII – NEGLIGENT MISREPRESENTATION
### (Defendants HELBIZ, PALELLA, PELLEGRINO, HANNESTAD, PROFUMO, GIULIANO, SKRILL, PAYSAFE and ALDARMAKI)

828. Plaintiffs re-allege and incorporate all paragraphs of this Complaint as if set forth fully herein.

829. Pleading in the alternative, some or all of the statements by Defendants were material misrepresentations made without reasonable care. These Defendants made the representations with the expectancy of profit, knowing and intending that the information would affect the market for HelbizCoin.

830. These Defendants' representation inflated the price of HelbizCoin and/or discouraging market participants from selling HelbizCoin at a higher price than they otherwise could have.

831. Plaintiffs were injured as a direct and proximate result. Paintiffs are entitled to actual and punitive damages.

### COUNT XVIII -- UNJUST ENRICHMENT
### (All Defendants)

832. Plaintiffs re-allege and incorporate all paragraphs of this Complaint as if set forth fully herein.

833. As to HelbizCoin, all Defendants enriched themselves by impoverishing Plaintiffs and the members of the class under circumstances that

were outrageous and lacking any justification. DIIORIO also did so as to the coins in the identified ICOs.

834. In good conscience and good policy Defendants should not be permitted to enrich themselves by such conduct. Likewise, it would be unjust for Defendants to retain ill-gotten gains after injuring Plaintiffs and the members of the Class.

835. Pleading in the alternative to other counts alleged in this complaint, Plaintiffs and the members of the class lack an adequate remedy at law.

836. The Court should require Defendants to disgorge their respective gains and derivatives thereof in good conscience and equity.

## COUNT XIX – RESPONDEAT SUPERIOR
### (Against HELBIZ, PAYSAFE, SKRILL, ALPHABIT and BINARY)

837. Plaintiffs re-allege and incorporate all paragraphs of this Complaint as if set forth fully herein.

838. By all of the above the agents of Defendant HELBIZ committed torts while acting within the scope of their agency or employment.

839. By all of the above, the agents of Defendants SKRILL and PAYSAFE committed torts while acting within the scope of their agency or employment.

840. By all of the above, the agents of Defendants ALPHABIT and BINARY committed torts while acting within the scope of their agency or employment.

236

841.   Defendants HELBIZ, SKRILL, PAYSAFE, ALPHABIT and BINARY are liable, respectively, for these torts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs RYAN BARRON, FILIPPO BULGARINI, GRANT ECHOLS, DENIS DASARI, ILLIA CHEHERST, ANTHONY CALIZTE, ANDREW SKZLAREK, MARAT GARIBYAN, RISHI KHANCHANDANI, DANIILS LEBEDEUS, DONG SEOK LEE, KAMIL JIWA, TAREK RAHMAN, FRANCISO PEREIRA, and ABHISHEK SIKARIA, for themselves on behalf of all Class Members, respectfully seek from the Court the following relief:

a.   Certification of the Class as requested herein;

b.   Appointment of Plaintiffs as the Class representatives and their undersigned counsel as Class counsel;

c.   Award Plaintiffs and members of the proposed Class compensatory, statutory and punitive damages;

d.   Award Plaintiffs and members of the proposed Class equitable, injunctive and declaratory relief;

e.   Award Plaintiffs and members of the proposed Class pre-judgment and post-judgment interest as permitted by law;

237

f.  Award reasonable attorneys' fees and costs of suit; including expert witness fees;

g.  Award reasonable incentive bonuses to the Plaintiffs for their efforts on behalf of the absent class memebrs; and

h.  Award Plaintiff and members of the proposed Classes any further relief the Court deems proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Dated: March 9, 2022

Respectfully submitted,

/s/ Mike Kanovitz
One of Plaintiff's Attorneys

Mike Kanovitz (*pro hac vice*)
Jon Loevy (*pro hac vice pending*)
Daniel Twetten (*pro hac vice pending*)
Heather Lewis Donnell
Anand Swaminathan
Scott Rauscher (*pro hac vice*)
Julia Rickert (*pro hac vice pending*)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900 (phone)
(312) 243-5902 (fax)

238

## APPENDIX

### I.    Complete wallet address cites

The following wallet and smart contract addresses are listed in the order in which they first appear in this complaint.

