**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

RYAN BARRON, FILIPPO BULGARINI,
GRANT ECHOLS, ANTHONY CALIXTE, DENIS
DESARL, ILLIA CHEHERST, ANDREW
SKZLAREK, MARAT GARIBYAN, RISHI
KHANCHANDANI, DANIILS LEBEDEUS, DONG
SEOK LEE, KAMIL JIWA, TAREK RAHMAN,
FRANCISO PEREIRA, and ABHISHEK
SIKARIA, for themselves and a class
of others similarly situated,

                    Plaintiffs,

        - against -

HELBIZ   INC.,    SALVATORE   PALELLA,
ANTHONY   DIIORIO,   DECENTRAL   INC.,
PAYSAFE  LTD.,   LORENZO  PELLEGRINO,
SKRILL  USA  INC.,  ALPHABIT  DIGITAL
CURRENCY   FUND,   BINARY   FINANCIAL,
GIULIO PROFUMO, JONATHAN HANNESTAD,
JUSTIN GIULIANO, SAEED ALDARMAKI, and
unknown Defendants

                    Defendants.
- - - - - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/1/23__

20 Civ. 04703 (LLS)
OPINION & ORDER

        Plaintiffs allege Defendants participated in a pump-and-

dump scheme and deceived them into purchasing HelbizCoin

cryptocurrency, offered in an initial coin offering ("ICO") and

on the market, with false promises that HelbizCoin would be the

exclusive payment method for the transportation smartphone

application that Defendants were building. Based on those

allegations, Plaintiffs brought common law claims sounding in

breach of contract, trespass and conversation of chattels,

constructive trust, quiet title, and spoilation, and state

1

statutory claims under section 20-701 of the New York City
Administrative Code and section 349 of the New York General
Business Law.

Although labeled as state law claims, I considered the
complaint to be substantively asserting federal securities
claims for fraud brought under Section 10(b). Accordingly, in my
Opinion and Order of January 22, 2021 (the "Opinion"), I applied
Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010) and
dismissed the complaint for failure to state a claim because
HelbizCoin was never listed on a domestic exchange nor purchased
or sold in the United States. I also denied leave to amend. See
Barron v. Helbiz Inc., No. 20 CIV. 4703, 2021 WL 229609
(S.D.N.Y. Jan. 22, 2021).

The Opinion was vacated and remanded by the Second Circuit
in Barron v. Helbiz, Inc., No. 21-278, 2021 WL 4519887 (2d Cir.
Oct. 4, 2021), which held, when viewed most favorably to
Plaintiffs, that the Complaint alleged that Defendants did not
fulfill the promises they made to induce Plaintiffs into
purchasing HelbizCoin and that Morrison does not apply to such
state law claims. The Second Circuit further concluded that
amendment was not futile. Id. at 4.

Plaintiffs filed the First Amended Complaint, alleging
additional facts concerning the domesticity of the sale and
purchase of HelbizCoin and asserting additional federal

2

securities, commodities, and racketeering claims. Defendants move to dismiss the case.

For the reasons that follow, Defendants' motions are granted in part and denied in part.

## I.    Background

The following facts are drawn from the allegations in the First Amended Class Action Complaint. [1] Dkt. No. 131 ("FAC"). The

---

[1] Defendants ask the Court, in ruling on the motion to dismiss, to consider the terms and conditions of the HelbizCoin exchange and the EXMO exchange because they are subject to judicial notice or are integral to the complaint. As the HelbizCoin Terms and Conditions are not mentioned in the FAC and plaintiffs allege that at least one of them never saw the conditions at their times of purchase, the Terms and Conditions are not integral to the FAC. HelbizCoin. Barron v. Helbiz, Inc., No. 21-278, 2021 WL 4519887, at *4 (2d Cir. Oct. 4, 2021). Nor are they ripe for judicial notice. Defendants are not entitled to an inference that the HelbizCoin Terms and Conditions were in effect at the time the purchases were made, especially when Plaintiffs have put forward evidence that they were not. See Dkt. No. 205 at 24. For that same reason, the Court declines to take judicial notice of the EXMO exchange conditions, which were also not mentioned in the FAC and thus are not integral to it. The Court thus considers neither document at the motion to dismiss stage.

Defendants also ask the Court to take judicial notice of an excerpt of Helbiz, Inc.'s audited financial statement, which was filed with the SEC. Regulatory filings "are relevant not to prove the truth of their contents but only to determine what the documents stated." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991). The document proves, at best, that Helbiz, Inc. told the SEC that it received a loan from HBZ Systems Pte Ltd. ("HBZ Systems"), which is not even mentioned by name in the filing. The Court therefore does not take judicial notice of defendants' claim that HBZ Systems loaned $1.3 million to Helbiz.

3

Court assumes the parties' familiarity with them and recounts only what is necessary.

## A. Defendants

Defendant Helbiz Inc. ("Helbiz") is a Delaware corporation with its principal place of business in New York City. FAC ¶ 59. Defendant Salvatore Palella, a New York resident, is the founder, owner, and Chief Executive Officer of Helbiz. FAC ¶¶ 75, 292. Palella, with his alleged co-conspirators, used Helbiz to create HelbizCoin and steal from investors, through a series of false facts, omissions, and promises that would not be, over $350 million. FAC ¶ 76.

Defendant Giulio Profumo, a New York citizen, is the CFO of Helbiz. FAC ¶ 81. Defendant Justin Giuliano was the President of Blockchain Operations for Helbiz. FAC ¶ 85. Defendant Jonathan Hannestad is the Create and Strategic Director of Helbiz. FAC ¶ 86.

Defendant Paysafe LTD ("Paysafe"), a Bermuda Corporation with a principal place of business in the United Kingdom, provides electronic payment systems and services for

---

Finally, Defendants argue that the Court may consider the Declarations of Salvatore Palella, Andrea Moni, and Jonathan Hannestad because the FAC quotes them. Dkt. No. 164 at 4n.1. However, the affidavits are only discussed in one out of the 841 paragraphs in the FAC. Based on that level of discussion, the FAC cannot be said to rely heavily on them such that they would properly be considered integral. See Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230-31 (2d Cir. 2016).

4

cryptocurrencies. FAC ¶ 61. Defendant Skrill USA Inc.
("Skrill"), a Delaware corporation with its principal place of
business in New York, is a subsidiary of Paysafe that offers
digital wallet services. FAC ¶ 66, 70. Defendant Lorenzo
Pellegrino is the CEO of Skrill and an employee of Paysafe. FAC
¶ 67. Paysafe and Skrill were allegedly partners with Helbiz.
FAC ¶ 69. Pellegrino served as an advisor, in his individual
capacity and as an agent of Skill and Paysafe, to Helbiz during
the ICO. FAC ¶ 79.

Defendant Anthony Di Iorio, who is well-known within the
cryptocurrency industry, runs Decentral Inc., a cryptocurrency
incubator and another named Defendant. FAC ¶ 91. Di Iorio was an
advisor to Helbiz. FAC ¶ 96.

Defendant Saeed Al Darmaki is the Managing Director of
Defendant Alphabit Digital Currency Fund ("Alphabit") who also
served as an advisor of Helbiz. FAC ¶¶ 109-10. Defendant Binary
Financial is a sister company of Alphabit. FAC ¶ 110.

**B. Overview of Alleged Helbiz Scheme**

Defendant Palella launched a scheme to fraudulently raise
capital for Helbiz through an Initial Coin Offering ("ICO") of
HelbizCoin. To promote the ICO and drive up the value of
HelbizCoin, Palella conspired with co-defendants by making false
or highly misleading misrepresentations about Helbiz and
HelbizCoin.  FAC ¶¶ 2, 11, 181-207, 311, 353. Such

5

misrepresentations include that HelbizCoin would be used to develop a decentralized smartphone application that allowed users to rent various modes of transportation.  FAC ¶¶ 7, 173-80, 287-95, 298, 302, 304-10. HelbizCoin, which ran off blockchain technology, was to be the only way users could make purchases in the app. The idea was that as the platform expanded, the demand and thus price for HelbizCoin would simultaneously rise. FAC ¶¶ 304-10. Defendants made such misrepresentations about Helbiz and HelbizCoin in the Helbiz Whitepaper, on the company's website and ICO website, on social media, at live events, and to the press, including industry publications. FAC ¶¶ 181-184.

