UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RYAN BARRON, ANDREW SZKLAREK, GRANT ECHOLS and DANIEL GRIEVES, on behalf of themselves and others similarly situated,

Plaintiffs,

20-cv-4703 (PKC)

-against-

OPINION AND ORDER

micromobility.com Inc., SALVATORE PALELLA, SKRILL USA INC., LORENZO PELLEGRINO, JONATHAN HANNESTAD, GIULIO PROFUMO, JUSTIN GUILIANO and BINARY FINANCIAL,

Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

The four plaintiffs assert that they were victims of a pump-and-dump scheme that defendants employed to profit from a now-defunct crypto token called the Helbiz Coin. They bring claims of securities fraud under sections 9, 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78i, 78j(b), and Rule 10b-5 promulgated thereunder; the Commodities Exchange Act, 7 U.S.C. §§ 9(a)(1), 13(a)(2); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO"); and breach of contract and other common law claims.

Plaintiffs move for class certification pursuant to Rule 23, Fed. R. Civ. P., seeking to certify a class solely as to their RICO claim. The motion will be denied because plaintiffs have not satisfied the predominance and superiority requirements of Rule 23(b)(3). Plaintiffs' motion ignores RICO's domestic-injury requirement and does not explain how generalized proof can show domestic injury to class members, many of whom purchased on foreign exchanges and

held the coin in wallets located in foreign countries. See generally RJR Nabisco v. European Community, 579 U.S. 325 (2016). Separately, plaintiffs' proposed method for proving causation and damages under RICO is inextricably intertwined with theories of securities fraud, even though the RICO statute providing a private right of action bars RICO claims that sound in securities fraud. 18 U.S.C. § 1964(c). Lastly, plaintiffs' expert on causation and damages anchors his analysis to legal conclusions and speculative opinions that have no grounding in reliable principles or methods. See Rule 702, Fed. R. Evid.

The motion for class certification will be denied.

BACKGROUND.

A. Overview of the Helbiz Coin.

Plaintiffs' RICO claim relates to an initial coin offering ("ICO") that was marketed as a way to raise revenue for a vehicle-sharing business called Helbiz Inc. ("Helbiz").[1] The Helbiz Coin was promoted as the exclusive way for customers to rent vehicles through an anticipated Helbiz vehicle-sharing platform. (ECF 75-1 at 3.)

According to plaintiffs, Helbiz sought to escape the scrutiny of United States regulators, and specifically the SEC, by misrepresenting that the Helbiz Coin was issued by a Singapore company called Helbiz Mobility System Pte. Ltd. ("HMSP"), a purportedly sham entity that defendants formed to deceive the SEC about the coin's status as a security issued in the United States. (ECF 399-6 at 145 (Singapore filing by HMSP); ECF 399-9 (Helbiz letter to SEC).) Plaintiffs assert that in reality, the ICO was orchestrated and run by Helbiz and its officers out of New York City. (See, e.g., ECF 399-11, -13, -14.) Those Helbiz officers include

[1] Helbiz was later renamed micromobility.com, Inc., and is identified by that name in the case caption.

defendants CEO Salvatore Palella, CFO Giulio Profumo, COO Jonathan Hannestad, and President of Blockchain Operations Justin Giuliano.

The ICO and an ICO pre-sale took place from January to March 2018. Like many initial coin offerings, the ICO was held on the Ethereum Network, using a self-executing code called a "smart contract." (Powers Rep. at 11 (ECF 409-2).) Participants in the ICO bought coins with Ether cryptocurrency held in their cryptocurrency wallets. (Powers Rep. at 25.) Helbiz Coins were then credited to the purchasers' wallets. (Powers Rep. at 25.) ICO participants received 6,000 Helbiz Coins for one Ether, and new coins were "minted" at the time of purchase. (Powers Rep. at 25.) Because coins were purchased using Ether and not fiat currency, like the dollar or the euro, the purchases were not made through traditional financial institutions, and the purchasers' location is not discernable from the coin wallet's address. (Powers Rep. at 22.)

The amount raised in the ICO is in dispute. Defendants assert that it raised $1.56 million, but plaintiffs argue that it raised between $38 million and $50 million. (See, e.g., ECF 358-1 at 4; Powers Rep. at 27.) Defendants assert that during the ICO and the ICO presale, approximately 11.6 million Helbiz Coins were purchased by 2,338 coin wallets. (Powers Rep. at 27.) Defendants also assert that approximately 43% of the total value of the ICO and ICO Presale was purchased by a single individual, Saeed Al-Darmaki, who bought 4.65 million Helbiz Coins.[2] (Powers Rep. at 30.)

In contrast to the 11.6 million Helbiz Coins purchased in the ICO, approximately 960.7 million Helbiz Coins were minted and credited to an address controlled by Helbiz. (Powers Rep. at 9, 32.)

[2] Al-Darmaki is a former defendant in this case, and all claims against him have been voluntarily dismissed. (ECF 376.)

A large number of Helbiz Coins were distributed for free as part of a promotional "airdrop." Defendants have asserted that approximately 76% of all Helbiz Coin holders received the coin for free through these airdrops. (Powers Rep. at 10.) Approximately 27.7 million Helbiz Coins were transferred in these promotional airdrops (i.e., more than twice the number purchased in the ICO), though some of the airdrop coins went to ICO purchasers as a form of bonus. (Powers Rep. at 34.) There is no dispute that holders who received coins only through airdrops are not members of the proposed class.

One of plaintiff's experts includes an "Exchange Addendum" indicating that the Helbiz Coin traded on at least seventeen cryptocurrency exchanges, four of which are based in the United States and thirteen of which are based in foreign countries. (See Groshong Report at 30-62 (ECF 399-7).) Plaintiffs point to evidence that the individual defendants, and not the Singapore-based HMSP, arranged for the coin's listings on these exchanges. (ECF 399-1, -5.) Plaintiffs assert that in the process of obtaining exchange listings, defendants committed acts of wire fraud by falsely stating to the exchanges that Singapore law exempted the Helbiz Coin from SEC registration requirements. (ECF 399-16.) More than 205 million Helbiz coins are still held by four foreign cryptocurrencies exchanges, and it is unclear whether those holdings belong to individual holders or are part of the exchanges' internal supply. (Powers Rep. 43-44.)

Helbiz never launched the vehicle-sharing platform it promoted in connection with the ICO, and instead created a more conventional app for the renting of motor scooters, one that accepted credit-card payments and did not require use of the Helbiz Coin. (ECF 399-16.) Plaintiffs assert that the platform undermined Helbiz Coin purchasers, who acquired coins with the understanding that they would be the sole way to pay for vehicle rentals and that rental revenues would benefit the coin holders. (ECF 399-17.)