### (1)    Section B

0x8BC2Fd5355fee3f7Fb5d3A8b20996321fd5Ce80D
0xE3592Fd8e438acBfFA700CE9582447B4cc3Dd5bD
0xE34e1944E776f39B9252790a0527eBDa647aE668
0x7C997920eDcdADE85F22235A508717DA91B3b9E0

### (2)    Section D.1

0x126F80b9451db43966AF0B125f10809520b29cDc
0xdD2Aa0D198c6EBf97e3396746d12e3D3D1a2ab01
0x4D2bFEcBDBeA5d7Cf0Fc15b6375732Da99439a17
0xC540ef971636ac372e02eaB9072F57da3059D8Dd
0xab9b079c020baeCB9AdDF09a9D568317e4D8171d
0x8CDa4aE91A28Dfc37397879cd5437D05be79Ea99
0xe14d4c828d52670Ee5C57020EaF421F67F5aC066
0x2349E5F41dD706136df2BC5c7d1e80b9E6926A8D
0x914b07eF87bd8AFBE322113659A9CFD15A46F5eC
0x3975C082eFDAF76Abb93980beBBAb97e37277312
0xe14d4c828d52670Ee5C57020EaF421F67F5aC066
0x122b6d036ED9a5Dfa9541517D66102E148bcaf91
0xBD0Ea1e32518DAC0BE4171a6022431c9E244e75F
0xae3DAdb78A157bB17FBA72a0A1C5B04D591595f4
0xB990169eA7AE7536BF937a39dce5bedD17cA2320
0x01dA7906a30f6893937615A6BA80827BeA9f2D9E
0xe72696Fa6C682C754E920497E7B67b3CbE4EEd67
0xBf7C70Fb67A1dAD9C2feb8600a778B72b796BDD1

### (3)    Section D.2

0xe8c773188a0e7ee0871a306905d1f936b16ba72c
0x7725e0bC98E61c47dcEb1906Be968492E8cD9080
0x5B5D517029321562111B43086d0b043591109a70

0x198eF1ec325a96CC354c7266A038BE8B5C558F67
0x88cc8cDC7BaEEb15D03Da28f0DB830eeb445D8E1
0xb96fBC8c9a25A62718a16F1cD323aB20C502FDE4
0x7277c239E5299b5523a51c6eA5F529B6fc5FFa1a
0x99f9B8539A183DaB4f17f217734D93652A958B79
0xd39379D7887C6a9ebD01007e2B96eFC774652047
0x428fBC00D1d36995F959f82690d9d16c66D643D2
0xe4511b97D3aD69825B316d1e4fa81cd2278b69c6
0x36Bf43Ff35dF90908824336c9B31CE33067e2f50
0x841145B44840C946E21dbC190264b8E0D5029369
0xd39379D7887C6a9ebD01007e2B96eFC774652047

**(4)    Section D.3**

0x283539ac22C039B66E3A8Fc4Db797d52607E1ff3
0xb115eE3Ab7641E1AA6d000E41Bfc1ec7210c2F32

**(5)    Section D.4**

0x3bC6e3ee7a56Ce8f14A37532590F63716b9966e8
0xC119C16775c8e3936Bb10ea9BB86f31d1A2f7D0c
0x1886c26ca59a5568A77771efB5Dae521Aea25142
0x79d01503e41E0d5BFeB98e30e27D959c003B475c
0xeAb6C417333dDD25B6d80d4ACA6245E8818E995D
0x1af098243428E522079D5a1148B7949321Cc260D
0x522552e6BCd2042b594a45b01aE388cd1E4eBba9

**(6)    Section D.5**

0xf3F404813108FB0A6b0e4FdB2AAc7C4deB42fFa2
0xEDaCafbc51145A9e9170Ab29408a6e5273eF9ddf

**(7)    Section D.6**

0xf911A71e6B5a212EC67Ef84fB14A055890903Ef2
0x87FC912b035d707A0da8cF27748Bb664c823BF0E
0x3829c32A3590D950eaDDE0C71B4fb8E70F087475
0xd78071ed7284228AF17951A90175149340993CA5
0x53C9ecA40973f63bb5927bE0bc6a8a8be1951F74

0xe3E181e62169CFb8b1eBDB356554Bd227052FD90
0xF9a43FD188a19a8Ea7c3dDd87a7c56984f7Dffba