Rather than keeping the promises to build the described platform, Plaintiffs allege that Palella used the funds from the ICO to develop a different platform that allowed individuals, with the swipe of a credit card or other fiat currency payment, to rent scooters. FAC ¶¶ 289, 461-66, 468-476, 758. They allege that he and his conspirators never had any intention of using HelbizCoin as the native token for Helbiz transactions.

The ICO took place in two stages, a pre-sale in January 2018 and a crowd sale in February-March 2018, with Helbiz allegedly raising $38.6 million and issuing approximately one billion HelbizCoins. FAC ¶¶ 185-86.

Following the ICO, Plaintiffs allege that Defendants further engaged in a campaign of misinformation as part of a "pump and dump" scheme. FAC ¶¶ 320-24, 335. They assert that this included Defendants engaging in "wash sales" and money laundering, FAC ¶¶ 218-58, before later dumping HelbizCoins, FAC ¶¶ 396-401, 432-44.

The scheme did not culminate there. Plaintiffs then assert that Palella announced a public stock offering of Helbiz. FAC ¶ 551.  To effectuate his next plan, they claim he threatened to destroy HelbizCoin by deleting the "smart contract on the Ethereum contract."[2] FAC at ¶ 578. Thus, they also allege that Palella and Helbiz improperly converted the Helbiz assets created from the ICO. FAC ¶¶ 758-59.

### C. Procedural History

Defendants Helbiz, Palella, Hannestad, Profumo, and Giulino (the "Helbiz Defendants") move to dismiss the FAC for failure to state a claim. Dkt. No. 163. As does Defendant Pellegrino. Dkt. No. 170.

Defendants Paysafe and Skrill (the "Paysafe Defendants") move to dismiss the FAC for lack of jurisdiction over Paysafe and for failure to state a claim against Skrill. Dkt. No. 155.

---

[2] This Court enjoined that proposed action. Dkt. No. 33.

Likewise Defendants Alphabit, Dkt. No. 189, and Al Darmaki, Dkt. No. 233, separately move to dismiss on those same grounds.

Defendants Di Iorio and Decentral move to dismiss the FAC for failure to effectuate proper service and for not stating a claim. Dkt. No. 213.

## II. Personal Jurisdiction and Service of Process

On a Rule 12(b)(2) motion, plaintiff "bears the burden of establishing that the court has jurisdiction over the defendant." DiStefano v. Carozzi N. Am., Inc., 286 F.3d 81, 84 (2d Cir. 2001). Such a motion can be supported by affidavits outside of the complaint, S. New England Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 138 (2d Cir. 2010), but the Court must construe the pleadings and affidavits in the light most favorable to the plaintiff and resolve all doubts in its favor, Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 85 (2d Cir. 2013).

The FAC alleges that Alphabit and Paysafe participated in the New York-based HelbizCoin scheme directly and through agents which, plaintiffs argue, is sufficient to establish specific jurisdiction under the agency theory that "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there," Daimler AG v. Bauman, 571 U.S. 117, 135 n.13 (2014), or under a conspiracy theory, which requires allegations "that (1) a conspiracy existed; (2) the

defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state," Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 87 (2d Cir. 2018).

### A. Paysafe

The Court does not have jurisdiction over Paysafe, a foreign defendant, under either the agency or conspiracy theory.

The FAC alleges that "PELLAGRINO is PAYSAFE's employee and agent. He acted within the scope of his employment with regard to all his conduct alleged in this complaint." FAC ¶ 68. In support of that conclusory statement, the FAC alleges that Pellegrino was paid by Paysafe, was an executive officer on the company's senior management team, and had the title "CEO of Digital Wallets," which plaintiffs argue means he oversaw engineers for both Skrill and Paysafe. FAC ¶¶ 67, 69.

While an uncontested principal owner of a company may be presumed to be an agent of a company, Banko Co. v. Starrett Hous. Corp., No. 90 CIV. 2178, 1991 WL 220958, at *3 (S.D.N.Y. Oct. 15, 1991), Paysafe disputes that it employed Pellegrino and asserts that he was instead employed as the CEO of its subsidiary, Skrill, Neteller & Income Access.

Paysafe's public regulatory filings, which it submitted in support of its motion, confirm both parties' assertions. Dkt.

No. 157 Ex. 2. Pellegrino is employed by Skrill, a separate entity from Paysafe, but following Paysafe's proposed merger in 2020, he was also to be on the senior management team at Paysafe.

Regardless of whether Pellegrino is an agent of Paysafe in this context, the FAC makes no allegations that Paysafe directed Pellegrino to take any actions to promote HelBiz in New York. Thus, this Court does not have jurisdiction over Paysafe under an agency theory.

Nor can the Court attribute to Paysafe the in-forum contacts of Helbiz or Pelella because the FAC does not adequately allege that Paysafe participated in a conspiracy.

"[T]he hallmark of a conspiracy is an 'agreement between two or more persons ... to participate in an unlawful act.' Evidence of an agreement may be 'indirect' but must show that the parties share a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" In re Terrorist Attacks on Sept. 11, 2001, No. 03-CV-06978, 2023 WL 2430381, at *13 (S.D.N.Y. Mar. 9, 2023) (internal citations removed). To infer such an agreement, Plaintiffs point to Palella's public statement that it was "furthermore thrilled to be able to partner directly with a company such as Paysafe, processing payments for tens of millions of people and hundreds of thousands of merchants. . ." FAC ¶ 349(D). Public statements by

10

Palella also revealed that Paysafe was partnering with Helbiz to help grow HelbizCoin into a mainstream currency. FAC ¶ 349(E).

At most, these facts suggest that Helbiz and Paysafe were in a legitimate business venture. They cannot plausibly be read to show the parties were combining resources to achieve an unlawful goal.

Thus, plaintiffs have failed to meet their burden to establish a prima facie showing of personal jurisdiction over Paysafe, and all claims against Paysafe are dismissed.

**B. Alphabit**

Plaintiffs also make the same arguments as to why the Court has jurisdiction over Alphabit, which is registered with the Cayman Island Monetary Authority and has a principal place of business in the United Arab Emirates. Neither is persuasive.

The FAC does not adequately allege that Alphabit was part of the Helbiz conspiracy. The only allegation to possibly lend support to that conclusion is that "HELBIZ published an article on Medium.com entitled: HELBIZ: The decentralized AirBnB for transportation, closes $5.5m presale and launches ICO backed by AlphaBit & Binary Financial. Defendants deleted this article as part of their scheme to exit the fraud and to disadvantage Plaintiffs in the litigation." FAC ¶ 118. However, without any additional support, Plaintiffs are not entitled to the inference that defendants intentionally deleted the article to perpetuate

11

a deception. Thus, stripped of this assertion, the allegation, accepted for the truth it asserts, does not lead to the conclusion that Alphapit conspired to take any illegal action.

Additionally, even if Al Darmaki had the power to bind Alphabit or was acting under Alphabit's control in connection to his relations with Helbiz, as the FAC asserts, he was doing so unilaterally. The FAC makes no allegation that Alphabit directed him to take any actions to perpetuate HelBiz's alleged fraud in New York, as is necessary for a finding of agency personal jurisdiction. See Daimler AG v. Bauman, 571 U.S. 117, 135 n.13 (2014).

Therefore, this Court has no jurisdiction over Alphabit and all claims against it must be dismissed.

### C. Saeed Al Darmaki

The Court has jurisdiction over Al Darmaki, an out-of-state defendant, because the FAC sufficiently alleges that Al Darmaki conspired with those who took action in New York in furtherance of that conspiracy.

"By joining the conspiracy with the knowledge that overt acts in furtherance of the conspiracy had taken place in New York," defendant "purposely availed themselves of the privilege of conducting activities within [New York]." Berkshire Bank v. Lloyds Banking Grp. plc, No. 20-1987-CV, 2022 WL 569819 at *4 (2d Cir. Feb. 25, 2022). The FAC alleges that Al Darmaki had

high-level positions at HelBiz, a New York company, as a board member, strategic advisor, and ICO Team Member, which gave him insider access to the true state of the company such that he knew, or should have known, that his public statements about the status of the platform and projections of the coin's success were materially false and made at the expense of defrauding purchasers. See FAC ¶¶ 107-15, 387, 656, 677, 737, 739.

The Court thus has jurisdiction over Al Darmaki.