According to plaintiffs, Helbiz's app for renting scooters thrived, but as the Helbiz Coin became "basically worthless," it presented a liability to defendants and raised questions from outside auditors. (ECF 399-6.) Plaintiffs assert that defendants falsely told Helbiz auditors that HMSP sold the coin, and then deleted evidence showing their own association with the coin. (ECF 399-6.)

In May 2020, the website HBZCoin.com announced that the coin would be delisted from exchanges and the smart contract for the coin would be destroyed. (ECF 13-1.) The message purported to be authorized by Quantum Analysis, which claimed that it bought HMSP. (Id.) Plaintiffs assert that in truth, the Quantum Analysis website was registered to defendant Palella and Quantum Analysis was owned by a Helbiz shareholder.

Defendant Hannestad asserts in a declaration that many coin holders participated in an "exit swap" in which coins purchased in the ICO were redeemed for 100% of the original consideration and that coins purchased in the secondary market on coin exchanges were redeemed at 200% of the then-prevailing market price. (Hannestad Dec. ¶¶ 24-25 (ECF 409-5).) Hannestad states that as a consequence of the swap, coin holders received approximately $1,562,823.97 in payments. (Hannestad Dec. ¶ 24.)

B. Defendants' Purported Racketeering Activity.

As noted, plaintiffs seek class certification solely as to their RICO claim. Plaintiffs identify three categories of RICO predicate acts. First, they assert that defendants committed "acts of obstruction" against the SEC by forming HMSP to conceal the Helbiz Coin's connection to the United States when they claimed that they did not have relevant materials in response to the SEC's voluntary request for information and submitted fabricated documents to the SEC. 18 U.S.C. § 1512(c). Second, they assert that defendants committed acts of wire fraud

by transmitting false statements to the SEC and cryptocurrency exchanges. 18 U.S.C. § 1343. Third, they assert that defendants engaged in money laundering by using the proceeds of Helbiz Coin sales to pay listing fees required by cryptocurrency exchanges. 18 U.S.C. §§ 1956, 1957.

Plaintiffs assert that defendants misrepresented to the SEC that HMSP issued and sold the Helbiz Coin out of Singapore, when, in truth, Helbiz and its officer defendants ran the ICO out of New York City. Plaintiffs describe HMSP as a "sham foreign entity" and a "front" that concealed the coin's United States origins. (Pl. Mem. at 4-6.) They point to evidence that United States-based defendants Pallela, Hannestad, Giuliano and Profumo were responsible for the ICO website, the white paper describing the coin, and direct communications with ICO purchasers. (Pl. Mem. 5-6, ECF 399-11, -12, -13.)

On July 25, 2018, the SEC wrote to Pallela, stating that it was investigating whether an unregistered coin offering violated the federal securities laws and directing Helbiz to voluntarily produce certain information and documents. (ECF 374-2.) The request included information about defendants' digital wallets, financial accounts, marketing information, and communications with cryptocurrency exchanges (Id.) Through counsel, Helbiz responded on August 15, 2018, stating that Helbiz Coin was issued by HMSP, a Singapore company distinct from Helbiz, and that the ICO complied with Singapore law and was not an offering of securities. (ECF 399-9.) It stated that the ICO "was not open to U.S. investors." (Id.) Helbiz's response attached an opinion letter authored by a Singapore attorney. (Id.)

The SEC sent Helbiz a second voluntary request for documents dated October 3, 2018.[3] In the opening paragraph of its response, Helbiz stated that no United States investors were permitted to buy the Helbiz Coin in the ICO and that United States purchasers were barred

[3] Although it is referenced in plaintiffs' submissions, the Court has been unable to locate a copy of this letter-request on the docket.

from buying the coin on cryptocurrency exchanges. (ECF 399-19.) Helbiz stated that several categories of responsive documents were controlled by HMSP in Singapore and not possessed by Helbiz. (ECF 399-19.) These included documents showing the Helbiz Coin ownership structure, documents identifying investors in the ICO, and documents related to any listing agreements on cryptocurrency exchanges. (Id.) Helbiz again maintained that "no U.S. investors can purchase HBZ tokens" and asserted that "all" exchanges where the coin traded "are located outside of the United States . . . ." (Id.)

Plaintiffs point to an "ICO workshop" that defendants held at a Cipriani location in Lower Manhattan, evidence that an ICO website included options for purchasers to identify themselves as "American," and bank records indicating that United States residents made coin purchases. This, according to plaintiffs, is evidence of the falsity of statements made to the SEC that U.S. investors could not purchase the coin. Plaintiffs also assert that defendants submitted fabricated documents to the SEC. Those documents include a slide deck purportedly created by HMPS was actually made by Palella and Hannestad, and that the slide deck sent to the SEC included doctored language barring United States residents from participating in the ICO that was not included in the original slide. (ECF 399-22.) Defendants purportedly misrepresented that a company called Cynopsis performed "know-your-customer" services in order to exclude United States ICO purchasers, and sent the SEC a purportedly fabricated letter from the HMSP CEO to Cynopsis stating that United States purchasers were restricted from participating in the ICO; metadata suggests that the letter was created a week before being sent to the SEC and that the signature was created with a font meant to mimic handwriting. (ECF 399-9, -24, -23.) Defendants also purportedly sent the SEC a spreadsheet with fake information about ICO

purchasers, which attributed Ukraine and Mexico residency to United States purchasers. (ECF 399-12, -21, -27.)

Plaintiffs' theory of RICO causation and damages turns on these purported misrepresentations to the SEC and a hypothetical scenario about an enforcement action that plaintiffs argue would have been brought had defendants truthfully responded to its inquiries. The Expert Report of John B. Bulgozdy, a former Senior Trial Counsel in the Los Angeles Regional Office of the SEC, opines that the SEC likely would have brought an enforcement action against defendants if Helbiz had responded truthfully to the voluntary requests for information. (See ECF 399-3.) Bulgozdy concludes that the SEC likely would have obtained a disgorgement remedy against defendants and then exercised its discretion to create a statutory Fair Fund that would have reimbursed coin purchasers, including all proposed class members. (See id.)

Plaintiffs separately assert that defendants made false statements over wires to cryptocurrency exchanges in order to obtain listings for the Helbiz Coin by misrepresenting the coin as exempt from United States securities laws by virtue of Singapore law. (ECF 399-16.) They assert that defendants engaged in money laundering by using coin proceeds to pay the exchanges' listing fees. (Pl. Mem. at 24.)