(8)    Section D.7

0xd0a6E6C54DbC68Db5db3A091B171A77407Ff7ccf
0x9937Dbb2128B55c44D8af7bF36FD76796A814Cf4
0xA72Dc46CE562f20940267f8deb02746e242540ed
0x12444B6eC62E616EbC8a23E56e61F8f4C6da610c
0x2323763D78bF7104b54A462A79C2Ce858d118F2F
0xf11bdDc1CaEb3EFfBb32D8D84A98B7Fcfc12A675
0x4b4d1819148c94ABc01a4838cF768bf1fa92c6b9
0x3B9bd803734F2686CE2479Bbb915f60781214Fdb
0xa94eD6963563C0619663Dd6bB65E9B9043484c6F
0x552B76F29F0b6f5bdDC2e5AD6c0256Bf5A7b5406
0xefF26235DA4E73E2D4b512A0c5945489701314FC
0x07d1920E45d63344fd7B9A3de9befD133E61e081
0x9b157bbfB405Ea4Cc3AA9F9257202770623bf3Ab
0x9C520c675BEB6eA07Aaf6F850a6Bc4Cd0724b015
0x407c2edE0F64B7A0162215fb8e58777F47111124

**(9)    Section F.1**

0x0cA266794fbF2a15FA190a1d305f1A413889A3F7
0x96aDa30FC8cf49216f9CD902A65f7e57E81D3441
0x3Fa17277a7D226EFA6a50B9bfbdec5Dc3F9653D9
0x29Ac7689793BC53DD598F84476334eC41aEe0E2F
0xa05d2271DA40192420a7B170362881a121b2F31a
0x49Db9DC8391fFd93d957d0188166b25b124B7343
0x09f7538c2123c5Fd9C7C8990002E3d1826248ac8
0xa02E73A0564874Cd17B82669E72daE170AcF0371
0xd223Fc192196F1a9953554b537DdD52976E958d7
0xe4AD82cBBeedd36f52cCc80FCA0728e591920A99

**(10)    Section H.1**

0x789C19eF373353E445165F26CA948939d64E3208
0x311DD717D214E289f0ae13756e194C4633bDC181
0xcAF501866A161eF9EBD531fA3525Cd45ACCE9A2f
0x91aB14e2f79a4d2097887267C69866BEB3A42f48

240

0xd6aE17235848A9Bb9444969f4459Da141540cd15
0xBB95D8DD867b5F0730DC03F4b654e228d3F531CE
0xa05d2271DA40192420a7B170362881a121b2F31a
0x5Db49f1AFc3CAa7F2ff9078DedD74e7796ccFaC9
0x318AcC77E04F79Deb2D7D971e243378715630456
0x5f2b3c16EFC41BdEB38E61c013ED840985507d6D

**(11)    <u>Section H.4.a</u>**

0x7343d26eDA393FE4C2E13484A94fc1456a6bBc75

**(12)    <u>Section H.4.b</u>**

0x25795d06D34bC872614342911F9EBe9120179c71
0x479237f4423C0cD7Bb85Ec677Fcc9dAc0C3b4C54

**(13)    <u>Section H.4.c</u>**

0x45Cd7a11f0410606969D90a8c540db2c1B163482
0x3aD296D69Af779D8E4E5fa01479dCa0B68b61AAF
0xB8E0d49858C5939A35586AFb3E649e3f0286a7Ab
0x755889888F056d1398575957fd8dfE99B5890C38
0x6e36cdaf8acc4911216ba1c5e93d17d5bf598a02
0x78fd75D2cf5efC21570580E029E6e900bcD8bC6b
0xc61E984Bf3FcB68eeCaB2125f51FD66e55177Fd6
0x2365Fd052461722713f723037aB9EE059a22bd37
0x461dA6129273A4589C28470f9d9D26a47947ecC9
0x195647B5d8E7c6A60c7A00Bb0bAbb571Ce2ec40B
0x349A4d1cAE9FaBC391a36fe098EddC533273cc55
0xF40FE5da243cEF09377a8bB7bed210Fe46b60c19
0xB8E0d49858C5939A35586AFb3E649e3f0286a7Ab
0x4052c71F638226c93e920380E91a0e2cBBb489D1
0x713Fd2a600cd9754Bc54856504Fc3Af2f0Bf83e4
0xa3553829f9c617a2fa7a09b65b73b96d664549ee
0x23c8c783be9d09F876e64CeE0FDb8AA1587d2cDa
0x0577881415E47F979fC46498FB05EF9eD4044A9e
0x0f77b20018cdfdf97fc9cc6aec7062f2c7b9f377
0xC179FBDDC946694d11185d4e15DbBa5Fd0aDac0a