### D. **Anthony Di Iorio**

In an Order from August 5, 2022, the Court authorized service of Di Iorio by (a) email to the addresses provided by the other defendants appearing in this case and (b) international mail delivery service that confirms the delivery with a signature from an adult at the intended recipient's address. Dkt. No. 198 at 6.

Di Iorio essentially argues that the Court should reconsider that Order granting alternative service and dismiss the FAC for failure of proper service. See Fed. R. Civ. P. 12(b)(5).

Di Iorio provides no persuasive reason for why the Court should reverse the Order. The Court has sound discretion over the decision of whether to order alternative service of process under Rule 4(f)(3). Berdeaux v. OneCoin Ltd., No. 19-CV- 4074, 2020 WL 409633, at *1 (S.D.N.Y. Jan. 24 , 2020). Plaintiffs

complied with that Order. Thus, service was properly effected, and Di Iorio's Rule 12(b)(5) motion is denied.

## II.    Domesticity Under Federal and State Law

Defendants argue that dismissal is warranted because the alleged HelbizCoin scheme primarily transpired outside of the territorial limits of this country and thus is not subject to the laws of the United States.

### A. Federal Statutes

It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247, 255 (2010). Neither the Securities Exchange Act, see id., the Commodities Exchange Act, Prime Int'l Trading, Ltd. v. BP P.L.C., 937 F.3d 94, 102 (2d Cir. 2019), nor civil RICO, RJR Nabisco, Inc. v. Eur. Cmty., 579 U.S. 325, 338 (2016) contain such a clearly expressed affirmative intention from Congress that would give the statutes extraterritorial effect.

Plaintiffs do not challenge that conclusion. Rather, they argue that dismissal is unwarranted because the FAC properly alleges domestic application of the statutes. As "it is a rare case . . . that lacks *all* contact with the territory of the United States," Morrison, 561 U.S. at 266 (emphasis in

original), a scheme that involves both domestic and foreign conduct may still be subject to federal law if the conduct that occurred within this country is of the type Congress sought to regulate through the statute or, in other words, is the focus of the statute. See id. at 266-67; see also Prime Int'l Trading, Ltd. v. BP P.L.C., 937 F.3d 94, 107-108 (2d Cir. 2019) (2020).

Thus, the Court must next decide if the claims are adequately domestic.

### 1. Securities Exchange Act of 1934

The focus of the Exchange Act is upon "purchases and sales of securities in the United States." Morrison, 561 U.S. at 266. Accordingly, the Exchange Act applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." Id. at 267. A transaction is domestic if "irrevocable liability is incurred or title passes within the United States." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 67 (2d Cir. 2012). Thus,

> in order to adequately allege the existence of a
> domestic transaction, it is sufficient for a plaintiff
> to allege facts leading to the plausible inference
> that the parties incurred irrevocable liability within
> the United States: that is, that the purchaser
> incurred irrevocable liability within the United
> States to take and pay for a security, or that the
> seller incurred irrevocable liability within the
> United States to deliver a security.

Id. at 68.

Plaintiffs make no assertion that they purchased HelbizCoin on domestic exchanges. Rather, they argue that their purchases were domestic transactions because title passed in the United States and defendants incurred irrevocable liability here.

This Court already found in its dismissal of the initial complaint that the allegations that all HelbizCoin were issued from servers in Kansas and transferred via the Ethereum blockchain, which is centralized in the United States, were insufficient to support a conclusion that the parties incurred irrevocable liability in the States. "Morrison dealt with the location of the change in the legal relationship between persons, not the electronic operations of creation, transport and delivery of the product." Dkt No. 116 at 13.

Since then, other courts in this circuit have come to the same conclusion that plaintiffs must allege more than that title passed in whole or in part over servers located in the United States that hosted the defendant's website. Anderson v. Binance, No. 1:20-CV-2803 (ALC), 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022).

The First Amended Complaint cures that defect. It goes beyond simply alleging that the sale of HelBizCoin was executed on a network in the United States. It alleges that the 0x8bc2 wallet, the virtual addresses that automatically created a HelbizCoin whenever a purchaser executed the smart contract, was

16

controlled by Palella, a New York resident, and operated out of New York. FAC ¶¶ 173-179, ¶ 200 ("HELBIZ was physically situated in the United States when it used its control over the 0x8bc2 wallet to mint the HelbizCoins"), ¶ 489 (incorporating Marques Declaration with Beltran's LinkedIn profile which states: "Lead Engineer at Helbiz Greater New York City Area"), ¶¶ 610-621 (identifying use of the private key to 0x8bc2 by Beltran). It further alleges that many defendants-Helbiz, Palella, Hannestad, Pellegrino, Giuliano—were "physically situated in the United States when they incurred irrevocable liability" by selling their own HelbizCoin to the general public. Id. ¶¶ at 459-60.

Therefore, plaintiffs have sufficiently alleged at the motion to dismiss stage that the United States is the place where defendants became bound to effectuate to sell HelbizCoin such that the invocation of the Exchange Act is valid.

Plaintiffs' additional allegations do little to nothing to bolster my finding of adequate domesticity. They argue that the FAC sufficiently alleges that the purchasers incurred irrevocable liability in the United States because it "specifically identifies multiple U.S.-based purchasers in the ICO" and "further identifies U.S.-based purchasers in the secondary market." Dkt. No. 205 at 3-4 (citing FAC ¶ 30 (Mr. Barron, ¶ 34 (Mr. Calixte), ¶ 35 (Mr. Echols), ¶ 37 (Mr. Echols' two friends); ¶ 44 (Mr. Grieves), ¶ 45 (Mr. Jiwa), ¶ 58 (members

of a family solicited directly by Palella, one of whom lives in
New York). However, alleging the citizenship of the purchaser
does nothing to show that the purchase happened in that country.
See Absolute Activist Value Master Fund Ltd., 677 F.3d at 70 ("a
party's residency or citizenship is irrelevant to the location
of a given transaction."). For most of those aforementioned
individuals, the FAC only alleges that the individual is a
resident of the United States. The only allegation that is
sufficient to support an inference of domesticity is that
concerning Mr. Calixte, Mr. Echols, and Mr. Jiwa because the FAC
alleges not only that they are American residents but also that
they purchased HelbizCoin in the United States. FAC ¶¶ 34, 200.

They also argue that the domesticity is appropriate because
the HelbizCoin scheme was run out of New York, pointing to the
fact that the "whitepaper itself identifies New York as the
locus of the operations and represents that the ICO and initial
launch of Helbiz operations would occur in Q1 2018 in New York"
and that "New York is also the site of meetings between co-
conspirators, including the Helbiz Defendants, Aldarmaki (of
Alphabit), and Pellegrino (of Paysafe and Skrill)." Dkt. No. 205
at 27. However, allegations that HelbizCoin was marketed in the
United States do not satisfy Morrison. Absolute Activist Value
Master Fund Ltd., 677 F.3d at 70. However, they do support the
necessary inference that the claims are not "so predominately

foreign as to be impermissibly extraterritorial." <u>Cavello Bay</u>
<u>Reinsurance Ltd. v. Shubin Stein</u>, 986 F.3d 161, 165 (2d Cir.
2021).

### 2. Commodities Exchange Act

Plaintiffs have also pled a domestic application of the
Commodity Exchange Act's provisions prohibiting the manipulation
of the price of any commodity or commodity future in interstate
commerce. <u>See</u> 7 U.S.C. §§ 9(1), 13(a)(2). In contrast with the
Exchange Act, the congressional focus of those provisions is
"preventing manipulation of the price of any commodity." <u>Prime</u>
<u>Int'l Trading, Ltd. v. BP P.L.C.</u>, 937 F.3d 94, 108 (2d Cir.
2019).

Plaintiffs have adequately alleged that conduct relevant to
that focus occurred domestically. The FAC alleges that Helbiz
and Palella used a private key to control hundreds of spoofed
transactions during the ICO. FAC ¶¶ 210-235, 441-443, 489-497,
610-621. Further, the FAC alleges that manipulative statements
about the value of HelbizCoin were made in the United States,
such as in the  HelbizCoin Whitepaper, which was allegedly
published by a New York company and on a New York registered
website, on the ICO website, also allegedly registered in New
York, and at marketing events, hosted on Wall Street. FAC ¶¶
184, 196-97, 206, 568.  Such allegations of manipulative conduct
and statements made in the United States are sufficient to

allege the proper domestic application of the Commodity Exchange

Act. See Prime Int'l Trading, Ltd. v. BP P.L.C., 937 F.3d at

108.