Plaintiffs also assert that defendants personally pocketed the ICO proceeds, pointing to evidence that coin-sale revenue was wired to Helbiz's own account at Signature Bank and that defendant Palella transferred Ether from the ICO coin wallet to his personal Coinbase account, then converted Ether into dollars and transferred proceeds to his Citibank account. (Pl. Mem. at 6-7.)

C. The Proposed Class Definition and Plaintiffs' Coin Purchases.

Plaintiffs move to "[c]ertify a Class of purchasers of Helbiz Coin from January 1, 2018 to January 1, 2023" and "seek certification of claims pursuant 18 U.S.C. 1961 et seq. (RICO) against Defendant micromobility.com Inc. (referred to in the accompanying brief by its name at the time of the events in question: 'Helbiz Inc.') and the individual defendants. Plaintiffs also seek certification of their *respondeat superior* claim against Defendant Skrill USA Inc." (ECF 397.)

Each plaintiff has filed a declaration describing the circumstances of his acquisition of the Helbiz Coin.

Ryan Barron states that he is a United States citizen residing in Texas, and that he bought approximately 5,000,000 Helbiz Coins on cryptocurrency exchanges in 2018 and 2019. (Barron Dec. ¶¶ 2-3 (ECF 399-28).) Certain of his purchases were made on behalf of friends, and he currently holds more than 3,000,000 coins. (Barron Dec. ¶ 3.) Barron bought the coins on exchanges based in Lithuania, the United Kingdom and St. Vincent and the Grenadines. (Barron Dec. ¶ 3; Groshong Report at 30-62 (ECF 399-7).)

Grant Echols is a United States citizen who resided in Florida at the time he bought 22,570 Helbiz Coins in the ICO pre-sale. (Echols Dec. ¶¶ 2-4 (ECF 399-29).) He states that he was able to access the ICO while physically present in the United States and that he disclosed his United States citizenship and residency during the purchase. (Echols Dec. ¶¶ 5-6.)

Andrew Szklarek is a citizen of the United Kingdom who bought approximately 59,490 Helbiz Coins in the ICO and ICO pre-sale while located in the United Kingdom. (Szklarek Dec. ¶¶ 2-4 (ECF 399-30).) He later bought more than 22 million coins on

cryptocurrency exchanges based in Panama and the United Kingdom between March and December 2018. (Szklarek ¶ 9.)

Daniel Grieves is a United States citizen who resided in Ohio at the time that he bought 249,718.76 Helbiz Coins on the Panama-based Idex exchange. (Grieves Dec. ¶¶ 2-5 (ECF 399-31).)

RULE 23 STANDARD.

A party moving for class certification must prove the elements of numerosity, commonality, typicality and adequacy under Rule 23(a), as well as one of the three requirements of Rule 23(b). See generally Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011).

"[A] party seeking to maintain a class action must affirmatively demonstrate his compliance with Rule 23." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quotation marks omitted). "To certify a class, a district court must find that each Rule 23 requirement is established by at least a preponderance of the evidence." In re Petrobras Sec., 862 F.3d 250, 260 (2d Cir. 2017) (quotation marks and citations omitted). "[P]laintiffs wishing to proceed through a class action must actually prove – not simply plead – that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258 (2014). The analysis must be "rigorous," and may "overlap with the merits of the plaintiff's underlying claim." Comcast, 569 U.S. at 33-34. "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013).

"Not only must each of the requirements set forth in Rule 23(a) be met, but certification of the class must also be deemed appropriate under one of the three subdivisions of

Rule 23(b)." Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010). Plaintiffs seek to certify a class under Rule 23(b)(3), which requires the Court to "take a close look at whether common questions predominate over individual ones." Comcast, 569 U.S. at 34 (quotation marks omitted).

DISCUSSION.

I. Defendants' Arguments Challenging Article III Standing Are Misplaced.

In opposition to this motion for class certification, defendants raise various arguments under the heading of Article III standing. The arguments do not implicate Article III standing because they do not involve "the constitutional limitation of federal-court jurisdiction to actual cases or controversies," Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016), and instead go toward issues of class definition, claims administration and the ultimate merits of plaintiffs' claims. None of the arguments support the denial of plaintiffs' motion.

Article III standing is a constitutional requirement that "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Id. at 338. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. "The filing of suit as a class action does not relax this jurisdictional requirement." Denney v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006). While courts "do not require that each member of a class submit evidence of personal standing . . . no class may be certified that contains members lacking Article III standing." Id. at 263, 264.

Defendants argue that the proposed class would consist "almost entirely" of class members who did not suffer an injury in fact. (See Def. Mem. at 8-10.) Plaintiffs' proposed class definition consists of "purchasers of Helbiz Coin from January 1, 2018 to January 1,

2023 . . . ." (ECF 397; emphasis added.) Defendants' expert, John Powers, asserts that approximately 28,200,000 Helbiz Coins were distributed through airdrops without any consideration from their recipients. (Powers Rep. at 34.) Powers estimates that approximately 76% of current Helbiz Coin holders received their coins entirely through airdrops. (Powers Rep. at 35.)

The class definition is limited to "purchasers" and does not encompass coin holders at large, including holders who received coins for free via promotional airdrops. Plaintiffs acknowledge that such coin holders are excluded from the class. (Pl. Reply at 2 ("To the extent anyone did receive HBZ without paying any consideration, they are not a 'purchaser' and therefore not be [sic] a member of the class.").) Defendants' argument challenging the Article III standing of the proposed class is meritless.

Defendants separately assert that many coin holders participated in an "exit swap" in which coins purchased in the ICO were redeemed for 100% of the original consideration and that coins purchased in the secondary market on coin exchanges were redeemed at 200% of the then-prevailing market price. (Hannestad Dec. ¶¶ 24-25.) Relevant facts are set forth in the declaration of defendant Jonathan Hannestad, Helbiz's former Chief Operating Officer, who provides reasonably detailed summaries of the exit swap. For example, Hannestad states: "Of the 1,804.45 ETH raised during the ICO—across 2,333 contributing wallets and worth approximately $1,562,823.97 at the time— a fact verifiable on the public blockchain (Etherscan link)—Quantum entered into settlement agreements with 1,771 wallets, repurchasing 955 ETH." (Hannestad Dec. ¶ 24.) Hannestad asserts that between airdrop recipients and participants in the exit swaps, more than 85% of Helbiz Coin holders either received the coins in a free promotion or redeemed their holdings. (Hannestad Dec. ¶ 26.)