241

**(14)   Section H.4.d**

0x4e6D5A180E48be883aE29762Aa7Fb77531fdc3bA
0xc61E984Bf3FcB68eeCaB2125f51FD66e55177Fd6
0xb824fEA1dDfC4705B537DEbB1a9D024A396EFF97
0xa02e73a0564874cd17b82669e72dae170acf0371

**(15)   Section K**

0x4f8a05B6163F2FDbd4Ef1555b8ac1AD845d56ff5
0xBa1b1bFdD6b28FF7749E84794057CdDaDBcD7286
0x28ff8e457feF9870B9d1529FE68Fbb95C3181f64
0x3c458Fa00eA30aA3132E85bf3454AFCF42f54FeC

**(16)   Section M.2**

0xd9AFFC754635FAA0DE0124080eBd93E89f38D14d
0xDC4c2c89994e2D12e8dbF2fC77Ec50A5be9e9d58
0x7e5b037DCE3bDEc745DeD0DAc434975BE09Ec3C1
0x8b714522fA2839620470EDcf0c4401b713663dF1
0x019906793934Cc823854ad49ee3230de06F537eF
0xaed66f317c9B297B97740E7110F2573c26de5f41
0x4a7B1E272dd22C7F4064324e0caF1a75557EE540

**(17)   Section M.3.c**

0x19f8c64c1f35acE0D463d8F8D6d8F8cdE01F7315
0xe33ff987541dde5cDEe0A8a96DCc3F33c3F24Cc2
0xE657ebC5085136559083A4f5B2581Ea9e70d1A32
0xA56340E6D4018Ee7E7f391277dEa3d6168EAcF7D
0xE09F738d7567cd35Dd54955DCE40165ba514C141

**(2)   Genesis Wallet 6 Path**

0x3bC6e3ee7a56Ce8f14A37532590F63716b9966e8
0xf9074C8141574cac6407e0b48fe6035eb57f132A
0x8fBDd2f9f65FFEAd8c907b9853A08ce57E69c766
0x8A923504901bC1e8E8D1c287623fFB9A9c54E0E1
0x1EdD7725178e911B9e1b7D7E4f2FBD952Ac1e637

0x80d582b81912e59b1E72C778e3A5cfD03C6b0BF1
0x9D079702DE0954dC2A09d94B4A7BfDD24e29382D
0x3B2668CabeAc9fe0F055D6469DF9b2De2e04d299
0xDe053f268689122A19F10bE5eC7c9A8721FD457f
0x42E8B98d5C25B31c660F1352499b3d1b2642899B
0x7638534528C4d3019fa8ffa72f34c81cE91960EF
0x9924AFeD06701d6AbbF006189dde19C9C68FD78b
0x2418Eebb328EdabDCDFAbc9E90FCC83e8D5Da774
0x3a3376BebBa09d17847eB44462258f957Dce36BC
0x6060EDC86Be8E7FC265D52F2852b8a1eacCA4725
0xe988D5F6B51eD20f6e0de32CB9a272b2d8563561
0x5D43097fad2be7a91DD0e603ebF2E08C664bC15C
0x8ad09492eBc911B2108A025fbDE82719aE5134ff
0x045C13a233082b08A938149272F260e7FC382454
0x1e29AAaEFC5347BC8CbA3637d44e4Fb643C7B5C5
0x415C1e195E4930E26C445F8f20760B72278ba689
0xFA2C0FF746a030d3120F4639c0BA7CAedf6Ba355
0x31cA808a517aa23D7719F21CA851D47ab16286CD
0x6717aB1cbbd5Bb4d0c011a8E77B77f9E393c524d
0x3C4D532C792abb79b85216D253C2407e15351244
0x495f934081153f9fA3909960E67f755386F8BC74
0xC119C16775c8e3936Bb10ea9BB86f31d1A2f7D0c

### (3)    0x1886 to 0xeAb6 Path

0xeAb6C417333dDD25B6d80d4ACA6245E8818E995D
0x9Ac0296F80D209Ca36cC7Ec8F3E0ab176549b483
0x402D48D7e41B582C4dc31A7c19A3756F0B5De8c2
0x095310FDc7AaA8083C60E754Daf815bb0016805B
0x9F8B3eb13c4dBE677Ab6e5456673CB583F0CDb8e
0x57d392F242977221AC3F79FFADd494CF3Dd98BEC
0x77D9C366BBEC51dFA0aaaBE3664762758eA7Deb9
0xC9A7b5d1067150ebD65681aa3D113aB388fafA0A
0x70B3101C7194887eCf52c194bED58957dBB0828c
0x16c3708533F98308986b501a5d79aDE111FDCf7C
0x52B02B4984b7986f73978c9a34Ab1d8C60B4a6df
0xA37B58ba455d59B09Cd5AABfce4dfAB1bB9261b7
0xD029cB3bB9fdd9708715734fA7d146AC2977fFb3
0xe1d8F3c94DeDc01a0D049604aa861095cC0c60Ad
0xf6366ed10E84371ef11B2c7975A7539eeD558043