### 3. Racketeering Influenced and Corrupt Organization Act

> Congress's incorporation of these (and other)
> extraterritorial predicates into RICO gives a clear,
> affirmative indication that § 1962 applies to foreign
> racketeering activity—but only to the extent that the
> predicates alleged in a particular case themselves
> apply extraterritorially. Put another way, a pattern
> of racketeering activity may include or consist of
> offenses committed abroad in violation of a predicate
> statute for which the presumption against
> extraterritoriality has been overcome.

RJR Nabisco, Inc. v. Eur. Cmty., 579 U.S. 325, 339 (2016).

Here, plaintiffs' RICO claims are primarily based on

predicate acts of wire fraud. The Second Circuit has not

"decide[d] precisely how to draw the line between domestic

and extraterritorial applications of the wire fraud

statute." Dennis v. JPMorgan Chase & Co., 343 F. Supp. 3d

122, 188 (S.D.N.Y. 2018) (quoting Eur. Cmty. v. RJR

Nabisco, Inc., 764 F.3d 129, 142 (2d Cir. 2014)).  To

overcome the presumption against extraterritoriality, the

scheme must allegedly be "both managed from and directed at

the U.S." Sonterra Cap. Master Fund Ltd. v. Credit Suisse

Grp. AG, 277 F. Supp. 3d 521, 581 (S.D.N.Y. 2017). Contacts

that create only "a minimal nexus to the United States" are

insufficient. Id.

The FAC alleges that the scheme was perpetuated by a United States company and a group of United States residents, who ran the scheme out of New York. FAC ¶¶ 59, 75, 200, 206. It further alleges that many false statements, which were distributed using the internet, were made in the United States on websites registered to United States companies and supported by servers located in the U.S. Id. ¶ 640. And, that the defendants used cryptocurrency exchange websites, hosted on U.S. servers for the pump and dump and to launder the money from their alleged fraud. Id. ¶ 642.

It also adequately alleges that the scheme was directed at the United States. For example, it alleges that defendants knew of the United States citizenship of purchasers of the coin. FAC ¶ 35, 36, 45, 58.

### B. State Statues and Common Law

The extra-territorial application of New York statutes and New York common law has historically been different.  "The established presumption is, of course, against the extraterritorial operation of New York" statute. Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd., 18 N.Y.3d 722, 735, 969 N.E.2d 187, 195 (2012). However, "New York common law, unlike certain statutes, applies to extraterritorial acts."

Norex Petroleum Ltd. v. Blavatnik, 22 N.Y.S.3d 138 (N.Y. Sup. Ct. 2015).

New York's statutory consumer protection law, N.Y. Gen. Bus. L. § 349, requires a plaintiff to allege a "transaction" with a sufficient New York nexus. See Goshen v. Mutual Life Ins. Co. of New York, 98 N.Y.2d 314, 324 (2002). Thus, such a claim can be sustained on behalf of out-of-state victims so long as the deceptive transaction occurred in New York. Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 123 (2d Cir. 2013).

Plaintiffs allege that Defendants sent out deceptive communications from websites registered to New York-based addresses, held marketing events in New York to (fraudulently) promote their coin, and administered the ICO website in the state. and perpetrated other aspects of their conspiracy from within New York. There is thus no extraterritorial bar to applying New York law to this case.

**III.          Failure to State a Claim**

When considering a motion to dismiss for failure to state a claim, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). To survive such a motion, the complaint must be facially plausible and contain sufficient factual matter "that allows the court to draw the

22

reasonable inference that the defendant is liable for the conduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, (2007)).

Before addressing the merits of each claim, the Court addresses, as a threshold matter, the parties' more general reasons for dismissal.

Decentral asserts, and plaintiffs concede, that the FAC does not sufficiently plead any claims against it. Thus, dismissal is granted.

The Helbiz Defendants argue that dismissal of many of the claims against them is warranted because the plaintiffs have conflated Helbiz with HBZ Systems Pte Ltd. ("HBZ Systems"), a private entity registered in Singapore and the party responsible for issuing the HelbizCoin ICO, the Helbiz Terms and Conditions, and the Whitepaper. Dkt. No. 164 at 28-29. In other words, they argue that plaintiffs have named the wrong defendant.

However, at this stage, the FAC adequately alleges that Helbiz was the issuer of HelbizCoin and that HBZ Systems is a sham entity. FAC ¶¶ 555-560, 582-585, 622-629. Of particular note is the fact that the FAC alleges that the presale of HelbizCoin launched in January 2018, but that HBZ Systems was not registered with the Singapore Corporate Registration Authority ("ACRA") until February 2018, and that before then HBZ

Systems had not begun operation. FAC ¶¶ 559, 568. Plaintiffs thus have adequately alleged that Helbiz, the entity actually named in the Whitepaper, is the entity responsible for HelbizCoin.

Similarly, Skrill argues that the FAC fails to assert any claims against it because most of the allegations against it are predicated on the acts of others, for which Skrill cannot be held liable.

Skrill is not liable for the acts of Pellegrino. The FAC does not support a finding that Pellegrino was acting subject to Skrill's direction and control as to Helbiz. In New York, an agency relationship requires the following elements: "(1) manifestation by the principal that the agent shall act for him; (2) the agent accepted the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking." Spagnola v. Chubb Corp., 264 F.R.D. 76, 89 (S.D.N.Y. 2010). The FAC does not allege any conduct by Skrill evidencing that it appointed Pellegrino to act for it in connection with Helbiz. The fact that Pellegrino was, at that time, CEO of Skrill, does not mean he was acting as an agent for Skrill when he undertook personally, and independently, to act as an advisor to Helbiz. See In re Shulman Transp. Enters., Inc., 744 F.2d 293, 295 (2d Cir. 1984) ("Even though a person is

termed an agent, he may, in fact, act as such in some matters, but not in others.").

Nor is Skrill liable for the acts of its alleged co-conspirators. The FAC alleges that Skrill was in a "conspiratorial agreement to commit fraud" with defendants Helbiz, Palella, Pellegrino, Paysafe, Hannestad, and Profumo by, in part, promoting "HelbizCoin using false facts and promises they did not intend to perform." FAC ¶¶ 77, 79, 750. But that is nothing more than a conclusory statement--no facts are alleged to "show that the parties share a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" In re Terrorist Attacks on Sept. 11, 2001, No. 03-CV-06978, 2023 WL 2430381, at *13 (S.D.N.Y. Mar. 9, 2023).

Nor is Skrill liable for the acts of any alleged partners. The allegations that Helbiz repeatedly publicly announced that it was partners with Skrill show, at best, a business partnership between the entities. They are insufficient to establish a legal partnership, which requires a showing (1) that the parties share in the profits and losses; (2) that there is joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to form a partnership. Ardis Health, LLC v.

<u>Nankivell</u>, No. 11-CV-5013 2012 WL 5290326 *5 (S.D.N.Y. Oct. 23, 2012). The FAC makes no such allegations.

Accordingly, all claims against Skrill are dismissed, except for the claim of respondeat superior, which is discussed below.

Finally, Pellegrino argues that the FAC should be dismissed as to him because it alleges no basis for him to be held liable as a partner or co-conspirator.

To survive a motion to dismiss, a complaint "must contain more than general allegations in support of the conspiracy." <u>Brownstone Inv. Grp., LLC v. Levey</u>, 468 F. Supp. 2d 654, 661 (S.D.N.Y. 2007). The FAC does just that. It alleges that Pellegrino "arranged for online cryptocurrency exchanges to list the HelbizCoin for trading," FAC ¶ 12, and made knowingly false public statements about the applicability of the coin to drive up its price, FAC ¶ 13. He also made promises that he did not intend to perform about the role he would play in the construction of Helbiz's payment processing systems, FAC ¶¶ 342–47, and he did not correct the public, material statements of others when they were made in his presence and he knew them to be false, FAC ¶¶ 373-385. Thus, the FAC adequately alleges that Pellegrino participated in the conspiracy to defraud HelbizCoin purchasers.