Hannestad does not cite or annex any documents to support his figures. Powers, the defendants' expert, states in his report that he received no information about the number of participants in the exit swap. (Powers Rep. at 31 ("I have not received or reviewed any information regarding the number of participants in the exit swap and buyback efforts . . . . The total number of tokens acquired and retired under the exit swap and buyback program is unknown to me.").)

Assuming the accuracy of Hannestad's figures, they do not implicate Article III standing. An appropriate plan of distribution would require any putative class member to submit a proof of claim documenting the purchase of the Helbiz Coin and resulting injury. Rule 23(e)(2)(c)(ii). The eligibility for class participation of a purchaser whose purchase has been refunded without interest need not be adjudicated at this juncture. The potential that an ineligible coin purchaser may submit a proof of claim is more properly handled in the claims administration process.

Lastly, defendants Skrill USA Inc. and Lorenzo Pellegrino argue that plaintiffs do not have Article III standing to pursue a RICO claim against them, asserting that there is no evidence showing their involvement in the RICO scheme. (See ECF 408.) While a standing argument may involve merits issues, neither defendants' standing arguments nor the requirements of Rule 23 are proper vehicles for an early adjudication of summary judgment in a defendant's favor.

Defendants' arguments directed to Article III standing are without merit.

II. Plaintiffs Satisfy Rule 23(a).

A. Plaintiffs Have Demonstrated Numerosity.

Rule 23(a)(1) requires the class representatives to demonstrate that "the class is so numerous that joinder of all members is impracticable . . . ." In this Circuit, "numerosity is presumed at a level of 40 members . . . ." Consolidated Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

Plaintiffs have demonstrated that it is more likely than not that the proposed class satisfies numerosity. Accepting the truth of the declaration of defendant Hannestad, the Helbiz Coin continues to be held in 3,192 coin wallets. (Hannestad Dec. ¶ 26.) Even if some individuals own more than one wallet, the class would still consist of hundreds or thousands of members.

Plaintiffs have satisfied the numerosity requirement.

B. Plaintiffs Have Demonstrated Commonality.

Rule 23(a)(2) requires the class representatives to demonstrate that "there are questions of law or fact common to the class . . . ." "[F]or purposes of Rule 23(a)(2), even a single common question will do . . . ." Wal-Mart, 564 U.S. at 359 (quotation marks and brackets omitted); accord Elisa W. v. City of New York, 82 F.4th 115, 127 (2d Cir. 2023).

In opposition, defendants raise arguments that are more properly considered under the predominance requirement of Rule 23(b)(3), specifically as to RICO's domestic-injury requirement and statutory prohibition against a private plaintiff asserting a securities fraud claim pursuant to RICO. The Court will address these arguments below. For the purpose of Rule 23(a)(2), questions common to the class include whether defendants engaged in a RICO enterprise by transmitting false statements over wires, as well as whether defendants

misappropriated ICO proceeds for their personal use. The Court concludes that plaintiffs have demonstrated the existence of common questions of law and fact.

C. Plaintiffs Have Demonstrated Typicality.

Rule 23(a)(3) requires the movant to demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class . . . ." "Typicality . . . 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)).

Plaintiffs' claims are typical of the proposed class. As with the commonality requirement, defendants' arguments in opposition are more properly considered as part of a Rule 23(b)(3) analysis. On typicality, plaintiffs would endeavor to prove that defendants formed a RICO enterprise and engaged in a pattern of racketeering activity that included transmitting by wire false statements to the SEC about Helbiz Coin's sponsor. The four named plaintiffs include both ICO purchasers and buyers from cryptocurrency exchanges. This is sufficient to satisfy the typicality requirement.

D. Plaintiffs Have Demonstrated Adequacy.

"Under Rule 23(a)(4), '[a]dequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.'" In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 827 F.3d 223, 231 (2d Cir. 2016) (quoting Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006)).

There is no suggestion that the four plaintiffs have interests antagonistic to class members. Each class member states that he understands his duties to act on behalf of the class, and asserts that he has followed this litigation and produced documents responsive to defendants' discovery requests. (Barron Dec. ¶¶ 5-6; Echols Dec. ¶¶ 10-11; Szklarek Dec. ¶¶ 11-12; Grieves Dec. ¶¶ 6-7.) The Court concludes that plaintiffs have adequately represented the interests of the class and would likely continue to do so.

III. Plaintiffs Do Not Satisfy Rule 23(b)(3).

A. Overview of Rule 23(b)(3) and the RICO Statute.

Rule 23(b)(3) provides that a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3), Fed. R. Civ. P.

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015) (quotation marks omitted). "Rule 23(b)(3)'s predominance requirement is 'more demanding than Rule 23(a).'" Johnson v. Nextel Commc'ns Inc., 780 F.3d 128, 138 (2d Cir. 2015) (quoting Comcast, 569 U.S. at 34). "In determining whether a plaintiff has sufficiently established that the requirements of Rule 23(b)(3) have been satisfied, courts must conduct 'a rigorous analysis.' 'Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim' and may even require courts 'to probe behind the pleadings.'" City of Philadelphia v. Banc of Am. Sec. LLC, 2025 WL 2180607, at *2 (2d Cir. Aug. 1, 2025)

(summary order) (internal citation omitted; quoting Comcast, 569 U.S. at 33, 33-34). "In making this determination, the district judge is to assess all of the relevant evidence admitted at the class certification stage and resolve material factual disputes." Jacob v. Duane Reade, Inc., 602 Fed. App'x 3, 7 (2d Cir. 2015) (summary order) (quotation marks omitted).

Plaintiffs move to certify a class to pursue claims under three subsections of RICO: 18 U.S.C. §§ 1962(a), (c) and (d). (See Pl. Mem. at 21-23.) "In order to recover damages under RICO . . . a plaintiff must show (1) a substantive RICO violation under § 1962; (2) injury to the plaintiff's business or property, and (3) that such injury was by reason of the substantive RICO violation." UFCW Loc. 1776 v. Eli Lilly & Co., 620 F.3d 121, 131 (2d Cir. 2010) (quotation marks omitted). "To show injury by reason of a RICO violation, a plaintiff must demonstrate that the violation caused his injury in two senses. First, he must show that the RICO violation was the proximate cause of his injury, meaning there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct. Second, he must show that the RICO violation was the but-for (or transactional) cause of his injury, meaning that but for the RICO violation, he would not have been injured." Id. at 132 (quotation marks and internal citation omitted). On a motion for class certification, the movant must come forward with evidence showing that causation can be shown through generalized proof. See id. at 131-36 (reversing class certification order because plaintiffs failed to offer generalized proof of causation).