243

0x1e5328D16b9eE1F0A1029d2FfB6C5FD11d5034c3
0xcfebfEa1Bd7E938A10eD167F217C4446853a86d6
0xc76894024413F4FD1E06d79da0f925BC21d6a084
0xC35c51c4BF3119A3b71466d4322e940c9776Ec36
0x6715BB9DdE349E79D46ED7F0FF5E7618b1751C71
0xa7CBeCf42dec94866D4dEBf6396475231eB0579d
0x1886c26ca59a5568A77771efB5Dae521Aea25142


## II.    The Identified ICOs

Based on a review of the ERC-20 transactions for the wallets indeitifed to Mr. Diiorio in the body of the foregoing complaint, Plaintiffs are informed and believe that following are coins from ICOs in which the founders conspired to launder the fundraising ETH to Anthony Diiorio and those working in concert with him:

HBZ, EOS, CIVIC, Stormj, BCAP, ELF, Golem, ICON, OMG, Poet, Polymath, QTUM, UnikoinGold, Gnosis, Storm, PayPie.

Filecoin, Tezos, Bankor, Livepeer, Powerledger, BAT, Worldcore, Blockmason, BAT, Worldcore, Blockmason,WAX.

Crowdmachine, Bloom, Kin, Scry, Decentraland, OPK skins, Odin, Stox, Berry, Arcona, PPT, Dragon Coin, Faith, Vankia,Vibe, Lendroid.

Bouts Pro, Pareto, Hex, Orchid, Enjin, Digix, Augur, Xenon, Sopay, Xcel, Rep, Livepeer, Coincrowd, Micromoney, Cryptonex, Singular DTV.

Firstblood,  SOS, Gitcoin, Credo, Ant, Fuel, Aeternity, Pluton, ZRX, Decentraland, Promodi, Status, Cand, Ebakus.

Metal, Inonomi, Atonomi, Molecular Future, Swarm, Salt, Dent, Vin, AICrypto, Chilz, Cashbetcoin, Tenxpay, Paid Network.

Quantstamp, polkadex, Kick, PPAY, Aion, Enigma, VeChain.

244

### III.   Mixer Wallet Paths

### (1)        Genesis Wallet 5 Path

0xb115eE3Ab7641E1AA6d000E41Bfc1ec7210c2F32
0x6EC4f8a4B47D6eEbc08a640918B0992eecE8ED1d
0xE634974dc1e0Dd5D2C810B353609D77AB75AC234
0x1281f0127959459d5b48615D62D3387be175f7BA
0x9034FD666E0272dED7a071B81dcc1936B1d95C2E
0x47FD48c6a8FEcA275985720d488b5362865f481B
0x12DF0cEfC81F3db34A92C788324efDD692b141F6
0x316427D539E9E4852D0777Aa9f5dC70503E0932d
0xFf78dE7226657e1BCd2276b6a85e0c774d30D35A
0xB329Aa16DbD572394b8d51233B8062C0812BFFDa
0xecb8061595D5e6958ff37C6cF5519e5cee8457b1
0x4c99895d2e9618586c365C5d694309b1CE06ad8d
0x984d70aa863433Aed757F25728Bb401091d9a969
0x1eF2d469Ad749E7C60b9D6233F44C91B75464Fe7
0x3852e6cdaa9c83D89FD6aE8aAcD81eF96082fCAa
0x7C0354bb926781C3C0c46483d5B366CdB5559F4A
0x3cE585f391a22f9572279Df942D00603AE156774
0xA7b57FD1d7356eB845402edf5158352D7F5C898a
0xb8ED4ceC331aBaB40358F7033Ee5ca5C02A972e2
0x74fb5731A844D0081e14956c3A354EE060280B98
0x63D67E788eb4381d9DB7ac329e40E1623Cac2B98
0x74C5bC0ae4716AF91836c092EedF9Ce214D20EEd
0x884B2b83e157a0aBb8006F70D78AD90cb0697672
0xc18479060B8B426367AAF530386E3F5393Bb4609
0x069b695d6129fF967965c7E63B21F7B4B9094834
0xE5F0bf8Fc73cB48b03b280eA7E8F20e124aED25B
0x9B30fC41B280CC85878ed61E75Aa59046877c07D
0x9A98c3A20BE32F15D7FE2955Fdc7259F666FF511
0x283539ac22C039B66E3A8Fc4Db797d52607E1ff3
0x8BC2Fd5355fee3f7Fb5d3A8b20996321fd5Ce80D