1.    **Breach of Contract** *(Defendants Helbiz, Palella,*
*Hannestad, Profumo, Giuliano, Pellegrino, and Al Darmaki)*

Defendants argue that the FAC does not sufficiently plead
the existence of a contract between plaintiffs and any of the
defendants. See Fischer & Mandell, LLP v. Citibank, N.A., 632
F.3d 793, 799 (2d Cir. 2011) ("Under New York law, a breach of
contract claim requires proof of (1) an agreement, (2) adequate
performance by the plaintiff, (3) breach by the defendant, and
(4) damages.").

"An agreement stems from 'a manifestation of mutual assent
sufficiently definite to assure that the parties are truly in
agreement with respect to all material terms.'" McCabe v.
ConAgra Foods, Inc., 681 F. App'x 82, 84 (2d Cir. 2017) (quoting
Express Indus. and Terminal Corp. v. N.Y. State Dep't ofTransp.,
715 N.E.2d 1050, 1053 (1999)). It thus requires an offer,
acceptance, consideration, mutual assent, and intent to be
bound. Kowalchuk v. Stroup, 61 A.D.3d 118, 121, 873 N.Y.S.2d 43
(N.Y. App. Div. 1st Dep't 2009).

Plaintiffs argue that the Whitepaper was a contract that
represented "the official promise of HELBIZ and the team as to
what they were undertaking to do with the funds raised, their
commitment to the value proposition for the coin, and other
material representations." FAC ¶ 288.

27

But the Whitepaper does not read as an offer that conveys an intent to be bound. Rather, it is a marketing material, a sales tactic more akin to a promotion or an advertisement, which in New York are generally not considered to be offers. McCabe, 681 F. App'x at 84. Even plaintiffs characterize whitepapers as generally "spelling out the nature of the proposed coin, the economics of its operations, how the funds raised will be used, and its technical details, among others." FAC ¶ 287. Without more definite statements, the broad generalizations made in the Whitepaper regarding future performance cannot be read as contractual promises. To find otherwise would be to hamstring defendants to one business plan, with no room for organic growth or pivots in other directions. See Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482, 548 N.Y.S.2d 920, 923 (1989) ("The requirement of definiteness assures that courts will not impose contractual obligations when the parties did not intend to conclude a binding agreement.")

The breach of contract claim against Helbiz, Paysafe, Skrill, Salvatore Palella, Jonathan Hannestad, Giulio Profumo, Justin Giuliano, Lorenzo Pellegrino, and Saeed Al Darmaki is thus dismissed.

**2.   Tortious Interference** *(Defendants Di Iorio and Pellegrino)*

Under New York law, the elements of tortious
interference with contract are (1) the existence of a
valid contract between the plaintiff and a third
party; (2) the defendant's knowledge of the contract;
(3) the defendant's intentional procurement of the
third-party's breach of the contract without
justification; (4) actual breach of the contract; and
(5) damages resulting therefrom.

Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir.

2006).

Plaintiffs allege that Diiorio and Pellegrino knew of the

promises Helbiz made in the Whitepaper and caused them to not be

performed. FAC ¶¶ 743-44. But the Court has already found that

the Whitepaper is not a contract between Helbiz and plaintiffs.

The FAC thus fails to adequately allege the existence of a valid

contract that defendants could have interfered with. Plaintiffs'

second claim is thus dismissed.

### 3.   **Trespass and Conversion of Chattels** *(Defendants Helbiz, Palella, Pellegrino, Hannestad, and Profumo)*

The Helbiz Defendants argue that the claims must be

dismissed as duplicative of the breach of contract claim. See AD

Rendon Comms., Inc. v. Lumina Americas, Inc., No. 04-CV-8832,

2007 WL 2962591, *5 (S.D.N.Y. Oct. 10, 2007) ("[A] tort cause of

action that is based upon the same facts underlying a contract

claim will be dismissed as a mere duplication of the contract

cause of action."). Despite the truth of the assertion, it is

meritless as applied here. There is no duplicative claim

following the Court's dismissal of the breach of contract claim.

29

The Helbiz Defendants' motion to dismiss the claim for trespass and conversion of chattels is thus denied.

Under New York Law, a "trespass to chattel occurs when a party intentionally damages or interferes with the use of property belonging to another." Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 437 (2d Cir. 2004). Similarly, conversion "is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's right." Thyroff v. Nationwide Mut. Ins., 460 F.3d 400, 403-404 (2d Cir. 2006). "Because the elements of a trespass-to-chattels claim are substantially similar to the elements of a conversion claim, the Court applies the same analysis." DeAngelis v. Corzine, 17 F. Supp. 3d 270, 283 (S.D.N.Y. 2014).

The FAC alleges that the Helbiz Defendant committed the tort of conversion by threatening to destroy the Ethereum smart contract that created HelbizCoin and that Pellegrino conspired to help them do so. FAC ¶ 749-50.

To sustain the claim, the FAC must "set forth facts supporting an allegation that [Pellegrino] either conspired to unlawfully convert property or consciously assisted in the unlawful conversion." Diamond State Ins. Co. v. Worldwide Weather Trading LLC., No. 02 CIV.2900, 2002 WL 31819217, at *5 (S.D.N.Y. Dec. 16, 2002). The FAC makes no such allegations. It

does not allege that Pellegrino was at all involved in the smart contracts. Accordingly, the claim is dismissed as to Pellegrino.

### 4.   **Conversion of Funds and Embezzlement** (*All Defendants*)

To state a claim for conversion of funds, plaintiffs must plausibly allege: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004). "Where the property alleged to have been converted is money, it must be specifically identifiable and be subject to an obligation to be returned or to be otherwise treated in a particular manner." E. Schodack Fire Co. v. Milkewicz, 140 A.D.3d 1255, 1256 (N.Y. App. Div. 2016).

The FAC alleges that Helbiz and Palella "kept the revenues HELBIZ earned on the platform for themselves, whereas these funds should have been paid to the coin holders, inter alia, by purchasing HelbizCoins from the coin holders." FAC ¶ 753. However, a general allegation that defendants kept the revenues lacks the specificity required to maintain a claim.

Further, the only support that the FAC offers to show that the revenues were to be treated in a particular manner, i.e.

31

used to purchase HelbizCoin from the coin holders, is the
allegation that the revenues were "repeatedly promised to the
coin holders." FAC ¶ 503. But that is not tantamount to a
showing that defendants were obligated to purchase HelbizCoins
from the plaintiffs. The FAC thus fails to state a claim of
conversion of funds against all Defendants.

     **5.   Constructive Trust** (*Defendants Helbiz, Palella,
Hannestad, and Profumo*)

     The FAC alleges that the named defendants "wrongfully took"
the capital the coin holders provided to build the Helbiz
platform and app and to obtain Helbiz-branded rental vehicles
and "converted them to their own use, including by taking the
payments made in fiat currency on the Helbiz platform." FAC ¶¶
757-59.

     The defendants first challenge the allegations themselves
arguing that the capital to build the platform was not provided
by the coin holders but by a loan from HBZ Systems for $1.3
million, which was less than the amount used to build the
platform. However, the fact that an alternative explanation
might exist does not render Plaintiffs' claims implausible.

     The defendants next challenge the legal sufficiency of the
allegations asserting that plaintiffs fail to adequately allege
any of the elements required by New York law. See In re Koreag,
Controle et Revision S.A., 961 F.2d 341, 352 (2d Cir. 1992)

("Under New York law, a party claiming entitlement to a constructive trust must ordinarily establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment.").

But "the constructive trust doctrine is equitable in nature and should not be 'rigidly limited.'" Id. "[A]ssets acquired by fraud are subject to a constructive trust for the benefit of the defrauded party." Chevron Corp. v. Donziger, 833 F.3d 74, 151 (2d Cir. 2016). The doctrine's "'applicability is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them." Simonds v. Simonds, 45 N.Y.2d 233, 241 (1978). Thus, New York courts have at times dispensed with one or more of these requirements. In re Koreag, Controle et Revision S.A., 961 F.2d at 353.

Accordingly, the FAC adequately alleges a claim for constructive trust—it alleges the coin holders relied on and were defrauded by defendants' misstates and that defendants reaped the resulting benefits. At this stage, equity requires denial of the named defendants' motion to dismiss the claim.

**6.   Quiet Title** (*Defendant Helbiz*)

Plaintiffs allege a claim for quiet title to the assets owned by Helbiz. FAC ¶ 764.