A private plaintiff bringing a RICO claim must "prove a domestic injury to its business or property." RJR Nabisco v. European Community, 579 U.S. 325, 346 (2016) (emphasis in original). Also, as provided in the statutory text, "any fraudulent conduct in connection with the purchase or sale of any security may not be the subject of a RICO claim."

Chelder v. General Conference Corp., 2026 WL 696903, at *4 (S.D.N.Y. Mar. 12, 2026) (Abrams, J.) (citing 18 U.S.C. § 1964(c)).

B. Individualized Proof of Class Members' Domestic Injury Would Overwhelm Questions Common to the Class.

Plaintiffs have not explained how generalized proof can show that the proposed class members suffered a domestic injury under RICO. As noted, plaintiffs seek to certify a class consisting of "purchasers of Helbiz Coin from January 1, 2018 to January 1, 2023." (ECF 397.)

But plaintiffs' submissions in support of this motion demonstrate that a large portion of the class purchased and held the Helbiz Coin outside of the United States. The analysis of class members' injuries and the task of differentiating domestic injury from foreign injury would overwhelm questions common to the class and defeat the predominance and superiority requirements of Rule 23(b)(3).

The Supreme Court has held that "[s]ection 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries." RJR, 579 U.S. at 354. "Allowing recovery for foreign injuries in a civil RICO action" risks "international friction" and "controversy" caused by "foreign citizens seeking to bypass their home countries' less generous remedies . . . ." Id. at 348-49. Further, "[n]othing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." Id. at 349.

"[I]n assessing whether there is a domestic injury, courts should engage in a case-specific analysis that looks to the circumstances surrounding the injury. If those circumstances sufficiently ground the injury in the United States, such that it is clear the injury arose domestically, then the plaintiff has alleged a domestic injury." Yegiazaryan v. Smagin, 599 U.S. 533, 545 (2023). Yegiazaryan held that a plaintiff demonstrated a domestic RICO injury caused

by a Russian defendant who used Nevada shell companies and sham foreign judgments to frustrate the collection of a California judgment owed to a California resident. Id. at 537-39, 545-46. It explained that the identification of a domestic injury is not determined by a bright-line rule but instead requires "a case-specific analysis that looks to the circumstances surrounding the injury." Id. at 545. A court must "look[ ] to the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects of that activity." Id. at 544. "Because of the contextual nature of the injury, no set of factors can capture the relevant considerations for all cases." Id. at 545. In Yegiazaryan, racketeering activity either occurred in California or was directed from California, with the aim of preventing the execution of a California judgment. Id. at 546. The Supreme Court observed that a plaintiff domiciled abroad could suffer a domestic RICO injury if a United States-based RICO organization injures the plaintiff's tangible or intangible property located in the United States. Id. at 547-48.

Applying Yegiazaryan, the Second Circuit concluded that because a complaint did not link a Kazakhstan-based scheme to a concrete domestic injury, plaintiff could not pursue his claim under section 1964(c). Yerkyn v. Yakovlevich, 164 F.4th 224, 230-32 (2d Cir. 2026). It stated that "the alleged use of New York-based bank accounts with respect to the wire fraud, bank fraud, and money laundering predicates . . . does not singlehandedly create a domestic injury." Id. at 230; see also Bascuñán v. Elsaca, 874 F.3d 806, 819-21, 824 (2d Cir. 2017) (transfer of stolen money through United States bank accounts does not establish a domestic RICO injury, though a domestic injury will typically occur if United States-based bank accounts or tangible property are stolen or harmed).

The Court has been unable to identify any discussion of domestic injury in plaintiffs' expert reports, and plaintiffs' moving brief makes no mention of the issue, even

though the domesticity of their claims has been a matter of dispute from the outset. The initial complaint brought only claims under New York law, and Judge Stanton dismissed the complaint on the basis that plaintiffs were in effect asserting an extraterritorial application of federal securities laws. Barron v. Helbiz Inc., 2021 WL 229609, at *2 (S.D.N.Y. Jan. 22, 2021). The Second Circuit reversed and remanded, stating that "[w]hile Plaintiffs' various claims might eventually fail for lacking adequate domesticity, that determination must be made pursuant to a more tailored approach . . . ." Barron v. Helbiz, Inc., 2021 WL 4519887, at *3 (2d Cir. Oct. 4, 2021) (summary order).

In their reply memorandum, plaintiffs argue that any analysis of domestic injury would prematurely resolve a merits issue. (Pl. Reply at 8-9 (ECF 424).) But domestic injury is required to pursue a private claim under section 1964(c), and the Supreme Court has instructed that merits issues must be considered when they are relevant to satisfying Rule 23. Amgen, 568 U.S. at 466. If plaintiffs cannot show that domestic injury is susceptible to classwide proof through generalized evidence, they cannot satisfy Rule 23(b)(3).

Plaintiffs argue that a jury "could find sufficient domesticity" based on the individual defendants' New York physical presence and their claimed misappropriation of Helbiz revenues within the United States. (Pl. Reply at 8-9.) Plaintiffs are correct that under Yegiazaryan and Yerkyn, defendants' United States presence and their activities within the United States are relevant factors to showing domestic injury. One of plaintiffs' experts summarizes evidence of defendants' work from Helbiz's New York offices and their efforts to directly sell Helbiz Coin to United States buyers, including a marketing event at Cipriani in Lower Manhattan. (Bulgozdy Report at 34 (ECF 399-3).) Those United States activities are relevant to the analysis, and it is likely that a purchaser who acquired the Helbiz Coin in a United

States transaction and held the coin in a United States-based wallet could make out a showing of domestic injury.

But plaintiffs' proposition that all proposed class members necessarily suffered a domestic RICO injury based on defendants' physical location lacks support from RJR and Yegiazaryan. A large part of the proposed class includes persons domiciled abroad who acquired the Helbiz Coin in foreign transactions, held the coin in a foreign coin wallet and suffered an injury to property located outside of the United States. Plaintiffs' own submissions reflect that the Helbiz Coin was heavily transacted on foreign crypto exchanges. An "Exchange Addendum" at the conclusion of the expert report of Chris Groshong catalogs Helbiz Coin transactions that took place on seventeen cryptocurrency exchanges. (Groshong Report at 30-62 (ECF 399-7).) Four of the exchanges are located in the United States while thirteen are located in a foreign country. (Id.)[4]

Of current Helbiz Coin holdings, an aggregate 205.8 million are held on four foreign exchanges: Mercatox and Bitlish in the United Kingdom, Exmo in Lithuania and HitBTC in St. Vincent and the Grenadines. (Powers Rep. at 43-44.) Defendants' expert states that it is unknown whether these holdings are credited to customer accounts or represent the exchanges' internal coin supply. (Powers Rep. at 44.)