245

## (2)     Genesis Wallet 6 Path

0x3bC6e3ee7a56Ce8f14A37532590F63716b9966e8
0xf9074C8141574cac6407e0b48fe6035eb57f132A
0x8fBDd2f9f65FFEAd8c907b9853A08ce57E69c766
0x8A923504901bC1e8E8D1c287623fFB9A9c54E0E1
0x1EdD7725178e911B9e1b7D7E4f2FBD952Ac1e637
0x80d582b81912e59b1E72C778e3A5cfD03C6b0BF1
0x9D079702DE0954dC2A09d94B4A7BfDD24e29382D
0x3B2668CabeAc9fe0F055D6469DF9b2De2e04d299
0xDe053f268689122A19F10bE5eC7c9A8721FD457f
0x42E8B98d5C25B31c660F1352499b3d1b2642899B
0x7638534528C4d3019fa8ffa72f34c81cE91960EF
0x9924AFeD06701d6AbbF006189dde19C9C68FD78b
0x2418Eebb328EdabDCDFAbc9E90FCC83e8D5Da774
0x3a3376BebBa09d17847eB44462258f957Dce36BC
0x6060EDC86Be8E7FC265D52F2852b8a1eacCA4725
0xe988D5F6B51eD20f6e0de32CB9a272b2d8563561
0x5D43097fad2be7a91DD0e603ebF2E08C664bC15C
0x8ad09492eBc911B2108A025fbDE82719aE5134ff
0x045C13a233082b08A938149272F260e7FC382454
0x1e29AAaEFC5347BC8CbA3637d44e4Fb643C7B5C5
0x415C1e195E4930E26C445F8f20760B72278ba689
0xFA2C0FF746a030d3120F4639c0BA7CAedf6Ba355
0x31cA808a517aa23D7719F21CA851D47ab16286CD
0x6717aB1cbbd5Bb4d0c011a8E77B77f9E393c524d
0x3C4D532C792abb79b85216D253C2407e15351244
0x495f934081153f9fA3909960E67f755386F8BC74
0xC119C16775c8e3936Bb10ea9BB86f31d1A2f7D0c

## (3)     0x1886 to 0xeAb6 Path

0xeAb6C417333dDD25B6d80d4ACA6245E8818E995D
0x9Ac0296F80D209Ca36cC7Ec8F3E0ab176549b483
0x402D48D7e41B582C4dc31A7c19A3756F0B5De8c2
0x095310FDc7AaA8083C60E754Daf815bb0016805B
0x9F8B3eb13c4dBE677Ab6e5456673CB583F0CDb8e
0x57d392F242977221AC3F79FFADd494CF3Dd98BEC
0x77D9C366BBEC51dFA0aaaBE3664762758eA7Deb9
0xC9A7b5d1067150ebD65681aa3D113aB388fafA0A

0x70B3101C7194887eCf52c194bED58957dBB0828c
0x16c3708533F98308986b501a5d79aDE111FDCf7C
0x52B02B4984b7986f73978c9a34Ab1d8C60B4a6df
0xA37B58ba455d59B09Cd5AABfce4dfAB1bB9261b7
0xD029cB3bB9fdd9708715734fA7d146AC2977fFb3
0xe1d8F3c94DeDc01a0D049604aa861095cC0c60Ad
0xf6366ed10E84371ef11B2c7975A7539eeD558043
0x1e5328D16b9eE1F0A1029d2FfB6C5FD11d5034c3
0xcfebfEa1Bd7E938A10eD167F217C4446853a86d6
0xc76894024413F4FD1E06d79da0f925BC21d6a084
0xC35c51c4BF3119A3b71466d4322e940c9776Ec36
0x6715BB9DdE349E79D46ED7F0FF5E7618b1751C71
0xa7CBeCf42dec94866D4dEBf6396475231eB0579d
0x1886c26ca59a5568A77771efB5Dae521Aea25142