33

"To maintain an equitable quiet title claim, a plaintiff must allege actual or constructive possession of the property and the existence of a removable 'cloud' on the property, which is an apparent title, such as in a deed or other instrument, that is actually invalid or inoperative." Barberan v. Nationpoint, 706 F. Supp. 2d 408, 418 (S.D.N.Y. 2010).

The FAC alleges that "coin holders provided the capital to build the Helbiz platform and app and to obtain Helbiz-branded rental vehicles and to otherwise create the assets and goodwill of the company." FAC ¶ 763. This statement does not carry the weight plaintiffs throw behind it. It does not adequately allege that the plaintiffs have actual or constructive possession of the assets of Helbiz. Accordingly. Plaintiffs' claim for quiet title cannot be sustained.

### 7. Common Law Claims of Misrepresentation

#### a. Common Law Fraud (*All Defendants*)

The elements of common law fraud in New York are: "(1) a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant; (2) made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury." Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103, 108 (2d Cir. 2009). Claims for fraud have a heightened pleading standard that requires the

34

complaint to state with particularity the circumstances
constituting the fraud—the who, what, when, where, and why the
statements are fraudulent. Rombach v. Chang, 355 F.3d 164, 170
(2d Cir. 2004).

The FAC is replete with allegations of specific false
and/or misleading statements made by the Helbiz Defendants,
Pellegrino, and Al Darmaki as well as material omissions, all of
which they knew to be false or misleading. See, e.g., FAC ¶ 195
("[O]n February 2, 2018, HELBIZ boasted on its @HelbizOfficial
corporate twitter account '10,000 have joined our Telegram'
channel, omitting any mention of its payments for those signups
and creating a false or, at least materially misleading,
impression of the true market interest in HELBIZ"); FAC ¶¶ 292,
298, 304-305, 312, 316 (Palella promised in the whitepaper that
"users would need HelbizCoin for all transactions on the
ecosystem," even though he intended to accept other payment
methods because he was trying to "drive the value for coin
buyers who provided financing to HELBIZ through their
purchases); FAC ¶¶ 363-65, 388-71, 391-92 (On an April 26
YouTube live cast, Hannestad purported to show and discussed the
HelBiz platform but he was pointing to "fake screenshots from
the carsharing app" and his statements that "the app was almost
completed, with only some "fine tuning" left to go "over the
next couple of weeks before we move into beta testing" was a

35

"knowing lie."); FAC ¶¶ 376-84(At the April 26 YouTube live
cast, Pellegrino falsely claimed they would be integrating on
the exchanges that are going to offer HelbizCoin in the near
future in order to facilitate consumers to deposit and withdraw
through Skrill); FAC ¶ 387 (At the April 26 YouTube live cast Al
Darmaki "echoed the fact that the coin was about to start
trading," which was false); FAC ¶ 85 ("GIULIANO was 'President
[of] Blockchain Operations' for HELBIZ. He added his name to the
ICO website as a member of the team behind HelbizCoin, touting
his supposed experience in blockchain technology. GIULIANO made
these statements in order to engender trust among investors that
HELBIZ could perform the promises about HelbizCoin and to induce
purchases. . . GIULIANO also was an author of the whitepaper,
making materially false statements and omissions); FAC ¶ 82-
92("PROFUMO added his name to the whitepaper. PROFUMO stated
that he had eight years of experience in the blockchain space,
which is unlikely given that his experience would have had to
have started only two years after the Bitcoin whitepaper was
published, inaugurating blockchain as a technology, and his
LinkedIn profile lists no such experience. In addition, PROFUMO
participated in the pump and dump, making misleading public
statements about the prospects for HELBIZ and emphasizing its
work in the blockchain space when he knew that HELBIZ was
breaching the representations in the whitepaper and was about to

36

release HelbizGo, without any blockchain component, taking
credit cards instead of HelbizCoin and keeping all of the
money.").

The FAC also pleads that they relied on these statements
when they chose to invest in HelbizCoin. FAC ¶¶ 765-767. The
Helbiz Defendants', Pellegrino's, and Al Darmaki's Motions to
Dismiss the common law fraud claim are therefore denied.

The FAC's allegations against Di Iorio do not satisfy Rule
9(b)'s particularity requirements. The FAC alleges that Di Iorio
published false and misleading statements about the HelbizCoin
ICO in Bitcoin Magazine. FAC ¶ 105. But it offers no support to
show that Di Iorio was the one who made the statements. The only
support it proffers for the conclusion that he authored the
articles is that it "is unlikely that Bitcoin Magazine would
have published something so dishonest were it not for DIIORIO's
influence on his sister," the managing editor of the magazine.
FAC ¶¶ 100, 103. This is a speculative conclusion at best and
thus fails to adequately allege that Di Iorio made false or
misleading statements. Thus, not only does the FAC fail to state
a claim for common law fraud against Di Iorio, but it also fails
to state a claim against him for securities fraud in violation
of Section 10(b) of the Securities Exchange Act and related Rule
10b-5 and for RICO.

**b. Negligent Misrepresentation** (*Defendants Helbiz, Palella, Pellegrino, Hannestad, Profumo, Giuliano, and Al Darmaki*)

In addition to claiming the misrepresentations were intentional, plaintiffs allege in the alternative that the misrepresentations that induced them to invest in HelbizCoin were made negligently.

Claims for negligent misrepresentation in New York require a "special relationship" between the parties that requires defendants to provide correct information to plaintiff. Hydro Inv'rs, Inc. v. Trafalgar Power, Inc., 227 F.3d 8, 20 (2d Cir. 2000). A special relationship exists only if defendant "possess[es] unique or specialized expertise" or is "in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Greenberg, Trager & Herbst, LLP v. HSBC Bank USA, 17 N.Y.3d 565, 578 (2011).

The FAC makes no allegation that the parties were in the requisite special relationship. Nor can such a relationship be inferred off its face. There is no special relationship between ordinary buyers and sellers in arm's length relationships. Fallman v. Hotel Insider Ltd, No. 14-CV-10140, 2016 WL 316378, at *9 (S.D.N.Y. Jan. 15, 2016). Plaintiffs try to argue that they are not arm's length buyers from the general public and instead assert that they were solicited as cryptocurrency

enthusiasts. Even if this distinction made a difference, there
is no allegation in the FAC that the classification would apply
to all coin holders. Plaintiffs' claim for negligent
misrepresentation is therefore dismissed.

    **8.**   **Consumer Protection/ Unfair Practices** (*All Defendants*)

    To sustain a claim under NYS General Business Law § 349, a
plaintiff must adequately allege: (1) the challenged act or
practice was consumer-oriented;(2) the act or practice was
misleading in a material way; and (3) the plaintiff suffered
injury as a result of the deceptive act. Stutman v. Chemical
Bank, 95 N.Y.2d 24, 29 (2000). To prove that an act or practice
was consumer-oriented, the plaintiff "must demonstrate that the
acts or practices have a broader impact on consumers at large,"
such as by affecting a market for consumer goods. DeAngelis v.
Corzine, 17 F. Supp. 3d 270, 284 (S.D.N.Y. 2014).

    Defendants argue that § 349 is inapplicable because
HelbizCoin is, according to the allegations in the FAC, either a
security or a commodity, not a consumer good that has a broad
impact on consumers at large. The Court agrees.

    Section 349(a) prohibits "[d]eceptive acts or practices in
the conduct of any business, trade or commerce or in the
furnishing of any service in [New York] state." The purchase of
a security or a commodity is distinguishable from a purchase of

a service, even if the service can be viewed as an investment because its value might increase over time.

Although plaintiffs argue that HelbizCoin can wear all three hats—security, commodity, and consumer good—the coin purchasers paid funds to HelBiz as an investment, not as a purchase of traditional consumer goods. See, e.g., DeAngelis v. Corzine, 17 F. Supp. 3d 270, 284 (S.D.N.Y. 2014).

The Court thus declines to apply § 349 to these claims.

**9.   Negligent Supervision** (*Defendant Helbiz*)

Plaintiffs allege that Helbiz had a duty to supervise its employees Hannestad and Giuliano, which they breached resulting in Hannestad and Giuliano making false and misleading statements to the public. FAC ¶¶ 775, 778.