Groshong's report also illustrates the individualized inquiry needed to identify the circumstances of each transaction and summarizes the complexity of tracing a purchaser's identity. In describing "blockchain forensics," Groshong, who was retained by plaintiffs as an

[4] The report lists transactions on crypto exchanges based in the Cayman Islands (Binance), the United Kingdom (Bitlish, Cubits and Mercatox), Seychelles (BitMEX), the United States (Coinbase, EtherDelta, Gemini and Kraken), Singapore (Coinhub.io and QCP Capital), Lithuania (Exmo), St. Vincent and the Grenadines (HitBTC), Panama (IDEX), Switzerland (ShapeShift), Turkey (Sistemkoin) and Gibraltar (Xapo). (Id. at 30-63.) An exchanged called CashBank is listed as "No longer in Operation." (Id. at 36.)

expert on tracing cryptocurrency transactions, states that "when an asset is deposited into an exchange, it becomes intermingled and can no longer be traced individually. A request of the entity is the only way to continue to follow the funds, but many exchanges are outside the subpoena power of U.S. courts, may have gone out of business, or be otherwise unlocatable." (Groshong Report at 2-3.) Groshong states that investigators are not "always able to tell who controls a wallet based on its movement or previous control." (Id. at 3.) He also states that there may be "transactions we do not have access to, or where information about ownership is unavailable." (Id.)

Plaintiffs do not meaningfully address the role of a buyer's coin wallet in the domesticity analysis and argue that the location of a purchaser's wallet should not be "dispositive" to evaluating domestic injury. (Pl. Reply at 8.) But even if the location of the coin wallet is not dispositive and just one factor in a context-intensive inquiry, its role still requires an individualized analysis that would overwhelm issues common to the class.

The Groshong Report also describes differences between a software wallet and a hardware wallet. (Groshong Report at 5.) A software wallet is an application that stores private keys to an Ethereum address and allows the user to spend the Ether cryptocurrency. (Id. at 5.) A hardware wallet is a physical device that performs the same function. (Id.) Both types of wallets transmit spending instructions to a blockchain network. (Id.) Plaintiffs do not address how the role of a coin wallet and its physical location may inform the injury analysis. The injury of a foreign purchaser using a hardware wallet in a foreign jurisdiction may differ from the injury of a foreign purchaser using a software wallet that is based in the United States. It may be that a foreign purchaser using a United States-based software wallet can demonstrate domestic injury

while a foreign purchaser using a hardware wallet or foreign-based software wallet cannot. In either case, determining domestic injury would require individualized and fact-intensive analysis.

Defendants' expert also distinguishes owner-controlled, self-custodial wallets from exchange-controlled wallets. (Powers Report at 45-46.) Plaintiffs do not explain how there is domestic injury to a purchaser who transacted through an exchange-controlled wallet managed by a foreign exchange. The controlling point is that a domestic-injury analysis would be necessary and that it would be individualized and fact-intensive. See Mazzei v. Money Store, 829 F.3d 260, 272 (2d Cir. 2016) (affirming order decertifying a class because "the fact-finder would have to look at every class member's loan documents to determine who did and who did not have a valid claim.").

Plaintiffs' own declarations demonstrate the buyer-specific nature of the domestic-injury analysis. Barron, who resides in the United States, bought his coin holdings from the United States on exchanges based in Lithuania (Exmo), the United Kingdom (Mercatox) and St. Vincent and the Grenadines (HitBTC). (Barron Dec. ¶ 3.) HitBTC's website prohibits use by persons located in the United States and Mercatox ceased operations in 2024. (Powers Rep. at 45-46.) Barron makes no averment as to the wallet locations of his coin holdings. Szklarek resides in the United Kingdom, and bought coins in both the ICO and through exchanges based in Panama (IDEX) and the United Kingdom (Bitlish). (Szklarek Dec. ¶¶ 2, 4, 9.) Bitlish ceased operations in May 2020. (Powers Rep. at 45.) Grieves, who resides in the United States, bought coins from the United States on the Panama-based IDEX exchange, and distinguishes holdings held in "my Idex exchange wallet" from those in "my wallet address." (Grieves Dec. ¶¶ 2-5.) Grieves purchased the coin in the ICO pre-sale from the United States and holds coins in two wallets. (Grieves Dec. ¶¶ 2-4.)

The Court concludes that the "case-specific analysis that looks to the circumstances surrounding the injury," Yegiazaryan, 599 U.S. at 545, would require individualized analysis of where the class member acquired and held the Helbiz Coin. Plaintiffs have proposed no method for identifying domestic injury through classwide evidence, and the individualized analysis required to determine whether class members suffered a domestic injury under section 1964(c) would overwhelm questions common to the class. The Court concludes that plaintiffs have not proven the predominance and superiority required by Rule 23(b)(3).

## C. Plaintiffs' Theory of Classwide Causation and Damages is Incompatible With the "RICO Amendment" of Section 1964(c).

### 1. Plaintiffs' RICO Analysis is Anchored in a Purported Securities Fraud Scheme that Injured the Class.

Even if plaintiffs could demonstrate domestic injury through evidence common to the class, their motion would be denied for the separate reason that their proposed methodology for proving classwide causation and damages is anchored in acts of securities fraud. Section 1964(c) expressly bars a RICO plaintiff from relying on conduct that would have been actionable securities fraud. Because plaintiffs' theory of RICO causation and damages is premised on fraud in the purchase and sale of securities, they have not shown that they can show causation through classwide proof.

As noted, section 1964(c) provides that no private plaintiff bringing a civil RICO claim "may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962," unless the action is brought against a person criminally convicted in connection with the fraud. 18 U.S.C. § 1964(c). There is no suggestion that any defendant has been criminally convicted of the conduct at issue in this case.

This language was added to RICO as part of the Private Securities Litigation Reform Act of 1995 in order "to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages." MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 274 (2d Cir. 2011) (quotation marks omitted). It also acts as a barrier against double recovery for a securities-law violation. D'Addario v. D'Addario, 75 F.4th 86, 93 (2d Cir. 2023). Commonly referred to as the "RICO Amendment," the Second Circuit has described the provision as "unambiguous" and "worded broadly." MLSMK, 651 F.3d at 278.