To state a claim, plaintiffs must allege that Helbiz "knew or should have known of the employee's propensity for the conduct which caused the injury" prior to the injury's occurrence. Kenneth R. v. Roman Catholic Diocese of Brooklyn, 654 N.Y.S.2d 791, 793 (2nd Dept. 1997). The FAC makes no allegation of that nature. The claim is accordingly dismissed.

**10.   Violations of the Securities Exchange Act of 1934 Sections 9, 10(b) and Rule 10b-5 Thereunder, and 20(a)**

The heightened pleading standard in Fed. Rule Civ. Pro. Rule 9 applies to these claims, and it, coupled with the PLSRA, requires that plaintiffs must plead with particularity not only

fraud, but that they must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2).

Plaintiffs assert a Section 9 price manipulation claim against Helbiz, Palella, and Pellegrino based on the use of spoofed transactions during the ICO. It further alleges that Di Iorio "used fraud and money laundering to make fake purchases and conceal the truth from the public." FAC ¶ 107.

The Court having already found that HelbizCoin is a security, Barron v. Helbiz Inc., No. 20 CIV. 4703, 2021 WL 229609, at *9 (S.D.N.Y. Jan. 22, 2021), plaintiffs need only allege: "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter, (3) for the purpose of inducing the security's sale or purchase by others, (4) was relied on by the plaintiff, (5) and affected plaintiff's purchase or selling price." Fezzani v. Bear, Stearns & Co, Inc., 384 F. Supp. 2d 618, 637 (S.D.N.Y. 2004).

The Helbiz defendants argue that plaintiffs trip over the first hurdle. The FAC does not allege sufficient factual material to draw the inference that the Helbiz Defendants owned, controlled, or had access to the digital wallets or smart

contracts that the plaintiffs allege engaged in the series of transactions that constituted manipulative trading.

As the people who announced that they were running the ICO, who repeatedly claimed to have raised the money in the ICO, and who stood to benefit from the proceeds of the ICO, the FAC alleges numerous reasons to infer that the Helbiz Defendants controlled the 0x8bc2 wallet that created the ICO contract. FAC ¶¶ 181-197. Whoever created the contract also controlled the flow of the Ethereum that was sent from it, which Ethereum was used to make the dummy purchases. FAC ¶¶ 177-178. Further, the FAC alleges that plaintiffs traced the private key to 0x8bc2 back to the Helbiz Defendants. FAC ¶¶ 441-443, 489-497, 610-621. Taken together, this is sufficient to pass the pleading stage.

Pellegrino argues that the FAC fails to adequately allege that he carried out a series of transactions to manipulate the price of HelbizCoin. Plaintiffs did not address his arguments but the Court's reading of the FAC concurs. The FAC merely alleges that Pellegrino received coins in March and April of 2018, FAC ¶¶ 260-63, sent those coins to someone in April and May 2018 FAC ¶¶ 401, 432, and five months later exchanged coins after the price had plummeted. FAC ¶ 433. The FAC does not provide any support for its assertions that Pellegrino sent those coins to a conduit. Therefore, plaintiffs have failed to state a Section 9 violation against him.

The FAC alleges that Di Iorio made a series of transactions in HelbizCoin to artificially increase their price when he traded Ethereum from his genesis wallets for them, only to have the Ethereum recycled back to him. FAC ¶ 240, 243, 251-258.

The issue with that allegation is that the FAC fails to show that Di Iorio is the owner of those genesis wallets. Plaintiffs speculate that Di Iorio is the likely owner of the wallets because, as an early investor in Ethereum, he received multiple genesis wallets, and he is the only original Ethereum investor known to have been involved in HelbizCoin. Rule(9) requires more than speculation to maintain a claim.

Accordingly, plaintiffs fail to state any claim that is dependent upon Di Iorio owning the genesis wallets, including claims for securities fraud and price manipulation in violation of Section 9 of the Securities Exchange Act and market and price manipulation in violation of the Commodities Exchange Act.

Plaintiffs next assert a claim under Section 10(b) and the corresponding Rule 10b-5, which require a showing that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff. In re Carter-Wallace, Inc. Sec. Litig., 150 F.3d 153, 155-56 (2d Cir. 1998).

Defendants primarily argue that dismissal is warranted because the FAC does not properly allege that any of the plaintiffs relied upon the defendants' deceptive acts. To survive a motion to dismiss their market-manipulation claim, "Plaintiffs must thus successfully allege that their losses were 'caused by reliance on an assumption of an efficient market free of manipulation.'" In re Barclays Liquidity Cross & High Frequency Trading Litig., 390 F. Supp. 3d 432, 447 (S.D.N.Y. 2019). The FAC makes such allegations. See FAC ¶ 794 ("The public market for HelbizCoin was sufficiently efficient to absorb, and reflect in its pricing/valuation, statements made about HelbizCoin by Defendants."); FAC ¶ 445-46 ("Singularly and together, the exchanges had a large customer base of active cryptocurrency traders that efficiently responded to and digested the false and misleading statements that Defendants published."). At this stage, therefore, the Court concludes that Plaintiffs are entitled to the presumption of reliance, but it is nothing more than that and maybe rebutted by appropriate evidence. Whether they can do so is a question for another day.

Plaintiffs have thus also stated a claim for control person liability under Section 20(a) against Palella. Palella's exclusive argument for dismissal is that Plaintiffs did not show the requisite primary violation of a securities law. The Court, having found otherwise, therefore denies their motion.

**11. Violations of the Commodities Exchange Act of 1934**

**Sections 9(a)(1), 13(a)(2), 25** (*All Defendants*)

Cryptocurrencies can be regulated as commodities, as they fall well within the CEA's definition of 'commodities' as 'all other goods and articles ... in which contracts for future delivery are presently or in the future dealt in.' Title 7 U.S.C. § 1(a)(9). The FAC adequately alleges that HelbizCoin is no exception, FAC ¶ 809, and there is no prohibition, at this stage, against defining it as a security and a commodity.

To sustain a private right of action, plaintiffs must adequately allege a violation of the CEA and show they have standing to sue because they have a statutorily recognized relationship with the defendant and suffered as a result of the manipulation "actual damages," which courts have understood to require a "net loss." In re Amaranth Nat. Gas Commodities Litig., 269 F.R.D. 366, 379 (S.D.N.Y. 2010).

Defendants challenge the sufficiency of the FAC's allegations of actual damages. However, the FAC specifies the amounts that each plaintiff lost. It further alleges that "Plaintiffs and members of the classes have suffered actual damages and injury in fact due to artificial prices to which they would not have been subject but for the unlawful conduct of the Defendants as alleged herein." FAC ¶ 813. As the FAC adequately alleges that plaintiffs transacted at artificial

prices, injury may be presumed at the pleading stage. See In re
Amaranth Nat. Gas Commodities Litig., 269 F.R.D. 366, 379
(S.D.N.Y. 2010) ("Moreover, case law suggests that because
plaintiffs transacted at artificial prices, injury may be
presumed.").

Turning to the merits, plaintiffs must allege in accordance
with Rule(9)'s heightened standards that: "(1) defendants
possessed an ability to influence market prices; (2) an
artificial price existed; (3) defendants caused the artificial
prices; and (4) defendants specifically intended to cause the
artificial price." In re Amaranth Nat. Gas Commodities Litig.,
730 F.3d 170, 173 (2d Cir. 2013).

The FAC adequately alleges that defendants caused the
artificial price of HelbizCoin in the same way that the
defendants manipulated the price of HelbizCoin as a security—
through spoof trading and fraudulent misrepresentations,
including the present existence and ability of the Helbiz
platform.

As the FAC alleges the elements required to state a cause
of action against defendants for market and price manipulation
under the CEA, the motions to dismiss the claim are denied.

As are Defendants' motions to dismiss the claim for Aiding
and Abetting Violations of the Commodities Exchange Act because

they predicated dismissal solely on the lack of an underlying
CEA claim, which the Court has, to the contrary, found exists.

### 12. Principal/ Agent Liability under the Commodities Exchange Act Section 2(a)(1) (*All Defendants*)

Defendants argue that the claim cannot be maintained
because a private right of action does not exist for Section
2(a)(1). However, courts in this district have allowed
plaintiffs to bring claims against defendants for principal-
agent liability for violations under section 2(a)(1). See
Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG, 277 F.
Supp. 3d 521, 570-72 (S.D.N.Y. 2017); In re Crude Oil Commodity
Futures Litig., 913 F. Supp. 2d 41, 61-62 (S.D.N.Y. 2012)
("Parnon's motion to dismiss Plaintiffs' CEA claims for lack of
standing is denied, as is Parnon's motion to dismiss Plaintiffs'
additional CEA claims for principal-agent liability.").