"[F]or a claim to be barred, the fraud must be 'in the purchase or sale of securities,' which means that the actual purchase or sale of securities was fraudulent; it is not enough for securities to be an incidental feature of an overall scheme." D'Addario, 75 F.4th at 93 (emphasis in original; quoting 18 U.S.C. § 1964(c)). As summarized by Judge Abrams:

> Courts consult Section 10(b) of the Securities Exchange Act of 1934 for guidance on what conduct is actionable as securities fraud for purposes of the RICO Amendment. The crux of this analysis is that any fraudulent conduct in connection with the purchase or sale of any security may not be the subject of a RICO claim.

Chelder, 2026 WL 696903, at *4 (citations and internal quotation marks omitted).

Plaintiffs propose three ways of proving RICO causation using generalized evidence common to the class. First, they argue that defendants "used obstruction to sell the coin" when they created HMSP to evade SEC oversight of an unregistered ICO, and thereby "directly targeted the class members' money." (Pl. Mem. 22.) Second, they argue that they can prove causation because all class members were "deprived of restitution" due to defendants' failure to comply with the SEC's voluntary requests for information. (Pl. Mem. at 23; Bulgozdy Report (ECF 399-3).) According to plaintiffs, defendants committed the predicate act of wire

fraud by making false statements in response to the SEC's requests, and, "[a]bsent Defendants' obstruction, the SEC, following its usual practices, would more likely than not have ordered disgorgement into a 'Fair Fund' in which each coin purchaser could participate." (Pl. Mem. 23.) Plaintiffs argue that they will establish classwide damages based upon disbursements that class members would have received from such a "Fair Fund." (Pl. Reply at 6 (ECF 424).) Third, defendants allegedly misled coin exchanges by sending each exchange a false opinion letter in order to be listed on the exchange, resulting in injury to class members who would not otherwise have purchased the coin. (Pl. Mem. 23-24.)

These causation theories are grounded in the unlawful sale of securities to class members, and are derived from Bulgozdy's expert report. (ECF 399-3.) Bulgozdy summarizes at length the SEC's voluntary requests for information submitted to Helbiz and explains that, in his view, the defendants refused to submit responsive documents within their custody or control. (Id. at 3-27.) He then opines as to why, had Helbiz produced responsive documents, it is more likely than not that the SEC would have brought an enforcement action under section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, which bars the sale of a security in interstate commerce unless a registration statement is in effect. (Id. at 28-35.)

Bulgozdy then explains that "[i]f the SEC were to prevail by judgment or settlement, any funds that were recovered and any penalties that had been paid would be distributed to investors through a claims process." (Id. at 35.) He summarizes the SEC's use of "Fair Funds" "to equitably distribute" proceeds "to claimants who have been harmed by the conduct of the defendant(s) in that action." (Id. at 7, 35-36.) Bulgozdy states that a claims administrator "could" recommend a pro rata distribution to all person who owned the Helbiz Coin, including purchasers in the ICO, purchasers who bought privately from the issuer and

resale purchasers from exchanges. (Id. at 36.) He states that pro rata distribution "could be an efficient claims process in this case." (Id.)

Plaintiffs and Bulgozdy have artfully avoided utilizing the terminology of section 10(b) and Rule 10b-5, and emphasize that their theory of causation and damages is grounded in the strict liability standard for the sale of unregistered securities under section 5 of the Securities Act, 15 U.S.C. § 77e. (Reply at 10.)

But Bulgozdy's analysis and plaintiffs' legal arguments are premised on Helbiz Coin's status as a security sold to purchasers who bought the coin due to defendants' misrepresentations and were injured as a result. Plaintiffs' memorandum states that the Helbiz Coin "was a security" and that defendants "created a sham foreign entity in Singapore" as part of "a scheme to obstruct the regulators." (Pl. Mem. 3-4.) Defendants purportedly retained coin proceeds for themselves, then lied to the SEC and fabricated documents in response to the agency's requests. (Pl. Mem. 6-13.) When the coin's value cratered, defendants published "a fraud" post that offered to buy Helbiz Coins at a reduced price in an "attempted extortion of every coin holder . . . ." (Pl. Mem. 14-15.)

These descriptions of defendants' actions describe a scheme or artifice to defraud under Rule 10b-5(a). See, e.g., Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021) (a scheme or artifice to defraud is shown through evidence that defendant "(1) committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter and (4) reliance.") (quotation marks omitted). They also are consistent with a claim under Rule 10b-5(b) directed to the purchase of a security made in reliance on a material misrepresentation or omission. See, e.g., Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014) ("To recover damages for violations of section 10(b) and

Rule 10b-5, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.") (quotation marks omitted). Plaintiffs' attempt to avoid the terminology of section 10(b) and Rule 10b-5 does not defeat the substance of their theory of classwide causation and damages. Cf. Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd., 205 F. Supp. 2d 243, 248-50 (S.D.N.Y. 2002) (concluding that the RICO Amendment barred plaintiffs' RICO claim directed to the sale of securities even though plaintiff did not plead a federal securities claim) (Sweet, J.); Louros v. Cyr, 175 F. Supp. 2d 497, 509 (S.D.N.Y. 2001) (RICO Amendment applies when "[t]he only possible basis of plaintiffs' RICO claim . . . is fraud in the sale of securities.") (Preska, J.).

Because plaintiffs' theory of causation and damages is based on conduct that amounts to securities fraud under section 10(b) and Rule 10b-5, it is barred by section 1964(c), and not susceptible to generalized, classwide proof.

2. Plaintiffs' Description of a Hypothetical "Fair Fund" Assumes that Class Members Were Harmed in the Purchase of a Security.

The role of a hypothetical, SEC-created "Fair Fund" underscores the extent to which the RICO claim is anchored in securities fraud.

The SEC has statutory authority to seek equitable remedies, including disgorgement. 15 U.S.C. §§ 78u(d)(5), 78u(d)(7). It may obtain disgorgement when a party has "invaded" or "violated" a victim's "legally protected interests," though it need not show that the victim suffered pecuniary loss. Sripetch v. S.E.C., 146 S. Ct. 1403, 1411, 1413 (2026). Under the statutory heading "Fair funds for investors," 15 U.S.C. § 7246(a) permits the use of civil penalties for the violation of the securities laws as "part of a disgorgement fund or other fund

established for the benefit of the victims of such violation." In applying section 7246(a), "courts allow [the SEC] to distribute the proceeds of disgorgement actions as compensation to injured investors." Official Committee of Unsecured Creditors of WorldCom, Inc. v. S.E.C., 467 F.3d 73, 83 (2d Cir. 2006). The SEC has ultimate discretion to create a "Fair Fund" and to decide "whether to distribute civil penalties to victims at all." Id. (emphasis in original).