Nonetheless, the FAC fails to allege that Pellegrino, Al
Darmaki, or Di Iorio had a culpable agent upon which
principal/agent liability could be based. The claim as to them
is thus dismissed.

### 13. Racketeering Influenced and Corrupt Organizations Act ("RICO") - 18 U.S.C. § 1961 et seq. (*All Defendants*)

To state a claim for a violation of RICO, a plaintiff must
allege "(1) that the defendant (2) through the commission of two
or more acts (3) constituting a 'pattern' (4) of 'racketeering

activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." <u>Town of W.Hartford v. Operation Rescue</u>, 915 F.2d 92, 100 (2d Cir. 1990) (citing and quoting 18 U.S.C. § 1962(a)-(c)). The heightened pleading requirements of Rule(9) "apply with particular force to civil RICO claims." <u>Behrens v. JPMorgan Chase Bank N.A.</u>, 2019 WL 1437019, at *4 (S.D.N.Y. Mar. 31, 2019).

The FAC lays out in great detail dozens of alleged wire frauds committed by the Helbiz Defendants, such as false statements distributed over the internet, use of Ethereum for money laundering and fraudulent HelbizCoin transactions, and use of the internet to disseminate the ICO website and make pump-and-dump transactions. FAC ¶¶ 639-649. The FAC also contains numerous factual allegations showing travel in interstate and foreign commerce. FAC ¶¶ 650-656. While "aiding and abetting securities fraud . . . is not racketeering activity under RICO," <u>Gottdiener v. Sater</u>, 35 F. Supp. 3d 386, 395 (S.D.N.Y. 2014), the FAC's allegations are sprawling and also dive into wrongdoings defendants are charged to have directly committed.

Further, a separate injury must be alleged if plaintiffs claim defendants invested the "racketeering proceeds back into the same RICO enterprise" because otherwise "the injuries stem

48

proximately not from the investment, but from the predicate acts that make up the racketeering activity." <u>Falise v. American Tobacco Co.</u>, 94 F. Supp. 2d 316, 349 (E.D.N.Y. 2000). Here, the FAC does allege a separate and distinct injury beyond plaintiffs being defrauded of their money. <u>See</u> FAC ¶¶ 21-23, 577-584. Plaintiffs have thus stated a claim of RICO violation.

**14.  Unjust Enrichment** *(All Defendants)*

"[A] plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party," such that they are not "too attenuated." <u>Georgia Malone & Co. v. Rieder</u>, 19 N.Y.3d 511, 516 (2012). This does not mean that the parties need to have a direct relationship. <u>Myun-Uk Choi v. Tower Rsch. Cap. LLC</u>, 890 F.3d 60, 69 (2d Cir. 2018). Rather, it means that at a minimum there is at "least an awareness by [the defendant] of [the plaintiff's] existence." <u>Mandarin Trading Ltd. v. Wildenstein</u>, 16 N.Y.3d 173, 182 (2011).

Plaintiffs' allegations establish a connection sufficient at this stage for a claim for unjust enrichment against Helbiz and Pallela, but not as to any of the other defendants. FAC ¶ 58 ("One such class member bought HelbizCoin after PALELLA personally solicited members of her family to buy HelbizCoin. . . Later, after announcing the end of the ICO, PALELLA again personally solicited her family members to purchase more HelbizCoin from him directly saying that it would soon be listed

on exchanges so they could sell it at a profit."). The FAC makes no allegations that any other defendant has a direct or indirect dealing with plaintiffs. See <u>Myun-Uk Choi</u>, 890 F.3d at 70 (maintaining unjust enrichment claim when "Plaintiffs alleged it to be a near statistical certainty that they directly traded with Defendants on the KRX night market during the relevant period").

**15.  Respondeat Superior** (*Defendants Helbiz and Skrill*)

The Helbiz Defendants argue that *respondeat superior* should be dismissed because the FAC does not adequately allege that the false statements and other tortious conduct that induced plaintiffs to purchase HelbizCoin did not occur within the scope of their employment. See <u>K.I. v. New York City Bd. of Educ.</u>, 256 A.D.2d 189, 191 (1st Dep't 1998) (noting that respondeat superior liability will not be found where tortious conduct was outside scope of volunteer's duties).

To the contrary, the FAC supports the inference that the statements made in the Whitepaper, on the ICO and HelbizCoin websites, and during the YouTube live cast were within the scope of defendants' employment, which is sufficient to maintain the claim for *respondeat superior* against Helbiz.

Skrill argues that anything Pellegrino did was in the scope of his individual capacity as an advisor for Helbiz, work for

which Helbiz compensated him, and thus was outside of the scope
of his employment with Skrill.

Although the Court is doubtful that the allegedly tortious
activity Pellegrino is claimed to have committed was done so in
furtherance of Skrill's interest instead of for his personal
motives, at the pleading stage it is plausible that Pellegrino
was acting within the scope of this employment. The allegations
in the FAC that Pellegrino is the CEO of Skrill and was speaking
on matters usually within the wheelhouse of a CEO when he made
the allegedly false statements are, matters which would increase
business for Skrill, are sufficient to state a claim of
*respondeat superior* against Skrill.

## IV.    Conclusion

Defendants' Helbiz, Palella, Hannestad, Profumo, and
Guiliano's Motion to Dismiss the First Amended Class Action
Complaint (Dkt. No. 163) is granted, in part, as to Claims 1-2,
4, 6, 8, 9, 17, and 18, but only to Hannestad, Profumo and
Guiliano.  Their Motion for Judicial Notice (Dkt. No. 164) is
denied.

Defendant Pellegrino's Motion to Dismiss (Dkt. No. 170) is
granted, in part, as to claims 1-4, 8-9, 10, 14, 17, and 18.

Defendant Al Darmaki's Motion to Dismiss (Dkt. No. 233) is
granted, in part, as to Claims 1, 4, 8, 14, 17, and 18.

Defendant Alphabit's Motion to Dismiss (Dkt. No. 189) is granted in full, as is Defendants Paysafe's and Skrills' Motion (Dkt. No. 155), except as to Claim 19 against Skrill.

Defendants Di Iorio's and Decentral's Motion to Dismiss is granted in full as to Decentral and in part as to Claims 2, 4, 6, 8, 10, 11, 13, 14, 17 and 18 against Di Iorio.

All the aforementioned are dismissed with prejudice and without leave to amend as amendment would be futile.

Thus, the Claims that remain viable are:
- Count III - Trespass and Conversion of Chattels against Helbiz, Palella, Hannestad, and Profumo;
- Count V - Constructive Trust against Helbiz, Palella, Hannestad, and Profumo;
- Count VII - Common Law Fraud against Helbiz, Palella, Hannestad, Profumo, Giuliano, Pellegrino, and Al Darmaki;
- Count X - Securities Fraud and Price Manipulation in Violation of Section 9 of the Securities Exchange Act of1934 against Helbiz and Palella;
- Count XI - Securities Fraud in Violation of Section 10(b) and Rule 10b-5 thereunder against Helbiz, Palella, Hannestad, Profumo, Giuliano, Pellegrino, and Al Darmaki;
- Count XII – Violation of Securities Exchange Act Section 20 against Palella;
- Count XIII – Violations of the Commodities Exchange Act of 1934 Sections 9(a)(1), 13(a)(2), 25 against Helbiz, Palella, Hannestad, Profumo, Giuliano, Pellegrino, and Al Darmaki;
- Count XIV – Principal/Agent Liability Commodites Exchange Act against Helbiz, Palella, Hannestad, Profumo, Giuliano;
- Count XV – Aiding and Abetting Commodities Exchange Act against Helbiz, Palella, Hannestad, Profumo, Giuliano, Pellegrino, Al Darmaki, and Di Iorio;
- Count XVI - RICO against Helbiz, Palella, Hannestad, Profumo, Giuliano, Pellegrino, and Al Darmaki;

- Count XVIII – Unjust Enrichment against Helbiz and Pallela;
- Count XIX – Respondeat Superior against Helbiz and Skrill.

So Ordered.

Dated: New York, New York
      August 31, 2023

LOUIS L. STANTON
U.S.D.J.