Thus, to obtain payment from a "Fair Fund," a class member necessarily would have been the "victim" of a securities-law violation based on an injury of legally protected interests. 15 U.S.C. § 7246(a); Sripetch, 146 S. Ct. at 1311. Likely conscious of the exclusion contained in section 1964(c), plaintiffs do not identify the precise injury of class members' legally protected interests, though Bulgozdy does state that any "disgorgement award" would "ultimately be returned to harmed investors." (Bulgozdy Rep. at 31.)

In obtaining relief from a "Fair Fund," the only discernable harm to a class member's legally protected interest would relate to the purchase of securities based upon defendants' fraudulent conduct. Plaintiffs' reliance on a hypothetical "Fair Fund" demonstrates that their proposed method for showing causation and damages is barred by section 1964(c), and cannot be demonstrated generalized, classwide proof.

D. Plaintiffs Cannot Rely on the Bulgozdy Report to Prove Causation and Damages.

Even if plaintiffs' proposed method for demonstrating causation were not precluded by section 1964(c), the Bulgozdy Report is entirely speculative and does not demonstrate that causation can be established through generalized proof.

First, the Bulgozdy Report's theories of causation are replete with legal conclusions that are not the proper subject of expert testimony. See, e.g., Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion

of expert testimony that expresses a legal conclusion."). Second, its conclusions are entirely speculative, including observations that "[i]t is more likely than not that a proceeding which reaches the enforcement stage will settle" and that the SEC's Department of Enforcement "could have recommended that charges be filed quickly to shut down the offering and enjoin such conduct." (Bulgozdy Rep. at 7, 37.) An expert's opinion must be "the product of reliable principles and methods," Rule 702(c), Fed. R. Evid., and "a trial judge should exclude expert testimony if it is speculative or conjectural . . . ." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 (2d Cir. 2009). The Bulgozdy Report is a lengthy, speculative thought experiment about events that might have occurred had defendants submitted different responses to the SEC. Bulgozdy's opinions are not the product of a reliable principle or method.

Because the Bulgozdy Report is inadmissible and cannot show classwide causation or damages through generalized proof, plaintiffs do not satisfy the requirements of Rule 23(b)(3).

### E. The Class Certification Motion Will Be Denied as to Skrill and Pelligrino.

Plaintiffs' Notice of Motion also seeks to class certification as to a respondeat superior claim against defendant Skrill in connection with the activities of its CEO, defendant Pellegrino. (ECF 397.)

For the reasons explained, plaintiffs have failed to satisfy the predominance and superiority requirement of Rule 23(b)(3). For that reason, the class certification motion will be denied as to Skrill and Pellegrino.

PLAINTIFFS' LETTER-MOTION TO STRIKE
DEFENDANTS' EXPERT REPORTS WILL BE DENIED.

Plaintiffs have filed a letter-motion to strike the three expert reports filed by defendants, arguing that they were not timely disclosed. (ECF 410.) The motion will be denied.

The motion for class certification was filed on September 30, 2025. (ECF 397.) In an Order of October 30, 2025, the Court directed: "If defendants have not designated a rebuttal expert on class certification, they shall do so within twenty-one days of this Order." (ECF 405.) The Court also extended defendants' time to respond to the class certification motion to January 30, 2026, and extended expert discovery to February 20, 2026. (Id.)

On November 20, 2025, defendants served an "IDENTIFICATION OF EXPERTS PURSUANT TO COURT ORDER [ECF 405]" that named three experts and offered broad and generalized descriptions of the subjects of their opinions. (ECF 410-1.) Defendants did not serve any expert reports. On November 21, 2025, plaintiffs' counsel wrote to defense counsel stating that defendants' failure to serve them expert reports did not meet the requirements of Rule 26(a)(2)(B), Fed. R. Civ. P. (ECF 410-2.) That Rule states that "[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case . . . ."

The letter stated that the Order of October 30, 2025 "plainly meant you needed to meet the Federal Rules' requirements for designating an expert witness by November 20th. If you believe that the Court's order sub silentio absolved you of the ordinary requirements under Rule 26, please explain your basis for that belief." (Id.)

Defense counsel replied in an email of December 5, 2025, which stated in its entirety: "in response to your inquiry, we confirm the Micromobility Defendants have complied

with the Court ordered schedule and will continue to do so in response to Plaintiffs' motion for class certification." (ECF 410-3.)

Plaintiffs did not then make an application to the Court.

On January 31, 2026, as part of their opposition to the class-certification motion, defendants filed the expert reports of John Powers, Ernest E. Badway and Brian J. Rice. (ECF 409-2, -3, -4.) Plaintiffs' counsel state that this was the first time that they received plaintiffs' expert reports and opinions, and state that they were "severely prejudiced" by the "intentionally-late disclosure." (ECF 410.)

In response, defendants point to several supposed discovery deficiencies on the part of plaintiffs, and assert that they similarly did not know the identities of plaintiffs' experts or the subjects of their opinions until plaintiffs filed their class certification motion. (ECF 415 at 3.) Defendants glibly state that the Order of October 30, 2025 "did not reference Rule 26(a)(2)" or require defendants to disclose their expert reports prior to filing their opposition to class certification. (Id.) Defendants claim that they acted "[i]n strict compliance with the Court's directive . . . ." (Id.)

If plaintiffs had timely alerted the Court to defendants' threadbare notice of November 20, 2025 and made an application, the Court almost certainly would have required defendants to serve expert reports. But even after defendants' email of December 5, 2025 confirmed their willful non-compliance with Rule 26(a)(2)(B), plaintiffs made no application. Instead, they waited to raise the issue until defendants filed their opposition to the class certification motion. The existence of these expert reports and defendants' reliance on them should have been obvious and foreseeable. Plaintiffs offer no explanation for their inaction and delay.

Defendants' artificially constrained reading of the October 30, 2025 Order does not absolve plaintiffs' failure to seek timely relief. It appears that plaintiffs made a tactical decision to bring this application after defendants filed their opposition papers, perhaps with the hope that the exclusion of the expert reports would confer a strategic advantage. Having known for two months that defendants did not comply with Rule 26(a)(2)(B), plaintiffs cannot now claim surprise or unfair prejudice.

Plaintiffs' letter-motion will be denied.

CONCLUSION.

The motion for class certification is DENIED. Plaintiffs' letter-motion to strike defendants' expert reports is DENIED. The Clerk is respectfully directed to terminate the motions. (ECF 397, 410.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
July 8, 2026